**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GENTEX CORPORATION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO.** |
| | : | |
| **BRAD SUTTER, PATRICK WALKO,** | : | |
| **SIMULA AEROSPACE & DEFENSE** | : | |
| **GROUP, INC., ARMOR HOLDINGS,** | : | **ELECTRONICALLY FILED** |
| **INC., and SPECIALTY DEFENSE** | : | |
| **SYSTEMS OF PENNSYLVANIA, INC.** | : | |
| | : | |
| **Defendants.** | : | |

---

**COMPLAINT**

---

Plaintiff Gentex Corporation, by and through its undersigned counsel, states the following as its Complaint against Defendants Brad Sutter, Patrick Walko, Simula Aerospace & Defense Group, Inc., Armor Holdings, Inc. and Specialty Defense Systems of Pennsylvania, Inc. in the above-captioned matter:

## **PARTIES**

1.    Plaintiff Gentex Corporation is a
corporation organized and existing under the laws of
the State of Delaware with a principal place of
business at 324 Main Street, Simpson, Pennsylvania.

2.    Defendant Brad Sutter is an adult
individual residing at 11340 East Fairbrook Street,
Mesa, Arizona and a former employee of Gentex
Corporation.

3.    Defendant Patrick Walko is an adult
individual residing at 120 Harrison Avenue, Old Forge,
Pennsylvania and a former employee of Gentex
Corporation.

4.    Defendant Simula Aerospace & Defense
Group, Inc. is a corporation organized and existing
under the laws of the State of Arizona with a principal
place of business in Phoenix, Arizona.  Simula
Aerospace & Defense Group, Inc. is believed to be a
subsidiary of Armor Holdings, Inc.

5. Defendant Armor Holdings, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 13386 International Parkway, Jacksonville, Florida.

6. Defendant Specialty Defense Systems of Pennsylvania, Inc. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business in Jessup, Pennsylvania. Specialty Defense Systems of Pennsylvania, Inc. is believed to be a subsidiary of Armor Holdings, Inc.

7. At all times relevant hereto, Armor Holdings, Inc. was the parent corporation of Simula Aerospace & Defense Group, Inc. and Specialty Defense Systems of Pennsylvania, Inc. and, in this capacity, managed, directed and controlled the operations of Simula Aerospace & Defense Group, Inc. and Specialty Defense Systems of Pennsylvania, Inc. and orchestrated, directed and controlled the wrongful conduct set forth

3

below. Simula Aerospace & Defense Group, Inc. and Specialty Defense Systems of Pennsylvania, Inc. and their employees were the agents and/or ostensible agents of Armor Holdings, Inc. and Armor Holdings, Inc. was the alter ego of Simula Aerospace & Defense Group, Inc. and/or Specialty Defense Systems of Pennsylvania, Inc. and they were at all times relevant hereto acting within the scope of those agency relationships. Furthermore, Armor Holdings, Inc., Simula Aerospace & Defense Group, Inc. and Specialty Defense Systems of Pennsylvania, Inc. were organized and collected together and did business together under the name "Individual Equipment Systems Division" (referred to as "IESD") and it was this entity that held out Sutter and Walko as its agents, employees and representatives and that orchestrated, directed and controlled the wrongful conduct set forth below. For all of these reasons, the named corporate defendants are vicariously liable for the wrongdoing of each other as set forth herein.

## **JURISDICTION AND VENUE**

8.    This Court has original subject matter
jurisdiction under 28 U.S.C. § 1331 over the violations
of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C.
§ 1030, alleged herein.  This Court has supplemental
jurisdiction over the related state law claims pursuant
to 28 U.S.C. § 1367(a).

9.    Venue lies properly in the Middle District
of Pennsylvania pursuant to 28 U.S.C. § 1391(b) in that
a substantial part of the events giving rise to the
claims occurred in this district and Specialty Defense
Systems of Pennsylvania, Inc. maintains a principal
place of business in this district.

