**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GENTEX CORPORATION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO. 3:CV-06-2358** |
| | : | |
| **BRAD SUTTER,** | : | **JUDGE CAPUTO** |
| | : | |
| **Defendant.** | : | |

| | | |
|---|---|---|
| **GENTEX CORPORATION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | **NO. 07-CV-1269** |
| | : | |
| **BRAD SUTTER, PATRICK WALKO, BAE SYSTEMS AEROSPACE & DEFENSE GROUP INC., BAE SYSTEMS AH INC. and BAE SYSTEMS SPECIALTY DEFENSE SYSTEMS OF PENNSYLVANIA INC.,** | : | **JUDGE CAPUTO** |
| | : | |
| **Defendants.** | : | |

# PLAINTIFF GENTEX CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION TO CORPORATE DEFENDANTS' MOTION TO EXCLUDE DAMAGES EXPERT

Edward F. Mannino
Mannino Law Firm
Suite 400
600 West Germantown Pike
Plymouth Meeting, PA 19462

Daniel T. Brier
Donna A. Walsh
Myers, Brier & Kelly, LLP
425 Spruce Street, Suite 200
Scranton, PA 18503

# TABLE OF CONTENTS


INTRODUCTION . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . 1

I. BAE's Motion Is Based on a Misunderstanding of Daubert . . . . . . 1

II. Creamer Is Qualified To Offer Opinions on Damages . . . . . . . . . . 4

III. Creamer Employed Reliable Methodologies . . . . . . . . . . 5

A. Creamer calculated lost profits pursuant to accepted methodology . . . . . . . . . . 7

1. Actual profits . . . . . . . . . . 7

2. Future profits . . . . . . . . . . 15

B. Creamer calculated unjust enrichment damages pursuant to accepted methodology . . . . . . . . . . 19

C. Creamer calculated a reasonable royalty pursuant to accepted methodology . . . . . . . . . . 22

IV. Creamer's Opinions Cover the Appropriate Time Period . . . . . . . . 28

V. Creamer Did Not Need To Individually Value the Stolen Trade Secrets . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . 30

# TABLE OF AUTHORITIES

## CASES

Alcatel USA, Inc. v. Cisco Sys., Inc., 239 F. Supp. 2d 660 (E.D. Tex. 2002) . . . . . . . . . . . . 15

Andreas v. Volkswagen of Am., Inc., 336 F.3d 789 (8th Cir. 2003) . . . . . . . . . . 20

Arlington Indus. v. Bridgeport Fittings, Inc., 658 F. Supp. 2d 630 (M.D. Pa. 2009) . . . . . . . . . . . . 4

Benjamin v. Peter's Farm Condominium Owners Ass'n, 820 F.2d 640 (3d Cir. 1987) . . . . . . . . . . . . 15

Bonjorno v. Kaiser Aluminum & Chem. Corp., 752 F.2d 802 (3d Cir. 1985), cert. denied, 477 U.S. 908 (1986) . . . . . . . . . . . . 3, 29

Broan Mfg. Co., Inc. v. Associated Distribs., Inc., 923 F.2d 1232 (6th Cir. 1991) . . . . . . . . . . . . 22

Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc., 246 F.3d 1336 (Fed. Cir. 2001) . . . . . . . . . . . . 15

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) . . . . . . . . . . . . 1, 2, 8, 14, 17, 25, 30

Elcock v. K-Mart Corp., 233 F.3d 734 (3d Cir. 2000) . . . . . . . . . . . . 15

Fenner Investments v. Hewlett Packard, 2010 WL 3911372 (E.D. Tex. Apr. 16, 2010) . . . . . . . . . . . . 28

Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505 (9th Cir. 1985) . . . . . . . . . . . . 21

In re Independent Serv. Org. Antitrust Lithog., 85 F. Supp. 2d 1130 (D. Kan. 2000) . . . . . . . . . . . . 21

Inter Medical Supplies, Ltd. v. EBI Medical Sys., Inc., 181 F.3d 446 (3d Cir. 1999), cert. denied, 528 U.S. 1076 (2000) . . . . . . . . . . . . . . . . . . . . 3

Intimate Bookshop, Inc. v. Barnes & Noble, Inc., 2003 WL 22251312 (S.D.N.Y. Sept. 30, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Konor Enters., Inc. v. Eagle Publications, Inc., 878 F.2d 138 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

LePage's, Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003) (en banc), cert. denied, 542 U.S. 953 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7, 8, 14, 19, 20, 29

Mattel, Inc. v. MGA Entertainment, Inc., 2011 WL 836418 (C.D. Cal. Mar. 4, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 28

Mercedes-Benz USA LLC v. Coast Automotive Grp., Ltd., 2006 WL 2830962 (D.N.J. Sept. 29, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387 (Fed. Cir. 2003) . . . . . . . . . 27

In re Paoli R.R. Yard PCB Litig., 35 F.3d 717 (3d Cir. 1994) cert. denied, 513 U.S. 1190 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Padillas v. Stork-Gamco, Inc., 186 F.3d 412 (3d Cir. 1999) . . . . . . . . . . . . . . . 11

Pineda v. Ford Motor Co., 520 F.3d 237 (3d Cir. 2008) . . . . . . . . . . . . . . . . 3, 15

Sanofi-Aventis deutschland GMBH v. Glenkark Pharmaceuticals, Inc., 2011 WL 383861 (D.N.J. Feb. 3, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 15

Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410 (7th Cir. 1992) . . . . 21

Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408 (3d Cir. 2002) . . . . . . . . . 3

Uniloc USA, Inc. v. Microsoft Corp., 632 F.2d 1292 (Fed. Cir. 2011) . . . . . . . 28

United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi, 80 F.3d 1074 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Univac Dental Co. v. Dentsply Int'l, Inc., Civ. A. No. 1:07-CV-0493, 2010 WL 1816745 (M.D. Pa. Apr. 27, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

University Computing Co. v. Lykes-Youngstown Computer Servs. Corp., 504 F.2d 518 (5th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . 15, 16, 18, 26, 27

Vermont Microsystems, Inc. v. Autodesk, Inc., 88 F.3d 142 (2d Cir. 1996) . . . 28

