# Exhibit M

COMMONWEALTH OF PENNSYLVANIA :
: ss
COUNTY OF LACKAWANNA :

---

**AFFIDAVIT**

---

I, Patrick Walko, being duly sworn according to law, depose and say as follows:

1. I am a mechanical engineer presently employed by Borton Lawson. Prior to working at Gentex, I had not been exposed to, nor worked with, ballistic materials, ballistic test procedures, ballistic manufacturing processes, ballistic products or key performance parameters relating to ballistic materials and products. I worked as a project engineer and engineering manager at Gentex Corporation from May 2001 to September 2005 and then worked for a brief period for Lockheed Martin in Owego, New York before accepting a position at Specialty Defense Systems of Pennsylvania, Inc. I worked as an engineer at Specialty Defense Systems of Pennsylvania, Inc. from August 7, 2006 until I was directed to resign or be fired on May 7, 2007.

2. Even though my paychecks were issued by Specialty Defense System of Pennsylvania, Inc., I understood that Armor Holdings, Inc. and Simula, Inc. had authority over my employment. For example, my direct supervisor was Brad Sutter who was an

[redacted]
EXHIBIT

employee of Simula, Inc. in Phoenix, AZ. I understood and referred to "Armor Holdings" as my employer and use that term in this Affidavit to refer to the affiliated companies that make up the Individual Equipment Systems Division of Armor Holdings.

3. At the time I was hired by Armor Holdings, Armor Holdings was in direct competition with Gentex on the Advanced Combat Helmet ("ACH") program. Despite my direct experience with the Gentex ACH product, no one at Armor Holdings ever warned me against the use of Gentex information or materials. There were no restrictions or limitations placed on me by Armor Holdings with respect to work assignments. I recognized the strong potential for conflict and, at or around the time I was hired, I specifically asked Brad Sutter what I would be permitted to talk about and work on in my new position. Mr. Sutter told me that, if both he and I possessed knowledge from our work at Gentex, it was "not a conflict" and we were able to talk about it, share it and use it. This was reinforced and repeated to me by management in both Jessup, PA and Phoenix, AZ, including Michael Daly, Joe Coltman, Steve Motoyama and employees in the HR department. I was told repeatedly that there was nothing wrong with sharing and using Gentex information to help solve Armor Holdings' problems.

4. When I interviewed for the position at Armor Holdings in July 2006, I witnessed first-hand the use of Gentex

intellectual property. I met with Brad Sutter in Jessup, PA. During the interview, Mr. Sutter turned the screen on his laptop to me and showed me a copy of a confidential Gentex spreadsheet used to track material information during ballistic production runs. He explained to me that this was the type of project that he was working on at Armor Holdings. I immediately recognized the spreadsheet as a Gentex document and pointed this out to Mr. Sutter. He acknowledged that the spreadsheet originated at Gentex and told me "don't worry about it."

5. Upper management at Armor Holdings, including Joe Coltman and Michael Daly, were aware that Brad Sutter and I had confidential Gentex information in our possession and were actively using it in connection with our work at Armor Holdings.

6. When I started my employment at Armor Holdings, I was told by Cheryl Nolan that the Gentex TBH II First Article Test Report information was stored on and available on the Armor Holdings computer network. Cheryl Nolan and I used and accessed the Gentex TBH II First Article Test Report information as part of my effort to improve the Armor Holdings ACH helmet.

7. I can recall several meetings with Joe Coltman where Gentex proprietary information was openly discussed. For example, there was a meeting in November 2006 involving Armor Holdings management and representatives from Dupont, Barrday and

Lewcott. Joe Coltman, Michael Daly and Brad Sutter were together in Phoenix, AZ and I participated by telephone from my office in Jessup, PA. Brad Sutter shared proprietary details concerning Gentex's weaving process during the meeting. Brad Sutter discussed the different combinations of materials used as well as different fiber types used by Gentex. We also talked about the need to identify product performance parameters before accepting material into the manufacturing process. This knowledge was based on the work we did at Gentex.

