# Exhibit N

COMMONWEALTH OF PENNSYLVANIA :
: ss
COUNTY OF WAYNE :

AFFIDAVIT

I, Sandra Gambuti, being duly sworn according to law, depose and say as follows:

1. I am a quality specialist and spent most of my career working at Gentex Corporation. I was employed by Gentex from May 1977 until April 14, 2006. During my long tenure at Gentex, I held a number of different positions and had access to Gentex proprietary information. I developed experience in every single phase of testing both ballistic and non-ballistic products at Gentex. I held the position of Quality and Design Assurance Specialist at the time of my resignation from Gentex. Gentex was always very good to me and I have no complaints about the way in which I was treated at Gentex.

2. In early 2006, I responded to Armor Holdings' newspaper advertisement seeking employees. I was hired as Quality Systems Manager. I understood that Armor Holdings, like Gentex, had just received an award to manufacture the Advanced Combat Helmet ("ACH") for the United States Army and that there was an urgent need for additional staff to work on the ACH

608
EXHIBIT
8/24/10 CL

program. I wanted to take some time off before starting my new job at Armor Holdings but was told that I needed to start ASAP. As a result, I left Gentex on April 14, 2006 and started working at Armor Holdings on April 17, 2006. My starting salary at Armor Holdings was for more money that I was making at Gentex. I received a raise of approximately ten percent. I would not have left my employment at Gentex unless Armor Holdings offered me more money.

3. I was immediately tasked with responsibility for conducting testing and preparing test reports on the ACH program in connection with the ACH First Article Test ("FAT") report. I received no training but rather relied on the knowledge I obtained at Gentex to complete the necessary testing.

4. To the best of my knowledge, Shane Alt was the only engineer at Armor Holdings assigned to the ACH program at the time I was hired. As a result, I completed the in-house testing which helped bring the ACH into production. Brad Sutter initiated a number of new procedures which were proprietary to Gentex, including developing instructions for pad placement and methods to improve traceability of materials through the production process. Brad Sutter also had significant involvement in addressing and remedying Armor Holding's ACH product problems.

5. Armor Holdings was nowhere near as sophisticated as Gentex. Gentex had many controls in place and strictly enforced a number of different test procedures to ensure quality products were being made. Armor Holdings was primarily motivated by the number of helmets sold and had no environmental controls for its raw materials and conducted only minimal inspections of raw materials at the time I was hired.

6. Shortly after I arrived at Armor Holdings, I reached out to Cheryl Nolan, who was working at Gentex, and asked her to send to me proprietary inspection instructions that I had worked on at Gentex. There were no similar instructions being used at Armor Holdings at the time and I was interested in using the Gentex instructions as a guide to prepare instructions for use at Armor Holdings.

7. Armor Holdings quickly staffed the ACH program with former Gentex employees, including myself, Brad Sutter, Cheryl Nolan, Mary Gowat and Patrick Walko. Scott Hartley and Deborah Panna also left Gentex to work at Armor Holdings. Almost the entire engineering department at Armor Holdings' Jessup facility came from Gentex.

8. No one at Armor Holdings ever warned me against the use of Gentex proprietary information and I was never restricted from any project or program because of my prior work

at Gentex. To the contrary, there were occasions where Gentex proprietary information was shared openly. For example, I can recall one instance where Brad Sutter talked openly with Cheryl Nolan, Bill Trainor and Shane Alt about Gentex proprietary methods for removing excess trim in order to reduce helmet weight and ways to improve the edge beading by using Gentex's solution. Brad Sutter openly talked about the way things were done at the "Big-G."

9. As the Quality Control Manager, I was responsible for making sure that the ACH helmets manufactured by Armor Holdings satisfied all of the government's specifications. My job was not always easy. There was constant tension between the quality and production departments.

10. There were a lot of helmets that were defective and had to be scrapped. The recurring defects included blisters, delaminations and molding defects. 3000 helmets had to be scrapped due to defects.

11. The helmets manufactured by Armor Holdings were plagued by voids and blisters. I showed the problems to Tim Mallory when he visited Jessup in early 2007. I explained to him that the voids leave the side area of the helmet deficient in places and create a gap in the material.

12. Armor Holdings manufacturing employees used patches to address the void problems. Individual molders kept a supply of patches in different sizes at their work stations and exercised their own judgment in deciding whether to insert patches during the molding process. Some molders used as many as six patches in a helmet. Armor Holdings did not keep track of which helmets were patched and never reported to the government that they were patching helmets.

