# Exhibit II


Calculating
Intellectual
Property
Damages
WEST.

Kerr and Troxel, Calculating IP Damages § 6:9

Calculating Intellectual Property Damages
Database updated May 2010

William O. Kerr; Richard B. Troxel

Chapter 6. Actual Damages and Reasonable Royalty in Trademarks, Trade Dress, Copyrights and Trade Secrets

## § 6:9. Reasonable royalty as a measure of damages

The owner of an IP asset that is a victim of infringement or misappropriation can generally seek a reasonable royalty as a financial remedy. From an economic and financial perspective, implementing a reasonable royalty analysis, such as is described in chapter 5, is similar for all types of IP. However, there is more diversity in the case law for other types of IP than there is for patents[1]

In general, the courts are inclined to accept a reasonable royalty analysis in a case when the primary remedies, infringer's profits or actual damages, are not relevant or not ascertainable. In such cases, a successful reasonable royalty analysis can provide a fair estimate of the market value of the IP asset involved, and of the loss in value caused by the infringement.

In some cases, a reasonable royalty is based on existing royalties established previously between an IP owner and others. Two such cases are described in § 6:8, above.

More commonly, the reasonable royalty analysis is based on consideration of a hypothetical negotiation between a willing licensor and a willing licensee attempting to negotiate a license to use the IP asset. Therefore, unlike either infringer's profits or actual damages, the analysis calls for explicit assessment of a broad range of economic, market and financial factors that might be significant to each of the parties.

For example, in a trade secrets case the Second Circuit ruled in (citing that circuit's decision in Georgia-Pacific, which has become a standard for determining a reasonable royalty in patent cases):

> A reasonable royalty award attempts to measure a hypothetically agreed value of what the defendant wrongfully obtained from the plaintiff. By means of a 'suppositious meeting' between the parties, the court calculates what the parties would have agreed to as a fair licensing price at the time that the misappropriation occurred[2]

In most cases involving reasonable royalties, there is no assumption that the owner would have actually licensed the IP involved. The approach sets up a hypothetical negotiation between the IP owner (assumed to be a willing and reasonable participant) and a potential licensor (again a willing and reasonable participant). The parties at the negotiating table are assumed to be knowledgeable about the value of IP assets at issue and the market, and to be willing to make a deal that balances the prospective gain that the licensee can expect if provided access to the IP and the costs and benefits to the owner of providing the license.

Under the patent statute, the owner of a utility patent cannot claim the infringer's profit as a remedy. The reasonable royalty option is necessary because IP owners can be injured even in situations in which they are not able to put forth a nonspeculative claim for lost profits. In cases involving other types of IP assets, it is generally possible for the victim of infringement to claim the benefits or profits earned by the infringer as a remedy. However, there are situations in which compensation is called for, but the plaintiff can neither show entitlement to lost profits nor demonstrate the extent of the infringer's profits.

For example, it may be difficult for the victimized owner of an IP asset to prove his or her own losses, either because the owner and infringer are not competitors, or because the operation of the market in which they operate is sufficiently complex that isolating the effects of the infringement on the owner may be difficult to do in a nonspeculative manner. At the same time, the owner may be unable to present a claim for the benefits that the infringer received from using the IP asset. The owner may not have been successful, leaving no profits for the owner to claim but causing harm, or the nature of the infringement may create difficulty in proving the extent of the infringer's benefits. In such cases, a reasonable royalty award bridges the gap between losses measured by the owner's actual damages and theinfringer's profit from his or her misconduct.

In University Computing, in affirming the district court, the Fifth Circuit recognized the appropriateness of a reasonable royalty in a trade secrets case. The court noted the analogous cases involving patents where "[t]he case law is ... plentiful, but the standard which emerges is very flexible."[3]

University Computing involved a failed joint venture between a computer services company, the owner of a proprietary computer system, and a manufacturer seeking to enter the same market. When the joint venture broke up, the manufacturer misappropriated the trade secrets embodied in the computer system and used the secrets to launch its own competing computer services business. The manufacturer's infringing operation was apparently a failure and earned no profits. In addition, apparently the record contained no clear evidence of actual damages.[4]

The jury approved, and the district court awarded, a reasonable royalty award to the plaintiff. The amount of the award was based on expert testimony. The expert testified that the proper way to compute value of IP in the industry was to apply a multiple of 2.5 times development cost. This testimony was supported by evidence of an offer that had been made for a third party to license the plaintiff's system.[5]

The defendant appealed the district court award, claiming the reasonable royalty award and the basis for the award were inappropriate in this case when there were no actual damages and no infringer's profits.[6] The Fifth Circuit denied the appeal in an extensive ruling. In supporting the reasonable royalty approach, the court cited the Supreme Court in Cawood:

> [T]he lack of actual profits does not isolate the defendants from being obliged to pay for what they have wrongfully obtained in the mistaken belief that their theft would benefit them.
>
> The rationale for this seems clearly to be that the risk of defendants' venture, using the misappropriated secret, should not be placed on the injured plaintiff, but rather the defendants must bear the risk of failure themselves. Accordingly the law looks to the time at which the misappropriation occurred to determine what the value of the misappropriated secret would be to a defendant who believes he can utilize it to his advantage, provided he does in fact put the idea to commercial use.[7]