10.  The claims asserted herein arose or first
became known after the related case against Sutter
(docketed at No. 06-2358) was filed and involve the
joinder of additional parties not named in the Sutter
action.  For these reasons, the claims are asserted in
this separate action.  Gentex Corporation will move to

consolidate the actions for trial and pre-trial
purposes.

## FACTUAL BACKGROUND

11. Gentex Corporation is an engineering and
manufacturing company that specializes in the design,
development and fabrication of integrated life safety
products, including, but not limited to, helmets and
helmet-mounted accessories, for sale to the military as
well as for commercial sale.

12. Armor Holdings, Inc. is a direct
competitor of Gentex Corporation. Approximately three
years ago, Armor Holdings, Inc. solicited an
intermediary to approach the owner of Gentex
Corporation, L. Peter Frieder, to inquire whether he
was interested in selling the shares and/or assets of
Gentex Corporation. The proposal was quickly rejected.
Having been rebuffed in its effort to acquire Gentex
Corporation's intellectual property through a
legitimate purchase, Armor Holdings, Inc. and its

6

affiliates embarked on the course of conduct described herein to obtain for themselves Gentex Corporation's research and development, intellectual property and personnel.

13. Gentex Corporation has been in the business of designing and manufacturing helmets for more than 55 years and is one of the world's leading manufacturers of helmets for military aircrew and ground troops. Its helmet products include the Tactical Ballistic Helmet-II (TBH-II™), the Personnel Protective Armor System Ground Troops (PASGT) helmet and the lightweight helmet designed for the U.S. Marines Corps.

14. Gentex Corporation also manufactures an advanced helmet system for the United States Army called the Advanced Combat Helmet or "ACH." Gentex Corporation is one of three contractors selected by the Army in 2005 to manufacture the ACH. The other contractors are Mine Safety Appliances Co. and Specialty Defense Systems of Pennsylvania, Inc., an

affiliate of Armor Holdings, Inc.

15. All of the ACH contractors are required to satisfy the same performance requirements established by the Army with respect to ballistics, impact, retention and other protective features, but each contractor utilizes its own design, chooses its own raw materials and establishes its own manufacturing processes. The Army pays a fixed price per helmet which varies by contractor. Because each contractor is slated to receive a fixed price for each helmet sold, there is a strong incentive to reduce production and manufacturing costs in order to realize more profit. This incentive exists for the life of the contract and for each delivery order.

16. The production of ballistic helmets and other life safety products requires a high degree of engineering sophistication, precision manufacturing processes and the incorporation of state-of-the-art technologies. Gentex Corporation invests substantial time, money and resources to develop its helmet and

8

other life safety products. The design and
manufacturing processes developed by Gentex Corporation
with respect to its helmet and other products,
including the ACH, are not shared outside of the
company and are protected from disclosure by company
policy as well as by non-disclosure obligations imposed
on Gentex Corporation employees and the vendors and
suppliers with whom Gentex Corporation does business.

17. Gentex Corporation is an industry leader
in helmet manufacturing at least, in part, because it
weaves and processes its own ballistic fabric. The
company originated as a textile mill in 1932 and
manufactured parachutes for the military during World
War II. Building upon this background, Gentex
Corporation refined its weaving operations over the
years to the point where it was able to weave its own
ballistic fabric for use in manufacturing life safety
products. The company thus acquired significant
expertise in the field of ballistic material and has
become a leading supplier of protective helmets and

other life safety equipment made from that material.

18. Defendant Brad Sutter was employed by Gentex Corporation from May 1991 until April 21, 2006 when he resigned to accept a position with Simula Aerospace & Defense Group, Inc. in the Individual Equipment Systems Division or IESD. Sutter was hired by Gentex Corporation as a design engineer immediately after his graduation from college in 1991. He held a number of positions with increasing responsibility over the years, including Project Engineer and Manager of Engineering Services. In or about September 2004, Sutter was promoted to the position of Senior Manager of Product Engineering. In this position, Sutter was responsible for all technical aspects of new product development and for managing helmet engineering design and development.