Vernon Walden, Inc. v. Lipoid GMBH, 2005 WL 3088333 (D.N.J. Nov. 17, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Williamson-Dickie Mfg. Co. v. Davis Mfg. Co., 251 F.2d 924 (3d Cir. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## STATUTES

12 Pa. C.S.A. § 5301 et. seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

12 Pa. C.S.A. § 5304(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fed. R. Evid. 702, Advisory Committee Note . . . . . . . . . . . . . . . . . . . . . . . . . 2

## MISCELLANEOUS

Fisher, Franklin M. & R. Craig Romaine, Janis Joplin's Yearbook and the Theory of Damages, J. Acctg. Auditing & Fin., Vol. 5, No. 1 (Winter/Spring 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Gaughan, Patrick A., Measuring Commercial Damages (2000) . . . . . . . . . . . . . 18

Kerr, William O. & Richard B. Troxel, Calculating Intellectual Property Damages (May 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24

Weil, Roman L. et al., Litigation Services Handbook: The Role of the Financial Expert (4th ed. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## INTRODUCTION

There is substantial evidence in the record that Gentex Corporation's confidential information was stolen, disclosed and used at BAE[1] to solve problems that BAE was having with its helmet and vest products. The evidence supporting Gentex's claims is so compelling that none of the Defendants sought summary judgment on any issue relating to the disclosure or use of Gentex's intellectual property or the damages suffered by Gentex. Unconcerned with the rules, BAE is seeking through the back door what is not available through the front. Specifically, BAE urges the Court to accept its mischaracterization of disputed facts and, on this basis, preclude Gentex from offering damage opinions based on a conflicting view of the record facts. Since resolution of disputed facts must properly be left for the jury, BAE's motion must be denied.

## ARGUMENT

### I. BAE's Motion Is Based on a Misunderstanding of Daubert.

BAE couches its challenge in terms of "reliability" but BAE is not attacking the methods that Anthony B. Creamer, CPA employed. Daubert v.

[1] The Corporate Defendants are "BAE."

Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593 (1993) (reliability turns on whether methodology is "scientifically valid"). BAE does not even mention the Daubert factors in its brief. Rather, its attack is premised on disagreement with Creamer's opinions and thus confuses the Court's role as gatekeeper with the jury's role as fact finder.

Rule 702 is not a "replacement for the adversary system." Fed. R. Evid. 702, Advisory Committee Note (quoting United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi, 80 F.3d 1074, 1078 (5th Cir. 1996)). The Advisory Committee note to Rule 702 makes clear that it is not the role of the district court to evaluate the correctness of facts underlying an expert's opinion:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in [Rule 702] on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

Fed. R. Evid. 702, Advisory Committee Note. In determining admissibility of expert testimony, the proper focus is on "principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. Challenges to an expert's conclusions are not decided in a Daubert proceeding but rather should be

presented through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Id. at 596.

It is firmly established that disagreement with an expert's conclusions is not a proper basis for excluding expert testimony. See, e.g., Pineda v. Ford Motor Co., 520 F.3d 237, 249 (3d Cir. 2008) ("Any dispute between the parties about the strength of the evidence . . . should be resolved by the jury."); LePage's, Inc. v. 3M, 324 F.3d 141, 165 (3d Cir. 2003) ("[T]he credibility of . . . experts is for the jury to determine.") (en banc), cert. denied, 542 U.S. 953 (2004); Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414-15 (3d Cir. 2002) (challenge to expert assumptions should be raised in cross-examination); Inter Medical Supplies, Ltd. v. EBI Medical Sys., Inc., 181 F.3d 446, 463 (3d Cir. 1999) ("credibility of the experts was for the jury to determine"), cert. denied, 528 U.S. 1076 (2000); In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994) (proponents "do not have to demonstrate . . . that the assessments of their experts are correct"), cert. denied, 513 U.S. 1190 (1995); Bonjorno v. Kaiser Aluminum & Chem. Corp., 752 F.2d 802, 814 (3d Cir. 1985) ("contentions [that] go to the weight of the evidence . . . [were] for the jury"), cert. denied, 477 U.S. 908 (1986); Univac Dental Co. v. Dentsply Int'l, Inc., Civ.A.No.1:07-CV-0493,

2010WL1816745,*4 (M.D. Pa. Apr. 27, 2010) (challenge to expert's sources does not go to admissibility) (Exhibit LL); Arlington Indus. v. Bridgeport Fittings, Inc., 658 F. Supp. 2d 630, 643 (M.D. Pa. 2009) (challenge to conclusions drawn from underlying facts is "purview of cross examination").

Disregarding this authority, BAE urges the Court to exclude Creamer because his opinions do not comport with BAE's version of the facts. That would be error.

## II. Creamer Is Qualified To Offer Opinions on Damages.

Creamer is highly qualified to offer opinion testimony on the issue of damages. He holds a Bachelor's Degree in Accounting and a Master's Degree in Business Administration, has practiced as a Certified Public Accountant for more than 30 years and presently serves as Managing Director at Navigant Consulting. He is Accredited in Business Valuation and Certified in Financial Forensics by the American Institute of Certified Public Accountants. Creamer has performed financial investigations, financial audits, due diligence investigations and cost accounting studies for public and private companies in a wide variety of industries. As noted in his Curriculum Vitae (Exhibit A), Creamer has been

qualified to testify as an expert 28 times in federal and state courts on issues relating to damage assessments, business valuations and forensic and cost accounting. Since BAE does not challenge Creamer's expertise, its attack on his opinions is inherently suspect.