8. Shortly after I was hired, I was present at a lunch meeting in August 2006 in Phoenix where Gentex information was discussed. Michael Daly, Brad Sutter and Dr. Tim Smith were present. While we were eating lunch, I specifically asked Mr. Sutter about Armor Holdings' use of the Gentex information that he had shown me. Mr. Daly asked which information I was referring to and Mr. Sutter answered: "Pre-preg information and data sheets." Mr. Daly then reaffirmed what Mr. Sutter had told me earlier. He said that it was okay for me and Mr. Sutter to talk about and share Gentex information if we both knew about from our work at Gentex. Mr. Daly was very open about the use of Gentex information and this conversation led me to believe that it was expected and encouraged that I would use Gentex information in my work at Armor Holdings.

9. I can also recall a discussion about Gentex's research efforts at a meeting convened in the fall of 2006 to discuss the ManTech program. ManTech is a government-sponsored research program intended to foster the use of thermoplastics in developing the next generation ballistic helmet. Present at the meeting were Ben Su, a representative of a company called Bond Laminates that Gentex had worked with, Steve Motoyama, Joe Coltman and Mary Gowat (another former Gentex employee who accepted a position at Armor Holdings). The Armor Holdings personnel talked openly at the meeting about Gentex's proprietary thermoplastics research and the work that Gentex did with Bond Laminates. The details of Gentex's research efforts and conclusions were shared and pictures of helmets built by Gentex using thermoplastic materials were passed around. I was shocked that Gentex information would be discussed so openly with senior Armor Holdings management, including Joe Coltman. This happened many times during the course of my employment at Armor Holdings.

10. Brad Sutter brought a lot of Gentex information and materials with him to Armor Holdings. Brad told me that he copied and removed a lot of information while he was cleaning out his office and that he took all of that information with him to Armor Holdings.

11. When I was working at Armor Holdings, it was

widely known at Armor Holdings that Brad Sutter and I had access to Gentex materials.

12. In August 2006, shortly after I arrived at Armor Holdings, I was tasked with helping to complete the First Article Test Report ("FATR") for the ACH that was required to be filed after certain presses were moved from Dunmore to Jessup. My colleagues at Armor Holdings, including Cheryl Nolan and Chris Dempsey, had the First Article Test report prepared by Gentex for its Tactical Ballistic Helmet ("TBH II") and relied heavily on the Gentex report in preparing the Armor Holdings FAT report.

13. I also saw a copy of Gentex's TBH FAT report on Michael Daly's desk when I visited the Phoenix, AZ office in mid-August 2006.

14. I can recall another instance in August 2006 when one of my Armor Holdings colleagues, Shane Alt, was attempting to get reliable helmet measurements for use in preparing another government report. Mary Gowat was asked about the measurement data collected by Gentex and in response Mary produced a Gentex spreadsheet which included an analysis of various measurement data. This spreadsheet and the knowledge gained from it helped Armor Holdings in its dealings with the Government.

15. Armor Holdings was having trouble with the

adhesion used to attach the edge beading to the ACH helmet shell. Steve Motoyama, Armor Holdings' Program Manager for the ACH, asked me: "What did you guys do at Gentex?" At his request, I accessed my "old Gentex email" to locate a document that describes the beading adhesion used by Gentex. I shared the document with Shane Alt. I also sent a copy of the document to Brad Sutter together with a Gentex budget document that I obtained from my old email. I bragged to Mr. Sutter about my ability to access these confidential Gentex materials.

16. This was not the only time that I accessed my old Gentex emails or other Gentex materials in order to solve a problem at Armor Holdings. I can offer other additional specific examples if I am allowed to access my old computer and file materials.