13. After Armor Holdings experienced a ballistic failure, I specifically told Patrick Walko to study the pre-form area because of the recurring problems that I complained about with voids.

14. I had been warned in the past by Karen Griffin not to talk to Bill Trainor about these matters. His primary interest was in the number of units sold. He showed little interest in addressing quality issues.

15. Gentex was in a different world than Armor Holdings when it came to quality. Gentex was very quality conscious whereas Armor Holdings cared only about the numbers. At Armor Holdings, the quality department reported to production and as a result it was hard for quality to have any real clout. If production could slip defects past, they would. I complained to my supervisor, Karen Griffin, on many occasions that quality

should not report to production but my complaints fell on deaf ears.

16. In my opinion, the quota system employed by Armor Holdings led to poor quality. Molders were required to meet a certain production requirement and thus had a superior interest in satisfying their numbers. They could not meet their quotas and make a quality product.

17. I was terminated from Armor Holdings in April 2007. Without any warning, I was called into the human resources office and was told by Brad Georgetti in the presence of my supervisor, Karen Griffin, that I was being terminated. This came as a shock because I had just been reviewed favorably and I received a raise. No real explanation was provided by Karen Griffin or by Brad Georgetti who was present for the discussion. Karen Griffin said only that I did not live up to expectations. This came as a complete surprise to me since everyone (including the QAR at the Jessup facility, Al Hopkins) told me I was doing a good job and I never received any warnings or reprimands for unsatisfactory performance. In fact, the only time I was reprimanded was for telling Cheryl Nolan in the spring of 2006 that Deborah Panna had accepted a job at Armor Holdings and would be coming to work soon. Matt Fazen told me that Deborah Panna was hired by Armor Holdings. Brad Georgetti later called me into

the office and accused me of telling other people at Gentex that Deborah Panna had been hired. Armor Holdings management was not happy that word was getting out about their recruitment of Gentex employees. I never told anyone at Gentex about Deborah Panna coming to work at Armor Holdings.

18. Shortly before I was discharged, I attended a four-hour meeting with a number of engineers from Phoenix (including Eric Gavelda) and manufacturing personnel from Pennsylvania concerning the defect rate. I was put under the gun as to why helmets were being rejected. I demonstrated the defective helmets and participated in the discussion concerning the defects and potential causes. Although I had been warned by Bill Trainor to "triple check" the helmets before declaring them defective, I held my ground and said that I could not accept the defective helmets without specific authorization from the government. I showed the group an example of a "double molded helmet" or a helmet that had been molded, reworked and patched, and then molded again. This was a plain violation of the government specifications and I pointed this out to the other people at the meeting, including Steve Motoyama, Karen Griffin, Eric Gavelda and Gordon Jenkins. The engineers present at the meeting seemed to agree with me that the defects were unacceptable and the helmets had to be scrapped. Karen Griffin argued that the defective helmets could be reworked and repaired.

I refused and showed the engineers the government specifications which prohibit these repairs.

19. Shortly after I was terminated, Karen Griffen was placed on administrative leave pending an internal investigation. I since learned that she was discharged as well. I understand that she was let go after it was discovered that she had been changing test data on ACH reports to reflect passing results on the absorption testing.

20. I believe that I was fired because I would not accept defective helmets. I was very vocal in my opposition to lax quality procedures and I believe that my opposition is what led to my termination.

21. Cheryl Nolan took over my position as Quality Control Manager after I was fired. This was a direct conflict of interest since Cheryl Nolan was directly involved in the ACH program at Gentex.

22. Brad Georgetti told me that Armor Holdings had hired a computer expert to come in and search my computer. He said that the company was interested in knowing what I had on my computer from Gentex before the computer expert searched my machine.

23. Even though my paychecks were issued by Specialty

Defense Systems, I always considered Armor Holdings to be my employer. In the beginning, there was some reference to Specialty Defense but soon afterwards everything was Armor Holdings.

24. Based on my observations and experience, Armor Holdings would not have been able to produce to the ACH specification without the Gentex proprietary knowledge it obtained from Gentex employees.

25. I can provide additional detail concerning the work that I did and the use of Gentex information if requested to do so and can provide supporting documentation if I am allowed to access my Armor Holdings computer and working files. This Affidavit is based on my own personal knowledge and recollection of the facts and I am signing voluntarily and without any pressure of any kind.

Sandra Gambuti
Sandra Gambuti

Sworn to and subscribed before me on this 21 day of May 2010.

Carol A. Kelleher
Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
CAROL A. KELLEHER, Notary Public
City of Scranton, Lackawanna County
My Commission Expires June 6, 2011