The Fifth Circuit's ruling contained a detailed and comprehensive assessment of the economic and financial issues that were present in the case. The court noted that the evidence on each issue supported the jury's award. In its detailed treatment of these issues, the court provides as clear and complete an evaluation of the factors that may be part of a reasonable royalty analysis in non-patent IP as the analysis provided, almost contemporaneously, by the court in the well-known Georgia-Pacific patent case.[8] Had the Fifth Circuit followed the Georgia-Pacific court's practice and provided a convenient check-list of the factors that must be considered in evaluating an award, a body of case law involving trade secrets and other IP might exist today citing to the University Computing Factors, as has happened with the Georgia-Pacific Factors.

1 For trade secrets, some of the diversity is caused by differences in state laws. In Lanham Act and copyright cases, a similar diversity can be seen because of differences among the federal circuits.

2 Vermont Microsystems, Inc. v. Autodesk, Inc., 88 F.3d 142, 151, 39 U.S.P.Q.2d 1421 (2d Cir. 1996). See §§ 5:25 to 5:29 for a discussion of the Georgia-Pacific approach.

3 University Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 183 U.S.P.Q. 705 (5th Cir. 1974).

4 The Fifth Circuit noted, "unless some specific injury to the plaintiff can be established—such as lost sales—the loss to the plaintiff is not a particularly helpful approach in assessing damages." University Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 183 U.S.P.Q. 705 (5th Cir. 1974).

5 University Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 183 U.S.P.Q. 705 (5th Cir. 1974).

6 This case predated the development of the current Uniform Trade Secrets Act that explicitly recognizes a reasonable royalty as a potential remedy in trade secrets matters.

7 University Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 183 U.S.P.Q. 705 (5th Cir. 1974) (citations omitted).

8 Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 166 U.S.P.Q. 235 (S.D. N.Y. 1970), judgment modified, 446 F.2d 295, 170 U.S.P.Q. 369 (2d Cir. 1971). See § 6:9, above, for a discussion of the Georgia-Pacific Factors.

End of Document

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

Kerr and Troxel, Calculating IP Damages § 7:7

Calculating Intellectual Property Damages
Database updated May 2010

William O. Kerr; Richard B. Troxel

Chapter 7. Infringer's Profits

## § 7:7. Both parties should consider apportionment

An award of defendant's profits in matters involving trademarks, trade secrets and copyrights should be limited to the profits attributable to the infringing activities. The initial burden is on the plaintiff to demonstrate the relevant sales on which the award should be based. The defendant has the burden of showing, if possible, what proportion of the claimed sales should be credited to the use of the protected property, and thus become part of the award, and what proportion are primarily the result of other factors and should be excluded from the award.

However, plaintiffs can benefit by going further, despite having no burden to do so. They might present evidence on the factors that affect the relationship between profits and the infringing activities and evaluating the strength of the relationship. Because it is their burden to do so, and because it is in their interest to do so, defendants can be expected to present opposing evidence, attributing little if any importance to the relationship between their profits and the infringing activities.

As noted above,[1] the plaintiff in Andreas succeeded in obtaining an award of defendant's profits from copyright infringement. In fact, the plaintiff obtained separate awards from two defendants, one for profits on direct infringing sales made by an advertising agency and the other for profits from indirect sales of automobiles promoted by the infringing ad. The plaintiff succeeded, in part, by producing evidence on the gross revenue derived by the defendants that was related to the infringing activity. But the plaintiff also presented evidence on the appropriate deductions from the overall revenues that it deemed to be appropriate. The defendants proposed their version of the appropriate deductions as well. The jury was able to compare the deductions proposed by the plaintiff and the infringer and to decide between them. The jury largely accepted the plaintiff's version of the facts.[2]

The plaintiff presented evidence that Audi, the manufacturer who used the commercial with the infringing music to promote its TT coupe, earned gross revenue of $153.7 million and after-tax profit of $5.7 million during the period affected by the TV commercial in question. The plaintiff provided evidence from contemporaneous records provided by Audi showing that the commercial was successful and that Audi recognized that the ad was instrumental in increasing sales of the car.

However, the plaintiff did not provide a detailed quantitative analysis showing the apportionment of the sales between the ad and other factors that might have contributed to sales. Despite this lack of quantitative precision, the jury took the plaintiff's recommendation and awarded 10% of Audi's profits.

The district court overturned this portion of the jury's award. It considered the plaintiff's evidence as not meaningfully tying the infringement to the sale of the cars. As a result, the court believed "[t]he jury was left to speculate as to how much of Audi's profits resulted from the infringement."[3]

The Eighth Circuit reinstated the jury's award. The court concluded that the plaintiff had met his burden showing a nexus between the infringement and Audi's sales. It went on to observe that the plaintiff did moreby showing the appropriate deductions from

revenue, even though it was Audi's burden to do so. The plaintiff presented evidence on economic and market factors affecting the sales of the cars and on the relative importance of the infringing commercial within the overall marketing campaign for the TT. As a result, even if the plaintiff's showing was not precisely quantifiable, "[t]his evidence provides a nonspeculative basis for the jury's award, and it is precisely the jury's function as the fact finder to do so."[4]

Andreas also claimed the profits of the defendant, M&S, the advertising agency that directly infringed the copyright by producing the TV commercial for Audi. The plaintiff provided an estimate that 50% of M&S's profits during the period the agency was working on the Audi campaign were attributable to the infringement. The jury accepted that claim despite evidence presented by M&S that the amount should be no more than 33% of its profits.