19. During the course of his employment, Sutter had access to proprietary information concerning Gentex Corporation's products, processes and technologies, including information relating to the

10

ACH.

20. Among other things, Sutter was assigned to oversee preparation of the proposal submitted by Gentex Corporation to the Army in pursuit of the ACH contract and thereby gained access to virtually every aspect of Gentex Corporation's design, equipment, manufacturing processes, cost information, pricing strategy, test results and research and development data.

21. In addition to proprietary data relating to the ACH, Sutter also had access to strategic and product development information relating to other products manufactured by Gentex Corporation and was allowed access to information concerning pricing, costs, budgets, vendors, suppliers, research and development and other sensitive information concerning the company and its products and customers.

22. Gentex Corporation entrusted Sutter with this information with the understanding that he would at all times keep the information confidential and use

the information solely for the benefit of Gentex

Corporation and not for personal gain or to compete

with Gentex Corporation.

23. Sutter executed an Employee's Agreement

for Non-Disclosure and the Assignment of Inventions

upon the commencement of his employment in May 1991.

Pursuant to this agreement, Sutter pledged that he

would "maintain in confidence and secrecy all knowledge

of the technical data, layouts, machines, processes,

designs, products, concepts, equipment, special tools,

work in process, and other such information acquired

while in employment with Gentex Corporation, its

personnel or its facilities."

24. In June 1995, following a business

transaction which transferred certain ownership

interests, Sutter signed a second Agreement for Non-

Disclosure and the Assignment of Inventions which

contained identical terms. By executing the agreement,

Sutter again committed to maintain the secrecy of and

not to use or disclose Gentex Corporation's proprietary

information.

25. Patrick Walko was employed by Gentex
Corporation from May 2001 through October 2005 when he
resigned to take a position at Lockheed Martin
Corporation. While at Gentex Corporation, he first
served as Project Engineer and was later promoted to
Manager of Rapid Response Engineering. He held the
position of Manager of Mechanical Design Engineering
when he left Gentex Corporation.

26. In these positions, Walko had
responsibility for ground troop helmet research and for
performing mechanical design engineering activities
relating to helmet systems.

27. Like Sutter, Walko was involved in
preparing the proposal which Gentex Corporation
submitted to the Army in pursuit of the ACH contract
and had access to proprietary and confidential
information relating to the manufacture of the ACH. He
was also entrusted with access to confidential and

13

proprietary information concerning the company's other products and customers.

28. Gentex Corporation entrusted Walko with this information with the understanding that he would at all times keep the information confidential and use the information solely for the benefit of Gentex Corporation and not for personal gain or to compete with Gentex Corporation.

29. Like Sutter, Walko signed an Employee's Agreement for Non-Disclosure and the Assignment of Inventions in May 2001 when he was hired. Pursuant to this agreement, Walko pledged that he would "maintain in confidence and secrecy all knowledge of the technical data, layouts, machines, processes, designs, products, concepts, equipment, special tools, work in process, and other such information acquired while in employment with Gentex Corporation, its personnel or its facilities."

14

30. Notwithstanding these commitments and the obligations imposed by the Pennsylvania Uniform Trade Secrets Act, both Sutter and Walko used Gentex Corporation computers to access, copy and misappropriate the company's confidential, proprietary and trade secret information, without authorization, prior to resigning from their positions.

31. Without authorization, Walko copied from his Gentex Corporation computer the contents of his email box, including all email messages and attachments, onto a CD-ROM or other storage device. The materials that Walko misappropriated include budget and financial information and technological information concerning the company's products and processes.

32. Walko seemed to acknowledge his wrongdoing in an email message that he sent to Sutter after the related action against Sutter was filed. He wrote on January 20, 2007: "I can't help but feel like the kid in 4th grade who is caught red-handed doing something he knows is wrong, but he was doing it be cool,

15

anyway."