## III. Creamer Employed Reliable Methodologies.

Although its motion is characterized as an attack on Creamer's "methodology," BAE does not challenge the methods that Creamer used to calculate damages. Rather, as the chart below demonstrates, Creamer employed the very same methodologies as BAE's expert, Ned S. Barnes[2]:

[2] Creamer's original and supplemental reports are Exhibits B and C. The Barnes report is Exhibit D.

| **Measure of Damages**[3] | **Barnes Methodology** | **Creamer Methodology** |
|---|---|---|
| Lost Profits | "Estimating lost profits damages generally involves identifying and measuring incremental sales the plaintiff would have made," then "subtracting . . . the amount of incremental costs or expenses . . . incurred . . . in achieving those sales." (Exhibit D, p.11.) | "Lost profits are calculated as lost sales, less the costs Gentex would have incurred to achieve these sales, i.e., incremental costs." (Exhibit B, p.13.) |
| Unjust Enrichment | "Estimating possible damages associated with unjust enrichment generally involves a consideration of the economic benefits gained by the defendant" and "incremental profits associated with sales the defendant would otherwise not have made." (Exhibit D, p.12.) | "Unjust enrichment represents the profits that Armor made on sales of products utilizing Gentex's trade secrets. . . ." (Exhibit B, p.13.) |
| Reasonable Royalty | "Estimating possible damages based a reasonable royalty analysis . . . generally involve the consideration of a hypothetical negotiation between a willing licensor and a willing licensee attempting to negotiate a license for the use of the relevant technology." (Exhibit D, p.13.) | "The determination of a reasonable royalty is based on an analysis of a hypothetical negotiation between the plaintiff (licensor) and the defendant (licensee)." (Exhibit B, p.31.) |

Thus, BAE cannot credibly dispute that Creamer's methods are reliable.

---

[3] Damages are awarded under Pennsylvania's Uniform Trade Secrets Act, 12 Pa. C.S.A. § 5301 et seq., for "actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." 12 Pa. C.S.A. § 5304(a). In lieu of damages measured by these methods, damages "may be measured by imposition of liability for a reasonable royalty. . . ." Id.

**A. Creamer calculated lost profits pursuant to accepted methodology.**

**1. Actual profits.**

The experts on both sides agree that lost profits are measured by calculating lost sales and subtracting expenses incurred in achieving those sales. (Supra p.6.) Consistent with this methodology, Creamer tallied BAE's sales of Advanced Combat Helmets ("ACH") from June 2006-March 2009 and projected future sales of helmets incorporating the misappropriated technology from 2009-2013; analyzed the market to determine the share of BAE's sales that Gentex would have captured in the absence of misappropriation and applied this ratio to BAE sales; then subtracted the incremental costs Gentex would have incurred to achieve those sales. (Exhibit B, pp.20-23.) BAE does not challenge Creamer's methodology but rather attacks the opinions that he reached based on facts in the record. This is not a proper basis for exclusion.

The Third Circuit's en banc decision in LePage's, Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003), is controlling. In LePage's, the defendant argued that the plaintiff's damage theory was based on "improper assumptions" and should have been excluded. Id. at 164. As in this case, the defendant in LePage's did not

challenge the plaintiff's expert's qualifications or his basic approach to calculating damages. Id. at 165 & n.16. Instead, it challenged the expert's underlying assumptions concerning market strategies. Id. at 165. The Third Circuit held that the expert's testimony was properly admitted notwithstanding disagreement over the validity of his assumptions because "[t]he credibility of LePage's and 3M's experts was for the jury to determine." Id. at 165.

Like the defendants in LePage's, BAE seeks to prevent Creamer from testifying because it disagrees with his assumptions that: (1) BAE would have been unable to manufacture the ACH without Gentex's trade secrets; (2) BAE risked defaulting on the ACH contract; and (3) Gentex would have assumed 50% of BAE's sales if BAE defaulted. (Supp. Br. at 6-12.) As in LePage's, however, the correctness of these conclusions must properly be left to the jury. LePage's, 324 F.3d at 165; see also supra pp.3-4. BAE's failure to acknowledge or even cite this controlling Third Circuit en banc decision is inexcusable.

Although disputes over the factual basis for an expert's opinions are not properly decided by the Court on a Daubert motion, it must be emphasized that there is substantial support in the record for each of Creamer's opinions. As the chart below demonstrates, each of his assumptions is factually grounded:

| Challenged Assertion | Proof in the Record |
|---|---|
| BAE would not have been able to produce the ACH without Gentex's trade secrets. (Supp. Br. at 6-7.) | • BAE's expert concedes its ACH design was too heavy and needed to be changed to satisfy Army specifications. (Exhibit E, p.43 n.66.) BAE had no solution and was in "unprecedented panic trying to get a handle on the weight problems" when Defendant Brad Sutter arrived. (Exhibit F.) BAE's engineering technician acknowledged Gentex's material control sheet was "a powerful tool to help us avoid this type of trouble in the future." (Id.)<br><br>• BAE's expert is not offering an opinion that BAE could have produced ACH without Gentex's trade secrets. (Exhibit G, 195:20-197:17.)<br><br>• BAE's solutions to weight problem were copied from Gentex. (Exhibit H.)<br><br>• BAE's Senior Vice-President acknowledged on March 14, 2006 that BAE's "technology offered on ACH is not decisive" and BAE's "technical team" was "weak." He expressed "concerns" over passing required government testing and proposed acquisition of Gentex or investment in "substantially stronger engineering team" as solutions. (Exhibit I.)<br><br>• BAE's Vice-President of Engineering acknowledged BAE was "short of engineering help to get through the successful launch of the ACH program," and directed Human Resources Manager to recruit "experienced engineer in helmet design/qualification or manufacturing" from Gentex. (Exhibit J.)<br><br>• BAE's Production Manager admitted "[t]he start up of this ACH contract has been a %^#$@* disaster,"(Exhibit K), and complained BAE was unable to "make a normal quality helmet" before Sutter arrived, (Exhibit L).<br><br>• Defendant Patrick Walko admitted "knowledge and information taken from Gentex was extensively relied upon by [BAE] to successfully deliver ACH helmets. Without the Gentex knowledge and information, [BAE] would not have been able to fulfill the government ACH contract." (Exhibit M, ¶23.)<br><br>• Sandy Gambuti, a former Gentex employees who defected to BAE, attested that "[BAE] would not have been able to produce to the ACH specification without the Gentex proprietary knowledge. . . ." (Exhibit N, ¶24.)<br><br>• Gentex's engineering expert opined: "Without [the Gentex] information, my opinion is that [BAE] was going to lose that contract." (Exhibit O, 77:19-20.)<br><br>• BAE had difficulty manufacturing the Warrior helmet to lower specifications and was threatened with default for failing to make timely deliveries. (Exhibit P.)<br><br>• Internal BAE email acknowledges plethora of "out of spec" conditions with BAE's ACH product. (Exhibit Q.) |