17. I specifically told Armor Holdings management, including Michael Daly, Brad Sutter and Brad Georgetti (the Human Resources Director at the Jessup site), in the fall of 2006 that I had Gentex information on my Armor Holdings work computer. I received a letter from Gentex in late September 2006 reminding me about my non-disclosure obligations. Knowing what was going on at Armor Holdings at the time, I was very scared when I got the letter. I called Mr. Daly immediately and told him that I was nervous because I had Gentex information in my possession. I

specifically told him that I had Gentex information and was using it in the course of my work at Armor Holdings. He told me not to worry, that they were "working on things" and that I should just "keep doing what you're doing."

18. Armor Holdings' lack of measurements, standards and controls was very surprising to me. Armor Holdings was in the "stone-age" compared to Gentex. Whereas Gentex devoted a great deal of time, effort and resources to designing its helmet and other life-saving products and to manufacturing consistent and repeatable products, Armor Holdings was interested in speed and number of units shipped and paid little or no attention to understanding product characteristics or developing and refining the processes and controls needed to consistently meet performance and qualify specifications.

19. When I worked at Gentex, we collected and studied huge amounts of data to identify trends, co-variations and correlations and then used this data to determine how material variances show up in physical testing and how manufacturing is affected. Gentex also devoted considerable time and energy to identifying the key performance parameters and data points to be tested, measured and monitored throughout the manufacturing process in order to ensure production of conforming products. This level of analysis, coupled with Gentex's weaving experience,

gave Gentex a significant advantage in terms of understanding the various characteristics of ballistic products and how those characteristics inter-relate and affect each other. Armor Holdings had no such insight and, to best of my knowledge, did not quantitatively analyze raw material or product characteristics before I arrived in early August 2006.

20. Unlike Gentex which was a "design to build" company, Armor Holdings was a "build to print" company. Armor Holdings' personnel lacked a firm understanding of its own manufacturing process, had little to no process controls and did no data collection or testing during manufacturing. I analogized Armor Holdings' approach to baking a cake without first determining whether the milk was sour. I understood from my work on ballistic fabrics at Gentex that it was important to collect and track key performance parameters, including dry weight, areal density and pic count, and Brad Sutter and I initiated significant efforts to begin collecting this data at Armor Holdings.

21. During my tenure with the company, Armor Holdings developed methodology and processes based directly on the Gentex knowledge, parameters and metrics. For example, Armor Holdings developed a procedure for measuring and testing incoming lots of ballistic material that mimicked the Gentex inspection procedure.

Armor Holdings had no such procedure in place before the former Gentex employees arrived and did not even measure these critical performance parameters. Similarly, Armor Holdings had no dedicated appropriate (climate controlled) facility or procedures in place for storing ballistic material before I arrived. The former Gentex employees, including me, recommended a number of test, measurement and storage methods based on our experiences at Gentex and Armor Holdings implemented these recommendations. As a result, Armor Holdings was able to make more consistent, better quality helmet and outer tactical vest ("OTV") products at lower cost. The benefit to Armor Holdings was significant.

22. Armor Holdings also relied on Gentex experience and Gentex data points in pressing its vendors for tighter material tolerances. After much trial and effort, Gentex identified key performance parameters affecting ballistic fabric and the ideal range for those parameters. Further, Gentex developed and used databases to track key performance parameters throughout the production process. Brad Sutter removed an electronic copy of a Gentex database and enlisted help from Cheryl Nolan and me to implement the same database at Armor Holdings. This had great value in terms of improving quality and reducing fallout. It also enabled Armor Holdings to gain better control and knowledge of the ballistic fabric supplied by its vendors.

23. The knowledge and information taken from Gentex was extensively relied upon by Armor Holdings to successfully deliver ACH helmets. Without the Gentex knowledge and information, Armor Holdings would not have been able to fulfill the government ACH contract.