The district court ruled that the plaintiff satisfied his burden by showing the defendant's gross revenues and convincing the jury as to the appropriate amount of deductions. Noting that it was the defendant's burden to rebut the plaintiff's claim, the court ruled that the defendant failed to do so. M&S had what the court described as inadequate and incomplete contemporaneous records to track how much of the agency's profits came from each of the services provided to Audi. The defendant's 33% figure was based on an estimate of what might have been attributable to the infringing commercial. The district court, later sustained by the Fourth Circuit, ruled:

> Based on the failure of the defendant [M&S] to better show what proportion of its revenues represented profits and what portion of its profits were not traceable to the infringement, the jury's determination ... was proper and will not be disturbed by this court.[5]

Another example of a successful plaintiff going beyond the basic requirement to show the defendant's profits occurs in a trade secrets case. The defendant was found to have misappropriated the plaintiff's trade secrets and used them to obtain a patent on a pharmaceutical product. The defendant could have produced the product without the secrets, but it was found that it could not have obtained the patent without the protected information. The plaintiff sought infringer's profits relating to the misappropriation of the trade secret.

The record contained evidence of the defendant's gross revenue from the product made using the patent and, indirectly, the trade secrets. The plaintiff, however, did not claim the infringer's entire profits from the product. Instead, it presented evidence of how much incremental revenue the defendant earned from having a drug protected by a patent, compared with the amount that might have been earned with an unprotected product that might have quickly become subject to competition from low-cost generics. The district court accepted the plaintiff's claim and awarded more than $23 million in profits.[6]

The defendant appealed, asking the Federal Circuit to overturn the award as being too speculative and only indirectly related to the actual benefit received from using the trade secrets. The defendant claimed a proper award would be the amount of money they would have had to pay at the time of the infringement to obtain the required information independently.

The Federal Circuit declined to overturn the award, concluding that the district court properly exercised its discretion to allow for disgorgement of the defendant's incremental profits. The court went on to evaluate the adequacy of the plaintiffs' evidence, relied on by the court to determine the proper allocation of the infringer's profits to be included in the award. The court found "ample evidence" to support the award.

The appeals court cited a study by the plaintiff's damages expert. The economist compared the revenues and profits earned on the product during the time the defendant enjoyed patent protection with the revenues and profits earned subsequently when the patent was no longer available. The Federal Circuit recognized that in accepting the expert's assessment, "the

district court properly limited the equitable remedy by calculating the incremental profits from the sale of Materna *attributable to the right to exclude* generic competition that Cyanamid gained from the '634 patent, not the total profits."[7]

1 See §§ 7:3 and 7:6.

2 Andreas v. Volkswagen of America, Inc., 210 F. Supp. 2d 1078, 63 U.S.P.Q.2d 1447 (N.D. Iowa 2002), aff'd in part, rev'd in part, 336 F.3d 789, 67 U.S.P.Q.2d 1429, 56 Fed. R. Serv. 3d 6 (8th Cir. 2003), aff'd in part, rev'd in part, Andreas v. Volkswagen of America, Inc., 336 F.3d 789, 67 U.S.P.Q.2d 1429, 56 Fed. R. Serv. 3d 6 (8th Cir. 2003).

3 Andreas v. Volkswagen of America, Inc., 210 F. Supp. 2d 1078, 1084, 63 U.S.P.Q.2d 1447 (N.D. Iowa 2002), aff'd in part, rev'd in part, 336 F.3d 789, 67 U.S.P.Q.2d 1429, 56 Fed. R. Serv. 3d 6 (8th Cir. 2003).

4 Andreas v. Volkswagen of America, Inc., 336 F.3d 789, 798, 67 U.S.P.Q.2d 1429, 56 Fed. R. Serv. 3d 6 (8th Cir. 2003).

5 Andreas v. Volkswagen of America, Inc., 210 F. Supp. 2d 1078, 1086, 63 U.S.P.Q.2d 1447 (N.D. Iowa 2002), aff'd in part, rev'd in part, 336 F.3d 789, 67 U.S.P.Q.2d 1429, 56 Fed. R. Serv. 3d 6 (8th Cir. 2003).

6 University of Colorado Foundation, Inc. v. American Cyanamid Co., 342 F.3d 1298, 1304, 68 U.S.P.Q.2d 1120 (Fed. Cir. 2003).

7 University of Colorado Foundation, Inc. v. American Cyanamid Co., 342 F.3d 1298, 1312, 68 U.S.P.Q.2d 1120 (Fed. Cir. 2003) (emphasis in original).

End of Document

© 2011 Thomson Reuters. No claim to original U.S. Government Works.