33. Later, after Walko accepted a position with Specialty Defense Systems of Pennsylvania, Inc., he accessed his "old email" which he described as "tons of fun and instructive," shared the information with Sutter and, on information and belief, used the information contained therein for the benefit of his new employer and/or its affiliates.

34. In January 2006, while Sutter was an employee of Gentex Corporation, Sutter accessed his Gentex Corporation computer to copy and transmit a proprietary drawing of an outer tactical vest. He sent the drawing to Walko with an email message that read: "Here is a little sketch just to wet [sic] your appetite. I love this shit man!!!!!!!!!!!!!!!!!!!!!!!"

35. Sutter also utilized a flash drive device to store information which he accessed and copied from Gentex Corporation's computer without authorization.

16

36. Sutter took with him when he left Gentex Corporation copies of electronic files containing graphs, charts and reports which belong to Gentex Corporation and contain Gentex Corporation proprietary and confidential data.  The information was removed by Sutter from Gentex Corporation's computer without authorization.

37. Sutter took with him to Simula Aerospace & Defense Group, Inc. and stored on his work computer thousands of pages of electronic files containing internal Gentex Corporation email messages and attachments which reference and contain highly proprietary and confidential information belonging to Gentex Corporation.  He accessed and misappropriated this information utilizing Gentex Corporation's computer and did so without authorization.

38. Such information was accessed, copied and misappropriated for the benefit of Sutter's and Walko's subsequent employers and for the purpose of competing with Gentex Corporation.

17

39. Sutter also disclosed Gentex Corporation proprietary information during his employment interview with representatives of Armor Holdings, Inc. and Simula Aerospace & Defense Group, Inc. in March 2006.  While he was still a Gentex Corporation employee, Sutter met with Joe Coltman, the Vice-President of Simula Aerospace & Defense Group, Inc., and Michael Daly, the Vice-President, Engineering of the Individual Equipment Systems Division, in Phoenix, Arizona to discuss employment opportunities.  During the interview, Sutter disclosed to Coltman and Daly proprietary information concerning Gentex Corporation's ballistic helmet program, production processes, test methods and results and research and development partners and initiatives.

40. Coltman and Daly were well aware of Sutter's involvement in Gentex Corporation's ballistic helmet program before hiring Sutter.  Sutter was actively recruited by Armor Holdings, Inc. and/or its affiliates precisely because he was the lead engineer on the ACH effort at Gentex Corporation and because he

18

had extensive knowledge concerning Gentex Corporation's helmet program.

41. While he was applying for a position with Armor Holdings, Inc. and prior to his resignation from Gentex Corporation, Sutter actively worked against and undermined Gentex Corporation's interests. Among other things, he concealed a business opportunity from Gentex Corporation and encouraged employees of Gentex Corporation to terminate their employment and join him at Armor Holdings, Inc. or one of its affiliates. When he was accused of "pilfering QA [i.e. quality assurance] staff" from Gentex Corporation on April 4, 2006, Sutter did not deny the accusation but rather made light of his conduct by stating: "What's that sound? Is it a vacuum? Or is it just the Ross Perot giant sucking sound that is starting to generate steam? . . . [T]here are more to follow."

42. On or about March 21, 2006, Sutter formally accepted an offer of employment from Simula Aerospace & Defense Group, Inc. He was not asked or

19

required to sign Armor Holdings, Inc.'s Code of
Business Conduct and Ethics which was apparently
intended to promote and ensure honest and ethical
conduct.

43. Although he spoke openly with Coltman and
Daly about his work at Gentex Corporation, Sutter
misrepresented his future plans when questioned by
representatives of Gentex Corporation. He promised
during his exit interview that he would not be involved
in producing ballistic helmets for his new employer.
This was not true. On April 24, 2006, his first day of
employment at Simula Aerospace & Defense Group, Inc.,
Sutter assumed responsibility for the ACH program and
helmet applications in general.