| Challenged Assertion | Proof in the Record |
| --- | --- |
| BAE would have defaulted on the ACH contract absent use of Gentex trade secrets. (Supp. Br. at 7-8.) | • BAE's production manager acknowledged BAE faced risk that government might "terminate the contract right after the first article failure" given difficulties encountered by BAE. (Exhibit R, 111:8-112:4.)<br>• BAE was "contractually late" with First Article Test Report and acknowledged risk of being "called in default of contract." (Exhibit S.) Sutter completed report using Gentex test report as guide. (Exhibit S, 82:8-84:24.)<br>• Government previously threatened BAE with default due to failure to deliver under ACH bridge contract. (Exhibit P.)<br>• Gentex's engineering expert opined: "Without [the Gentex] information, my opinion is that [BAE] was going to lose that contract." (Exhibit O, 77:19-20.)<br>• BAE Senior Vice President conceded before hiring of Sutter and Walko that BAE had "some concerns over passing FAT [First Article Testing]" and "greater concerns over routinely passing LATs [Lot Acceptance Testing]." (Exhibit I.)<br>• BAE's initial ACH design did not meet government specifications. (Exhibit E, p.43 n.66.)<br>• BAE's ACH program manager acknowledged concern over making timely ACH deliveries. (Exhibit U, 262:2-6.)<br>• BAE production manager admits BAE was unable to make "normal quality helmet" before Sutter and Walko arrived. (Exhibit L.)<br>• BAE engineering technician acknowledged "unprecedented panic" over overweight helmet problem which was solved using Gentex trade secrets. (Exhibit F.) |
| Half of BAE's ACH sales would have gone to Gentex. (Supp. Br. at 9-11.) | • ACH contract states that quantities from canceled contract would be divided equally among other contractors. (Exhibit V, §H1.)<br>• Only Gentex and MSA had qualifying ACH products in the spring of 2006. (Exhibit B, p.5.)<br>• Government prefers to make awards to more than one contractor to ensure continuity of supply. (Exhibit W, 320:15-321:5.)<br>• Gentex had necessary capacity to make additional ACHs and enjoyed pricing advantage over MSA. In addition, Gentex was in good standing with the Government on all issues relating to ACH. (Id.; Exhibit B, p.21) |

There is thus substantial record evidence to support each of Creamer's opinions.[4]

BAE's assertions to the contrary are without merit. Contrary to BAE's claim on page 7, Gentex's engineering expert, David Roylance, Ph.D., a distinguished professor from MIT who studied, analyzed and tested ballistic protective products for 30 years, opined that BAE was unable to satisfy the ACH contract without the stolen Gentex information. He testified unequivocally: "Without that information, my opinion is that Armor was going to lose that contract." (Exhibit O, 77:19-20.) (Emphasis added.) BAE's reference to page 283 of Roylance's testimony is misleading since the colloquy on that page does not refer to the ACH but rather to different helmets manufactured to less exacting standards before the ACH went into production. (Id., 283:9-15.) In fact, Roylance never deviated from his firm conclusion that "a hundred percent" of BAE's ACH profits are attributable to the stolen Gentex trade secrets. (Id., 77:14-20.) This opinion, coupled with the many contemporaneous internal communications

---

[4] The record is voluminous and Creamer's reports are heavily annotated. Additional support is included in Gentex's Fourth Supplemental Response to Interrogatory No. 1 which is attached as Exhibit "X" and incorporated by reference. Gentex is unable to itemize all of the evidence supporting Creamer's conclusions in the space allowed. If the Court is inclined to consider the weight of the evidence in deciding this motion, Gentex requests the opportunity to develop a full record at an evidentiary hearing. Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999) ("[W]hen the ruling on admissibility [of expert evidence] turns on factual issues, . . . failure to hold such a hearing may be an abuse of discretion.").

documenting BAE's desperate struggle to achieve the required performance on the ACH contract, amply supports Creamer's opinion.

BAE also mischaracterizes the October 3, 2005 letter threatening BAE with default. (Supp. Br. at 7-9.) As BAE well knows, the letter refers to the bridge contract pursuant to which BAE (and Gentex) manufactured off-the-shelf items to satisfy the Army's urgent need for helmets before the more advanced ACHs were produced. Contrary to BAE's claim on page 8, the contract referenced in the October 3, 2005 letter (Exhibit Y) relates expressly to the "Advanced Combat Helmet." The letter was sent to BAE pursuant to "standard practice for defense contracting authorities" to warn that the government was contemplating "terminating the contract . . . for default" as a result of BAE's failure to make timely deliveries. (Exhibit P; Exhibit Z, 125:17-23.) This is powerful evidence of how the Government would have reacted to a default by BAE in the spring of 2006 and was properly considered by Creamer.

Contrary to BAE's suggestion on page 7, Creamer considered much more than the October 2005 letter in concluding that BAE was at risk of default. As noted in his reports, Creamer considered the "documents and testimony [which] indicate that from the beginning of its ACH contract, Armor experienced

difficulties performing. . . . [and] suggest that had Armor not obtained this information Armor would not have been able to successfully produce the ACH." (Exhibit C, p.4.) That BAE had already been threatened with default in October 2005 in connection with the ACH bridge contract only further substantiates Creamer's opinion. Moreover, contrary to BAE's assertion on pages 8-9, Creamer gave proper consideration to the possibility of a corrective action plan. (Id., p.7.) He considered the possibility but concluded that BAE would not have been able to develop a corrective action plan because, by its own admission, BAE lacked the technical capability to build the ACH to government specifications. (Exhibit W 291:2-15; 294:6-12; Exhibit I.)[5] Creamer's opinions are thus well grounded.

Finally, BAE misstates the record in claiming that "[i]t is undisputed" that helmet orders were not to be divided equally. (Supp. Br. at 10.) This was not Creamer's testimony. Rather, Creamer opined that BAE's lost sales would have been divided equally among Gentex and the only other competitor in the field, MSA. (Exhibit W, 318:14-321:8; 459:15-460:24.) Creamer based his opinion on the ACH contract which provides that quantities from a contract that is no longer in

---

[5] BAE's attempt to draw an analogy to Gentex's experience fails. (Supp. Br. at 9.) Unlike BAE, Gentex never encountered difficulty satisfying the Army's technical specifications. Rather, Gentex recalled helmets after discovering that one of its suppliers committed fraud by supplying non-conforming screws.

place will be distributed in equal amounts to the remaining contractors:

> If, at any point, a contract is terminated, or is no longer in place, the quantities from that contract will be distributed in equal amounts to the remaining contracts.