24. One of my most significant contributions while at Armor Holdings was the work that I did in the area of ballistic trend and failure analysis. I gained significant experience in failure analysis while at Gentex. As I noted above, Gentex spent a great deal of time identifying and studying key performance parameters and the knowledge that I gained from these efforts played a significant part in the ACH and OTV programs at Armor Holdings. No one at Armor Holdings did this type of analysis before. The work that I did at Armor Holdings was instrumental in refining the Armor Holdings OTV design to meet the government's ballistic requirements and in positioning Armor Holdings to avoid material constraints. Specifically, Armor Holdings modified its OTV design from an all Kevlar design to a design consisting of a combination of Twaron and Kevlar. Both Brad Sutter and I were instrumental in suggesting, testing and defining the new construction and new ply patternization design and in ensuring that the new design met government specifications.

25. Armor Holdings used Gentex data points, including prepreg measurements, molded shell weight, final weight and ballistic performance, as "starting points" for its Advanced Combat Helmet ("ACH") product. Brad Sutter shared the Gentex data points with Armor Holdings personnel and the Gentex data points became the "starting points" when manufacturing the ACH. Senior Management at Armor Holdings involved in the ACH program was aware that Gentex data was being used, including Steve Motoyama, Rob Monks, Michael Daly, Connie Tapia and Bill Trainor.

26. For example, Armor Holdings relied on Gentex's performance specifications for pre-preg material to develop its own specs. This was exactly the same work that Brad Sutter did at Gentex. One of the very first things that Cheryl Nolan showed me after I was hired at Armor Holdings was a copy of Gentex's pre-preg specification. She was very open and not at all secretive about her use of the Gentex document. I called Brad Sutter after Cheryl Nolan showed the Gentex spec to me and asked him about it. He told me again that, if the former Gentex employees had confidential information from Gentex, it was not a problem to talk about it and share it with Armor Holdings employees. Armor Holdings used and relied on the Gentex spec to develop a pre-preg spec for the Armor Holdings ACH. This had great value to Armor Holdings because Armor Holdings was able to standardize its procedures and methods and better control the raw

materials ordered from its vendors. Cheryl Nolan, Brad Sutter, Mary Gowat, Scott Hartley, Sandy Gambuti and I were involved in developing the Armor Holdings pre-preg specification.

27. Armor Holdings also copied and misappropriated the mass prediction spreadsheet developed by Gentex. This was a proprietary technique developed by Gentex to predict helmet weight and performance. Brad Sutter worked together with Shane Alt to implement an identical spreadsheet for use by Armor Holdings. The spreadsheet was instrumental in helping Armor Holdings to predict performance and solve its overweight helmet problem.

28. Armor Holdings also created a discrepant helmet document modeled on the confidential document created at Gentex for use by quality inspectors in identifying defective helmets. Brad Sutter gave the Gentex document to Sandy Gambuti and tasked her with taking pictures of Armor Holdings helmets that exhibited the same flaws which would then be inserted into the Armor Holdings version of the discrepant helmet document. Cheryl Nolan was also involved in replicating the Gentex document at Armor Holdings and Scott Hartley knew that Armor Holdings was copying the Gentex compilation.

29. These were not the only instances in which Armor Holdings used Gentex work product. Armor Holdings also copied

Gentex incoming material testing plans, ballistic material storage procedures and non-ballistic impact test protocols.

30. As I noted earlier, Armor Holdings heavily leveraged the weaving experience that we gained at Gentex. Armor Holdings benefitted by gaining knowledge of the weaving process without spending any R&D monies of its own. This allowed them to better negotiate with their suppliers and achieve a more conforming product.

31. Armor Holdings also based its product offerings on Gentex products. Armor Holdings used Gentex photos and measurements to design and develop a "cut down" helmet called the MACH I. This is a ballistic helmet that is cut around the ears to allow for use of headphones. Gentex was the sole source of the "cut down" helmet which it called the Tactical Ballistic Helmet ("TBH") or TBH II. Armor Holdings used the Gentex cut out to create its version of a cut down helmet for the MACH I program. Steve Motoyama told me that I was selected to work on the MACH I product because of my experience with the cut down helmet at Gentex. Armor Holdings was able to develop a cut down helmet model much more quickly and efficiently as a result of the use of Gentex drawings and the collective experience of myself and the other former Gentex engineers working on the project.