44. Sutter was assigned to the research and
development organization known as the "Individual
Equipment Systems Division" or "IESD." That division
is made up of employees from Simula Aerospace & Defense
Group, Inc., Armor Holdings, Inc. and Specialty Defense
Systems of Pennsylvania, Inc. Although Specialty

20

Defense Systems of Pennsylvania, Inc. is the party that formally contracted with the Army, all three work together to fulfill the ACH contract and apparently share the benefits of the contract.

45. As stated above, both before and after he was hired, Sutter actively recruited other Gentex Corporation employees to join him at Armor Holdings, Inc.

46. Two quality assurance employees, Sandy Gambuti and Cheryl Nolan, left Gentex Corporation to work for Specialty Defense Systems of Pennsylvania, Inc. in April or May 2006. In or around July 2006, Sutter made an offer of employment to a Gentex Corporation design engineer, Mary Gowat, and, in August 2006, created a special position for Walko at Specialty Defense Systems of Pennsylvania, Inc. Another engineer, Deborah Panna, left Gentex Corporation to work for Specialty Defense Systems of Pennsylvania, Inc. in September 2006.

21

47. In all, seven former Gentex Corporation employees (including Sutter) with more than 91 years of collective experience at Gentex Corporation in the area of ballistic helmets and other life safety products joined Armor Holdings, Inc. or its affiliates during the period from February to September 2006.

48. Of these employees, Sutter, Gambuti, Nolan, Gowat and Walko were immediately assigned to work on the ACH program in direct competition with Gentex Corporation.

49. Sutter and Walko were also assigned by their new employers to work on outer tactical vests (OTVs). The Gentex Corporation proprietary drawing which is referenced in Paragraph 34 above and which Sutter sent to Walko depicted a design for an OTV product.

50. On or about June 8, 2006, Armor Holdings, Inc. received a new contract award of $112 million to provide outer tactical vests to the U.S. Army.

51. Armor Holdings, Inc., Simula Aerospace & Defense Group, Inc. and Specialty Defense Systems of Pennsylvania, Inc. knew that Sutter and Walko had knowledge of Gentex Corporation's trade secrets and confidential and proprietary information relating to Gentex Corporation's helmet and other life safety products and expected that they would bring this information with them and utilize this information in their new employment in violation of their contractual, statutory and common law obligations to Gentex Corporation.

52. On April 13, 2006, prior to Sutter's commencement of employment with Simula Aerospace & Defense Group, Inc., the President of Gentex Corporation, L.P. Frieder, Jr., wrote to Robert Schiller, the President of Armor Holdings, Inc., to specifically advise him of Sutter's confidentiality obligations. The letter informed Schiller that Sutter executed an Employee's Agreement for Nondisclosure and the Assignment of Inventions and that he was thereby

obligated to refrain from disclosing any trade secrets
or other confidential and proprietary information
belonging to Gentex Corporation.  The letter goes on to
state:  "We would expect that your company would not
interfere with Mr. Sutter's complying with his non-
disclosure obligations to Gentex, or encourage him in
any way to breach his duty of non-disclosure."  A
similar notice was sent directly to Sutter.

53.  More than a month later, Schiller
acknowledged receipt of the letter in an interoffice
memorandum dated May 16, 2006 which directed Kenneth G.
Fredericks, the Senior Vice-President of Human
Resources of Armor Holdings, Inc., to make sure that
the "appropriate" personnel are aware of Sutter's
"limits."  Copies of the memorandum were sent to
Coltman as well as Ian Graham, the company's in-house
counsel.

54.  More than two months passed before Taryn
Sickels, the Director of Human Resources for IESD, sent
an email message on July 19, 2006 to six employees

24

advising them of Sutter's non-disclosure obligation and stating that Sutter will be "knowledgeable" as to what he "can and can not disclose."

55. Neither Schiller, Fredericks nor Graham nor any other member of management did anything to identify or define the "limits" of Sutter's obligations, impose appropriate safeguards to prevent the disclosure of Gentex Corporation intellectual property or otherwise ensure that Sutter was not violating his non-disclosure obligations to Gentex Corporation.