(Exhibit V, §H1; Exhibit W, 460:18-461:9.) This is the only provision in the ACH contract that speaks to cancellation and it applies to "quantities from that contract" without restriction or limitation. (Exhibit V, §H1.)[6] Based on this provision, as well as the evidence that the government has a preference for utilizing several contractors to ensure reliable supply and that Gentex had a price advantage, sufficient capacity to build additional helmets and was in good standing with the government customer, it was reasonable for Creamer to assume that Gentex would have received orders for half of BAE's sales if BAE defaulted. (Exhibit W, 320:15-321:5.) Each of his opinions is grounded in record facts.

Put simply, since none of BAE's attacks cast doubt on Creamer's methodology for excluding lost profits, there is no basis under Daubert or Rule 702 for excluding Creamer's calculations. Given the latitude that must be afforded to a plaintiff in presenting damages, LePage's, 324 F.3d at 166, and the "liberal policy

---

[6] The provision that BAE relies on, Section C2.7.2.4., does not address cancellation of a contract. (Supp. Br. at 8.) The only provision that addresses the consequences of cancellation is the one that Creamer relied on.

of admissibility" under Rule 702, Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008), it would be error to exclude Creamer.[7]

### 2. Future profits.

BAE argues that Gentex should not be able to recover for continuing and future misuse of the stolen technology because Creamer's lost profit opinions incorporate projections. (Supp. Br. at 12-14.) This argument is a non-starter since it is based on a misunderstanding of the rationale for awarding lost profits.

BAE fails to understand that a plaintiff's damage is measured from the date of misappropriation. University Computing Co. v. Lykes-Youngstown Computer Servs. Corp., 504 F.2d 518, 536 (5th Cir. 1974). The Fifth Circuit

---

[7] In what has come to be a disturbing pattern, the cases in BAE's brief do not stand for the proposition that BAE attributes to them. Contrary to BAE's representation, none of the cases cited on pages 6-7 involve a claim for lost profits. Elcock v. K-Mart Corp., 233 F.3d 734 (3d Cir. 2000) (post-injury vocational ability); Benjamin v. Peter's Farm Condominium Owner's Ass'n, 820 F.2d 640, 642 (3d Cir. 1987) (post-injury earnings); Alcatel USA, Inc. v. Cisco Sys., Inc., 239 F. Supp. 2d 660, 669 (E.D. Tex. 2002) ("Alcatel is not claiming it suffered lost profits . . . ."). There was no analysis of the standard for admissibility in Sanofi-Aventis since the plaintiff admitted that his damage calculations were "speculative." Sanofi-Aventis deutschland GMBH v. Glenkark Pharmaceuticals, Inc., 2011WL383861, **10-11 (D.N.J. Feb. 3, 2011). The Federal Circuit in Crystal Semiconductor expressly declined to "reach the reliability of [the expert's] testimony." Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc., 246 F.3d 1336, 1356-57 (Fed. Cir. 2001). The other cases cited by BAE involved the irrelevant issue of whether an expert can rely on calculations performed by someone else. Benjamin, 820 F.2d at 640; Mercedes-Benz USA LLC v. Coast Automotive Grp., Ltd., 2006WL2830962, *12 (D.N.J. Sept. 29, 2006); Vernon Walden, Inc. v. Lipoid GMBH, 2005WL3088333, *11 (D.N.J. Nov. 17, 2005).

explained this rule as follows:

> The rationale for this seems clearly to be that the risk of defendants' venture, using the misappropriated secret, should not be placed on the injured plaintiff, but rather the defendants must bear the risk of failure themselves. Accordingly the law looks to the time at which the misappropriation occurred to determine what the value of the misappropriated secret would be to a defendant who believes he can utilize it to his advantage, provided he does in fact put the idea to a commercial use.

Id. Not surprisingly, this measure of damages is endorsed in the accounting and financial literature. See, e.g., Weil, Roman L. et al., Litigation Services Handbook: The Role of the Financial Expert, Chapter 8 (4th ed. 2007) (Exhibit AA).)[8]

Consistent with University Computing and the professional literature, Creamer properly calculated projected lost profits as of the date of misappropriation. He took into account "what the reasonable expectations were as of the time the material was removed" and determined that BAE's "reasonable

---

[8] A well-known example of ex ante damage calculation concerns theft of a hypothetical high school yearbook signed by Janis Joplin before she became famous. If the yearbook is stolen before Joplin becomes famous but the trial on the matter occurs after her rise to stardom, is the owner of the yearbook entitled to the value on the date of the theft or the value at the time of trial? The answer is that damages are measured as of the time the yearbook is stolen, not the measurement arrived at through hindsight. This is because "[m]aking the plaintiff whole today means making it whole as of the date of the violation plus compensation for the pure time value of money." Fisher, Franklin M. & R. Craig Romaine, Janis Joplin's Yearbook and the Theory of Damages, J. Acctg. Auditing & Fin., Vol. 5, No. 1, at 156 (Exhibit BB).)

expectations were that the company was going to be successful in . . . selling these products." (Exhibit W, 382:13-383:1; 389:20-390:2.) Although hindsight reveals that BAE sold no ACHs since 2009, the theft of Gentex's trade secrets enabled BAE to obtain a contract to build the Lightweight Helmet ("LWH") for the United States Marine Corps in March 2010 and also enables BAE to compete for future ballistic helmet markets. As Creamer explained: "[T]he fact of the matter is, they still have the capability of doing it." (Id., 390:5-7; 352:18-22.)

BAE's own expert recognizes that damages are properly measured "based on a defendant's anticipated economic benefits measured at the time of the alleged misappropriation." (Exhibit D, p.12 n.53.) BAE offers no contrary authority and points to no other method of computation that it claims should have been used in calculating future lost profits. Instead, its argument boils down to disagreement with the opinions that Creamer reached based on the record facts. Again, this is not an appropriate basis for exclusion under Daubert.