32. One of my colleagues in Phoenix, Chris Dempsey,

used a "water table" developed by Gentex to create the drawings for the Armor Holdings ACH product.

33. Armor Holdings also relied on the data that Gentex collected with regard to pre-preg specifications and fabric weight. While I was at Gentex, I can recall that Gentex engineers, including Hemant Singh, spent a great deal of time studying methods for controlling and reducing the weight of ballistic products. Gentex learned from this experience and from its own experience as a weaver that it was possible to control weight back to the raw material stage. Mr. Singh and the other engineers developed a unique method of specifying the ballistic (or pre-preg) fabric in order to tightly control weight and refined the product specifications to a narrow range that was both achievable and yielded the most beneficial weight results. Brad Sutter openly shared these experiences and the resulting Gentex data points with our colleagues at Armor Holdings and Armor Holdings implemented these same units and measurements in addressing and to a large extent solving its overweight helmet problem.

34. Gentex test results and photographs were used in the proposal that Armor Holdings submitted to the government on the ManTech program. I knew as soon as I saw the proposal that the pictures and diagrams originated from confidential efforts

and research at Gentex. I believe that senior management was aware of the use of the Gentex test results and photos because Ben Su mentioned he had worked with Brad Sutter, Scott Hartley and Mary Gowat.

35. Armor Holdings management had access to a number of other Gentex materials. For example, both Michael Daly and Steve Motoyama had access to Gentex R&D reports, research done with outside vendors (including Solectria), material spec sheets and Gentex's TBH II First Article Test report.

36. Armor Holdings also copied engineering procedural materials that were removed from Gentex. Armor Holdings had no standard operating procedures and, shortly after I arrived, I was tasked with creating them. I can remember an instance when either Michael Daly or Brad Sutter directed me to send to Matt Johnson a copy of Gentex's Standard Operating Procedure 404 which is a detailed checklist to track products from design through development. The intent was to have Matt Johnson develop a procedure for Armor Holdings based on the Gentex procedure.

37. Armor Holdings was intent on capturing markets dominated by Gentex. For example, management expressed strong desire to manufacture a flight helmet. I can recall a meeting in the fall of 2006 at which we discussed Gentex's flight helmets and Gentex's X-harness retention system. The idea originated

with Brad Sutter who spoke with the government customer about the government preference for the Gentex X-harness design. I expressed reluctance to become involved with the project given the work that I did at Gentex and I was ribbed by my Armor Holdings colleagues for not being a "team player." Brad Sutter and Deborah Panna remained involved in the project and eventually developed the Armor Holdings version of Gentex's X-harness. I believe that they could not have made the X-harness without relying on Gentex proprietary information.

38. At the conclusion of the meeting referenced in Paragraph 37 above, there was a discussion about developing a flight helmet. Armor Holdings was anxious to build flight helmets that could compete with the Gentex offerings. I tried to recruit Nate Palumbo from Gentex by promising that Armor Holdings planned to get into the flight helmet business.

39. Armor Holdings also leveraged Gentex's vendor relationships. For example, Armor Holdings developed relationships with the engineering department at the University of Delaware after it was disclosed by the former Gentex employees that Gentex collaborated with that institution.

40. The data taken from Gentex was very valuable in overcoming ballistic failure issues and other problems experienced with the Armor Holdings Outer Tactical Vest ("OTV").

As noted above, both Brad Sutter and I were instrumental in developing an alternate successful design consisting of Twaron (a material with which I had much experience at Gentex) and Kevlar.