56. There were no products or projects at Simula Aerospace & Defense Group, Inc., Armor Holdings, Inc. or Specialty Defense Systems of Pennsylvania, Inc. that Sutter was prevented from working on.

57. Sutter never once refused an assignment or declined to answer a question posed to him because he believed the assignment or response might constitute a breach of his non-disclosure obligations.

25

58. Nor did his employer or its affiliates ever warn him not to utilize Gentex Corporation intellectual property in the course of his employment.

59. Both before and after Sickels sent her email, Sutter openly used confidential and proprietary trade secret information obtained during the course of his employment with Gentex Corporation in his new position at Simula Aerospace & Defense Group, Inc.

60. This information was used and continues to be used with the knowledge of and for the benefit of Simula Aerospace & Defense Group, Inc., Armor Holdings, Inc. and Specialty Defense Systems of Pennsylvania, Inc.

61. The misappropriated information that Sutter shared with his new employer relates to Gentex Corporation's manufacturing processes, equipment, suppliers, research and development endeavors and business partners. Members of upper management, including Coltman, Daly, Jeff Mears, Stan Lyons and

Tony Russell, were aware of and condoned the disclosure of this information. Coltman even joked about it.

62. In addition, Armor Holdings, Inc., Simula Aerospace & Defense Group, Inc. and Specialty Defense Systems of Pennsylvania, Inc. recruited a number of other former Gentex Corporation employees because of their background and experience at Gentex Corporation and immediately placed those former Gentex Corporation employees in positions with responsibility for helmet products, including the ACH.

63. On information and belief, Specialty Defense Systems of Pennsylvania, Inc. and/or its affiliates secured significant cost savings as a result of misappropriating and implementing for themselves technologies, advancements and improvements developed by and belonging to Gentex Corporation. It is believed that Specialty Defense Systems of Pennsylvania, Inc. made changes and improvements to its ACH design that resulted in significant cost savings which inured to its benefit and the benefit of its affiliates and which

were not revealed or disclosed to the Army.

64. On information and belief, Armor Holdings, Inc., Simula Aerospace & Defense Group, Inc. and Specialty Defense Systems of Pennsylvania, Inc. have used and are continuing to use Gentex Corporation's proprietary information and intellectual property to obtain a competitive advantage over Gentex Corporation for sales of helmets and other products to the government in violation of the Procurement Integrity Act, 41 U.S.C. § 423(b).

65. When the nature of Sutter's new employment was revealed, in an effort to avoid litigation, Gentex Corporation demanded that Sutter attest under oath that he had not and would not disclose any proprietary or confidential information that he learned during his long tenure with Gentex Corporation. Sutter refused and his employer, through its counsel, claimed to have "taken steps" to prevent disclosure.

66. Gentex Corporation thereafter commenced the related action against Sutter on December 8, 2006 to enjoin him from continuing to work in a position that threatens the disclosure of its proprietary and confidential information and to enjoin any breaches of his non-disclosure obligations. In papers filed and/or exchanged in that action, Sutter falsely represented under oath that he had no day-to-day role in the design and manufacture of the ACH and falsely represented that he took no electronic data with him when he left his employment at Gentex Corporation. In fact, Sutter had and continued to have significant day-to-day involvement in the design and manufacture of the ACH and took with him and stored on his work computer thousands of electronic files containing Gentex Corporation proprietary data.

### COUNT I

### COMPUTER FRAUD AND ABUSE ACT ("CFAA"),

### 18 U.S.C. § 1030

67. Paragraphs 1 through 66 of this Complaint

are incorporated by reference as if set forth fully herein.

68. While still employed by Gentex Corporation, Sutter and Walko knowingly and with intent to defraud accessed, obtained and copied from the company's computer system confidential and proprietary information belonging to Gentex Corporation. Obtaining and using such information for the benefit of any person or entity other than Gentex Corporation exceeded any authority which Sutter and Walko had to use the company's computers and was in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

69. The actions of Sutter and Walko were intentional and done without Gentex Corporation's knowledge, permission or authorization.