Although disputes over the facts must be left to the jury, it must be noted that each of Creamer's opinions is well supported by facts in the record. (Supp. Br. at 13-14.) His projections are based on BAE's ability to compete in the ballistic helmet market utilizing the misappropriated trade secrets. As evidence of

BAE's continuing ability to compete, Creamer notes that BAE received a $28 million contract from the Marine Corps in March 2010 to produce 120,000 LWHs with an option to manufacture an additional 120,000 helmets. (Exhibit CC.)[9] BAE never before made the LWH (Gentex was the exclusive supplier of the LWH before Sutter and Walko defected to BAE) and was able to secure a contract in 2010 only after Sutter accessed at BAE countless Gentex electronic files relating to Gentex's LWH product. (Exhibit DD, pp.12-14.) BAE used the same machinery to make the ACH and LWH, (Exhibit G, 175:16-19), and BAE's LWH design was admittedly "constructed using the same proven techniques" developed on the ACH program, (Exhibit EE, p.7). Further, Creamer properly considered historical performance in projecting future helmet sales.[10] (Exhibit B, p.24.) Each of his opinions is well grounded in the record facts.

---

[9] BAE's claim that it has not yet earned a profit on the LWH is immaterial. (Supp. Br. at 14.) "[T]he lack of actual profits does not isolate the defendants from being obligated to pay for what they have wrongfully obtained in the mistaken belief their theft would benefit them." University Computing, 504 F.2d at 536. Furthermore, as recently as July 25, 2011, BAE produced an invoice confirming its continuing participation in the LWH program, but BAE has refused to allow discovery concerning this ongoing program. (Exhibits FF, GG.) BAE cannot prevent Gentex from recouping profits unjustly accumulated by BAE on the LWH program because the date of payment was not known in 2006 when Sutter absconded with countless electronic files relating to Gentex's LWH product. Nor can BAE limit its liability by preventing Gentex from taking discovery on the issue of BAE's continuing profits.

[10] BAE insinuates that it was improper for Creamer to base his projections on historical sales data. (Supp. Br. at 14.) But BAE's own expert concedes that, in projecting future sales, a company's historical performance is properly considered. (Exhibit G, 257:19-263:15; see also Gaughan, Patrick A., Measuring Commercial Damages, 131-26 (2000) (Exhibit HH).)

Moreover, contrary to the suggestion by BAE, there is still a market for the ACH. (Supp. Br. at 13.) As Creamer noted in his report, the Government has announced plans to procure between 177,766 and 1,395,231 additional ACHs. (Exhibit B, pp.23-24.)

Given the substantial record supporting Creamer's lost profit calculations, it would be error under LePage's to prevent him from testifying.

### B. Creamer calculated unjust enrichment damages pursuant to accepted methodology.

The experts on both sides agree that unjust enrichment damages are measured by determining the infringer's profits on sales of products using the misappropriated trade secrets. (Supra p.6.) This is the methodology that Creamer employed. He identified BAE's sales of the ACH, Outer Tactical Vest ("OTV") and Improved Outer Tactical Vest ("IOTV") from June 2006-March 2009 and calculated the profit on projected sales of products employing the stolen Gentex technology. (Exhibit B, pp.28-30.) BAE does not challenge this methodology but rather attacks Creamer for the opinions that he gives based on facts in the record. (Supp. Br. at 14-19.) Again, this is not a proper basis for striking opinion testimony.

First, BAE claims that Gentex's engineering expert does not support Creamer's conclusion that 100% of BAE's profit on the ACH is attributed to Gentex's trade secrets. (Supp. Br. at 14-16.) This is a blatant misrepresentation of Roylance's testimony. Roylance testified without equivocation that "a hundred percent" of BAE's success on the ACH contract is attributable to Gentex's trade secrets. (Exhibit O, 77;14-78:6.) Creamer considered Roylance's opinion and the substantial record developed in discovery and concluded that BAE would not have been able to get "over the goal line" without the stolen Gentex files. (Exhibit W, 444:16-445:5.) Further, the evidence shows that Gentex's entire manufacturing process was disclosed to BAE and therefore the injury resulting from the misappropriation is indivisible. (Exhibit X.) Thus, it was appropriate for Creamer to attribute all of BAE's profits on the ACH to the misappropriated Gentex trade secrets.

Second, BAE is mistaken in arguing that a plaintiff in a trade secrets case has an obligation to apportion unjust enrichment damages between misappropriation and other factors. (Supp. Br. at 15-16.) This argument misstates the burden of proof. A plaintiff is not obligated to apportion damages. LePage's, 324 F.3d at 166. Rather, it is the defendant's burden to demonstrate, if it can, any portion of its profits attributable to factors other than theft. Andreas v.

Volkswagen of Am., Inc., 336 F.3d 789, 796 (8th Cir. 2003); Konor Enters., Inc. v. Eagle Publications, Inc., 878 F.2d 138, 141 (4th Cir. 1989); Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 514 (9th Cir. 1985); Williamson-Dickie Mfg. Co. v. Davis Mfg. Co., 251 F.2d 924, 927 (3d Cir. 1958).[11] Even the treatise cited by BAE's expert acknowledges that "[t]he defendant bears the burden of showing, if possible, what proportion of the claimed sales should be credited to the use of the protected property . . . and what proportion are primarily the result of other factors . . . ." Kerr, William O. & Richard B. Troxel, Calculating Intellectual Property Damages, § 7.7 (May 2010) (Exhibit II); see also Exhibit G, 39:3-18; 194:3-21; 219:10-220:11; 230:3-231:6. BAE's expert concedes that such an analysis was "fundamentally imperative" and "may very well have been difficult," (Exhibit G, 232:20; 218:19-20), but he never bothered to do it even though it was

[11] Again, the authorities cited by BAE do not support its argument. Schiller supports Gentex to the extent it acknowledges that apportionment is the defendant's burden. Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 415 (7th Cir. 1992) ("it would be [defendant's] burden to prove how much less" than total profits were attributable to theft). The other cases cited by BAE are materially distinguishable in that there was no nexus between the allegedly unlawful acts and the profits sought to be disgorged. Intimate Bookshop, Inc. v. Barnes & Noble, Inc., 2003 WL 22251312 (S.D.N.Y. Sept. 30, 2003) (plaintiff failed to establish lost sales stemmed from antitrust violations); In re Independent Serv. Org. Antitrust Lithog., 85 F. Supp. 2d 1130, 1153 (D. Kan. 2000) (plaintiff failed to establish sales resulting from illegal acts); see also cases cited by BAE on p.17 n.51. The issue in Mattel was whether the plaintiff could recoup the value of investments made by the defendant in improving the stolen trade secrets. Mattel, Inc. v. MGA Entertainment, Inc., 2011WL836418, *2 (C.D. Cal. Mar. 4, 2011). BAE is not claiming that it did anything to enhance the value of the stolen Gentex trade secrets and therefore Mattel does not apply.