41. My Gentex background was so valuable to Armor Holdings that my co-workers continued to tap me for information and advice even after I returned from administrative leave in March 2007 and was supposedly banned from working on helmet products. During that period, I received frequent phone calls from co-workers, including Michael Daly, Rob Monks, Connie Tapia and Steve Motoyama, asking for detailed engineering help on helmet-related matters. I remember one occasion when a co-worker handed me a cell phone to answer a helmet-related question posed by a colleague. I was told that the personal cell phone was being used so that there would be no record of a phone call on Armor Holdings office phones.

42. In March 2007, after I returned from administrative leave, and long after I admitted to Armor Holdings management that I had Gentex information on my computer, Armor Holdings management told me not to worry, that everything would blow over and that I should "keep doing what you're doing." Joe Coltman called me at home on Good Friday 2007 with an urgent request concerning the OTV product and told me "don't worry, this will blow over, keep doing what you're doing."

43. I worked principally on the ACH and OTV products. In the course of my work, I regularly relied on the experience and proprietary knowledge that I gained at Gentex. Specifically, I used the knowledge and experience that I gained at Gentex to initially specify the tolerance of the ACH material, to understand the performance characteristics of the ballistic materials and to help qualify an alternative ballistic package for the OTV consisting of a different ply count and later by including the use of Twaron (a fabric that I worked with at Gentex).

44. I was asked by Armor Holdings management to resign in early May 2007 and was told that I would be fired if I did not resign. I was told at the time that the decision to terminate me was based on the discovery of Gentex materials on my work computer and/or a flash drive that I used at work. I know for certain, however, that management, including Michael Daly, was aware that I had Gentex information in my possession and on my computer and that I was using this information long before he asked for my resignation. Michael Daly did offer to help me find another job. He told me that "many people" made "errors in judgment" concerning the hiring of the former Gentex employees.

45. I was encouraged by Michael Daly to erase electronic files that originated at Gentex. I received an email

in January 2007 advising me to retain information that might be related to the case that had been filed by Gentex against Brad Sutter. I was concerned when I received the email and I called Michael Daly immediately to talk about my concern. I specifically mentioned the Gentex information on my computer and told him that I was concerned that the information would be discovered. He told me: "Do what you think you have to do to clean up. If you need to clean up, clean up." I understood that he was directing me to delete incriminating Gentex files from my computer. At his direction, I deleted Gentex files from my Armor Holdings work computer.

46. After Brad Sutter was sued by Gentex, I asked Dave Morgan, the local IT person for Armor Holdings, how to delete information from my Armor Holdings computer. Dave Morgan did not encourage me to preserve any electronic information. Rather, Dave Morgan reminded me that I could run a Windows clean-up utility. I understood that by running the Windows clean-up utility I would make it more difficult to find the Gentex information that I had deleted from my computer.

47. I believe that Cheryl Nolan and Matt Johnson were also directed by Michael Daly to "clean up" their computers. Michael Daly talked frequently with Matt Johnson about theft of trade secrets and said that "you have to do whatever it takes to

make it go away."

48. Brad Sutter admitted to me that he deleted Gentex information from his Armor Holdings work computer. He also encouraged me to "do what it takes, clean up."

49. In summary, I was openly encouraged to share Gentex information with Armor Holdings management and employees and senior management was aware of the widespread and frequent use of Gentex information. Furthermore, I was encouraged by Armor Holdings management to delete, destroy and erase Gentex information after the first lawsuit against Brad Sutter was filed.

50. The examples set forth above are just a summary of my experiences at Armor Holdings. I can provide additional detail concerning the work that I did and the use of Gentex information if requested to do so and can provide supporting documentation if I am allowed to access my Armor Holdings computer, flash drive and working files. This Affidavit is based

on my own personal beliefs, knowledge and recollection of the facts. I have carefully reviewed this Affidavit with my legal counsel before signing.

Patrick Walko

Sworn to and subscribed before me on this 23 day of November 2009.

Brenda A. Foersch
Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Brenda A. Foersch, Notary Public
City of Pittston, Luzerne County
My Commission Expires January 24, 2013