70. This unauthorized access and use was done with the knowledge of, for the benefit of and at the direction of Simula Aerospace & Defense Group, Inc., Armor Holdings, Inc. and/or Specialty Defense Systems

of Pennsylvania, Inc. and these entities are therefore vicariously liable for the violations.

71. As a result of these violations, Gentex Corporation has suffered and continues to suffer damages and losses for which Defendants are liable.

WHEREFORE, Plaintiff Gentex Corporation demands the entry of judgment in its favor against Defendants Brad Sutter, Patrick Walko, Simula Aerospace & Defense Group, Inc., Armor Holdings, Inc. and Specialty Defense Systems of Pennsylvania, Inc., together with an award of compensatory damages and such other and further relief as this Court deems appropriate under the circumstances.

## COUNT II

## PENNSYLVANIA'S UNIFORM TRADE SECRETS ACT,

## 12 Pa. C.S.A. § 5301 et seq.

72. Paragraphs 1 through 71 of this Complaint are incorporated by reference as if set forth fully herein.

31

73.  By virtue of their employment at Gentex Corporation, Sutter and Walko had access to confidential and proprietary information concerning a wide variety of products and technology researched, designed, manufactured, developed and sold by Gentex Corporation, including but not limited to, the ACH. Specifically, Sutter and Walko had access to proprietary and confidential design drawings, formulas, contract proposals, contract terms, production processes, test data, quality control information, business plans, budgets, pricing and cost information, marketing plans and research and development results.

74.  This information derives independent economic value from not being known to or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use and is the subject of reasonable efforts by Gentex Corporation to maintain its secrecy and therefore constitutes protected trade secrets.

75. Sutter and Walko have willfully and maliciously misappropriated Gentex Corporation's trade secrets in violation of Pennsylvania's Uniform Trade Secret Act, 12 Pa. C.S.A. § 5301 et seq.

76. Sutter and Walko were obligated to maintain the secrecy of this information but nonetheless breached their obligations in order to gain an unfair advantage for their new employers which are in direct competition with Gentex Corporation.

77. Prior to hiring Sutter and Walko, Armor Holdings, Inc., Simula Aerospace & Defense Group, Inc. and Specialty Defense Systems of Pennsylvania, Inc. were aware that Sutter and Walko possessed trade secrets and other confidential and proprietary information belonging to Gentex Corporation and that this information would be of significant value to their own business.  On information and belief, Armor Holdings, Inc., Simula Aerospace & Defense Group, Inc. and Specialty Defense Systems of Pennsylvania, Inc. hired Sutter and Walko with the goal and intent of

33

acquiring and using for their own benefit the Gentex Corporation trade secrets that Sutter and Walko possessed.

78. Armor Holdings, Inc., Simula Aerospace & Defense Group, Inc. and Specialty Defense Systems of Pennsylvania, Inc. have been and continue to be unjustly enriched by the misappropriation and unauthorized use of Gentex Corporation's trade secrets and Gentex Corporation has been and continues to suffer injury as a result of the misappropriation of its trade secrets.

WHEREFORE, Plaintiff Gentex Corporation demands judgment in its favor and against Defendants Patrick Walko, Simula Aerospace & Defense Group, Inc., Armor Holdings, Inc. and Specialty Defense Systems of Pennsylvania, Inc. as follows:

(a) Awarding compensatory damages in an amount sufficient to reimburse Plaintiff Gentex Corporation for the actual loss as well as the unjust

34

enrichment caused by the misappropriation of its trade secrets;

(b) Awarding exemplary damages in the amount of twice the award of compensatory damages;

(c) Enjoining Defendants from further misappropriations of Plaintiff Gentex Corporation's trade secrets;

(d) Awarding reasonable attorneys' fees, expenses and costs; and

(e) Granting such other and further relief as this Court deems appropriate under the circumstances.