BAE's burden. Thus, BAE's argument fails.

Finally, BAE's characterization of Creamer's testimony concerning the OTV product is not accurate. (Supp. Br. at 18.) In fact, Creamer testified that his unjust enrichment calculation is based in part on Walko's admission that "[t]he data taken from Gentex was very valuable in overcoming ballistic failure issues and other problems" on BAE's OTV programs. (Exhibit W, 461:11-462:10; Exhibit B, p.12 n.59; Exhibit M, ¶40.) This is ample support for Creamer's opinions concerning OTV profits.

In sum, Creamer's opinions employ reliable methodology and are well supported by record facts. The weight to be afforded to those opinions must properly be left to the jury. See, e.g., Broan Mfg. Co., Inc. v. Associated Distribs., Inc., 923 F.2d 1232, 1236-38 (6th Cir. 1991) (remanding for new trial on damages where district court credited defendant's factual allegations in striking expert).

### C. Creamer calculated a reasonable royalty pursuant to accepted methodology.

The experts on both sides agree that a reasonable royalty is determined by constructing a hypothetical negotiation between a willing licensor and a willing licensee, giving consideration to the factors outlined in Georgia Pacific. (Supra

p.6.) BAE does not challenge this methodology, but rather accuses Creamer of not "credibly address[ing]" the Georgia Pacific factors. (Supp. Br. at 20.) This is just not true. In fact, Creamer outlined in his rebuttal report precisely how he addressed each of the Georgia Pacific factors. (Exhibit C, pp.12-13.) BAE's argument fails on its face. There is no doubt that Creamer employed acceptable methodology and his calculation is based on relevant record facts.

In performing his hypothetical negotiation, Creamer carefully analyzed BAE's perspective and concluded that BAE would have been an extremely motivated buyer due to the significant problems it was having on the ACH contract and the fact that it did not have qualified internal resources to solve those problems. (Exhibit B, p.31.) He noted that, at the time of the hypothetical negotiation, BAE desired to capture one third of the ACH market and eventually replace Gentex as the industry leader. BAE ranked Gentex as its highest priority large company acquisition target and was willing to pay more than $50 million for Gentex's helmet systems business group. (Id., pp.32-33.)

Creamer also carefully evaluated Gentex's perspective in a hypothetical negotiation. He observed that the manufacture of ballistic helmets conforming to government specifications requires a high degree of engineering

skill, sophisticated technologies, precision production processes, strict quality control procedures and reliable test methods. Gentex developed this proprietary knowledge over the course of its 100-year history. From 2000 to 2009 alone, Gentex spent more than $85 million on research and development. The Gentex know-how that went into the ACH evolved over time and is rooted in previous helmet technologies developed at Gentex. (Exhibit B, pp.31-32.) Further, Creamer acknowledged that Gentex took significant measures to protect the security of its information and would not have willingly licensed its technology to BAE. (Id., p.31; Exhibit W, 411:16-21.)[12]

After careful consideration of these competing perspectives and the Georgia Pacific factors, and after considering alternative valuation methods,[13] Creamer opined that the stolen intellectual property had a value of $21.1 million and BAE would have been willing to pay and Gentex would have been willing to accept this amount for the stolen technology. (Exhibit B, pp.44-45.) Creamer

---

[12] BAE makes much out of the fact that Gentex would not have entertained the possibility of licensing its hard-earned technology to its chief rival. (Supp. Br. at 23 n.67.) This is completely beside the point. Even the treatise cited by BAE's expert recognizes that, "[i]n most cases involving reasonable royalties, there is no assumption that the owner would have actually licensed the IP involved." (Exhibit II, § 6.9.)

[13] Creamer also considered comparable third-party royalty agreements, comparable merger and acquisition transactions and the valuation of guideline public companies but rejected each of these approaches as unreliable, even though some of them would have yielded higher damages for Gentex. (Exhibit B, pp.40-44.)

reasoned that this was within the range that BAE contemplated paying for Gentex's helmet business and that it would have taken BAE less than six years of selling helmets using the misappropriated technology to recoup its investment. (Id., p.45.) He arrived at his opinion utilizing the traditional hypothetical negotiation methodology and after considering each of the Georgia Pacific factors. His opinions are undeniably reliable under Daubert. To the extent BAE disagrees with his conclusions, those challenges must be reserved for the jury.

BAE misstates Creamer's opinion in arguing that he "begins his reasonable royalty analysis with the entire value of Gentex's ballistic business." (Supp. Br. at 20.) Creamer did not presume that a reasonable royalty would equate to the value of the enterprise — he rejected this approach. (Exhibit W, 411:1-412:18.) Instead, consistent with the caselaw, Creamer constructed a hypothetical negotiation which took into consideration facts relevant to both parties' perspectives and then valued the misappropriated technology using an accepted residual value approach and discounted cash flow analysis. (Id., 425:3-8; 433:9-24; see also articles attached as Exhibit JJ.) His reasonable royalty calculation is properly "based on the amount that Gentex and [BAE] would have agreed upon if both parties had been reasonably and voluntarily trying to negotiate a one-time payment for an exclusive, perpetual license for the Subject Technology." (Exhibit

B, p.31.) Further, BAE misses the mark in suggesting that Creamer should have based his calculation on actual costs incurred by Gentex in developing the trade secrets. (Supp. Br. at 21.) This unfairly ignores the commercial reality in which the theft occurred. University Computing, 504 F.2d at 538.

BAE also faults Creamer for not evaluating what was left behind at Gentex, (Supp. Br. at 22-23), but this is not part of the traditional hypothetical negotiation. Rather, as noted above, Creamer valued what was taken. In other words, he "valued the information, knowledge, documentation and know-how that made it possible for [BAE] to produce helmets to specification." (Exhibit W, 274:19-23; 275:10-14; 276:12-15; 277:9-14.) The premise on which Creamer relied "is that the defendants in this case got free use of everything that's valuable in the intellectual property realm, so much so that they are now able to compete in the helmet industry arena where they demonstrated an inability to be effective." (Id., 279:2-280:24.)[14] Contrary to BAE's claim, Creamer did not testify that his methodology was novel. (Supp. Br. at 22.) His actual testimony is: "This is not a novel approach that we've employed." (Exhibit W, 425:17-18 (emphasis added).)