## COUNT III

### BREACH OF CONTRACT

79. Paragraphs 1 through 78 of this Complaint are incorporated by reference as if set forth fully herein.

35

80. Walko pledged that he would not utilize Gentex Corporation's trade secrets for his own benefit or for the benefit of anyone but Gentex Corporation.

81. The use by Walko of trade secrets and proprietary and confidential information obtained during his employment with Gentex Corporation for his own benefit and for the benefit of his new employer is a violation of the Employee's Agreement for Non-Disclosure and the Assignment of Inventions that Walko signed.

82. Gentex Corporation has suffered and will continue to suffer substantial harm as a result of Walko's breach of his contractual obligations.

WHEREFORE, Plaintiff Gentex Corporation demands judgment in its favor and against Defendant Patrick Walko as follows:

(a) Declaring that the Agreement for Non-Disclosure and the Assignment of Inventions is valid, enforceable and binding upon Defendant Patrick Walko;

36

(b) Awarding compensatory damages in an amount sufficient to reimburse Plaintiff Gentex Corporation for the demonstrated breaches of contract; and

(c) Such other and further relief as the Court deems appropriate under the circumstances.

## COUNT IV

### TORTIOUS INTERFERENCE

83. Paragraphs 1 through 82 are incorporated by reference as if set forth fully herein.

84. Gentex Corporation had a valid business relationship with its former employees, Sutter, Walko, Nolan, Gambuti and Gowat, and had agreements with those employees to protect the confidentiality of its business information.

85. Although they were aware of these employment relationships and related confidentiality obligations, Simula Aerospace & Defense Group, Inc.,

37

Armor Holdings, Inc. and Specialty Defense Systems of Pennsylvania, Inc. encouraged and induced Sutter, Walko, Nolan, Gambuti and Gowat to terminate their employment relationships with Gentex Corporation and accept employment in direct competition with Gentex Corporation.

86. On information and belief, Armor Holdings, Inc., Simula Aerospace & Defense Group, Inc. and Specialty Defense Systems of Pennsylvania, Inc. engaged in this systematic enticement of Gentex Corporation employees for the purpose of disrupting its business and obtaining for themselves the intellectual property researched, investigated and developed by Gentex Corporation.

87. As a result of this intentional interference with its employment relationships, Gentex Corporation has suffered and continues to suffer harm and damages for which Defendants are liable.

88. The acts of Defendants were done willfully, maliciously and in wanton disregard for the rights of Gentex Corporation. As a result, Gentex Corporation is entitled to an award of punitive damages.

WHEREFORE, Plaintiff Gentex Corporation demands the entry of judgment in its favor against Simula Aerospace & Defense Group, Inc., Armor Holdings, Inc. and Specialty Defense Systems of Pennsylvania, Inc., together with an award of compensatory and

punitive damages and such other and further relief as this Court deems appropriate under the circumstances.

Respectfully submitted,

/s/ Daniel T. Brier
Daniel T. Brier (ID #53248)
dbrier@mbklaw.com
Donna A. Walsh (ID #74833)
dwalsh@mbklaw.com

MYERS, BRIER & KELLY, LLP
425 Spruce St., Ste. 200
Scranton, PA 18503
Ph:  (570) 342-6100
Fax: (570) 342-6147

/s/Edward F. Mannino
Edward F. Mannino (ID # 04504)
emannino@akingump.com

Akin Gump Strauss Hauer & Feld, LLP
2005 Market Street
Suite 2200
Philadelphia, PA  19103-7013
Ph: (215) 965-1340
Fax: (215) 965-1210

Of Counsel:

Thomas P. McLish
Akin Gump Strauss Hauer & Feld, LLP
1333 New Hampshire Ave., N.W.
Washington, D.C.  20036
Ph:  202-887-4324
Fax:  202-887-4288
tmclish@akingump.com

Attorneys for Plaintiff,
Gentex Corporation

Dated:  July 13, 2007