---

[14] On the issue of patents, Creamer explained that he considered the value of existing patents and determined they had no value. (Exhibit W, 438:1-12; 440:18-441:20.)

The factual foundation for Creamer's opinion that the Defendants "got free use of everything that's valuable" has only grown stronger since Creamer wrote his reports. Sutter recently admitted that he took with him when he left Gentex "much of the information that he had stored on his hard drive and all of the information that he had in the .pst file [i.e. his email box]." (Doc. No. 348, p.4.) This is consistent with Walko's admission that he took without authorization his entire "My Documents" folder from Gentex. (Exhibit KK, 480:8-12.) In light of these admissions, and since the devices used to steal Gentex's trade secrets and substantial electronic evidence demonstrating disclosure and use of those trade secrets at BAE have been destroyed in violation of the duty to preserve, (Doc. Nos. 295, 313, 379), Defendants cannot credibly argue that Creamer overstated the theft.

In any event, challenges to Creamer's opinions must properly be resolved by the jury. As the Fifth Circuit held in University Computing, calculating a reasonable royalty "requires a flexible and imaginative approach" and "each case is controlled by its own peculiar facts and circumstances." University Computing, 504 F.2d at 538 (citation and quotations omitted). Where, as in the present case, facts relevant in determining a reasonable royalty are disputed, "it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1392 (Fed.

Cir. 2003). BAE's challenges to Creamer's opinions must therefore be left to the jury.[15]

## IV. Creamer's Opinions Cover the Appropriate Time Period.

BAE contrives a conflict between Creamer's calculations and this Court's October 20, 2010 ruling limiting deposition questioning of Gentex's engineer to the period before Sutter resigned. (Supp. Br. at 25-26.) There is no conflict. Creamer did not rely on any aspect of Gentex's post-theft operations in support of any of his opinions. Nor has BAE pointed to any materials considered by Creamer that were not provided to the defense. Its challenge to the time period covered by Creamer's reports is baseless.

---

[15] BAE chronically attempts to mislead this Court by plucking language it likes out of cases having nothing to do with the issue before the Court. (Supp. Br. at 20-22.) The reference to "actual market value" in Mattel relates to the standard in copyright infringement cases and, as Mattel recognized, does not apply in a trade secrets case. Mattel, Inc. v. MGA Entertainment, Inc., 2011WL836418 (C.D. Cal. Mar. 4, 2011). There was no reference to "enterprise value" in Vermont Microsystems, but rather the reasonable royalty in that case was reversed because it was based on an opening demand to settle trade secret and other claims. Vermont Microsystems, Inc. v. Autodesk, Inc., 88 F.3d 142, 152 (2d Cir. 1996). Uniloc and Fenner also had nothing to do with "enterprise value" but rather dealt with the need to distinguish between patented features and unpatented features in a patent infringement case. Uniloc USA, Inc. v. Microsoft Corp., 632 F.2d 1292, 1318 (Fed. Cir. 2011); Fenner Investments v. Hewlett Packard, 2010WL3911372, *1 (E.D. Tex. Apr. 16, 2010). None of these cases apply to the issue before this Court.

## V. Creamer Did Not Need To Individually Value the Stolen Trade Secrets.

As its last argument, BAE purports to fault Creamer for not separately valuing each stolen trade secret. (Supp. Br. at 27-28.) The Third Circuit made clear in LePage's that there is no obligation to attribute a fixed amount of damages to any single act where, as in this case, many acts taken together constitute the violation. LePage's, 324 F.3d at 166; Bonjorno v. Kaiser Aluminum & Chem. Corp., 752 F.2d 802, 813 (3d Cir. 1984), cert. denied, 477 U.S. 908 (1986). As Creamer repeatedly testified, since the "sum total" of Gentex's manufacturing process and "the entire bundle of know-how" were stolen, parsing is unnecessary. (Exhibit W, 97:6-13; 363:14-364:7; 365:19-366:11.)

## CONCLUSION

For these reasons, BAE's effort to seek pre-trial rulings on disputed issues of fact under the guise of Daubert must be denied.

Respectfully submitted,

/s/ Donna A. Walsh
Daniel T. Brier
Donna A. Walsh

Attorneys for Plaintiff,
Gentex Corporation

MYERS, BRIER & KELLY, L.L.P.
Suite 200, 425 Spruce Street
Scranton, PA 18503

Of Counsel:

Edward F. Mannino, Esquire
600 West Germantown Pike, Suite 400
Plymouth Meeting, PA 19462

Date: August 29, 2011

**CERTIFICATE OF COMPLIANCE**
**WITH LOCAL RULE 7.8(b)(2)**

I, DONNA A. WALSH, hereby certify that the foregoing Memorandum of Law in Opposition to Corporate Defendants' Motion to Exclude Damages Expert is in compliance with Local Rule 7.8(b)(2). The brief contains 6,998 words as computed by WordPerfect 12.

/s/ Donna A. Walsh

Date: August 29, 2011

**CERTIFICATE OF SERVICE**

I, Donna A. Walsh, hereby certify that a true and correct copy of the foregoing Memorandum of Law in Opposition to Corporate Defendants' Motion to Exclude Damages Expert was served upon the following counsel of record via the electronic case filing system on this 29th day of August, 2011:

Gino J. Benedetti, Esquire
Dilworth Paxson LLP
1735 Market Street
3200 Mellon Bank Center
Philadelphia, PA 19103

George A. Reihner, Esquire
Wright & Reihner, PC
148 Adams Avenue
Scranton, Pa 18503

David R. Fine, Esquire
Kirkpatrick & Lockhart Preston
Gates Ellis LLP
17 North Second Street, 18th Floor
Harrisburg, PA 17101

Jeffrey H. Daichman, Esquire
Lauren Dayton, Esquire
Kane Kessler, PC
1350 Avenue of the Americas
New York, NY 10019

/s/ Donna A. Walsh