# Exhibit WW

C
Only the Westlaw citation is currently available.

United States District Court, E.D. North Carolina, Western Division.
ALLIANCE INTERNATIONAL, INC., Plaintiff,
v.
James F. TODD, Kathy Carver, and Allena Thompson, Defendants.

No. 5:08-CV-214-BR.
July 22, 2008.

John D. Cole, Michael L. Wade, Jr., Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Charlotte, NC, for Plaintiff.

M. Todd Sullivan, Mark R. Sigmon, Womble Carlyle Sandridge & Rice, Raleigh, NC, for Defendants.

ORDER

W. EARL BRITT, Senior District Judge.

*1 This matter is before the court on defendants' 29 May 2008 motion to dismiss. The motion has been fully briefed and is ripe for disposition. FN1

FN1. At the outset, the court notes that defendants' reply brief may be in violation of L. Civ. R. 10. 1, EDNC, in that it appears to have been typed in a font size which is smaller than "at least 11 point[s]" as required by the rule. All counsel are reminded to comply with the local rules of this court.

I. BACKGROUND

Plaintiff Alliance International, Inc. ("Alliance"), is a corporation organized under the laws of the State of Oklahoma. (Compl.¶ 1.) Alliance is authorized to conduct business in the State of North Carolina and maintains its principal place of business in Wake County, North Carolina. (*Id.*) Defendants are all citizens and residents of Wake County, North Carolina. (*Id.* ¶¶ 2-4.) Alliance "is in the business of recruiting and placing military veterans and industry experienced candidates with positions in private industry[.]" (*Id.* ¶ 10.) John Todd founded Alliance in 2003, and in July 2004, he hired defendant James Todd, his brother, as Vice-President. (*Id.* ¶ 12.) Defendant Todd was promoted to the position of President of Alliance in January 2005. (*Id.* ¶ 13.)

While still employed by Alliance, defendant Todd began making plans to form his own, directly competing business, Genesis. (Compl.¶¶ 20-22.) In August 2007, defendant Todd purchased the domain name "genrecruit.com," which he ultimately used as the website for Genesis. (Compl.¶ 20.) In October 2007, defendant Todd filed Articles of Organization with the North Carolina Department of the Secretary of State to form Genesis. (*Id.* ¶ 22.)

In September and October 2007, defendant Todd used a commercial software erasure program to permanently delete over 2000 files from his Alliance-issued computer. (Compl.¶¶ 23, 44.) The files deleted included business and contact lists for potential and former recruitment candidates, employers, and potential client leads of both defendant Todd and current and former Alliance employees, all obtained in the course of their employment with Alliance. (*Id.*) On 31 October 2007, defendant Todd resigned as Alliance's President. (*Id.* ¶ 25.)

Defendant Todd recruited defendants Carver and Thompson, both Alliance employees, to work for Genesis. (Compl.¶¶ 28-29.) In doing so, defendant Todd "communicated and worked in concert with [defendants] Carver and Thompson in devising a plan to access their respective [Alliance-owned] computers without authorization, [and] delete all pertinent client-contact and other proprietary business information of Alliance from those computers[.]" (*Id.* ¶ 31.) None of the defendants was authorized to delete this information from their Al-

liance computers. (*Id.* ¶¶ 24, 53, 58.)

Alliance filed the instant action on 9 May 2008, asserting a claim of violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.* ("*CFAA* "), a claim of conspiracy to violate the CFAA, and a state-law claim of conversion. (Compl. ¶¶ 61-82 .) Alliance seeks compensatory and punitive damages [FN2] and both preliminary and permanent injunctive relief. (*Id.* ¶¶ 83-90; Prayer for Relief.)

FN2. The court agrees with defendants that punitive damages under N.C. Gen.Stat. § 1D-15 are neither a separate claim as pled in the complaint, nor are they available for Alliance's CFAA claim. (Br. Supp. Mot. at 19 n. 6.)

***2** In November 2007 and January 2008, Alliance filed complaints in Wake County Superior Court against defendants Carver and Todd and Genesis (which is not a party to the instant action), alleging various state law claims [FN3] and seeking injunctive relief. (Mot., Exh. 2 (state court complaint).) The state court held a hearing on Alliance's motions for preliminary injunction, and granted the motions. (Mot., Exhs. 15-16 (state court orders).) Defendant Todd and Genesis appealed the order against them, and on 14 April 2008, the North Carolina Court of Appeals stayed the order "pending ... ruling on the petition for writ of supersedeas." (Mot., Exh. 19 (4/14/08 order).) The state court actions remain pending in state court. (Br. Supp. Mot. at 1; Br. Opp. Mot. at 6.)

FN3. Specifically, as to Genesis and defendant Todd, Alliance has brought claims of tortious interference with contract; tortious interference with prospective business advantage; misappropriation of trade secrets; breach of fiduciary duty; and unfair and deceptive trade practices. (Mot., Exh. 2 (state court complaint against Genesis and defendant Todd).) As to defendant Carver, Alliance has brought claims of breach of contract and tortious interference with prospective business advantage. (Mot., Exh. 3 (state court complaint against defendant Carver).)

## II. DISCUSSION

Defendants contend that dismissal of the instant action is warranted because: (1) the court should abstain from hearing the action pursuant to *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813 (1976); (2) Alliance has filed this action in an attempt to reverse the order of the North Carolina Court of Appeals staying the preliminary injunction in violation of "the *Rooker/Feldman* doctrine;" (3) North Carolina's "claim splitting" doctrine disfavors proceeding with this action; and (4) the complaint fails to state a claim under Fed.R.Civ.P. 12(b)(6). (Br. Supp. Mot. Dismiss at 2.) The court addresses each of these contentions in turn.

### A. *Colorado River Abstention*

In *Colorado River,* the Supreme Court made clear that the pendency of a similar action in state court does not pose an absolute bar to proceeding with the federal action. 424 U.S. at 817. As a general rule, "our dual system of federal and state governments allows parallel actions to proceed to judgment until one becomes preclusive of the other." *Chase Brexton Health Servs., Inc. v. Maryland,* 411 F.3d 457, 462 (4th Cir.2005). Indeed, federal courts have a "virtually unflagging obligation" to exercise the jurisdiction given to them, *Colorado River,* 424 U.S. at 817, and "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not [,]" *Chase Brexton,* 411 F.3d at 462 (internal quotation and citation omitted).

There is, however, an "extraordinary and narrow exception" to exercising jurisdiction. *Colorado River,* 424 U.S. at 813. A federal district court may abstain from hearing a case over which it has jurisdiction in "exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest."

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Id.* (internal quotation and citation omitted). The burden for the party seeking a stay in federal court is high: "the task [of the district court] is to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' ... to justify the surrender of jurisdiction." *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 25-26 (1983) (citation and emphasis omitted).

***3** Abstention under *Colorado River* is only appropriate if the court first determines that the federal and state suits are parallel. Simultaneous federal and state suits are deemed parallel if "substantially the same parties litigate substantially the same issues." *New Beckley Mining Corp. v. Int'l Union, UMWA,* 946 F.2d 1072, 1073 (4th Cir.1991). The Fourth Circuit has reviewed the similarities between concurrent federal and state suits in three key respects: (1) the parties; (2) the legal issues; and (3) the remedy sought. *See, e.g., Great American Ins. Co. v. Gross,* 468 F.3d 199, 207-08 (4th Cir.2006) (reviewing all three in determining that the district court erred in dismissing the suit on *Colorado River* abstention grounds). If the court determines that the actions are parallel, the court must then balance six factors as set forth by the Fourth Circuit to determine whether an "exceptional circumstance" exists. *Chase Brexton,* 411 F.3d at 463. The factors are:

> (1) whether the subject matter of the litigation involves property where the first court may assume in rem jurisdiction to the exclusion of others; (2) whether the federal forum is an inconvenient one; (3) the desirability of avoiding piecemeal litigation; (4) the relevant order in which the courts obtained jurisdiction and the progress achieved in each action; (5) whether state law or federal law provides the rule of decision on the merits; and (6) the adequacy of the state proceeding to protect the parties' rights.

*Id.* at 463-64.

In order to find that state and federal actions are parallel, the Fourth Circuit "requir[es] that the parties involved be almost identical." *Great American Ins. Co.,* 468 F.3d at 208. In the instant case, the plaintiff is the same in all actions, and two of the three instant defendants are involved in both the state and the federal actions, and the court therefore concludes that they are sufficiently identical. Likewise, with regard to the remedies sought, the court finds that Alliance is seeking substantially the same damages in the state and federal actions.

However, with regard to the legal claims at issue, "there is no guarantee that the issues [to be] litigated in the ... state court actions will include the facts necessary for [Alliance] to prove its claim[s]" in the instant action, *Great American Ins. Co .,* 468 F.3d at 208. In the instant action, the central issues to be litigated are the scope of defendants' authority to delete information from Alliance's computers, and whether they conspired to engage in the unauthorized deletion of information. By contrast, the state court actions deal with a far wider scope of factual and legal issues, including contract law, trade secrets,[FN4] whether there was a fiduciary relationship between Alliance and defendant Todd, and potential business opportunities of Alliance and Genesis. *See, e.g., Chase Brexton,* 411 F.3d at 464 (finding lack of similarity in legal claims where state court Medicaid administrative appeals challenged reimbursements for fiscal years 1996-1998, but federal action challenged reimbursements for fiscal years 1996-2001, as well as a 2001 change in the reimbursement system). Accordingly, the court concludes that the state and federal actions are not parallel.

FN4. By way of example, in the instant action, Alliance alleges that the defendants deleted and/or took proprietary information primarily in the form of its client and candidate contacts. (Compl.¶¶ 17, 21, 23, 31, 43, 47, 49, 52, 54, 56). In its state court complaint against defendant Todd, Alliance alleges in its claim for misappropriation of trade secrets that its "Confidential Information" includes not only client con-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

> tact information, but also "vendor lists, ... current and future projects, operational techniques, financial data, business plans and systems, proprietary processes, designs, marketing and sales plans and strategies, and other information." (Mot., Exh. 2, ¶ 44).

***4** Even if the court did conclude that they were parallel, in evaluating the six abstention factors, the court finds that the instant action is not an "exceptional case" warranting abstention. Assuming under the third factor that both the state and federal courts will be deciding the issue of the authority of defendants Todd and Carver to delete and/or possess information from Alliance's computers, abstention "is not warranted simply because related issues otherwise would be decided by different courts, or even because two courts otherwise would be deciding the same issues." *Gannett Co., Inc. v. Clark Const. Group, Inc.,* 286 F.3 d 737, 744 (4th Cir.2002) (quotation and citation omitted). The fourth factor, the order in which jurisdiction was obtained, weighs in favor of abstention in light of the progress made in the state court suits. The fifth factor weighs against abstention because Alliance has brought a claim under federal law in this action. *See New Beckley Min. Corp. v. Int'l Union, United Mine Workers of America,* 946 F.2d 1072, 1074 (4th Cir.1991) (even where a claim under federal law may be brought in either state or federal court, a federal law claim "militates in favor of retention of jurisdiction, since federal law provides the rule of decision on the merits of the ... claim"). The remaining factors do not have any strong bearing on the abstention analysis, and thus "counsel[ ] against abstention." *Gannett Co.,* 286 F.3d at 748 n. 10 (the court's "task in cases such as this is not to find some substantial reason for the exercise of federal jurisdiction ... [but] rather ... to ascertain whether there exist exceptional circumstances, the clearest of justifications, to justify the surrender of jurisdiction[,]" and thus factors which are "neutral" indicate that abstention is not warranted (quotations, alterations and citation omitted)). Accordingly, the factors overwhelmingly support retaining jurisdiction in the instant suit.

B. *The Rooker/Feldman Doctrine*

> The *Rooker-Feldman* doctrine ... is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments. *Rooker-Feldman* does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions.
>
> * * *
>
> When there is parallel state and federal litigation, *Rooker-Feldman* is not triggered simply by the entry of judgment in state court. This Court has repeatedly held that "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." Comity or abstention doctrines may, in various circumstances, permit or require the federal court to stay or dismiss the federal action in favor of the state-court litigation. But neither *Rooker* nor *Feldman* supports the notion that properly invoked concurrent jurisdiction vanishes if a state court reaches judgment on the same or related question while the case remains *sub judice* in a federal court.
>
> ***5** Disposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law.
>
> *Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280, 284, 292-93 (2005) (citations omitted).

Defendants contend that because the instant suit seeks a preliminary injunction the action should be dismissed. (Br. Supp. Mot. at 17.) Alliance contends that the doctrine does not apply be-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

cause the state appellate court order staying enforcement of the preliminary injunction "is not ... a final judgment (or any type of judgment) on the merits of Alliances' [sic] state-law claim for injunctive relief." (Br. Opp. Mot. at 18.) The court agrees with Alliance that, not only has no judgment [FN5] been entered in the state court cases which could trigger the doctrine, Alliance has not pursued preliminary injunctive relief in this court, and thus any potential for conflict is premature. *See Davani v. Virginia Dept. of Transp.,* 434 F.3d 712, 718 (4th Cir.2006) (if a party "is not challenging the state-court decision, the *Rooker-Feldman* doctrine does not apply"). Furthermore, if Alliance were to file a motion for a preliminary injunction tomorrow, it would not necessarily mandate dismissal of the entire action; the court could simply decline to consider the issue. *See, e. g., Briggman v. Virginia, Dept. of Social Servs., Div. of Child Support Enforcement,* 526 F.Supp.2d 590, 599 (W.D.Va.2007) (dismissing some of plaintiff's claims under *Rooker-Feldman* ).

> FN5. There is still an open question "as to which state court orders are sufficiently final to implicate *Rooker -Feldman[,]" Field Auto City, Inc. v. General Motors Corp.,* 476 F.Supp.2d 545, 552 (E.D.Va.2007) (collecting cases), but in any event, by its own terms, the appellate court order staying the preliminary injunction pending a hearing was certainly not a final judgment of any sort.

C. *North Carolina's "Claim Splitting" Doctrine*

> "[T]he common law rule against claim-splitting is based on the principle that all damages incurred as the result of a single wrong must be recovered in one lawsuit." *Bockweg v. Anderson,* 333 N.C. 486, 492 (1993). "Where the second action between two parties is upon the same claim, the prior judgment serves as a bar to the relitigation of all matters that were or should have been adjudicated in the prior action." *Id.* However, if the second action involves a different claim, "the prior judgment serves as a bar only as to issues actually litigated and determined in the original action." *Id.* "While it is true that a 'judgment is conclusive as to all issues raised by the pleadings,' the judgment is not conclusive as to issues not raised by the pleadings which serve as the basis for the judgment." *Id.* (citation omitted).... [Additionally, a plaintiff is not] required to have brought a claim of which it could not have reasonably known at the time of the first action.
>
> *Country Club of Johnston County, Inc. v. United States Fidelity & Guar. Co.,* 150 N.C.App. 231, 239-40 (N.C.App.2002) (parallel citations omitted).

Defendants have not pointed to a single case where the claim-splitting doctrine was applied to two simultaneous legal actions, but regardless, the court finds that the instant state and federal actions are sufficiently different to avoid its application here. Alliance has alleged different types of wrongs committed by the defendants in the actions, even though the wrongs were committed in a common timeframe. *See Davenport v. North Carolina Dept. of Transp.,* 3 F.3d 89, 93 (4th Cir.1993) (state employee who pursued administrative claim for wrongful discharge was not precluded under North Carolina's claim-splitting doctrine from pursuing a § 1983 claim that his discharge was politically motivated, based on evidence discovered during the administrative proceedings); *Bockweg,* 333 N.C. at 493 (successive actions alleging separate acts of medical malpractice resulting in separate physical injuries during a continuing course of treatment in a single hospitalization did not give rise to the same claim).

D. *Dismissal Under Fed.R.Civ.P. 12(b)(6)*

***6** "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, a Rule 12(b)(6) motion does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir.1999) (internal quotation marks and alterations omitted). In review-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing a Rule 12(b)(6) motion, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs, Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993), *cert. denied,* 510 U.S. 1197 (1994). While the court must accept the plaintiff's factual allegations as true, the court "need not accept the legal conclusions drawn from the facts." *Eastern Shore Markets, Inc. v. J.D. Associates Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir.2000). "Similarly, [the court] need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Id.*

As the Supreme Court recently explained:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.... Factual allegations must be enough to raise a right to relief above the speculative level.

*Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1965 (2007). A complaint will survive a Rule 12(b)(6) motion to dismiss if it sets forth "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.

1. *CFAA Claim*

Defendants cite to several cases which have dismissed CFAA claims on the grounds that the statute "target[s only] the unauthorized procurement or alteration of information, not its misuse or misappropriation." *Shamrock Foods Co. v. Gast,* 535 F.Supp.2d 962, 965 (D.Ariz.2008) (quotation and citation omitted) (collecting multiple cases and dismissing CFAA claim against former employee where employee allegedly "emailed numerous documents containing [plaintiff]'s confidential and proprietary information to his personal email account" and then took that information to a competitor); *see also International Ass'n of Machinists and Aerospace Workers v. Werner-Masuda,* 390 F.Supp.2d 479, 499 (D.Md .2005) (dismissing CFAA claim by labor union against former secretary of local union branch alleging that she accessed union's confidential membership list in order to organize a rival labor union; "[t]he ... CFAA, ... do[es] not prohibit the unauthorized disclosure or use of information, but rather unauthorized access. Nor do[es its] terms proscribe authorized access for unauthorized or illegitimate purposes."). Alliance points to several cases, most notably *International Airport Centers, L.L.C. v. Citrin,* 440 F.3d 418, 419-21 (7th Cir.2006), which have recognized a cause of action under the CFAA when a former employee uses a data erasure program to delete company information from a computer. *See also ViChip Corp. v. Lee,* 438 F.Supp.2d 1087, 1092 (N.D.Cal.2006) (awarding summary judgment to employer on CFAA claim where former employee admitted "accessing [employer]'s file server and deleting the contents of computer files that [the defendant] had generated as an employee ... [and] deleting the contents of [the defendant]'s [employer]-issued laptop computer"); FN6 *Forge Indus. Staffing, Inc. v.De La Fuente,* No. 06 C 3848, 2006 WL 2982139, *5 (N.D.Ill. Oct. 16, 2006) (employer stated CFAA claim against former employee with allegations that employee "alter[ed] or destroy[ed] data on his computer to hide his actions and/or the existence of [his competing business], ... [and] r[an] software that destroyed information on the hard drive or destroyed [employer]'s customer and business information").

FN6. The court notes that it is not clear whether the employee in *ViChip* used any sort of erasure program; the district court focused on *Citrin's* holding that an employee who, in accessing a computer, engages in conduct which breaches his duty of loyalty to his employer, has lost any authorization to access the computer and thus violates the CFAA. *See ViChip,* 438 F.Supp.2d at 1100 ("when [defendant-employee] decided-the night

> before his termination and after knowing that he was being asked to step down and give up his duties at [employer]-to delete all information from [employer]'s server and his [employer]-issued computer, he similarly breached his duty of loyalty and terminated his agency relationship to the company" (citing *Citrin,* 440 F.3d at 420)).

***7** In the instant case, the relevant allegations of the complaint contend that defendants "deleted, removed and destroyed information, documents and/or data contained on ... protected computers" and "knowingly caused the transmission of a program, information, code or command, including but not limited to, Net Eraser Trial, and as a result of such conduct, intentionally caused damage without authorization, to a protected computer" in violation of the CFAA. (Compl.¶¶ 62-63.) The court concludes that plaintiff has sufficiently pled a CFAA claim.

b. *Conspiracy Claim*

Defendants contend this claim should be dismissed "because there is no well-pleaded factual allegation in the complaint that the other [d]efendants had an agreement with [defendant Todd] to use Net Eraser or any other similar software program on their Alliance computers." (Br. Supp. Mot. at 24.) The complaint alleges that "[d]efendants had an agreement between themselves to intentionally and knowingly access their respective Alliance computers, without authorization, to delete all pertinent client-contact and other proprietary business information of Alliance from those computers, resign *en masse* from employment with Alliance and form Genesis, and take that information with them to Genesis to use it in direct competition with Alliance." (Compl. ¶ 74 (italics in original).) Because the court has found that Alliance has pled a CFAA claim, and finds that Alliance has sufficiently pled " 'an agreement between two or more persons to do an unlawful act ... that results in damages to the claimant[,]' " *Jackson v. Blue Dolphin Communications of North Carolina, L.L.C.,* 226 F.Supp.2d 785, 791 (W.D.N.C.2002) (quoting and citing *Dalton v. Camp,* 135 N.C.App. 32, 42 (1999)), the court also finds that Alliance has pled a conspiracy claim. *Cf. MDM Group Associates, Inc. v. Emerald Isle Realty, Inc.* No. 2:07-CV-48-D, 2008 WL 2641271, *5-6 (E.D.N.C.2008) ("There is no independent claim for civil conspiracy in North Carolina, and a civil conspiracy claim requires a viable underlying predicate claim.... [Because the] plaintiff's Lanham Act claim fails ...., [the] defendants' motions to dismiss the civil conspiracy claim are granted to the extent the civil conspiracy claim is premised on the Lanham Act." (citations omitted)).

3. *Conversion Claim*

Defendants contend that this claim fails because North Carolina law does not recognize a claim for conversion of intangible interests. (Br. Supp. Mot. at 24.) The court agrees. "In North Carolina, only goods and personal property are properly the subjects of a claim for conversion. A claim for conversion does not apply to ... intangible interests such as business opportunities [.]" *Norman v. Nash Johnson & Sons' Farms, Inc.,* 140 N.C.App. 390, 414 (2000). The property at issue in the complaint is "client-contact and other proprietary business information ... [that had been stored on] Alliance computers[,]" (Compl.¶ 80), and thus the court concludes that Alliance has failed to state a claim for conversion.

III. CONCLUSION

***8** For the foregoing reasons, defendants' motion to dismiss is ALLOWED IN PART and DENIED IN PART, and Alliance's claim for conversion is DISMISSED.

E.D.N.C.,2008.
Alliance Intern., Inc. v. Todd
Not Reported in F.Supp.2d, 2008 WL 2859095 (E.D.N.C.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Only the Westlaw citation is currently available.

United States District Court,
N.D. Georgia,
Atlanta Division.
AMEDISYS HOLDING, LLC, Plaintiff,
v.
INTERIM HEALTHCARE OF ATLANTA, INC.,
Denise Cathey, Brenda Hogan, and Jennifer Mack,
Defendants.

No. 1:11–cv–1437–WSD.
June 3, 2011.

**Background:** Provider of home healthcare and hospice services sued a competitor and three former sales representatives employed by the competitor, claiming that the representatives took confidential and trade-secret materials before they left and had used those materials at the competitor. Provider moved for preliminary injunctive relief.

**Holdings:** The District Court, William S. Duffey, Jr., J., held that:
(1) referral logs and workbook were constituted and contained trade-secret information protectable under the Georgia Trade Secrets Act (GTSA);
(2) preliminary injunctive relief was warranted against the competitor and one of the sales representatives; but
(3) preliminary injunctive relief was not warranted as to the other two representatives.

Ordered accordingly.

West Headnotes

**[1] Injunction 212 ⚷138.1**

212 Injunction
212IV Preliminary and Interlocutory Injunctions
212IV(A) Grounds and Proceedings to Procure
212IV(A)2 Grounds and Objections
212k138.1 k. In General. Most Cited Cases

To be eligible for a preliminary injunction a movant must show: (1) a substantial likelihood of prevailing on the merits; (2) that Plaintiff will suffer irreparable injury if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the opposing party; and (4) that if granted, the injunction would not be adverse to the public interest. Fed.Rules Civ.Proc.Rule 65, 28 U.S.C.A.

**[2] Injunction 212 ⚷132**

212 Injunction
212IV Preliminary and Interlocutory Injunctions
212IV(A) Grounds and Proceedings to Procure
212IV(A)1 In General
212k132 k. Nature and Scope of Provisional Remedy. Most Cited Cases

Preliminary injunctive relief is a drastic and extraordinary remedy which should not be granted unless the movant can clearly establish each of the four elements. Fed.Rules Civ.Proc.Rule 65, 28 U.S.C.A.

**[3] Injunction 212 ⚷147**

212 Injunction
212IV Preliminary and Interlocutory Injunctions
212IV(A) Grounds and Proceedings to Procure
212IV(A)4 Proceedings
212k147 k. Evidence and Affidavits. Most Cited Cases

Burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff. Fed.Rules Civ.Proc.Rule 65, 28 U.S.C.A.

**[4] Antitrust and Trade Regulation 29T ⚷414**

29T Antitrust and Trade Regulation
29TIV Trade Secrets and Proprietary Informa-

tion
29TIV(A) In General
29Tk414 k. Elements of Misappropriation. Most Cited Cases

Claim for misappropriation of trade secrets under the Georgia Trade Secrets Act (GTSA) requires a plaintiff to prove that (1) it had a trade secret and (2) the opposing party misappropriated the trade secret. West's Ga.Code Ann. § 10–1–760 et seq.

**[5] Antitrust and Trade Regulation 29T ⚷420**

29T Antitrust and Trade Regulation
29TIV Trade Secrets and Proprietary Information
29TIV(A) In General
29Tk420 k. Particular Cases, in General. Most Cited Cases

**Antitrust and Trade Regulation 29T ⚷421**

29T Antitrust and Trade Regulation
29TIV Trade Secrets and Proprietary Information
29TIV(A) In General
29Tk421 k. Customer Lists and Information. Most Cited Cases

Both referral logs, containing detailed information regarding current and prospective patients, and a workbook containing doctor referral statistics and other industry metrics constituted and contained trade-secret information protectable under the Georgia Trade Secrets Act (GTSA); the information in the documents, which a provider of home healthcare and hospice services collected, evaluated, analyzed, and arranged, enabled its employees to make informed, fact-based decisions on where to focus their business solicitation efforts, the information was not generally available or ascertainable from other sources, and the provider undertook reasonable efforts to maintain the confidentiality of the information. West's Ga.Code Ann. § 10–1–761(4).

**[6] Injunction 212 ⚷138.33**

212 Injunction
212IV Preliminary and Interlocutory Injunctions
212IV(A) Grounds and Proceedings to Procure
212IV(A)3 Subjects of Relief
212k138.30 Property, Conveyances and Encumbrances
212k138.33 k. Trade Secrets; Customer Lists. Most Cited Cases

For purposes of preliminary injunctive relief, a provider of home healthcare and hospice services established a substantial likelihood of prevailing on its claim that a former sales representative misappropriated trade secrets, in violation of the Georgia Trade Secrets Act (GTSA), in the form of referral logs containing detailed information regarding current and prospective patients; the representative sent the referral logs to her personal email account before going to work for a competitor, for the purpose of using them to solicit business at the competitor. West's Ga.Code Ann. § 10–1–761(1, 2).

**[7] Injunction 212 ⚷138.33**

212 Injunction
212IV Preliminary and Interlocutory Injunctions
212IV(A) Grounds and Proceedings to Procure
212IV(A)3 Subjects of Relief
212k138.30 Property, Conveyances and Encumbrances
212k138.33 k. Trade Secrets; Customer Lists. Most Cited Cases

For purposes of preliminary injunctive relief, a provider of home healthcare and hospice services failed to establish a substantial likelihood of prevailing on its claim that a former sales representative misappropriated trade secrets, in violation of the Georgia Trade Secrets Act (GTSA), in the form of a workbook containing doctor referral statistics and other industry metrics, which she inadvertently failed to return after leaving the provider; she had developed close personal and professional relationships with the majority of the doctors who referred patients to her, and thus did not need the workbook to know which physicians to contact or how to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

reach them, and there was no evidence that she used the workbook while working for a competitor. West's Ga.Code Ann. § 10–1–761(1, 2).

**[8] Injunction 212 ⚷138.33**

212 Injunction
212IV Preliminary and Interlocutory Injunctions
212IV(A) Grounds and Proceedings to Procure
212IV(A)3 Subjects of Relief
212k138.30 Property, Conveyances and Encumbrances
212k138.33 k. Trade Secrets; Customer Lists. Most Cited Cases

For purposes of preliminary injunctive relief, a provider of home healthcare and hospice services failed to establish a substantial likelihood of prevailing on its claim that a former sales representative misappropriated trade secrets, in violation of the Georgia Trade Secrets Act (GTSA), despite claim that because she worked as an assistant to another former employee alleged to have misappropriated trade secrets, she inevitably would use material the other employee had misappropriated; speculation about use of misappropriated material was insufficient to show a likelihood of prevailing on the merits. West's Ga.Code Ann. § 10–1–761(1, 2).

**[9] Injunction 212 ⚷138.33**

212 Injunction
212IV Preliminary and Interlocutory Injunctions
212IV(A) Grounds and Proceedings to Procure
212IV(A)3 Subjects of Relief
212k138.30 Property, Conveyances and Encumbrances
212k138.33 k. Trade Secrets; Customer Lists. Most Cited Cases

For purposes of preliminary injunctive relief, a provider of home healthcare and hospice services established a substantial likelihood of prevailing on its claim that a competitor violated the Georgia Trade Secrets Act (GTSA) by allowing an employee, a former sales representative of the employer, to use misappropriated trade secrets in the form of referral logs containing detailed information regarding current and prospective patients. West's Ga.Code Ann. § 10–1–761(1, 2).

**[10] Injunction 212 ⚷138.33**

212 Injunction
212IV Preliminary and Interlocutory Injunctions
212IV(A) Grounds and Proceedings to Procure
212IV(A)3 Subjects of Relief
212k138.30 Property, Conveyances and Encumbrances
212k138.33 k. Trade Secrets; Customer Lists. Most Cited Cases

Preliminary injunctive relief was warranted against a former sales representative of a provider of home healthcare and hospice services, and against a competitor for whom the representative was working, in connection with the provider's claims that the representative had misappropriated trade secrets, in violation of the Georgia Trade Secrets Act (GTSA), in the form of referral logs containing detailed information regarding current and prospective patients; the provider would suffer irreparable harm if the representative were allowed to solicit patients from the same doctors and facilities that were referenced in the misappropriated logs or if the competitor allowed him to do so, the balance of harms favored the provider, and there was a strong public policy in favor of promoting fair competition. West's Ga.Code Ann. § 10–1–761(1, 2).

**[11] Injunction 212 ⚷138.33**

212 Injunction
212IV Preliminary and Interlocutory Injunctions
212IV(A) Grounds and Proceedings to Procure
212IV(A)3 Subjects of Relief
212k138.30 Property, Conveyances and Encumbrances
212k138.33 k. Trade Secrets; Customer Lists. Most Cited Cases

For purposes of preliminary injunctive relief, a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

provider of home healthcare and hospice services established a substantial likelihood of prevailing on its claim that a former sales representative violated the Computer Fraud and Abuse Act (CFAA) by sending to her personal email account, prior to going to work for a competitor, referral logs containing detailed information regarding current and prospective patients. 18 U.S.C.A. § 1030(a)(2)(C), (e)(6).

**[12] Injunction 212 ⚷138.33**

212 Injunction
212IV Preliminary and Interlocutory Injunctions
212IV(A) Grounds and Proceedings to Procure
212IV(A)3 Subjects of Relief
212k138.30 Property, Conveyances and Encumbrances
212k138.33 k. Trade Secrets; Customer Lists. Most Cited Cases

For purposes of preliminary injunctive relief, a provider of home healthcare and hospice services established a substantial likelihood of prevailing on its claim that a former sales representative violated the Stored Communications Act (SCA) by sending to her personal email account, prior to going to work for a competitor, referral logs containing detailed information regarding current and prospective patients. 18 U.S.C.A. §§ 2701(a), 2707.

**[13] Injunction 212 ⚷138.33**

212 Injunction
212IV Preliminary and Interlocutory Injunctions
212IV(A) Grounds and Proceedings to Procure
212IV(A)3 Subjects of Relief
212k138.30 Property, Conveyances and Encumbrances
212k138.33 k. Trade Secrets; Customer Lists. Most Cited Cases

For purposes of preliminary injunctive relief, a provider of home healthcare and hospice services established a substantial likelihood of prevailing on its breach of contract claim against a former sales representative who, after going to work for a competitor, retained referral logs from the provider containing detailed information regarding current and prospective patients; her employment contract required her to return any confidential information to the provider upon leaving the company.

**[14] Injunction 212 ⚷138.33**

212 Injunction
212IV Preliminary and Interlocutory Injunctions
212IV(A) Grounds and Proceedings to Procure
212IV(A)3 Subjects of Relief
212k138.30 Property, Conveyances and Encumbrances
212k138.33 k. Trade Secrets; Customer Lists. Most Cited Cases

Preliminary injunction against a former sales representative for a provider of home healthcare and hospice services was not warranted based on her alleged breach of contract in failing to return a workbook containing doctor referral statistics and other industry metrics at the end of her contract; she returned her copy of the workbook shortly after she left the provider, and any damages that resulted from the breach could be addressed through monetary, not injunctive, relief.

Michael Wayne Johnston, Milton Russell Wofford, Jr., King & Spalding, LLP, Atlanta, GA, for Plaintiff.

Cheryl Renee Treadwell, Michael P. Davis, Chamberlain Hrdlicka, Benjamin I. Fink, Neal F. Weinrich, Berman Fink Van Horn, Atlanta, GA, for Defendants.

***OPINION AND ORDER***

WILLIAM S. DUFFEY, JR., District Judge.

***1** This matter is before the Court on Amedisys Holding, LLC's Motion for a Preliminary Injunction [25] and Motion for Leave to File Supplemental Exhibits in Support of its Motion for Preliminary Injunction [35]. The Court, having considered the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

memorandum submitted by the parties, as well as the arguments of counsel and testimony presented at the May 23, 2011, hearing on Plaintiff's injunction motion, now considers Plaintiff's request for preliminary injunctive relief.

**I. BACKGROUND**

Plaintiff Amedisys Holding, LLC ("Amedisys") and Defendant Interim Healthcare of Atlanta, Inc. ("Interim") compete in providing home healthcare and hospice services. They each employ sales representatives who meet with doctors and other healthcare practitioners to encourage those clinicians to refer patients in need of home healthcare and hospice services. On April 18, 2011, three Amedisys sales representatives, Defendants Jennifer Mack ("Mack"), Brenda Hogan ("Hogan"), and Denise Cathey ("Cathey") (collectively the "Individual Defendants"), resigned from Amedisys to begin employment at Interim. Amedisys alleges that the Individual Defendants took confidential and trade-secret materials before they left and have used those materials at Interim.

The trade-secret materials at issue in this case are known as the "Referral Logs" and the "Workbook." The Referral Logs are a resource to track patient referrals. They contain detailed information regarding current and prospective patients. Amedisys employees use the Referral Logs to target their sales efforts to particular clinicians and facilities most likely to refer patients to Amedisys.[FN1] This allows their employees to concentrate their marketing efforts on the clinicians most likely to generate business for Amedisys. The Workbook is a short document that contains doctor referral statistics and other industry metrics. It ranks doctors within a particular geographic area based on the number of home healthcare and hospice referrals each doctor issues.[FN2] Amedisys employees use the Workbook to target certain doctors who frequently refer patients for home healthcare and hospice services. Amedisys claims that it treats and maintains both the Referral Logs and the Workbook as trade secrets.

On April 12, 2011, six days before she left Amedisys, Defendant Mack sent a copy of the Referral Logs from her Amedisys email account to her personal email account. These particular Referral Logs contained information on over 1,200 patients from several geographic areas, including areas in which Mack did not work as an Amedisys employee. Amedisys further alleges that Mack provided the Referral Logs to Defendant Cathey. On April 18, 2011, the day she left Amedisys, Defendant Hogan failed to return a copy of the Workbook before beginning her employment with Interim.

In the days after the Individual Defendants left Amedisys, several Amedisys employees saw the Individual Defendants soliciting business at local hospitals and patient care centers. Amedisys contends that the Individual Defendants have and continue to use the Referral Logs and the Workbook to compete against Amedisys at their new employer Interim.

***2** On May 4, 2011, Plaintiff filed the Complaint in this action, alleging that the Individual Defendants and Interim (collectively "Defendants") took Amedisys' trade secrets to unfairly compete in the provision of healthcare and hospice services. The Complaint lists eight causes of action, including: (1) violation of the Stored Communications Act, 18 U.S.C. §§ 2701, 2707; (2) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; (3) misappropriation of trade secrets, O.C.G.A. § 10–1–760 *et seq.*; (4) Computer Theft and Computer Invasion of Privacy, O.C.G.A. § 16–9–93; (5) breach of fiduciary duty and employee duty of loyalty; (6) tortious interference with business relations; (7) trover/conversion of corporate property and assets; and (8) breach of contract.[FN3] The Complaint also sought injunctive relief, specifically, an order prohibiting the Defendants from using Plaintiff's confidential, proprietary, and trade-secret information.

Plaintiff also sought a Temporary Restraining Order ("TRO") requiring (1) the Defendants to return any Amedisys trade secret materials they had

in their possession or to which they had access; (2) the Defendants to submit to a forensic audit of their computer systems; and (3) prohibiting the Individual Defendants from soliciting business on behalf of Interim. Defendants opposed the motion on several grounds. In support of their opposition, Mack and Hogan submitted declarations, made under oath, to the Court.

In her declaration, Mack admitted to sending herself a copy of the Referral Logs on April 12, 2011, but claimed that she did not do so with the intention of using it at Interim. Mack stated that:

• She sent copies of the Referral Logs to her personal email address "in the ordinary course of business almost every month for years" and she sent the April 12, 2011, email as part of her standard working practice, not as an attempt to steal the Referral Logs before leaving Amedisys (Mack Decl. at 2);

• the "purpose of sending these e-mails was to open [the Referral Logs] on my home computer so that I could add to the logs patients who had been referred during the previous month, an action I was required to do by Amedisys" (*id.*); and

• the Referral Logs would not help her at Interim because she had worked with the same clinicians for years, knew them well, and knew who to contact to solicit business without using the Referral Logs. (*Id.* at 3.)

Hogan stated in her Declaration that she did not intentionally take the Workbook from Amedisys and she simply forgot to return it when she left. (Hogan Decl. ¶ 5.) Hogan also stated that the Workbook would not help her at Interim because she knew the contents of the Workbook by heart. (*Id.* ¶ 3.)

On May 6, 2011, the Court held a hearing on Plaintiff's Motion for a TRO. Counsel for the Individual Defendants explained to the Court that the Individual Defendants "represented in their declarations and they've affirmed here today that whatever they have was inadvertently maintained and they are willing to delete it and return it and they certainly haven't used or disclosed it, provided it to Interim Healthcare. They don't need it, they don't want it. It doesn't help them in their business." (Tr. [32] at 19.) Based on these representations, the Court denied Plaintiff's request to temporarily restrain the Individual Defendants from soliciting business from clinicians. The Court, however, required Defendants to (1) refrain from using any Amedisys information; (2) return any Amedisys material by May 9; and (3) submit to a third party forensic examination of their computers [21].[FN4]

***3** On May 18, 2011, Plaintiff moved the Court for an order preliminarily enjoining the Defendants from using Amedisys' trade-secret information and enjoining the Individual Defendants from soliciting new patients for Interim from doctors and other healthcare providers with whom they had contact while employed by Amedisys. Plaintiff argued that Mack and Hogan made several misrepresentations in the declarations filed with the Court, that the Court should not trust them, and that a preliminary injunction is necessary to protect Amedisys' confidential business information.

Based on information developed during discovery after the TRO hearing, Amedisys now contends that Mack made several misrepresentations in her declaration. Mack stated in her declaration that she sent copies of the Referral Logs to herself, by email, almost every month for years. (Mack Decl. at 2.) In her deposition, however, Mack could not recall any occasion where she sent herself a copy of the Referral Logs, aside from the April 12, 2011, email. (Mack Dep. at 133:14–134:2.) Mack also testified that when she signed her declaration, she did not have a basis for her statement that she sent the Referral Logs to her personal email address "almost every month for years." (*Id.* at 133:4–18.)

Amedisys also contends that Mack misrepresented why she sent the Referral Logs to herself. Mack stated in her declaration that she sent the Re-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ferral Logs to her personal email account on April 12, 2011, so she could work on them from home and add additional patients who had been referred during the previous month. (Mack Decl. at 2.) Mack, however, had already completed this update work and had, on April 11, 2011, sent the updated report to her supervisor. (McDonald Decl. ¶¶ 6–8.)

Amedisys further contends that Mack misrepresented the usefulness of the Referral Logs. In her declaration, Mack stated that the Referral Logs did not help her at Amedisys because she had worked for the same ten healthcare providers for years and knew their contact information by heart. (Mack Decl. at 1.) Mack's new position as Vice President of Business Development at Interim involves managing a team of salespeople charged with developing referral sources throughout Georgia. (Mack Dep. at 193:3–19.) The Referral Logs that Mack sent to herself contain information in addition to the ten physicians with whom Mack worked while an Amedisys employee. Amedisys contends that this additional information, which Mack does not know by memory, would aid her and her subordinates to convert Amedisys clients to become clients of Interim.

Plaintiff also introduced evidence that Hogan misrepresented the usefulness of the Workbook. In her declaration, Hogan stated that she seldom used the Workbook while at Amedisys and that it would not help her in her duties at Interim because she knew her referral sources by heart. (Hogan Decl. ¶¶ 3, 8.) Hogan testified in her deposition that, while employed at Amedisys, she printed a copy of the Workbook each time she received a copy by email and used the Workbook to determine which doctors to visit. (Hogan Dep. at 108:22–109:2.) At her deposition she was able to recite, by memory, the persons who served as her referral sources while at Amedisys. (*Id.* at 155:12–160:3.)

***4** On May 23, 2011, the Court held a hearing on Plaintiff's Motion for a Preliminary Injunction. Because Plaintiff's primary basis for relief was the alleged misrepresentations made by Mack and Hogan, the hearing focused on the truthfulness of the statements made by Mack and Hogan and which were communicated to the Court by their counsel. FN5

Mack testified at the hearing that:

- despite what she claimed in her sworn declaration testimony, FN6 she had not sent herself a copy of the Referral Logs almost every month for the past several years (Tr. [34] at 19, 33, 34);

- she had only done so on less than five occasions since working at Amedisys and could not specifically recall a single occasion of having done so (*id.*);

- she did not send herself the Referral Logs on April 12, 2011, to work on records from the previous month, as she stated in her declaration (*id.* at 23);

- the Referral Logs did not contain data from the previous month that she could have worked on ( *id.* at 36–38); and

- she sent herself Referral Logs containing information about territories where she did not work at Amedisys, but did at Interim, and she did not know this information by heart. (*Id.* at 42–47).

Perhaps most troubling is the timing of the April 12, 2011, email. Mack testified that she made the decision to join Interim the weekend of April 16 and officially accepted the job at Interim on April 18, the day she left Amedisys. (*Id.* at 23, 24.) Plaintiff, however, introduced an April 14, 2011, email exchange between Interim and Mack that directly contradicted her testimony to the Court under oath. The email, entitled "My wish list," detailed several things Mack requested for her "roll out" at Interim, including business cards and letterhead. (Pl's Ex. 61 at 3.) Mack also stated in the exchange: "THANK YOU FOR THIS OPPORTUNITY, WOW I AM SOOOOO EXCITED ... I HAVE A FEW OF [sic] THINGS TO [PREPARE] FOR

PERSONALLY AND PROFESSIONALY." (*Id.* at 4 (emphasis in original).) The exchange also indicated that Interim had purchased for Mack a 2011 Mini Cooper. (*Id.* at 1.) Mack reluctantly admitted that she had been promised a car to come to work for Interim. (Tr. [34] at 35, 52, 53.) Interim also attached to the email exchange a copy of its upcoming sales and budget projections for the remainder of 2011.[FN7] Despite this overwhelming evidence showing that Mack had accepted the position at Interim as early as April 14, 2011, Mack incredibly maintained that she did not decide to work for Interim until April 16, 2011.[FN8] (*Id.* at 53.) Mack's testimony at the hearing was not believable.

Brenda Hogan also testified at the hearing and the Court found her testimony credible. Hogan explained that she had worked in the industry for over twenty years and during that time she had developed substantial relationships, both professional and personal, with the clinicians who refer patients to her. (*Id.* at 121–23.) Because of these relationships, Hogan did not need the Workbook or other Amedisys materials to know who to contact to generate business. (*Id.* at 123–26.) Hogan credibly testified that she inadvertently retained a copy of the Workbook when she left Amedisys.[FN9] (*Id.* at 133–35, 139.)

***5** On May 25, 2011, two days after the hearing, Amedisys filed a Motion for leave to file supplemental exhibits in support of its motion for a preliminary injunction [35]. Amedisys asked the Court to consider a May 4, 2011, text message to Mack from one of her subordinates at Interim, Donnisha Barnes. The "Barnes Message," sent on the day Amedisys filed the Complaint, stated:

> Hi Jenny when we meet can u please brng ur cheat sheet lol u have frm Amedysis [sic] so that I can see other places I may target 2 increase my numbers.

Mack responded, the day after the Complaint was filed, stating:

> I donot [sic] have anything from Amedisys we just have to go building to building to see what meds are in the area, also think about rehabs, PC homes, dialysis clinics, how about the dekalb hospitals?

Amedisys also offered an email exchanged between Interim executives dated April 8, 2011. The email referred to Mack as Interim's "new Director of Business Dev[elopement]." This email further confirms that Mack had been untruthful when she testified at the hearing that that she had not accepted a job with Interim before she sent the Referral Logs to herself. Mack's self-serving response to the Barnes Message further discredits Mack's testimony. Importantly, Mack did not deny she had informed Barnes that she had a "cheat sheet" at some time which could be used to target Interim's business solicitation. She simply stated she did not have the materials, which Amedisys, in its Complaint, accused her of taking.

## II. DISCUSSION

[1][2][3] To be eligible for a preliminary injunction a movant must show: (1) a substantial likelihood of prevailing on the merits; (2) that Plaintiff will suffer irreparable injury if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the opposing party; and (4) that if granted, the injunction would not be adverse to the public interest. Fed.R.Civ.P. 65; *see Schiavo ex rel. Schindler v. Schiavo,* 403 F.3d 1223, 1225–26 (11th Cir.2005); *Parker v. State Bd. of Pardons and Paroles,* 275 F.3d 1032, 1034–35 (11th Cir.2001); *Baker v. Buckeye Cellulose Corp.,* 856 F.2d 167, 169 (11th Cir.1988). Preliminary injunctive relief is a drastic and extraordinary remedy which should not be granted unless the movant can clearly establish each of the four elements. *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.,* 320 F.3d 1205, 1210 (11th Cir.2003). "The burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff." *Canal Auth. of Florida v. Callaway,* 489 F.2d 567, 573 (5th Cir.1974).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

A. Likelihood of Prevailing on the Merits on Plaintiff's Claim for Misappropriation of Trade Secrets

[4] "A claim for misappropriation of trade secrets under the Georgia Trade Secrets Act [the "GTSA"] requires a plaintiff to prove that '(1) it had a trade secret and (2) the opposing party misappropriated the trade secret.' " *Capital Asset Research Corp. v. Finnegan,* 160 F.3d 683, 685 (11th Cir.1998) (quoting *Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.,* 139 F.3d 1396, 1410 (11th Cir.1998)).

i. Trade Secrets

***6** [5] The GTSA defines trade secrets as confidential, proprietary information not commonly known by the public that: "(A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." O.C.G.A. § 10–1–761(4). Trade secrets can include methods, financial plans, product plans, or lists of actual or potential customers. *Id.*

The parties dispute whether the Referral Logs and the Workbook constitute trade secrets. Amedisys contends the Referral Logs reveal which doctors refer which patients to Amedisys and allow its sales representatives to identify which patients require long-term care and are susceptible to "poaching" by a competing home healthcare provider. The Workbook, Amedisys claims, contains information about how often certain clinicians refer patients to in-home care, for what ailments they recommend in-home care, and which in-home care providers receive the referrals. The Defendants argue that the Referral Logs and the Workbook simply contain a collection of names of healthcare providers and facilities, and such information does not constitute a trade secret.

Plaintiff has satisfied its burden of establishing that the Referral Logs and the Workbook constitute trade secrets. The Referral Logs and the Workbook are more than a list of names of healthcare providers and facilities. They are not simply a directory of healthcare providers. They contain valuable, proprietary information uniquely known to Amedisys, and which is not publicly available. This information, which Amedisys collects, evaluates, analyzes, and arranges, enables Amedisys employees to make informed, fact-based decisions on where to focus their business solicitation efforts. It is this information that transforms an ordinary list of doctors and healthcare providers to a trade secret. *Essex Grp., Inc. v. Southwire Co.,* 269 Ga. 553, 501 S.E.2d 501, 503 (1998) ("[T]hat some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements.") (quoting Restatement (Third) of Unfair Competition § 39(f) (1995)).

While the names of the doctors and healthcare centers could be developed in the logs by other means, including through a cumbersome and time-intensive deconstruction of medical directories, visitation to hospitals, internet searches,[FN10] and the like, these "public" sources do not indicate which doctors or healthcare centers refer patients to in-home care, for what ailments the patients suffer from, who provided the referrals, and do not allow one to identify which patients are susceptible to poaching by a competing home healthcare provider. *Paramount Tax & Accounting, LLC v. H & R Block E. Enters.,* 299 Ga.App. 596, 683 S.E.2d 141, 147 (2009) ("While many names and addresses are readily available from a phone book, the fact that certain individuals listed therein have previously used [plaintiff] for tax preparation services is not."). This is uniquely developed by Amedisys and even Mack and Hogan admitted in their testimony that this referral information is not publicly known. (Tr. [34] at 57–60, 99–100.) This type of information is simply not generally available or ascertainable from other sources and is eligible for trade secret protection. *See Crews v. Roger Wahl, C.P.A.,* 238 Ga.App. 892, 520 S.E.2d 727, 732 n. 4 (1999)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

("Confidentiality is afforded only where the customer list is not generally known or ascertainable from other sources....").

***7** The evidence also shows that Amedisys undertook reasonable efforts to maintain the confidentiality of the Referral Logs and Workbook.[FN11] Amedisys only transmitted the Referral Logs and the Workbook through its protected computer network and email system. Amedisys made geographically specific Workbooks available to only Account Executives who work in those areas. Finally, Amedisys marked each page with a "confidential property" designation. *See Elec. Data Sys. Corp. v. Heinemann,* 268 Ga. 755, 493 S.E.2d 132, 136 (1997) (affirming determination of trade secret, in part, because employer's confidentiality agreements and limited access constituted reasonable care). Both the Referral Logs and the Workbook constitute and contain protectable trade-secret information.

ii. Misappropriation

The Court next considers whether the Defendants misappropriated the trade secrets belonging to Amedisys. A person misappropriates a trade secret by acquiring it improperly or disclosing it without consent. O.C.G.A. § 10–1–761(1), (2) (defining "improper means" as including "theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means.")

***Defendant Mack***

[6] Plaintiff contends that Mack misappropriated Amedisys' trade secrets when she sent the Referral Logs to her personal email account. Mack testified that she sent the Referral Logs to her personal email account, not to take them from Amedisys, but to work on them from home. The Court concludes Mack's testimony is not truthful and that she misappropriated the Referral Logs. This conclusion is based on the timing of the transmission of the Referral Logs to Mack's personal email account, that she did not need the Referral Log information to complete a task for her Amedisys supervisor because it is now clear that the task was completed before the Referral Logs were sent on April 12, 2011, and based on the blatant inconsistencies and untruthfulness of Mack's testimony in her declaration and at the TRO and Preliminary Injunction hearings.

The Barnes Message confirms Mack's untruthfulness and that she is conceding her possession and use of Amedisys' confidential information.[FN12] The Barnes Message indicates that Mack told Barnes that she had a "cheat sheet" and Barnes could use it to identify clinicians likely to refer patients. Amedisys employees use the Referral Logs for precisely this purpose. It is inconceivable that Barnes would have written this message if Mack had not described the Referral Logs to Barnes and explained their value and availability.[FN13] The totality of the information available to the Court, including the Court's opportunity to observe Mack's hearing testimony, how she responded to questions, and the logic of her answers confirm to the Court that Mack did not at the hearing and is not now being truthful. The Court concludes that Mack sent the Referral Logs to herself to use them to solicit business at Interim, not to simply work on them from home, for the benefit of her former employer. The Court finds that Mack's response to the Barnes Message is a calculated attempt to conceal her misconduct in taking and intending to use confidential, protected information from Amedisys. Amedisys has shown that it has a substantial likelihood of prevailing on its trade secret claim against Mack.

***Defendant Hogan***

***8** [7] Amedisys contends that Hogan misappropriated Amedisys' trade secrets when she kept her Workbook after resigning. Hogan testified that she kept her copy of the Workbook in her carry-all bag and that she inadvertently took it with her when she left Amedisys. (Tr. [34] at 133–35, 139.) When Amedisys asked for the Workbook back, she promptly returned it. (*Id.* at 138–40.) Hogan further testified that she rarely used the Workbook while at

Amedisys, and that she only looked at it once every quarter to see if any doctors had been added or removed from her territory. (*Id.* at 124.) She also stated that over her many years in the industry she developed close personal and professional relationships with the majority of the doctors who referred patients to her. (*Id.* at 125.) Because of these relationships, Hogan did not need the Workbook to know which physicians to contact or how to reach them. There is no evidence that Hogan used the Workbook while working for Interim.

The Court finds Hogan's testimony credible. The Court believes that Hogan inadvertently failed to return the Workbook after leaving Amedisys and did not, and had no intent to, use the Workbook to compete against Amedisys. The Court concludes that Plaintiff has failed to show a substantial likelihood of prevailing on its trade secret claim against Hogan.

***Defendant Cathey***

[8] Plaintiff has not offered any evidence that Cathey took or received any trade secrets. Amedisys, instead, argues that because Cathey works as an assistant to Mack, Cathey inevitably will use material Mack misappropriated from Amedisys. Plaintiff's speculation about use of misappropriated material is insufficient to meet Plaintiff's burden to show a likelihood of prevailing on the merits. The requested relief, with respect to Cathey, is denied.

***Defendant Interim***

[9] Amedisys argues that "[b]y allowing Mack, Hogan, and Cathey to continue soliciting healthcare facilities, providers, and patients with whom they had contact or about whom they obtained information for Amedisys, Interim has misappropriated Amedisys trade secrets." (Pl's Br. [25.1] at 12.) Amedisys relies on *Bennett v. United States,* to argue that Interim is liable for the acts of its employees. 102 F.3d 486, 489 (11th Cir.1996). In *Bennett,* the Eleventh Circuit considered whether the United States could be held liable for a soldier's accidental shooting on an army base. *Id.* at 488. The court looked to Georgia respondeat superior law and noted that "Georgia courts will hold an employer responsible for the conduct of its employee if the employee acted in the course of the employer's business and with a desire to benefit the employer." *Id.* at 489. Conversely, "when an employee undertakes an act purely personal in nature, no respondeat superior liability may be imposed." *Id.* The Eleventh Circuit noted that "[t]he question of whether a given act falls within the scope of employment is highly fact-specific, and turns on the unique circumstances of the case at bar." *Id.*

***9** In this case, Plaintiff has established that Mack acted within the scope of her employment with Interim when she continued to use the misappropriated Referral Logs to solicit patients.[FN14] There is some question whether Mack took the Referral Logs to benefit Interim, or whether she took them to benefit herself. While new patient referrals would likely benefit Interim, they would most directly benefit Mack as she receives a commission for her work and the work of her subordinates. The record here, however, shows that use by Mack of wrongly appropriated Amedisys information in her work for Interim would be wrongful use within Mack's scope of employment for Interim. That the Referral Logs were perceived as beneficial to Interim and its business is supported by the Barnes Message. The Court concludes that Plaintiff has met its burden of showing that it is substantially likely to succeed on the merits of its claim regarding use of Amedisys' confidential information to further Interim's business.

B. Irreparable Harm

[10] The Court concludes that Amedisys will suffer irreparable harm if Mack is allowed to solicit patients from the same doctors and facilities that were referenced in the misappropriated Referral Logs or if Interim allows Mack to do so.[FN15] Amedisys invested substantial time and expense to create the Referral Logs that Mack misappropriated. Allowing Mack to continue to solicit business from the same doctors and facilities will give Mack

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

and Interim an unearned advantage in the marketplace and will likely cause Amedisys to lose patients and referral sources.

Because of Mack's repeated misrepresentations, the Court simply cannot trust that Mack no longer has a copy of the Referral Logs, or has not maintained a copy of the Referral Logs in some other form, or that she will not use the Referral Logs to compete unfairly with Amedisys. Mack misrepresented (1) how often she sent herself the Referral Logs; (2) why she sent herself the Referral Logs; (3) how useful the Referral Logs would be to her at Interim; (4) when she accepted the position at Interim; and (5) whether she intended to use the Referral Logs at Interim. Based on these misrepresentations, the Court concludes that Mack and Interim are required to be prevented from allowing Mack to solicit healthcare facilities and providers of patients that are listed in the Referral Logs that Mack transmitted to her personal email account on April 12, 2011.

C. Balance of the Harms

The balance of the harms favors Amedisys. If Mack continues to unfairly compete, Plaintiff stands to lose significant revenue and the value of its trade secrets will erode materially. Mack, on the other hand, "cannot suffer compensable harm when enjoined from an unlawful activity." *Specialty Chem. & Servs., Inc. v. Chandler,* No. Civ. 1:87–cv–2338MHS, 1988 WL 618583, at *4 (N.D.Ga. Sept. 29, 1988); *see MediaOne of Delaware, Inc. v. E & A Beepers and Cellulars,* 43 F.Supp.2d 1348, 1354 (S.D.Fla.1998). Interim also will suffer little harm as it is merely prohibited from allowing Mack to continue to use the information contained in the misappropriated Referral Logs.

***10** The Individual Defendants argue that if the Court grants an injunction, Mack "will be precluded from maintaining gainful employment in the field and industry in which [she has] extensive experience." (Individual Def.'s Opp'n [27] at 23.) This is simply not true. The Court is only enjoining Mack from soliciting healthcare facilities and patients referenced in the Referral Logs that Mack misappropriated from Amedisys. Mack is permitted to solicit healthcare facilities, providers, and patients that were not listed in the Referral Logs. Interim argues that Amedisys is trying to subject Mack to a non-competition agreement, where no such agreement exists. The proposed injunctive relief prevents only a subset of competition. It does not prohibit Mack from competing or engaging in other meaningful work for Interim. It also does not prohibit Interim from competing, it simply prohibits Interim from allowing Mack to compete unfairly. *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1547 (11th Cir.1987) ("We review the district court's order [issuing an injunction] only for an abuse of discretion; '[t]he trial judge's ability to formulate a decree tailored to deal with the violations existent in each case is normally superior to that of any reviewing court, due to his familiarity with [the] testimony and exhibits.' ") (quoting *United States v. Loew's, Inc.,* 371 U.S. 38, 52, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962)).

D. Public Interest

An injunction prohibiting Mack from soliciting patients from doctors and facilities that are referenced in the Referral Logs she took from Amedisys will best serve the public interest. There is a strong public policy in favor of promoting fair competition. *MacGinnitie v. Hobbs Grp., LLC,* 420 F.3d 1234, 1243 (11th Cir.2005); *Salsbury Labs., Inc. v. Merieux Labs., Inc.,* 735 F.Supp. 1537, 1544 (M.D.Ga.1987) ("public interest favoring competition 'does not mean that defendants are entitled to free access to plaintiff's trade secrets nor does this mean that defendants may compete unfairly.' "). There is also a strong public policy for protecting trade secrets from misappropriation. *Wesley–Jessen, Inc. v. Armento,* 519 F.Supp. 1352, 1361 (N.D.Ga.1981). Allowing Mack to compete unfairly and use Amedisys' trade secrets would undermine those policies.

E. Remaining Claims Against Mack

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[11] In addition to its trade secret claim, Plaintiff alleges that Mack violated the Computer Fraud and Abuse Act ("CFAA"), the Store Communications Act ("SCA"), and breached her employment contract with Amedisys. The Court concludes that Plaintiff has shown that it has a substantial likelihood of prevailing on the merits of each of these additional claims against Mack.

The Computer Fraud and Abuse Act ("CFAA") provides a private cause of action against a person who "accesses a computer without authorization or exceeds authorized access," to obtain "information from any protected computer." 18 U.S.C. § 1030(a)(2)(C). The CFAA defines the term "exceeds authorization" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled to obtain or alter." *Id.* § 1030(e)(6)
.

***11** Plaintiff contends that Mack exceeded her authorized access by sending Referral Logs to herself for reasons that had nothing to do with her work at Amedisys. (Pl's Br. [25.1] at 13.) While there is some question of whether Plaintiff generally permitted Mack to send the Referral Logs to her personal email account, there is no question that Mack exceeded any authority she had when she sent them to herself after accepting a position at Interim for use in competing with Amedisys.[FN16] *United States v. Rodriguez,* 628 F.3d 1258, 1263 (11th Cir.2010) (holding that an employee exceed his authorization when he accessed employer records for non-business reasons in violation of employer policy); *Int'l Airport Centers, L.L.C. v. Citrin,* 440 F.3d 418, 420 (7th Cir.2006) (concluding that a former employee's authorization to access his employer's computers terminated when he decided to quit his job).

[12] Plaintiff similarly alleges that Mack violated the Stored Communications Act ("SCA") by sending herself the Referral Logs. The SCA imposes civil liability on those who "intentionally access without authorization a facility through which an electronic communication service is provided; or intentionally exceeds an authorization to access that facility; and thereby obtains ... a wire or electronic communication while it is in electronic storage...." 18 U.S.C. §§ 2701(a), 2707. Mack likely violated the SCA by downloading, copying, or transferring to her personal email account trade-secret material after she accepted employment at Interim. *Lasco Foods, Inc. v. Hall & Shaw Sales, Marketing, & Consulting, LLC,* No. 4:08CV01683 JCH, 2009 WL 3523986, at *5 (E.D.Mo. Oct. 26, 2009) (finding that employees exceed authorization under the SCA when they began accessing their employers materials to benefit their own interests, not their employer's); *see also Genworth Fin. Wealth Mgmt., Inc. v. McMullan,* 721 F.Supp.2d 122 (D.Conn.2010).

[13][14] The Court also agrees that Mack likely breached her employment contract with Amedisys. Mack's employment contract required her to return any confidential information to Amedisys upon leaving the company. Mack clearly retained a copy of the Referral Logs after leaving Amedisys and Plaintiff has shown that it is likely to succeed on the merits of its breach of contract claim against Mack.[FN17]

## III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Preliminary Injunction [25] is **GRANTED IN PART** and **DENIED IN PART.** Defendant Mack and Interim are **ENJOINED** from allowing Mack to contact on behalf of Interim, either directly or indirectly, any healthcare facilities, providers, patients, or prospective patients referenced in the Referral Logs she emailed to her personal email account on April 12, 2011, or any other Referral Logs or Referral Log information to which she now has access ("the Reference Log Persons"). Indirect contact shall include, but is not limited to, assisting others at Interim to identify, plan for, or make contact with any Reference Log Person.

***12 IT IS HEREBY FURTHER ORDERED**

that Plaintiff's request for a preliminary injunction prohibiting Defendants Hogan and Cathey from soliciting business on behalf of Interim is **DENIED.**

**IT IS HEREBY FURTHER ORDERED** that the Defendants are enjoined from using any information obtained from or owned by Amedisys and which cannot be independently obtained by Defendants from other sources.

**IT IS HEREBY FURTHER ORDERED** that Plaintiff's Motion for Leave to File Supplemental Exhibits in Support of its Motion for Preliminary Injunction [35] is **GRANTED.**

**IT IS HEREBY FURTHER ORDERED** that the parties are directed to meet to develop a Detailed Discovery Plan (the "Plan") and to submit the Plan to the Court on or before 5:00 p.m. on June 10, 2011.[FN18]

FN1. Amedisys employees compile the Referral Logs through their visits to doctors and healthcare centers.

FN2. A third party prepares the Workbook and sends an updated copy to Amedisys every quarter. The third party charges Amedisys $12,500 for every quarterly update. (Benton Decl. ¶ 6.)

FN3. Counts 1, 2, 4, 7, and 8 are based on the conduct of Mack and Hogan, Count 5 is based on the conduct of each of the Individual Defendants, and Counts 3 and 6 are based on the conduct of the Individual Defendants and Interim. audit of their computer systems; and (3) prohibiting the Individual Defendants from soliciting business on behalf of Interim.

FN4. The Court also directed the parties to consider what discovery they needed to prepare for a preliminary injunction hearing and set the preliminary injunction hearing for May 16, 2011, which was later rescheduled, at the parties' request, for May 23, 2011. (Tr. [32] at 27–28.)

FN5. Counsel for Mack admitted at the commencement of the hearing that misrepresentations had been made to the Court in the Mack declaration. Counsel stated that the information in the declaration was based on information provided by Mack. (Tr. [34] at 11.)

FN6. Mack admitted at the hearing that she reviewed her declaration and had adequate time to make corrections before signing it. (*Id.* at 21.) She also admitted that she did nothing to determine how often she emailed herself the Referral Logs before signing the declaration. (*Id.* at 22.)

FN7. The Court finds it inconceivable that Interim would have sent this information to Mack had she not accepted her position at Interim. Interim's counsel deemed this information so sensitive that he requested that it be designated "attorneys' eyes only" pursuant to the parties' protective order. (Tr. [34] at 26–27.)

FN8. Hogan testified that she decided to work for Interim on April 14, 2011. (*Id.* at 112.)

FN9. The Court also notes that the evidence indicates that Amedisys lacked a rigorous protocol to ensure employees returned confidential material upon their departure. (*Id.* at 130–32, 136.) This may have contributed to Hogan's inadvertent retention of the Workbook. There is no evidence that Hogan believed she was entitled to keep copies of the Workbook after she departed Amedisys' employ.

FN10. Defendants contend the Referral Logs and the Workbook can be constructed using these processes. A simple review of the Referral Logs and the Workbook to see

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the information they contain and how it is structured discredit that the Referral Logs and the Workbook can be developed from public source information.

FN11. This was in addition to protections afforded to this information by HIPAA, with which Defendants would be required to comply. Mack understood that HIPAA prohibited her from sharing patient information with someone outside of Amedisys. (Tr. [34] at 73.)

FN12. The Court grants Plaintiff's Motion for Leave to File Supplemental Exhibits in Support of its Motion for Preliminary Injunction [35]. Although Amedisys submitted this information after the Preliminary Injunction hearing, the Court will not turn a blind eye to Mack's misrepresentations.

FN13. The Individual Defendants offered a Declaration from Barnes to explain her text message. Barnes stated that she wrote the message in jest, that she did not expect Mack would provide Amedisys information or documents, and that Mack did not provide her with Amedisys documents. Given the circumstances of this case, the Court finds this explanation doubtful and is likely an attempt to limit the impact of damaging evidence. Even if true, however, Barnes does not describe how she knew that Mack had an Amedisys "cheat sheet." This leads the Court to conclude that Mack told Barnes that she had Amedisys material and that Mack intended to make it available to Interim employees.

FN14. There is a lack of evidence showing that Interim asked the Individual Defendants to take Amedisys trade secret materials or that it was even aware of the materials before this lawsuit.

FN15. Amedisys contends that Mack's misappropriation of trade secrets is *per se* irreparable harm. (Pl's Br. [25.1] at 16, 17.) This is an overstatement of the law and many courts refuse to issue injunctions despite finding misappropriation of trade secrets. *See* O.C.G.A. § 10–1–762(a) (providing that "actual or threatened misappropriation *may* be enjoined.") (emphasis added); *Salsbury Labs., Inc. v. Merieux Labs., Inc.,* 735 F.Supp. 1537, 1543 (M.D.Ga.1987) (refusing to grant preliminary injunction when monetary damages were sufficient to compensate for alleged misappropriation of trade secrets).

FN16. Mack admitted that she had no business reason for sending some of the Referral Logs to herself, even while employed at Amedisys. (Tr. [34] at 42:11–43:9.) The Court further notes that the Referral Logs contained information protected by HIPPA and Amedisys prohibited its employees from accessing or using protected health information except as required by their job duties. (Pl's Motion for TRO, Ex. A [2.2] at 3.)

FN17. Plaintiff also contends that Hogan breached her employment contract with Plaintiff and that Hogan's alleged breach warrants a preliminary injunction. Amedisys contends that, because Hogan did not return the Workbook when she left Amedisys, she breached the contract. The Court finds that Plaintiff Hogan did not return the Workbook at the end of her employment, as her contract required her to do, and Plaintiff is likely to succeed on its contract claim against Hogan. The Court notes, however, that a preliminary injunction against Hogan is not warranted based on her alleged breach of contract. Hogan returned her copy of the Workbook shortly after she left Amedisys. Any damages that resulted from this breach can be addressed

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

through monetary, not injunctive, relief. *Corbin v. Corbin,* 429 F.Supp. 276, 282 (N.D.Ga.1977) ("[A] mere threatened monetary injury, which can be addressed in damages, is insufficient to establish the irreparable injury essential to the issuance of a preliminary injunction.").

FN18. The Parties are advised to go to the district court's website at www.gand.uscourts.gov. On the home page, locate the Attorney Information link which will direct you to Preparation for a Civil and/or Criminal Trial Before Judge Duffey. Here, the Court has provided its Standing Order Regarding Civil Litigants, which describes the contents of the Plan. (http://www.gand.uscourts.gov/pdf/Standing_Order_Re_Civil_Litigation.pdf).

N.D.Ga.,2011.
Amedisys Holding, LLC v. Interim Healthcare of Atlanta, Inc.
--- F.Supp.2d ----, 2011 WL 2182720 (N.D.Ga.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
CALYON, Plaintiff,
v.
MIZUHO SECURITIES USA, INC., Mizuho International PLC, Alexander Rekeda, Douglas Munson, James Shepard, William Budd, Jr., Clifford Condon, Xavier Capdepon, Paolo Torti, Gwen Snorteland, Daniel Will, Rachel Yang, and Yuri Chumak, Defendants.

No. 07 Civ. 2241(RO).
Sept. 5, 2007.

*MEMORANDUM AND ORDER*

OWEN, District Judge.

***1** This case was brought by one banking corporation, Calyon, against another banking corporation, Mizuho, and eleven individuals who used to work at Calyon but now work at Mizuho. Defendants have moved to dismiss the complaint or, in the alternative, stay the action and compel arbitration.

On a motion to dismiss, the Court must accept as true all material factual allegations in the complaint, *Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 986 F.2d 196, 198 (2d Cir.1992). In addition to the facts set forth in the complaint, the Court may also consider documents attached thereto and/or incorporated by reference therein, *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 67 (2d Cir.1998), as well as matters of public record, *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir.1998), *cert. denied*, 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999).

On December 8, 2006, ten of the eleven individual defendants resigned from Calyon after signing employment agreements with Mizuho the night before (the eleventh had been fired by Calyon earlier and had already started working for Mizuho). Towards the end of their employment at Calyon, some defendants copied information that Calyon claims is proprietary from Calyon's computer system. Others emailed copies of those documents to their personal email accounts. Some emailed Calyon documents directly to Mizuho. Many of these documents were transmitted before the defendants signed their employment agreements with Mizuho, but some were transmitted after. These acts violated Calyon's internal email policies.

Plaintiff's complaint has one federal cause of action, under 18 U .S.C. § 1030, the Computer Fraud and Abuse Act ("CFAA"), and a number of state law causes of action (for breach of fiduciary duty, inducing/aiding and abetting a breach of fiduciary duty, unfair competition, tortuous interference with business relationships, and civil conspiracy).

Defendants argue that the purported federal cause of action, under the CFAA, does not state a claim, and that the Court should not exercise supplemental jurisdiction over the state law claims if the federal claim be dismissed. Calyon relies, on two sections of the CFAA to establish federal jurisdiction. Section (a)(4) provides a claim against whoever, "knowingly and with intent to defraud, accesses a protected computer *without authorization, or exceeds authorized access,* and by means of such conduct furthers the intended fraud and obtains anything of value...." 18 U.S.C. § 1030(a)(4). Section (a)(5)(A)(i) provides a claim against whoever "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage *without authorization,* to a protected computer. 18 U.S.C. § 1030(a)(5)(A)(i). Courts in other circuits have interpreted the "without authorization" and "exceeds authorized access" in different ways. [FN1] But, the plain language of the statute seems to contemplate that, whatever else, "without access" and "exceeds authorized access" would include an employee who is accessing documents on a computer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

system which that employee had to know was in contravention of the wishes and interests of his employer. Accepting as true the allegations in the complaint, Calyon's employees did not have authorization to access the Calyon computer system and take out proprietary documents for use by a competitor bank. On that basis, Calyon has stated a claim under the CFAA, and there is federal jurisdiction.

FN1. *Compare Intern. Ass'n of Machinists v. Werner-Masuda,* 390 F . Supp.2d 479 (D.Md.2000); *Secureinfo Corp. v. Telos Corp.,* 387 F .Supp.2d 593 (E.D.Va.2005); *Lockheed Martin Cop. v. Speed,* 2006 WL 2683058 (M.D.Fla. Aug. 1, 2006) *with Shurgard Storage Centers v. Safeguard Self Storage,* 119 F.Supp.2d 1121 (W.D.Wash.2000); *International Airport Centers, L.C.C. v. Citrin,* 440 F.3d 418 (7th Cir.2006); *Pharmerica, Inc. v. Arledge,* 2007 WL 865510 (M.D.Fla. March 21, 2007).

***2** The defendants also ask this Court to stay the action and compel Calyon to arbitrate. Calyon is not subject to an arbitration agreement with the defendants; instead, a wholly owned subsidiary Calyon Securities International (CSI) is a registered member of the National Association of Securities Dealers (NASD) and is party to an arbitration agreement through the NASD.[FN2] Because Calyon, the plaintiff here, itself is not a party to the agreement, whatever else, it cannot be compelled to arbitrate this dispute.

FN2. The agreement is found in the NASD Code of Arbitration Procedure.

Accordingly, defendants' motion to dismiss or, in the alternative, to compel arbitration are denied.

So ordered.

S.D.N.Y.,2007.
Calyon v. Mizuho Securities USA, Inc.

Not Reported in F.Supp.2d, 2007 WL 2618658 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
DELOITTE & TOUCHE LLP, Plaintiff,
v.
Lyle CARLSON and David A. Deckter, Defendants.

No. 11 C 327.
July 18, 2011.

Jeffrey Hoke Bergman, Brian V. Alcala, Ungaretti & Harris LLP, Chicago, IL, for Plaintiff.

Shelly Byron Kulwin, Kulwin, Masciopinto & Kulwin, LLP, Chicago, IL, for Defendants.

***MEMORANDUM OPINION AND ORDER***

JAMES B. ZAGEL, District Judge.

*1 Plaintiff Deloitte & Touche LLP sues two of their former employees, Lyle Carlson and David A. Deckter, for actions they allegedly took in the late stages of their employment with Deloitte, and continuing into their employment with another entity, Edgile, Inc.

Counts I, III, IV, VII, and X are leveled at Carlson. Respectively, they allege a violation of the Computer Fraud and Abuse Act, breach of the non-solicitation provision of an employment contract, breach of a right-to-inspect provision of the contract concerning access to personal computers, breach of the fiduciary duty of loyalty, and tortious interference with prospective economic relations. Count II, V, VI, VIII, and IX are aimed at Deckter. They allege violations of the Computer Fraud and Abuse Act, breach of a provision of his Senior Management Agreement concerning the right to inspect, breach of another provision concerning return of computer hardware and data, tortious inducement to breach the fiduciary duty of loyalty, and tortious interference with contract.

Defendants jointly move to dismiss all claims under Rule 12(b) (6). For the reasons that follow, the motion is denied as to each of the numbered counts but is granted for an additional, implied claim of breach of contract for client solicitation.

BACKGROUND

The alleged facts, which I take as true for purposes of this motion, are as follows.

Deloitte & Touche LLP ("Deloitte" or "Plaintiff") is a consulting and professional services firm. It is organized as a Delaware limited liability partnership and has its principal place of business in New York City. Deloitte also operates an office in Chicago, where most of the alleged conduct was centered.

Carlson, an Indianapolis resident, worked for Deloitte but now works for Edgile, Inc. Carlson had started his most recent stint with Deloitte in 2002 as a Senior Manager in Deloitte's Security and Privacy Practice. Senior Manager is the third-highest position level at Deloitte. He eventually rose to the position of Director, the second-highest position level within the firm. As a Director, Carlson had access to a large volume of confidential and proprietary information, ranging from client lists to internal security protocols. Carlson's specific duties in the Security and Privacy group meant that he was well-acquainted with computer hardware and software and with technological security.

*Carlson's and Deckter's Employment Agreements*

Carlson signed an employment contract—a "Director Agreement" on August 18, 2006. One provision of the agreement is that during his employment and for one year after his employment ends, he would not "directly or indirectly ... solicit or attempt to solicit, or participate in the solicitation of or any attempt to solicit any partner, principal, member, officer, or employee of [Deloitte] to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

leave [Deloitte] ... or to join any firm or business with which [he] may be or become affiliated."

An additional provision stated that Carlson "agree[d] to allow [Deloitte] to inspect any of [Carlson's] personal or home computers to determine whether any Proprietary Information or Property belonging to the Employer or a Connected Entity resides on such computers and to permit [Deloitte] to remove such Proprietary Information or Property from such computers."

***2** Deckter signed a "Senior Manager Agreement" on September 20, 2004. Deckter's agreement had an identical inspection provision to Carlson's Director Agreement. Also relevant here, Deckter's Senior Manager Agreement had a provision stating that upon the termination of his employment he would "immediately deliver to [Deloitte] any Proprietary Information of [Deloitte] in a tangible form that [Deckter] may then or thereafter hold or control."

*The Carlson and Deckter Departures*

Carlson voluntarily resigned from Deloitte on October 29, 2010 to work for Edgile, Inc. Like the group Carlson worked for at Deloitte, Edgile provides computer network security and privacy services. On August 15, 2010–two and a half months prior to Carlson's departure-Deckter sent an email to Carlson with the subject line "ddeckter@gmail.com" and no body text other than Deckter's electronic signature. Plaintiff alleges that this email was sent from Deckter to Carlson to facilitate Carlson's solicitation of Deckter to work at Edgile. Plaintiff avers on information and belief that Deckter and Carlson thereafter engaged in email exchanges and video conferencing, the goal of which was for Carlson to solicit Deckter and ultimately for both of them to coordinate their departures to Edgile. Deckter in fact did leave Deloitte for Edgile, on November 26, 2010–less than one month after Carlson.

Additionally, Plaintiff claims that Carlson told other Deloitte employees to "Sit tight ... I'll be in touch," which Plaintiff claims was a loaded statement implying that Carlson would reach back to solicit them to join him at Edgile along with Deckter.

*The Hardware and Data Destruction*

When Carlson resigned from Deloitte, he returned his company-issued laptop computer but did not return the hard drive originally issued with that computer, despite an exit checklist commanding him to return all computer hardware and data. Rather than return the originally issued hard drive, he destroyed that hard drive by physically shattering it. The computer he returned had a new, blank hard drive.

A letter from Carlson's attorney is attached as an exhibit to the complaint. In it, counsel explained that Carlson destroyed the hard drive because he had personal data stored on it, including such personal documents as tax returns and private account information. The letter represents that Carlson uploaded all Deloitte documents from the hard drive onto Deloitte's servers prior to destroying it, but Deloitte disputes this fact. Additionally, Deloitte claims that even for data which was downloaded, they were only able to restore it to a usable form at some effort and cost. Further, Deloitte notes that Carlson's lawyer's letter expressly does *not* say that he no longer also has the Deloitte data himself—it merely says that he uploaded Deloitte files onto Deloitte's servers.

Using what Deloitte describes as "a more contemporary approach" than physically smashing his computer hardware, Deckter downloaded a commercially available software program called "Eraser" from the Internet. Running the program had the effect of permanently deleting substantial volumes of Deloitte data.

*Client Solicitation*

***3** Plaintiff claims that Carlson has "contacted" several of his clients from Deloitte, in violation of a client non-solicitation provision in his Director Agreement.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

STANDARD OF REVIEW

With exceptions not relevant here, complaints asserting claims for relief in the federal courts are governed by the notice pleading standard of Rule 8. *See Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th Cir.2008). A motion under rule 12(b)(6) requests dismissal of a complaint, or a claim within a complaint, for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P 12(b)(6). Such motions test the legal sufficiency of the complaint, not the underlying factual merits. *Christensen v. County of Boone,* 483 F.3d 454, 458 (7th Cir.2007).

I must take all facts alleged in a plaintiff's complaint as true and draw all reasonable inferences from those facts in favor of that plaintiff. *Pisciotta v. Old Nat. Bancorp,* 499 F.3d 629, 633 (7th Cir.2007). Plaintiffs need not plead particularized facts, but the factual allegations in the complaint must be enough to raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 569 n. 14, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Plaintiffs must plead their facts so that, when accepted as true, they show the plausibility of their claim for relief. *Ashcroft v. Iqbal,* —U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). In short, a complaint governed by Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

DISCUSSION

A. Client Solicitation

Before considering the numbered counts in the complaint I consider the allegations of illicit client solicitation by Carlson. Plaintiff devotes three short paragraphs in its complaint to Carlson's alleged "contact" with Deloitte clients. Seeing this allegation, Defendants moved to dismiss any claim insofar as it relies on client (as opposed to employee) solicitation. Plaintiff asserts that they have not made "any such claim, and the Court should not dismiss the breach of contract claim based on this argument."

On the one hand, it is true that none of the numbered counts in the complaint appear to directly base a claim on client solicitation. But on the other hand, certain relief in the complaint is targeted at client solicitation. For example, paragraph 17 of the complaint (a background paragraph that comes before the counts) says that "[b]y this action ... [Deloitte] seeks, among other things ... injunctive relief enjoining Carlson and Deckter from any solicitation of [Deloitte's] clients." Further, paragraph 78(e), which is part of Count III, requests that I "enter a preliminary and permanent injunction prohibiting Carlson ... from directly or indirectly soliciting any [Deloitte] client or prospective client ."

Therefore, over Deloitte's protestations, I do interpret their complaint as making a claim rooted in wrongful client solicitation. Because all Plaintiff alleges on that front is "contact" with the client—and nothing more—the claim falls short of an allegation of solicitation. The implied claim is therefore dismissed, without prejudice.

B. Claims Against Carlson

i. Count I—Computer Fraud and Abuse Act

***4** Under the Computer Fraud and Abuse Act ("CFAA"), it is a crime to:

(A) knowingly cause the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

(B) intentionally access a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

(C) intentionally access a protected computer without authorization, and as a result of such conduct, causes damage and loss.

18 U.S.C. § 1030(a)(5). The CFAA also provides for a civil action:

Any person who suffers damage or loss by reason

of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A) (i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages.

*Id.* at § 1030(g). Deloitte argues for liability based on subclause (I), which requires "loss to 1 or more persons during any 1–year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value." *Id.* at § 1030(c)(4)(A)(i)(I).

Defendants argue first that there is no allegation that Carlson acted "without authorization," as required by the statute. Defendants highlight that Carlson was an employee of Deloitte when the alleged data destruction occurred, and therefore not acting "without authorization." Defendants do acknowledge that an employee may be acting without authorization if he has breached a duty of loyalty to his employer prior to the alleged data destruction. *See Int'l Airport Centers LLC v. Citrin,* 440 F.3d 418, 420–21 (7th Cir.2006). In Defendants' words, *Citrin* does not apply because in that case "the employee had been undertaking a pattern of activity adverse to his employers' interests" prior to the official end of his employment.

This is exactly what is alleged in this case. Here, Carlson is claimed to have begun his solicitation of Deckter before departing Deloitte. The data destruction was done, in part, to cover his tracks in wrongfully soliciting Deckter. If, as claimed, Carlson was so nakedly violating his Director Agreement, he would have been acting contrary to his employer's interests, thereby ending his agency relationship with Deloitte and making his conduct "without authorization." *See id.*

Incidentally, *Citrin'* s holding has even more force in this case. In *Citrin,* the former employee's employment contract allowed him to "return *or destroy"* data in his laptop. *Id.* (emphasis in original). The Seventh Circuit still found the employee to have acted without authorization, because in that case the data destruction was intended to deprive the employer of important data. Here, Carlson's agreement expressly compels him to return all hardware and data-there isn't even the option of data destruction as there was in *Citrin.*

***5** Aside from the "without authorization" argument, Defendants argue that Deloitte has not adequately pled "damage or loss" required by § 1030(g).

Deloitte's allegations are sufficient. Plaintiff claims first that they have not restored all of Carlson's data, despite his counsel's assurances to the contrary.[FN1] This data included, among other things, potentially valuable client information and proprietary Deloitte processes. Plaintiff also claims that to the extent such data was restored, it came at great time and expense. The "damage or loss" allegations are sufficient.

FN1. Defendants argue that Deloitte cannot challenge Carlson's assurances that he returned all of the Deloitte data and only destroyed his own personal information. This is so, say Defendants, because Deloitte has adopted Carlson's statements by attaching his lawyer's letter as an exhibit to its own complaint. This might be true if the exhibit were a contract or a loan and that document itself was the subject of the complaint. When the exhibit, however, is not the subject of a claim, "Rule 10(c) does not require a plaintiff to adopt every word within the exhibits as true for purposes of pleading simply because the documents were attached to the complaint to support an alleged fact." *N. Ind. Gun & Outdoor Shows, Inc. V. City of South Bend,* 163 F.3d 449, 454 (7th Cir.1998). That's what

Deloitte was doing here. They attached Carlson's counsel's letter simply to point out that Carlson had admitted destroying the hard drive. Deloitte did not intend to adopt everything their adversary was claiming in that letter.

ii. Count III—Breach of Contract

This count alleges that Carlson breached the non-solicitation of his Director Agreement by soliciting Deckter to follow him to Edgile. Defendants claim this count fails the sufficiency standards of Rule 8 as interpreted in *Twombly* and *Igbal.*

Plaintiffs have asserted sufficient facts to state a viable claim. Defendants argue that all is shown by the complaint is that Deckter sent Carlson his personal email address. Everything beyond that, say Defendants, are the sorts of "naked assertion[s]" without "further factual enhancement" that run afoul of Rule 8. *Igbal,* 129 S.Ct. at 1949. Without more, this might be so. But Defendant overlooks a key fact that is not only alleged but undisputed—Deckter left Deloitte for Edgile less than one month after Carlson. Linking the email with Deckter's actually having left for Carlson's new firm, Deloitte asserts (albeit only on information and belief) that Carlson and Deckter must have been using their personal email accounts to coordinate the move to Edgile. This is a plausible allegation given the circumstances and timing.

iii. Count IV—Breach of Contract (Specific Performance)

Through Count IV, Plaintiff seeks specific performance of the provision of Carlson's Director Agreement allowing Deloitte "to inspect any of [Carlson's] personal or home computers to determine whether any Proprietary Information or Property belonging to the Employer or a Connected Entity resides on such computers and to permit [Deloitte] to remove such Proprietary Information or Property from such computers."

Defendants claim this count should fail because the term it purports to enforce is indefinite and incomplete. They cite the basic axiom of contract law that specific performance requires not only a "definite" and "complete" agreement, but an even greater degree of specificity regarding the "essential terms" for which a party seeks specific performance. *White Hen Pantry, Inc. v. Cha,* 214 Ill.App.3d 627, 158 Ill.Dec. 310, 574 N.E.2d 104, 108 (Ill.App.Ct.1991); *see also Cinman v. Reliance Fed. Sav. & Loan Assoc.,* 155 Ill.App.3d 417, 108 Ill.Dec. 78, 508 N.E.2d 239, 244 (Ill.App.Ct.1987) ( "Specific performance requires as a prerequisite a clear and precise understanding of the terms of the contract.").

The essential term at issue here is sufficiently clear and precise. It states that Defendant can inspect "any of [Carlson's] personal or home computers" to check for any Deloitte information or property. While this term may be expansive, even invasive, there is nothing unclear about it.

*6 Defendant also argues that the term contains no time limitation, so it must fail for uncertainty on that basis. Not so. First, with regards to timing of a post-termination inspection, the clause is not inherently unlimited. It states that such event take place "upon termination of your employment." While this is a triggering clause, by its context it is also meant as a limitation provision because it prompts the employee to swiftly return hardware, software, and data. More fundamentally, though, while the clause is not perfectly precise, it is also not an essential term. Specific performance requires heightened specificity only of the "essential" terms, not any and all terms sought to be enforced. *See Cha,* 574 N.E.2d at108 (Ill.App.Ct.1991) (discussing "essential" terms); *see also Cinman,* 108 Ill.Dec. 78, 508 N.E.2d at 244 (same). When, precisely, after employment such an inspection takes place is not so essential as to allow this clause to fail.

The motion as to Count IV is denied.

iv. Count VII—Breach of Fiduciary Duty of Loyalty

In this count, Plaintiff reframes the conduct

supporting their CFAA and breach of contract claims as breaches of the fiduciary duty of loyalty. Specifically, they assert that the destruction and/or theft of Deloitte property and data as well as the solicitation of Deckter are breaches of that duty.

Mirroring Plaintiff's incorporations, Defendants incorporate by reference their arguments supporting dismissal of those claims. Defendants conclude that the failure to adequately plead the destruction of Deloitte property or the solicitation of Deckter means that a breach of fiduciary duty claim fails as well. As explained above, Plaintiff's claims under the CFAA and for breach of contract are well pled. Therefore, the breach of fiduciary duty claim survives, too.

The motion to dismiss Count VII is denied.

v. Count X—Intentional Interference with Prospective Economic Relations

Under Illinois law, the elements of a claim of tortious interference with prospective economic relations are 1) reasonable expectancy of entering into a valid business relationship; 2) defendant's knowledge of that expectancy; 3) an intentional and unjustified interference by the defendant that caused or induced a breach of the expectancy; and 4) damages resulting from the interference. *Fellhauer v. Geneva,* 142 Ill.2d 495, 154 Ill.Dec. 649, 568 N.E.2d 870, 878 (Ill.1991).

Defendants urge dismissal because Plaintiffs have not pled facts sufficient to support a "reasonable expectancy" that Deckter would have stayed on at Deloitte.[FN2] A reasonable expectancy means something more than a "mere hope" that a relationship will continue. *MJ & Partners Restaurant Ltd. Pshp. v. Zadikoff,* 126 F.Supp.2d 1130, 1138 (N.D.Ill.1999) (citing Illinois law).

FN2. Defendants also incorporate their arguments regarding solicitation. That argument has been duly addressed.

Plaintiffs have alleged sufficient facts to support an inference of more than a "mere hope." David Deckter had worked for Deloitte for over twelve years at the time he left for Edgile. He was promoted in 2004 and signed an agreement which, though at-will, had significant non-compete and non-solicitation provisions tending to encourage an employee in a client-centric business to stay on board.

*7 The motion to dismiss Count X is denied.

B. Claims Against Deckter

i. Count II—CFAA

The reasons provided above in Count I as to Carlson's physical destruction of his hard drive are equally applicable to Deckter's download and use of the program "Eraser" to void his hard drive. The motion to dismiss this count is denied.

ii. Count V—Breach of Contract (Specific Performance)

The explanation as to Count IV applies equally here. Defendants' motion to dismiss this count is similarly denied.

iii. Count VI—Breach of Contract

Count VI alleges that Deckter breached his Senior Manager Agreement when he failed to return Deloitte property and instead deleted large quantities of data using the "Eraser" program. Defendants claim that no facts are alleged to describe what "property" was not returned. But paragraph 38, which was incorporated into Count VI, describes that property as, among other things, capable of being stored on a computer's hard drive, "research, analysis, research materials, marketing plans, economic forecasts, [and] proprietary computer software." This intellectual property is plainly contemplated in several provisions of the Director Agreement and its return was mandated in that agreement in paragraphs 10 and 21.

The motion to dismiss Count VI is denied.

iv. Count VIII—Tortious Inducement to Breach a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Fiduciary Duty

Under Illinois law, this tort requires a plaintiff to prove that: 1) the defendant colluded with a fiduciary in committing a breach; 2) the defendant knowingly participated in or induced the breach of duty; and 3) the defendant knowingly accepted the benefits resulting from that breach. *Borsellino v. Goldman Sachs Group, Inc.,* 477 F.3d 502, 508–09 (7th Cir.2007) (citing *Regnery v. Meyers,* 287 Ill.App.3d 354, 223 Ill.Dec. 130, 679 N.E.2d 74, 80 (Ill.App.Ct.1997).

Defendants first contend that there is insufficient support for the bare allegation that Deckter participated in or induced Carlson to hire Deckter at Edgile.

There is enough here. As explained above, Deckter had been at Deloitte since 1998 yet left for Edgile less than one month after Carlson went there. Further, there is the email passing along Deckter's private Google email account, which Deloitte claims facilitated collusive discussion between the two about their moves to Edgile. As discussed above, in context this allegation is plausible and it need not be proven at the pleading stage.

Defendants also contend that no allegations support the fact the Deckter could have known of Carlson's non-solicitation provision. Not only is it plausible that Deckter would have known of such a provision being attached to a Director—the second highest position in the company—it is highly likely. But as plausibility is all that is required, the pleading is sufficient.

The motion to dismiss Count VIII is denied.

v. Count IX—Tortious Interference with Contract

Defendants reiterate their arguments respecting Count VIII in regards to Count IX. For the same reasons, the motion to dismiss this count is denied.

CONCLUSION

***8** The motions to dismiss each of the numbered counts are DENIED.

The motion to dismiss the implied count of breach of contract based on client solicitation is GRANTED, without prejudice.

N.D.Ill.,2011.
Deloitte & Touche LLP v. Carlson
Slip Copy, 2011 WL 2923865 (N.D.Ill.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.



H
Only the Westlaw citation is currently available.

United States District Court,
E.D. Wisconsin.
DENTAL HEALTH PRODUCTS, INC., Plaintiff,
v.
Frank RINGO, Defendant.

No. 08-C-1039.
April 20, 2009.

Bruce A. Olson, Davis & Kuelthau SC, Green Bay, WI, for Plaintiff.

Howard J. Fishman, John M. Riccione, Aronberg Goldgehn Davis & Garmisa, Chicago, IL, for Defendant.

**DECISION AND ORDER**

WILLIAM C. GRIESBACH, District Judge.

***1** Plaintiff Dental Health Products, Inc., ("DHP") filed this action against Defendant Frank Ringo ("Ringo") for injunctive relief and damages based on claims of Misappropriation of Trade Secrets pursuant to Wisconsin Statutes § 134.90; Breach of Agency Duty; and violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. The case is currently before the Court on Ringo's Federal Rule of Civil Procedure 12(b)(3) motion to dismiss for improper venue or, alternatively, for transfer to the Northern District of Illinois pursuant to 28 U.S.C. § 1406(a). In the event venue is found to be proper, Ringo seeks dismissal of DHP's claims for Misappropriation of Trade Secrets and violation of the Computer Fraud and Abuse Act pursuant to Rule 12(b)(6) for failure to state a claim. Ringo has also filed a motion for a more definite statement regarding DHPS's Breach of Agency Duty claim, pursuant to Rule 12(e). For the reasons that follow, all of Ringo's motions will be denied.

**FACTS**

At this stage of the proceedings, the Court must deem DHP's well-pleaded allegations as true, and draw all reasonable inferences in favor of DHP. *See Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th Cir.2008). The facts of the case are therefore derived from the allegations in DHP's Complaint.

DHP is a Wisconsin corporation in the business of selling dental supplies and dental products to licensed dentists and dental practitioners throughout the United States. (Compl.¶ 7.) Ringo was employed by DHP as a field sales representative for the purpose of selling dental supplies and dental equipment from February 2002 until July 31, 2008. (*Id.* ¶¶ 5, 6.) DHP observed a decline in Ringo's sales volume, beginning several months prior to Ringo's resignation in July 2008. (*Id.* ¶ 7.) In July 2008, DHP discovered that Ringo was affiliated with another dental supply company. (*Id.* ¶ 8.) DHP also discovered that customers who had ordered from DHP in the past were placing orders with the other dental supply company while Ringo was still in DHP's employ. (*Id.* ¶ 10-11.)

During the time that Ringo was employed by DHP, he was furnished with a laptop computer to be used in accessing the DHP's password-protected computer network, which was hosted on computer servers located in New Franken, Wisconsin. (*Id.* ¶ 13.) Ringo had access through the laptop to, among other things, highly confidential information about customers, business practices of DHP as it related to its customers, negotiating strategies of customers, information as to product availability, and sales reports. (*Id.* ¶ 14.) This information was not available through any other source. (*Id.* ¶ 15.) Ringo was instructed by DHP to immediately return the laptop upon his resignation. (*Id.* ¶ 17 .) DHP performed forensic tests upon the laptop after its return and discovered that Ringo had installed and used a Norton ghostwriting program on the laptop to copy the entire hard drive onto an external hard drive on multiple occasions. (*Id.* ¶¶ 18-26.) DHP alleges that Ringo used the information copied from the computer to fill customer supply orders from DHP's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

competitors. (*Id.* ¶ 27 .) DHP alleges that Ringo has used the proprietary information to the benefit of Ringo's current employer and to the detriment of DHP. (*Id.* ¶ 29.)

**DISCUSSION**

**I. Venue and Transfer**

***2** Ringo first seeks dismissal of the case for improper venue or, alternatively, transfer to the Northern District of Illinois pursuant to 28 U.S.C. § 1406(a). "When a defendant challenges venue, the plaintiff bears the burden of establishing that its chosen venue is proper." *Emjayco v. Morgan Stanley & Co.,* 901 F.Supp. 1397, 1400 (C.D.Ill.1995). Courts decide venue questions mainly on the basis of the pleadings. *Id.* When deciding a venue question, a court takes as true the allegations in the plaintiff's complaint unless controverted by the defendant's affidavits. *Id.* The court resolves any conflicts in the affidavits in the plaintiff's favor. *Id.* To defeat a motion to dismiss or transfer a case, the plaintiff must allege and establish facts which support venue in its chosen district. *See id.*

Venue is, in general, governed by 28 U.S.C. § 1391. Unless another statute provides otherwise, a civil action in which jurisdiction is not founded solely on diversity of citizenship, which is the case here, can be brought only in:

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b). Since Ringo does not reside in this district, venue would lie here only if "a substantial part of the events or omissions giving rise to the claim" occurred here, or "a substantial part of the property that is the subject of the action" is situated here.

Ringo argues that it is clear from DHP's complaint that he worked from a branch office located in Illinois and the only other states that were involved are Indiana and Iowa. He is alleged to have begun working for a dental supply company in Iowa and to have solicited business in Indiana, as well as Illinois. Although DHP's principal place of business is in Wisconsin and its computer server is located there, Ringo argues that the complaint contains no allegations of events or omissions in Wisconsin. Absent any allegation that a substantial part of the events or omissions giving rise to its claims occurred in the Eastern District of Wisconsin, Ringo argues that the case should either be dismissed or transferred to the Northern District of Illinois where it could have been brought originally.

Venue is clearly proper in the Eastern District of Wisconsin. Count II of DHP's complaint asserts a breach of agency duty claim against Ringo. The agency relationship alleged in the complaint arose by operation of an employment contract, and thus the claim is at least one of breach of contract, and may be tortious as well. *Burbank Grease Services, LLC v. Sokolowski,* 2006 WI 103,¶ 42, 294 Wis.2d 274, 717 N.W.2d 781 ("A claim for the breach of an agent's duty of loyalty may sound both in tort and in contract."). In determining whether a substantial part of the events or omissions giving rise to the plaintiff's contract claim occurred or did not occur in a particular district, "the factors that the courts tend to focus on include: where the contract was negotiated or executed, where the contract was to be performed, and where the alleged breach occurred." Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice And Procedure: Jurisdiction 3d* § 3806.1, at 205-12 (2007). Moreover, "[i]n the electronic age, when face-to-face encounters are less common, the letters, facsimiles, e-mails, and telephone calls that are transmitted from, and received in, a district during the negotiation and execution of a contract often are deemed substantial events in the district for venue purposes." *Id.* at 212. Thus, in *Schomann Intern. Corp. v. Northern Wireless, Ltd.* 35 F.Supp.2d 205

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(N.D.N.Y.1999), a substantial part of a New York telecommunication company's breach of contract action against a nonresident engineering firm was found to have occurred in the Northern District of New York where, even though the defendant was not in New York during either the negotiation or execution of the contract, the terms of contract required the defendant firm to maintain regular contact with company's New York office.

***3** The facts here present an even stronger case for venue in this district. Ringo negotiated his employment contract in Wisconsin and signed all "new hire" documents at DHP's home office in this district. (Aff. of Dale Roberts ¶¶ 2, 3.) He executed a confidentiality agreement that contained a provision stating that all questions arising thereunder would be governed by Wisconsin law and submitting to jurisdiction and venue in Wisconsin as to any action arising in connection with the agreement. (*Id.* ¶ 4.) During the course of his employment, he had weekly, if not daily telephone and email communication with the home office in Wisconsin, and used the corporate computer systems for email, access to Sales Logix (a database of highly confidential information regarding DHP's customers and business, (Compl.¶ 14)) and to receive sales and productivity reports. (*Id.* ¶ 5.) Ringo received his regular paychecks from Wisconsin, attended mandatory quarterly managers meetings in Green Bay, along with annual sales recognition events and sales conferences. (*Id.* ¶¶ 7, 8.) He also reported to DHP's Wisconsin-based supervisory personnel, including its CEO, on a regular basis.

The trade secrets Ringo is alleged to have misappropriated in Count I of the complaint consist of DHP's confidential compilation of information concerning its customers for dental products; its costs and margins for supplying dental products; the limitations on its ability to meet identified needs of existing and potential DHP customers; DHP's strategic plans, market research and discussions regarding the market for and business opportunities available for supplying new and existing dental products; and DHP's sales productivity and account information for other company sales representatives, all of which was stored on its server located in Wisconsin. It thus follows that the computer system Ringo is alleged to have accessed in violation of the Computer Fraud and Abuse Act as alleged in Count III of the complaint is also located in Wisconsin.

In *Argent Funds Group, LLC v. Schutt,* 2006 WL 2349464 (D. Conn. June 27, 2006), the Court discussed the question of venue for a claim arising under the Computer Fraud and Abuse Act in a case in which a former employee of a Connecticut financial services firm had allegedly accessed confidential and valuable fund and financial information remotely, downloaded that information to two laptop computers and two hard drives of a Dell desktop computer, and stole the laptops, the hard drives, and their associated software after being terminated from her position. The confidential information that was allegedly stolen was located on computer file servers at the firm's headquarters in Connecticut, and the former employee resided in Florida at the time. Despite the fact that the information obtained by the former employee was not used in Connecticut, the Court had no difficulty in concluding that a substantial part of the event giving rise to the claim occurred there:

> ***4** the nature of Argent's claim is an injury arising from the alleged theft of confidential information, the computers, and the software that was originally installed on the computers. Substantial events material to the claim occurred in Connecticut; Schutt would not have been able to obtain the confidential information had the Connecticut file server never transferred the information to her via the internet. The Connecticut file servers thus played a central role in the events that gave rise to the claim, and were one of the means by which the defendant allegedly stole the confidential information.

*Id.* at *2. Even if a substantial part of the events or omissions giving rise to the claim had not occurred in Connecticut, the Court concluded that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

venue would still be appropriate there under § 1391(b) because a substantial part of property that was the subject of the action was situated in Connecticut. "The intellectual property at issue in this case is Argent's confidential business information, which is located on the file servers in Connecticut. Therefore, venue is appropriate in Connecticut either because the property at issue is located here, or because a substantial part of the events giving rise to the claim occurred in Connecticut." *Id.*

The same reasoning applies in this case. The trade secrets alleged stolen by Ringo and the computers system in which they were stored and that he allegedly accessed in violation of the Computer Fraud and Abuse Act were located in Wisconsin. Moreover, the duty of loyalty to DHP that he is accused of breaching required ongoing communication and regular contact with his supervisors in Wisconsin. The alleged acts of disloyalty, at least to the extent that they took the form of deception and misrepresentation, constitute a substantial part of the events or omissions giving rise to DHP's breach of agency duty claim. It thus follows that a substantial part of the events or omissions giving rise to DHP's claims occurred in this district. Ringo's motion to dismiss will therefore be denied. And since venue in this district is proper, it necessarily follows that his alternative motion to transfer venue to the Northern District of Illinois pursuant to 28 U.S.C. § 1406(a) must be denied also.

**II. Rule 12(b)(6) Motion To Dismiss Counts I and III.**

A Rule 12(b)(6) motion to dismiss is used to test the legal sufficiency of a complaint. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). Dismissal is granted only if the "plaintiff has failed to allege any set of facts upon which relief may be granted." *Id.* In order to give a defendant fair notice of what the claim is, and the grounds upon which the claim rests, Fed.R.Civ.P. 8(a)(2) requires only a short and plain statement of a claim showing that the plaintiff is entitled to relief. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A claim for relief does not need detailed factual allegations; however, the factual allegations must be enough to create a right to relief beyond the "speculative level." *Id.* Plaintiff's complaint meets this test.

**A. Misappropriation of Trade Secrets Claim**

***5** Count I of the complaint asserts a claim for misappropriation of trade secrets. To state a claim for misappropriation of trade secrets, a plaintiff must demonstrate that the material referred to in the complaint is a trade secret and that the trade secret was misappropriated. Wisconsin has codified the definition of a trade secret as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply: (1)[t]he information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use [;][and] (2)[t]he information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

Wis. Stat. § 134.90(1)(c); *Minuteman, Inc. v. Alexander,* 147 Wis.2d 842, 852, 434 N.W.2d 773, 777 (Wis.1989). In order to show that particular information was a trade secret, the plaintiff must show that its trade secret is valuable, not known to others who might profit from its use, and that the trade secret has been handled by means reasonably designed to maintain secrecy. *Idx Sys. Corp. v. Epic Sys. Corp.,* 285 F.3d 581, 583 (7th Cir.2002).

In addition, Wisconsin courts have held that a customer list may be considered a trade secret when identical or nearly identical products or services or both are sold to a small, fixed group of purchasers. *Nalco Chem. Co. v. Hydro Tech., Inc.,* 984 F.2d 801, 804 (7th Cir.1993); *Minuteman, Inc.,* 147 Wis.2d at 857, 434 N.W .2d at 779. When analyzing whether customer information is a trade secret, a court looks at whether the plaintiff took reason-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

able measures to protect the confidentiality of the information. *Maxpower Corp. v. Abraham,* 557 F.Supp.2d 955, 961 (W.D.Wis.2008). A court looks at, among other factors, whether the plaintiff had its employee sign a confidentiality agreement, whether the employee used the information for the benefit of the new employer, and whether the plaintiff made an attempt to insure that the employee no longer had access to the confidential information through the employee's laptop after the employee's resignation. *See id.*

Here, I am satisfied that DHP has alleged facts that show that the customer information could constitute a trade secret, and that the trade secret may have been misappropriated by Ringo. DHP took reasonable measures to protect the confidentiality of the information by having Ringo sign a confidentiality agreement (Compl.¶ 36). Additionally, DHP alleges that Ringo used the information for the benefit of his new employer. (Compl.¶¶ 29, 30, 33.) Also, DHP attempted to insure that Ringo no longer had access to the confidential information by requiring the immediate return of the laptop. (Compl.¶ 17.) In addition, DHP has alleged facts that show that the information is valuable and not generally known to others because the information is only found on DHP's computer network. (Compl.¶ 15.) Finally, DHP alleges that Ringo misappropriated the information by downloading the confidential information during the time Ringo was employed and after he gave notice of his resignation, but prior to returning the laptop. (Compl.¶¶ 17, 18-26.) These alleged facts are sufficient to support a claim of misappropriation of trade secrets under Wisconsin Statutes § 134.90(1)(c).

**B. Violation of the Computer Fraud and Abuse Act Claim**

***6** Count III of the complaint alleges a violation of the Computer Fraud and Abuse Act ("CFAA"). 18 U.S.C. § 1030 (2008). Although its complaint does not specify the provisions of the CFAA Ringo is alleged to have violated, DHP argues in its response to Ringo's motion to dismiss that the facts alleged in its complaint support claims under section 1030(a)(2)(C), (a)(4), (a)(5)(A)(i) and (B)(i). Section 1030(a)(2)(C) makes subject to criminal penalties one who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains ... information from any protected computer if the conduct involved interstate or foreign communication." Section 1030(a)(4) makes subject to such penalties one who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." And under section 1030(a)(5)(A)(i) and (B)(i), one who "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer" and thereby causes "loss to 1 or more persons during any 1-year period ... aggregating at least $5,000 in value" is subject to criminal penalties.

Although the CFAA is primarily a criminal statute, section 1030(g) authorizes a person who suffers damage or loss due to a violation of some other provision of the Act to bring a civil action for compensatory damages and injunctive or other equitable relief. As another court has recently noted, however, section 1030(g) is "put together in a somewhat confusing way." *Motorola, Inc. v. Lemko Corp.,* 2009 WL 383444, *3 (N.D.Ill. Feb. 11, 2009). Section 1030(g) reads in pertinent part:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 U.S.C. § 1030(g). This subsection has been construed to permit a civil action for damage or loss caused by a violation of any of the substantive provisions of the CFAA, as long as the conduct involved one or more of the factors set forth in section 1030(a)(5)(B)(i)-(v). *Fiber Sys. Int'l, Inc. v. Roehrs,* 470 F.3d 1150, 115657 (5th Cir.2006); *Charles Schwab & Co., Inc. v. Carter,* 2005 WL 351929, *3 (N.D.Ill. Feb. 11, 2005). "In short, a person suing under section 1030(g) must prove: (1) damage or loss (2) by reason of (3) a violation of some other provision of section 1030, and (4) conduct involving one of the factors set forth in section 1030(a)(5)(B)(i)-(v)." *Motorola,* 2009 WL 383444 at *4. The factors set forth in section 1030(a)(5)(B)(i)-(v) describe various kinds of harm that must exist in order to bring a civil action. In this case, the only kind of harm alleged that would qualify is the harm set forth in section 1030(a)(5)(B)(i): "loss to 1 or more persons during any 1-year period .... aggregating at least $5,000 in value." The question presented by Ringo's motion is whether DHP has stated a claim under any of the provisions it has cited.

**1. Violation of section 1030(a)(2)(C)**

*7 A person violates section 1030(a)(2)(C) if he or she "intentionally accesses a computer without authorization or exceeds authorized access and thereby obtains information ... from any protected computer if the conduct involved an interstate or foreign communication." 18 U.S.C. § 1030(a)(2)(C). The elements of a section 1030(a)(2)(C) violation thus include (1) intentional access of a computer, (2) without or in excess of authorization, (3) whereby the defendant obtains information from the protected computer. *Motorola,* 2009 WL 383444 at * 4.

Ringo contends that the complaint fails to state a claim under this section because it is clear from the allegations that Ringo was an employee of DHP and was authorized to access DPH's computer system. The term "exceeds authorization," as defined in the CFAA, means "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accessor is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6). The term "without authorization," though not defined in the CFAA, has been interpreted by other courts to mean "conduct by outsiders who do not have permission to access the plaintiff's computer in the first place." (Def.'s Br. In Opp. Mot. S.J. at 7.) Based on these definitions, Ringo argues that DHP's claim under section 1030(a)(2) fails because it is clear from the complaint that he was employed by DHP and thus had access to the very information DHP claims he obtained without authorization.

In support of his argument, Ringo relies on several cases that have rejected CFAA claims by employer plaintiffs against employees who have used their computer access to misappropriate confidential information and then share it with a competitor. In *US Bioservices Corp. v. Lugo,* 595 F.Supp.2d 1189 (D.Kan.2009), for example, the plaintiff group of specialty pharmaceutical care providers who serviced the pharmaceutical needs of manufacturers, physicians, patients, and payors, sued former employees who allegedly obtained confidential information while still employed by the plaintiff and then disclosed the information to their new employer, a competitor of plaintiffs, who then used the information to interfere with plaintiffs' contractual and business relationships. *Id.* at 1190. Finding it clear from the complaint that the defendant employees had access to the computer in which the information was maintained as part of their employment at the time they obtained it, the district court dismissed the CFAA claim on the ground that they had not acted without or in excess of that authorization. Ringo argues that the same reasoning applies here. Since he was authorized as part of his employment to access DHP computers and retrieve the information he is alleged to have obtained, DHP cannot state a claim under section 1030(a)(2).

The difficulty with Ringo's argument is that the

cases upon which he relies conflict with binding Seventh Circuit precedent. In *Int'l Airport Ctrs., LLC v. Citrin,* 440 F.3d 418 (7th Cir.2006), the Seventh Circuit, applying agency principles, held that an employee's breach of his duty of loyalty to his employer terminates the agency relationship and with it the employee's authority to access the employer's computer system. *Id.* at 420-21. Thus, an employee who acquires an interest adverse to his employer and fails to disclose it loses his authority to obtain confidential information. *Id.* at 421. While *Citrin* has been criticized and rejected by other courts, *see, e.g., Shamrock Foods Co. v. Gast,* 535 F.Supp.2d 962, 964-65 (D.Ariz.2008), it is controlling here. DHP's allegation that Ringo breached his duty of loyalty by going to work for one of its competitors while remaining in its employ is therefore sufficient to state a section 1030(g) claim that he violated section 1030(a)(2) by his continued "usage, copying, downloading or removal of information." (Compl.¶ 53.) And because DHP has alleged that as a result of his obtaining access to information from its protected computer, Ringo caused DHP loss in excess of $5,000, the complaint sufficiently alleges a civil claim against Ringo under that provision of the CFAA.

**2. Violation of section 1030(a)(2)(4)**

***8** A person violates section 1030(a)(4) of the CFAA if he or she "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value...." 18 U.S.C. § 1030(a)(4). Ringo contends that "DHP has failed to establish that Ringo accessed its computers without authorization or in excess of his authorized access." (Br. In Opp. at 9.) He further contends that "DHP has failed to allege any facts in support of its claim that Ringo acted with any intent to defraud." (*Id.*)

For the reasons already stated in connection with DHP's claim that Ringo's conduct violated section 1030(a)(2), the complaint sufficiently alleges that Ringo acted without or in excess of his authorization. As to Ringo's assertion that DHP has failed to allege facts in support of its claim that Ringo acted with intent to defraud, it is sufficient to note that at the pleading stage detailed factual allegations are not required. *George v. Smith,* 507 F.3d 605, 608 (7th Cir.2007) (noting that while plaintiffs "need not plead facts, .... they must give enough detail to illuminate the nature of the claim and allow defendants to respond"). While a violation of section 1030(a)(4) requires that the defendant act with intent to defraud, fraud *per se* is not an element. Thus, the particularity requirement of Rule 9(b) does not apply. *See* Fed.R.Civ.P. 9(b); *Motorola,* 2009 WL 383444 at *3. Moreover, even if Rule 9(b) did apply, the complaint sets forth significant particularity regarding Ringo's alleged deception of DHP in using confidential information to compete against it even while continuing in DHP's employ. (Compl.¶¶ 13-33.) While it is true that DHP alleges Ringo's intent to defraud only generally, Rule 9(b) requires nothing more. Fed.R.Civ.P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *see also C.H. Robinson Worldwide, Inc. v. Command Transportation, LLC,* No. 05 C 3401, 2005 WL 3077998, at *4 (N.D.Ill.Nov.16, 2005) It thus follows that DHP's claim under section 1030(a)(4) survives as well.

**3. Violation of section 1030(a)(5)**

It is not enough for DHP to show it sustained a loss of income as a result of Ringo's alleged conduct in order to establish a violation of section 1030(a)(5). "In contrast to a claim under section 1030(g) based on violation of section 1030(a)(2) or (a)(4), a plaintiff seeking to recover via section 1030(a)(5) of the CFAA must allege, and ultimately prove, the defendant's conduct resulted in damage as the CFAA defines that term." *Motorola,* 2009 WL 383444, at *7. Damage, as defined by the CFAA, "means any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(d)(8). Downloading confidential information would not seem to cause "damage" so defined.

***9** The Seventh Circuit held in *International Airport Centers v. Citrin,* however, that an employer's allegation that its employee had installed a secure-erasure program on the employer's computer which deleted the employer's files, as well as other files that incriminated the employee himself, was sufficient to state a claim under section 1030(a)(5)(i) and (ii). 421 F.3d at 420. It made no difference, according to the Court, whether the erasure program was downloaded from the internet or copied from a floppy disc or CD inserted into a disc drive that was either inside the computer or attached to it by a wire. *Id.* at 419. Either method involved the transmission of a program intended to cause damage without authorization to a protected computer. *Id.*

It is not clear from the complaint in this case whether Ringo is alleged to have engaged in similar conduct. DHP alleges facts from which it could be inferred that he installed an "enterprise version of Norton Ghost software" on the laptop issued to him by DHP without DHP's authorization (Compl.¶¶ 18-26), but it is unclear if this software simply assisted the copying of the hard drive or also deleted files that incriminated Ringo. If the latter, *Citrin* suggests that his conduct would be actionable under section 1030(a)(5), as well as the other cited subsections of the CFAA. *Id.* at 421. Given my conclusion that DHP has sufficiently stated section 1030(g) claims for Ringo's alleged violations of section 1030(a)(2) and (a)(4), there is no need to proceed further at this pleading stage of the case. Accordingly, Ringo's motion to dismiss DHP's claim under the CFAA will be denied.

**III. Motion for More Definite Statement**

The purpose of Federal Rule of Civil Procedure 12(e) is to narrow issues, disclose the boundaries of the plaintiff's claims, and simplify and expedite proceedings. *Scarbrough v. RWay Furniture Co.,* 105 F.R.D. 90, 91 (E.D.Wis.1985). However, "because of the many discovery procedures presently available to litigants in federal courts, district judges are admonished to exercise their discretion sparingly in ordering more definite statements." *Id.* A motion for a more definite statement must be denied where the complaint is not so vague or ambiguous as to make it unreasonable to use pretrial devices to fill gaps in detail. *Id.* A Rule 12(e) motion is used when a complaint is unintelligible, and not for when a defendant just wants more detail. *Id.* Rule 12(e) motions are rarely granted and are disfavored by courts. *Id.* at 92.

Here, DHP has not drafted a complaint that is so vague or ambiguous as to preclude Ringo from formulating a responsive pleading. Although Ringo states in his motion that the breach of agency duty claim is "vaguely consistent with a cause of action for breach of fiduciary duty," in fact, the Complaint states outright that Ringo owed DHP certain fiduciary duties of agent to principal, and that Ringo breached those duties. (Compl.¶¶ 45-46.) The Complaint is not unintelligible, nor does it lack sufficient detail as to the claim. Under these circumstances, I conclude that the motion should be denied.

***10** For the reasons given above, the motions (Doc. # 9) are **DENIED.** The Clerk is directed to set this matter on the Court's calendar for a Rule 16 scheduling conference. *See* Fed.R.Civ.P. 16(b).

**SO ORDERED.**

E.D.Wis.,2009.
Dental Health Products, Inc. v. Ringo
Not Reported in F.Supp.2d, 2009 WL 1076883 (E.D.Wis.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

C
Only the Westlaw citation is currently available.

United States District Court,
M.D. Pennsylvania.
Robert DUDICK, individually and derivatively on behalf of SUSQUEHANNA PRECISION, INC., Plaintiff,
v.
Michael VACCARRO, individually and in his capacity as an officer and director of Susquehanna Precision, Inc., Andrew Vaccarro and Endless Mountains Specialties, Inc., Defendants.

Civil Action No. 3:06-CV-2175.
June 25, 2007.

Joseph G. Ferguson, Rosenn Jenkins & Greenwald, LLP, Scranton, PA, for Plaintiff.

Sal Cognetti, Jr., Foley, Cognetti & Comerford, Scranton, PA, for Defendant.

***MEMORANDUM***

A. RICHARD CAPUTO, United States District Judge.

*1 Presently before the Court is Defendants Michael Vaccarro, individually and in his capacity as an officer and director of Susquehanna Precision, Inc., Andrew Vaccarro and Endless Mountains Specialties, Inc.'s Motion to Dismiss Plaintiff Robert Dudick's First Amended Complaint. (Doc. 9.) For the reasons set forth below, the Court will deny this motion. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367.

**BACKGROUND**

On February 7, 2007, Plaintiff filed his First Amended Complaint (Doc. 6). FN1 Therein, he alleges as follows. Susquehanna Precision, Inc. ("SPI") was incorporated on February 20, 1980. ( *Id.* ¶ 8.) From the time of its incorporation, Plaintiff has held a fifty percent (50%) ownership interest in SPI. (*Id.* ¶ 9.) Michael Vaccarro owned and does now still own the other 50% interest in SPI. (*Id.* ¶ 10.) Plaintiff and Michael Vaccarro serve as the officers and directors of SPI, receive compensation and dividends in equal amounts, and have done so since its incorporation. (*Id.* ¶¶ 12, 17.)

FN1. Plaintiff filed his Complaint (Doc. 1) on November 6, 2006. Defendants filed a motion to dismiss (Doc. 5) on January 29, 2007 but failed to file a supporting brief. As such, the Court deemed the motion withdrawn. (Doc. 8.)

SPI is in the business of providing mechanical and electrical engineering services and products to customers in the aerospace industry. (*Id.* ¶ 18.) SPI has amassed a significant library of proprietary blue prints, plans and drawings provided to it by its customers for the purpose of enabling it to supply services and products. (*Id.* ¶ 20.) Many of these blueprints, plans and drawings are stored on SPI's computer system. (*Id.* ¶ 21.) SPI considers these documents to be proprietary and confidential business information. (*Id.* ¶ 22.)

On October 1, 1997, SPI hired Andrew Vaccarro, Michael Vaccarro's son, as an employee. (*Id.* ¶ 24.) As a SPI employee, Andrew was entrusted with the duty of maintaining contact with customers concerning bids, proposals, and the filling and completion of orders. (*Id.* ¶ 25.) SPI entrusted Andrew with access to its customers, bids, proposals, orders and other proprietary and confidential information. (*Id.* ¶ 26.) Andrew contacted SPI customers via mail, email and telephone, as well as in person. (*Id* . ¶ 27.)

At SPI, Andrew came into contact with proprietary and confidential information, particularly email correspondence, involving SPI's most significant customer, Aerospace International, Inc. ("Aero"). (*Id.* ¶ 29.) SPI received more than one million dollars ($1,000,000) in revenue from its sales to Aero. (*Id.* ¶ 30.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

In 2003, Andrew incorporated Endless Mountains Specialties ("EMS"). (*Id.* ¶ 31.) Without the knowledge of Plaintiff, and with the assistance of his father Michael, Andrew, while employed by SPI, used SPI's computers, including its computer programs and equipment, to divert SPI's proprietary and confidential information, received from Aero, to EMS. (*Id.* ¶ 32.) This confidential information included purchase orders from Aero that SPI could have accepted and filled, orders which contained Aero's requirements, requests, products and services. (*Id.* ¶¶ 32-33.)

***2** Since 2003, SPI's revenue from sales to Aero has significantly declined as a result of Defendants' actions. (*Id.* ¶¶ 35-36.) In 2003, SPI's revenue from sales to Aero was one million fifty-seven thousand dollars ($1,057,000). (*Id.* ¶ 35.) In 2004, this figure was approximately nine hundred seventy-eight thousand dollars ($978,000). (*Id.*) In 2005, this figure was reduced to approximately three hundred sixty-nine thousand dollars ($369,000). (*Id.*) Through May, SPI's 2006 revenue from Aero was only one hundred twenty-two thousand dollars ($122,000). (*Id.*)

Plaintiff confronted Michael Vaccarro concerning the loss in sales revenue and sought to persuade him to take appropriate action against EMS. (*Id.* ¶ 36.) Michael refused to take any such action. (*Id.* ¶ 37.) Instead, Michael attempted to freeze Plaintiff out and exclude him from the proper share of benefits owed to him as a shareholder of SPI. (*Id.* ¶ 37.)

On June 20, 2006, Michael Vaccarro took the following actions: (1) he changed the locks on all of SPI's buildings and refused to provide Plaintiff with a set of keys; (2) he contacted the post office to divert the delivery of SPI's mail to an address unknown to Plaintiff; and (3) he closed SPI's bank account and opened a separate bank account to which Plaintiff has no access. (*Id.*) Since that time, Michael has refused to recognize Plaintiff as a fifty-percent (50%) shareholder of SPI. (*Id.*)

Plaintiff bases the Court's jurisdiction over this matter on Count I of his First Amended Complaint (Doc. 6). This count sets forth a claim under the federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. (*Id.* ¶ 40-46.) As such, Plaintiff claims the Court has federal question jurisdiction over his action pursuant to 28 U.S.C. § 1331. (*Id.* ¶ 6.) Plaintiff contends that the Court has jurisdiction over his thirteen (13) remaining counts pursuant to supplemental jurisdiction, 28 U.S.C. § 1367. (*Id.*)

Count I of Plaintiff's First Amended Complaint reads as follows.

> 40. The averments of paragraphs 1 through 39 are herein incorporated by reference.
>
> 41. SPI's computers are used by SPI in transacting interstate commerce.
>
> 42. As set forth hereinabove, in violation of the CFAA, ANDREW, individually and as an agent of EMS, did, without authorization or exceeding the authorization he had been given as an employee of SPI, intentionally accessed the SPI computer system and obtained, communicated, delivered and/or transmitted information from SPI's protected computer to EMS, an entity not entitled to receive such information.
>
> 43. As set forth hereinabove, in violation of the CFAA, ANDREW, individually and as an agent of EMS, did intentionally cause customers orders, including but not limited to orders from Aero, and other valuable, confidential, and proprietary business information to be transmitted from SPI's protected computer to EMS, an entity not entitled to receive such information.
>
> ***3** 44. Such conduct caused damage because it impaired the integrity of the confidential and proprietary information on the SPI computer.
>
> 45. By reason of ANDREW's violation of the CFAA, SPI has suffered damage and loss in excess of $5000, said damage/loss includes:
>
> a. the time and resources spent and the cost of

hiring of an expert to research and assess the unauthorized information and assets transmitted to/ from SPI's protected computer and, to the extent possible, remedy the damage done and protect against such damage and loss in the future; and

b. the diminution in value and impairment of the integrity of SPI's confidential, proprietary and trade secret information, the loss of goodwill; and

c. the economic loss caused by Andrew's interference with SPI's customer relationships, particularly its relationship with Aero.

46. ANDREW, individually and through his new company EMS, has, and upon information and belief, intends to continue using the information which he unlawfully acquired from SPI's protected computer.

(*Id.* ¶¶ 40-46.)

Defendants have filed a Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 9), arguing that Plaintiff, in setting forth his CFAA claim, has failed to state a claim upon which relief can be granted. (*Id.* ¶¶ 1-3.) As such, Defendants assert that Plaintiff's First Amended Complaint must be dismissed for lack of subject matter jurisdiction. (*Id.*)

This motion is fully briefed and ripe for disposition.

## LEGAL STANDARD

Rule 12(b) (6) of the Federal Rules of Civil Procedure provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. Dismissal is appropriate only if, accepting all factual allegations in the complaint as true and "drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations in the complaint." *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.,* 140 F.3d 478, 483 (3d Cir.1998).

In deciding a motion to dismiss, the Court should consider the allegations in the complaint, exhibits attached to the complaint and matters of public record. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993). The Court may also consider "undisputedly authentic" documents where the plaintiff's claims are based on the documents and the defendant has attached a copy of the document to the motion to dismiss. *Id.* The Court need not assume that the plaintiff can prove facts that were not alleged in the complaint, *see City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 263 (3d Cir.1998), nor credit a complaint's "bald assertions" or "legal conclusions." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997).

When considering a Rule 12(b)(6) motion, the Court's role is limited to determining whether the plaintiff is entitled to offer evidence in support of the claims. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Court does not consider whether the plaintiff will ultimately prevail. *See id.* In order to survive a motion to dismiss, the plaintiff must set forth information from which each element of a claim may be inferred. *See Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). The defendant bears the burden of establishing that the plaintiff's complaint fails to state a claim upon which relief can be granted. *See Gould Elecs. v. United States,* 220 F.3d 169, 178 (3d Cir.2000).

## DISCUSSION

### I. Defendants' Arguments

***4** Defendants submit two arguments challenging the sufficiency of Count I of Plaintiff's First Amended Complaint. First, Defendants argue that "[o]ther than setting forth conclusory allegations mirroring the language of the CFAA, the First Amended Complaint avers no specific or factual conduct constituting a violation of the CFAA." (Doc. 10 at 7.) "The First Amended Complaint does not identify a single piece of information accessed, obtained or transmitted from an SPI computer nor

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

does it identify any instances of Defendant, Andrew Vaccarro, accessing SPI's computers or any information obtained and/or improperly used by such access." (*Id* .) Further, Defendants point out that "[t]he First Amended Complaint does not set forth what information is contained in SPI's computers or what level of access or authorization was granted to Andrew Vaccarro on such computers." (*Id.*) Indeed, Defendants posit that Plaintiff's contention that Andrew Vaccarro exceeded his authorization directly contradicts Plaintiff's allegation that Andrew was entrusted with access to SPI's proprietary and confidential information. (*Id.*) As such, Defendants assert that Plaintiff has failed to allege conduct that violates the CFAA. (*Id.*)

Second, Defendants argue that the First Amended Complaint "has not set forth damage or loss permitting a civil action under the CFAA." (*Id.* at 8.) "Under the CFAA, the term 'damage' means any impairment to the integrity or availability of data, a program, a system, or information[.] 18 U.S.C. § 1030(e)(8)." (*Id.*) "[T]he term 'loss' means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service. 18 U.S.C. § 1030(e)(12)." (*Id.*) Defendants argue that "[t]he First Amended Complaint fails to allege or identify any impairment to the integrity, availability of data, a program, a system, or information, nor does it allege or identify any loss of data, programs, systems or information or any interruption of service of SPI's computer." ( *Id.*) As such, Defendants assert, Plaintiff has failed to state a claim under the CFAA. (*Id.*)

The Court will address these arguments in reverse order.

**II. Has Plaintiff sufficiently pled "damage" or "loss"?**

The CFAA is primarily a criminal statute because of its location in Title 18 of the United States Code. However, a private cause of action does exist. The CFAA provides:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B). Damages for a violation involving only conduct described in subsection (a)(5)(B)(i) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damages. No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

***5** 18 U.S.C. § 1030(g).

Thus, under section 1030(g), in order to maintain a private cause of action under the CFAA, a plaintiff must suffer: (1) a root injury of damage or loss; and (2) one of the five operatively-substantial effects set forth in subsection (a)(5)(B)(i)-(v).[FN2] *P.C. of Yonkers, Inc. v. Celebrations! The Party & Seasonal Superstore, L.L .C.,* Civ. A. No. 04-4554(JAG), 2007 WL 708978, at *4 (D.N.J. Mar.5, 2007). "The factors in Sections 1030(a)(5)(B)(i)-(v) do not address prohibited conduct, but instead list specific forms of 'damage' or 'loss' that are possible harmful results of violations of other parts of the statute, ... under which Plaintiff[ ] ha[s] brought [his] claims." *Id.*

> FN2. Subsection (g) requires a plaintiff to allege one of the following five effects set forth in section 1030(a)(5)(B):
>
> (I) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

> only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;
>
> (ii) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;
>
> (iii) physical injury to any person;
>
> (iv) a threat to public health or safety; or
>
> (v) damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security[.]
>
> 18 U.S.C. § 1030(a)(5)(B).

The CFAA defines "damage" as "any impairment to the integrity or availability of data, a system, or information." 18 U.S.C. § 1030(e)(8). "Loss" is treated separately from "damage" under the CFAA, and is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

Here, Plaintiff, in paragraph 45 of his First Amended Complaint, alleges that he has suffered the following damage/loss: (a) the time and resources spent and the cost of hiring an expert to research and assess the unauthorized information and assets, transmitted to/from SPI's protected computer and, to the extent possible, remedy the damage done and protect against such damage and loss in the future; (b) the diminution in value and impairment of the integrity of SPI's confidential, proprietary and trade secret information, and the loss of goodwill; and (c) the economic loss caused by Andrew Vaccarro's interference with SPI's customer relationships, particularly its relationship with Aero. (Doc. 6 ¶ 45.) This damage/loss exceeds five thousand dollars ($5,000). (*Id.*)

These incurred costs in paragraph 45(a) of Plaintiff's First Amended Complaint are explicitly identified in the CFAA's definition of "loss," which includes "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense ...." 18 U.S.C. § 1030(e) (11); *P.C. of Yonkers, Inc.*, 2007 WL 708978, at *5. Moreover, while Defendants may be correct in arguing that no physical damage or impairment to the integrity of SPI's computer system, the CFAA has been held to apply in cases involving former employees wrongfully acquiring and using a plaintiff employer's confidential or trade secret information. *See, e.g., Pacific Aerospace & Electronics, Inc. v. Taylor,* 295 F.Supp.2d 1188, 1196-97 (E.D.Wash.2003) (holding that CFAA enabled former employer to maintain action to prevent former employee from using wrongfully acquired trade secret information in order to compete against former employer). While "the majority of CFAA cases still involve 'classic' hacking activities[,] ... [e]mployers ... are increasingly taking advantage of the CFAA's civil remedies to sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system." *Id.* at 1196. Indeed, the United States District Court for the Western District of Washington explicitly recognized that the CFAA allows civil claims challenging the unauthorized removal of information or programs from a company's computer database. *Id.* (citing *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.,* 119 F.Supp.2d 1121 (W.D.Wash.2000) (holding that (1) a "damage" claim was stated even though the defendant former employee's misappropriation of trade secret information did not affect the integrity of the trade secrets within the employ-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

er's computers and (2) a "loss" claim was stated in that the employer suffered loss in the form of expenses incurred in modifying its computers to prevent future misappropriations).

***6** Accordingly, Plaintiff has adequately alleged "damage" or "loss" in the form of the responsive costs he incurred due to Andrew Vaccarro's putative violation of the CFAA. However, to the extent that Plaintiff claims lost revenue, loss of goodwill, and interference with his customers, particularly Aero, such injuries are not cognizable losses under the CFAA. *Nexans Wires S.A. v. Sark-USA, Inc.,* 166 Fed. Appx. 559, 562 (2d Cir.2006); *P.C. of Yonkers, Inc.,* 2007 WL 708978, at *5 n. 2. FN3

FN3. Plaintiff has also sufficiently pleaded one of the five operatively-substantial effects set forth in subsection (a)(5)(B)(i)-(v) by specifically alleging damage or loss in excess of five thousand dollars ($5,000). *See* 18 U.S.C. § 1030(a)(5)(B)(i). Defendants do not contest this assertion.

Because Plaintiff has sufficiently pleaded the predicate loss and effect required to state a claim under the CFAA, Defendants' motion to dismiss for failure to adequately allege such loss will be denied.

**III. Has Plaintiff sufficiently alleged conduct that violates the CFAA?**

Plaintiff argues in his brief that he has sufficiently alleged violations of 18 U.S.C. § 1030(a)(4) and (a)(5)(A)(iii). (Doc. 21 at 7.) FN4 However, the Court initially notes that Plaintiff failed to specify the particular subsection of the CFAA under which he seeks relief. While Plaintiff was not required to plead the specific subsection of the statute he claims has been violated in order to satisfy the notice-pleading standard of Rule 8(a)(2) of the Federal Rules of Civil Procedure, FED. R. CIV. P. 8(a)(2), *see P.C. of Yonkers, Inc.,* 2007 WL 708978, at *6 n. 3, the failure to do so complicates matters for the Court.

FN4. Plaintiff cannot rely on section 1030(a)(5)(B)(I) because it does not prohibit conduct, but instead lists specific forms of "damage" or "loss" that are possible harmful results of CFAA violations.

**A. Section 1030(a)(4)**

The United States Court of Appeals for the Third Circuit has held that "[a] claim under CFAA § 1030(a)(4) has four elements: (1) defendant has accessed a 'protected computer;' (2) has done so without authorization or by exceeding such authorization as was granted; (3) has done so 'knowingly' and with 'intent to defraud'; and (4) as a result has 'further[ed] the intended fraud and obtain [ed] anything of value.' " *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC,* 428 F.3d 504, 508 (3d Cir.2005).

Noticeably absent from Plaintiff's First Amended Complaint are any allegations that Defendants acted with the "intent to defraud," and, by accessing SPI's protected computer without authorization or exceeding the authorization that was granted, "further[ed] the intended fraud and obtain[ed] anything of value." As such, Defendants cannot fairly be said to be on notice of a section 1030(a)(4) claim. Therefore, to the extent that Plaintiff claims a violation of section 1030(a)(4), the Court finds that he has failed to adequately plead such violation.

**B. Section 1030(a)(5)(A)(iii)**

A violation of section 1030(a)(5)(A)(iii) occurs whenever one "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes" one of the five operatively-substantial effects set forth in subsection (a)(5)(B)(i)-(v).

In the opinion of the Court, the First Amended Complaint clearly indicates that Plaintiff seeks relief pursuant to section 1030(a) (5)(A)(iii), because, as Defendants point out, Plaintiff's allegations closely track the language of this subsection. FN5 However, Defendants argue that Plaintiff's First

Amended Complaint so closely tracks the language of the CFAA that it merely sets forth conclusory allegations.

FN5. Plaintiff alleged in his First Amended Complaint that Andrew Vaccarro, "individually and as an agent of EMS, did, without authorization or exceeding the authorization he had been given as an employee of SPI, intentionally access the SPI computer system ...." (Doc. 6 ¶ 42.)

*7 Under the Federal Rules of Civil Procedure liberal notice-pleading requirements, *see* FED. R. CIV. P. 8(a) and 12(b)(6), these allegations are sufficient to put Defendants on notice of the claims against them. *See P.C. of Yonkers, Inc.,* 2007 WL 708978, at *7 (holding that the plaintiffs adequately alleged a violation of the CFAA when their complaint exactly mirrored the statutory language). As such, the Court rejects Defendants' argument.

Defendants also assert that Plaintiff's allegation that Andrew exceeded his authorization directly contradicts Plaintiff's allegation that Andrew was entrusted with access to SPI's proprietary and confidential information. This assertion is also rejected. Courts faced with CFAA claims brought by employers against their former employees have found that an employee can act without authorization when he obtains proprietary information from his former employer's computers for the benefit of his new employer. *See, e.g., Shurgard Storage Centers, Inc.,* 119 F.Supp.2d 1121. As such, Plaintiff's allegations, that (1) Andrew was trusted with access to SPI's proprietary information and (2) acted without authorization in obtaining that information for the benefit of EMS, are entirely consistent with his section 1030(a)(5)(iii) claim.

Accordingly, the Court concludes that Plaintiff has stated a claim upon which relief can be granted pursuant to section 1030(a) (5)(A)(iii) of the CFAA.

**CONCLUSION**

For the reasons stated above, the Court will deny Defendants' Motion to Dismiss. (Doc. 9.) Plaintiff may proceed with Count I of the First Amended Complaint as an 18 U.S.C. § 1030(a)(5)(iii) claim. Because this federal count will not be dismissed, Plaintiff's state law claims also remain pursuant to the Court's supplemental jurisdiction.

An appropriate Order follows.

***ORDER***

**NOW,** this *25th* day of June, 2007, **IT IS HEREBY ORDERED** that Defendants Michael Vaccarro, individually and in his capacity as an officer and director of Susquehanna Precision, Inc., Andrew Vaccarro and Endless Mountains Specialties, Inc.'s Motion to Dismiss Plaintiff Robert Dudick's First Amended Complaint (Doc. 9) is **DENIED.**

M.D.Pa.,2007.
Dudick, ex rel. Susquehanna Precision, Inc. v. Vaccarro
Not Reported in F.Supp.2d, 2007 WL 1847435 (M.D.Pa.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Only the Westlaw citation is currently available.

United States District Court,
D. Nebraska.
ERVIN & SMITH ADVERTISING AND PUBLIC RELATIONS, INC., Plaintiff,
v.
William ERVIN, Thomas Ervin, Lynnette Roxburgh, David Zemunski, and BTM, Inc., d/b/a Ervin Group, Defendants.

No. 8:08CV459.
Feb. 3, 2009.

West KeySummary**Corporations and Business Organizations 101 1811**

101 Corporations and Business Organizations
101VII Directors, Officers, and Agents
101VII(D) Rights, Duties, and Liabilities as to Corporation and Its Shareholders or Members
101k1811 k. Fiduciary nature of relation. Most Cited Cases
(Formerly 101k307)

**Corporations and Business Organizations 101 1923**

101 Corporations and Business Organizations
101VII Directors, Officers, and Agents
101VII(D) Rights, Duties, and Liabilities as to Corporation and Its Shareholders or Members
101k1915 Actions Between Corporation and Its Directors, Officers, or Agents
101k1923 k. Pleading. Most Cited Cases
(Formerly 101k319(6))

An advertising, marketing, and public relations corporation claiming that two former employees stole trade secrets failed to allege facts sufficient to demonstrate that the employees owed the corporation a fiduciary duty, and thus failed to state a claim for breach of fiduciary duty. Although the corporation alleged that the employees had served as officers of the corporation at times, the corporation failed to allege that either employee held the requisite managerial authority or degree of management participation necessary to warrant a finding that either employee owed the corporation a fiduciary duty. The corporation did not state facts attesting to whether the employees were still officers of the corporation at the time the alleged breach of duty occurred.

Jill R. Ackerman, Lindsay K. Lundholm, Allison D. Balus, Baird, Holm Law Firm, Omaha, NE, for Plaintiff.

Jeffrey J. Blumel, Nicholas T. Dafney, Tyler P. McLeod, Abrahams, Kaslow Law Firm, Omaha, NE, Jeffery R. Kirkpatrick, McHenry, Haszard Law Firm, Lincoln, NE, for Defendants.

**MEMORANDUM AND ORDER**

LAURIE SMITH CAMP, District Judge.

***1** This matter is before the Court on Defendants' Motion to Dismiss (Filing No. 25), pursuant to Fed. Rules Civ. Pro. 12(b)(6) and 9(b).[FN1] The Court has reviewed the parties' briefs and applicable law, and concludes that the Defendants' Motion to Dismiss should be granted in part and denied in part.

FN1. Only Defendants William Ervin, Thomas Ervin, and BTM, Inc., d/b/a Ervin Group (collectively "Defendants") have filed the instant Motion to Dismiss. Defendants Lynnette Roxburgh and David Zemunski did not join in this Motion. Consequently, this Order has no bearing on any of the Plaintiff's claims against Lynnette Roxburgh and David Zemunski, and any and all general references to "Defendants" in this Order refer to William Ervin, Thomas Ervin, and BTM, Inc., d/b/a Ervin Group ("Ervin Group") only.

**PROCEDURAL BACKGROUND**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

On October 13, 2008, Ervin & Smith Advertising and Public Relations, Inc., ("Ervin & Smith") filed the instant Complaint against William Ervin, Thomas Ervin, Lynnette Roxburgh, David Zemunski, and BTM, Inc., d/b/a Ervin Group ("Ervin Group"). (Filing No. 1). The allegations in the Complaint stem from conflicts surrounding the former employment relationship between the Plaintiff and William Ervin, Thomas Ervin, Lynnette Roxburgh, and David Zemunski. Ervin & Smith is a corporation engaged in the business of advertising, marketing, and public relations. (Filing No. 1 at ¶ 11). Both Defendants William Ervin and Thomas Ervin (collectively "the Ervin Brothers") were employees of Ervin & Smith. (Filing No. 1 at ¶ 12). At the time of their resignation on July 3, 2007, Plaintiff employed the Ervin Brothers as Executive Designers working primarily on agricultural accounts. (Filing No. 1 at ¶ 12). Both William Ervin and Thomas Ervin served as officers of Ervin & Smith at one point in time during their employment with Plaintiff. (Filing No. 1 at ¶ 12). During their employment, the Ervin Brothers formed their own company, Ervin Group, as a competing advertising agency; following their resignation at Ervin & Smith, the Ervin Brothers now work solely for their company, Ervin Group. (Filing No. 1 at ¶ 33).

In the Complaint, Ervin & Smith alleges that the Ervin Brothers were employed "in positions of substantial trust and confidence." (Filing No. 1 at ¶ 15). During their course of employment, Plaintiff communicated confidential information and trade secrets to the Ervin Brothers. (Filing No. 1 at ¶ 15). In their positions with Plaintiff, the Ervin Brothers were given access to numerous Ervin & Smith customers. (Filing No. 1 at ¶ 20).

Plaintiff alleges that, in the few months before they resigned from their positions with Ervin & Smith, the Ervin Brothers e-mailed confidential, trade secret, and copyrighted documents to their home computers in order to use the information for their own personal gain. (Filing No. 1 at ¶ 26). Among many other allegations, Plaintiff alleges that the Ervin Brothers concealed certain job orders from customers, which they then diverted to their own company, Defendant Ervin Group. (Filing No. 1 at ¶ 26).

Plaintiff filed the instant Complaint, alleging twelve separate causes of action based on claims for breach of fiduciary duty, unlawful restraint of trade, violation of the Nebraska Computer Crimes Act, fraud, deceptive trade practices, computer fraud and abuse, and violations of federal copyright law. (Filing No. 1).

On December 15, 2008, Defendants filed their 12(b)(6) Motion to Dismiss (Filing No. 25). In their Motion to Dismiss, Defendants aver that this Court should dismiss Plaintiff's Third, Fifth, Sixth, and Twelfth Claims for Relief for failure to state a claim upon which relief can be granted. Additionally, Defendants ask the Court to dismiss Plaintiff's Ninth and Tenth Claims for Relief for failure to state with particularity the facts and circumstances constituting a claim for fraud.

## STANDARD OF REVIEW

*2 Pursuant to the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The rules require that this "statement" constitute a " 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* 551 U.S. 89, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (quoting *Bell Atlantic Corp.,* 550 U.S. at ----, 127 S.Ct. at 1964). However, plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp.* 550 U.S. 544, 127 S.Ct. at 1965, 167 L.Ed.2d 929.

In order to survive a motion to dismiss under

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Fed.R.Civ.P. 12(b)(6), the plaintiff's obligation to provide the grounds for his entitlement to relief necessitates that the complaint contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* Yet when ruling on a defendant's motion to dismiss, the Court must rule "on the assumption that all the allegations in the complaint are true." *Id.*

Thus, the Court must find "enough facts to raise a reasonable expectation that discovery will reveal evidence" to substantiate the necessary elements of the plaintiff's claim. *Id.* When the allegations in a complaint, even when assumed to be true, cannot raise a claim of entitlement to relief, the complaint should be dismissed for failure to state a claim under Fed.R.Civ.P. 12(b)(6). *Id.* at 1965–66.

"Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions. Rule 9(b), for example, provides for greater particularity in all averments of fraud or mistake." *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 513, 122 S.Ct. 992, 152 L.Ed.2d 1, (2002). "Under Rule 9(b) , a plaintiff must plead such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *BJC Health Sys. v. Columbia Cas. Co.* 478 F.3d 908, 917 (8th Cir.2007)(internal quotations omitted). "In other words, the party must typically identify the 'who, what, where, when, and how' of the alleged fraud." *Id.*

"Rule 9(b) is to be read in the context of the general principles of the Federal Rules, the purpose of which is to simplify pleading. Thus, the particularity required by Rule 9(b) is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations." *U.S. ex rel. Costner v. U.S.,* 317 F.3d 883, 888 (8th Cir.2003). Therefore, "[c]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *BJC Health Sys.,* 478 F.3d at 917.

## DISCUSSION

### 1. Plaintiff's Third Claim for Relief: Breach of Fiduciary Duty

***3** In their Motion to Dismiss, Defendants aver that the Court should dismiss Plaintiff's Third Claim for Relief for failure to state a claim upon which relief can be granted. Upon review of the record and the Plaintiff's Complaint, the Court concludes that Plaintiff's Third Claim for Relief should be dismissed.

In the Third Claim for Relief, Plaintiff asserts a claim for breach of fiduciary duty. Plaintiff has failed to allege sufficient facts, however, to demonstrate that either the Ervin Brothers or Ervin Group owed a fiduciary duty to Plaintiff at the time of the alleged breach. In Nebraska, "[a] director or other corporate officer cannot acquire an interest adverse to that of the corporation while acting for the corporation or when dealing individually with third persons. An officer or director of a corporation occupies a fiduciary relation toward the corporation and its stockholders and should refrain from all acts inconsistent with his or her corporate duties." *Bellino v. McGrath North Mullin & Kratz, PC LLO,* 274 Neb. 130, 144, 738 N.W.2d 434 (Neb.2007) (internal citations omitted).

Yet under Nebraska law, only officers with management authority owe the corporation a fiduciary duty. *See Aon Consulting, Inc. v. Midlands Fin. Benefits, Inc.,* 275 Neb. 642, 660–61, 748 N.W.2d 626 (Neb.2008)("In Nebraska, an officer must comply with all applicable fiduciary duties when dealing with the corporation and its shareholders. Nominal corporate officers, with no management authority, generally do not owe fiduciary duties to the corporation. However, an officer who participates in management of the corporation, exercising some discretionary authority, is a fiduciary of the corporation as a matter of law.")(internal quotations omitted). Plaintiff has failed to assert any facts demonstrating that Defendants held any management authority or participated in the management of Ervin & Smith.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

While the Complaint states that "[t]he Ervin Brothers at times had served as officers of Ervin & Smith" (Filing No. 1 at ¶ 12), this allegation alone is not sufficient to substantiate Plaintiff's claim for breach of fiduciary duty. To establish a claim for breach of fiduciary duty, Plaintiff would also need to plead facts to show that Defendants were officers of the corporation *when* the alleged breach of duty occurred. *See Aon Consulting,* 275 Neb. 642, 662, 748 N.W.2d 626 (Neb.2008)("We are more persuaded by decisions from other jurisdictions holding that the existence of a fiduciary duty of an officer in a closely held corporation depends on the ability to exercise the status which creates it. These courts conclude that when a corporate officer loses managerial responsibilities, the corresponding fiduciary duty ceases to exist.")(internal quotations omitted). From the face of the Complaint, Plaintiff has failed to state facts attesting to whether Defendants were still officers of the corporation at the time the alleged breach of duty occurred. Because, under Nebraska law, the "corresponding fiduciary duty ceases to exist" when an "officer loses managerial responsibilities," this omission by Plaintiff is fatal to Plaintiff's Third Claim for Relief.

*4 Accordingly, the Court will grant Defendants' Motion to Dismiss Plaintiff's Third Claim for Relief.

**2. Plaintiff's Fifth Claim for Relief: Unlawful Restraint of Trade**

Defendants argue that the Court should dismiss Plaintiff's Fifth Claim for Relief. In the Complaint, Plaintiff asserts that Defendants' actions constitute an unlawful conspiracy in restraint of trade and/or commerce in violation of the Junkin Act. *See* Neb.Rev.Stat. § 59–801 (1943). In their Motion to Dismiss, Defendants aver Plaintiff has failed to allege facts sufficient to establish that Defendants had the requisite *intent* to carry out the unlawful restraint of trade. *See Hompes v. B.F. Goodrich Co.,* 137 Neb. 84, 288 N.W. 367, 373 (Neb.1939)("The evidence as a whole must show by a preponderance, however, the *intent* of the alleged wrong doers to accomplish a result prohibited by the statute.")(emphasis added). Yet after reviewing the record and applicable law, the Court finds that Plaintiff has sufficiently pled facts to support the Complaint's Fifth Claim for Relief.

The Nebraska Supreme Court has evaluated claims for relief under Neb.Rev.Stat. § 59–801, and has held that:

> A combination or conspiracy between two or more persons against any person, firm or corporation to damage or destroy the business of such person, firm or corporation, which is carried into effect, is a violation of the Junkin Act (Comp.St.1929, art. 8, ch. 59) and subjects such wrong doers to an action for damages.
>
> [A] conspiracy need not be established by direct evidence of the acts charged, but may, and generally must, be proved by a number of indefinite acts, conditions and circumstances, which vary according to the purposes to be accomplished. The evidence as a whole must show by a preponderance, however, the intent of the alleged wrong doers to accomplish a result prohibited by the statute.
>
> [W]hen the alleged overt acts are in themselves lawful, and the evidence does not tend to show an unlawful intent to conspire against and injure the business of another by stifling competition, the action must fail for want of proof.

*Id.* Defendants have interpreted the *Hompes* Court's interpretation of the statute to support their argument that Plaintiff's Complaint does not set out sufficient facts to establish that Defendants had the intent "to accomplish a result prohibited by the statute."

Defendants, however, have misconstrued the *Hompes* Court's application of the statute. Plaintiff's Complaint need not include allegations that Defendants had the requisite intent, but rather, the Plaintiff must plead facts that "by a number of in-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

definite acts, conditions and circumstances ... show by a preponderance [of the evidence] the intent of the alleged wrong doers to accomplish a result prohibited by the statute." *Id.* The question of intent is evidentiary in nature and, consequently, the Court must "look into the evidence bearing upon the question of intent." *Id.* at 372. "A conspiracy need not be established by direct evidence of the acts charged, but may, and generally must, be proved by a number of indefinite acts, conditions, and circumstances which vary according to the purposes to be accomplished." *State ex rel. Douglas v. Associated Grocers of Neb. Co-op., Inc.,* 214 Neb. 79, 84, 332 N.W.2d 690 (Neb.1983)(citing *Hompes,* 137 Neb. 84, 288 N.W. 367 (1939)).

***5** Plaintiff has met its burden of establishing the requisite intent by a preponderance of the evidence. Plaintiff pled facts stating that the Ervin Brothers emailed confidential, trade secret documents from Ervin & Smith's computers to their home computers. (Filing No. 1 at ¶ 26). Plaintiff alleged that "[t]he Ervin Brothers and Ervin Group copied and modified Plaintiff's copyrighted work and are displaying such copyrighted work on the Ervin Group's website as the work of the Ervin Group and not Ervin & Smith." (Filing No. 1 at ¶ 26). Plaintiff further alleged that the Ervin Brothers, while still employed at Ervin & Smith, solicited Ervin & Smith's customers for their own business, Ervin Group, which now competes in the exact same business as Ervin & Smith. (Filing No. 1 at ¶ 27). Because "[t]he party alleging a conspiracy in restraint of trade does not have to show any overt act other than the act of conspiracy," ( *Associated Grocers of Neb.,* 214 Neb.79, 84, 332 N.W.2d 690 (Neb.1983)), Plaintiff has alleged sufficient facts to establish Plaintiff's claim that Defendants engaged in a conspiracy and held the requisite intent to commit the unlawful act.

Defendant's Motion to dismiss Plaintiff's Fifth Claim for Relief will be denied.

**3. Plaintiff's Sixth Claim for Relief: Neb.Rev.Stat. § 20–148.**

In their Motion to Dismiss, Defendants suggest that Plaintiff has failed to plead facts that establish a cognizable claim under Neb.Rev.Stat. § 20–148. The Court concurs and concludes that Plaintiff's Sixth Claim for Relief should be dismissed.

In the Complaint, Plaintiff asserts a claim under Neb. Reb. Stat § 20–148, which in part states:

> Any person or company, as defined in section 49–801, except any political subdivision, who subjects or causes to be subjected any citizen of this state or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the United States Constitution or the Constitution and laws of the State of Nebraska, shall be liable to such injured person in a civil action or other proper proceeding for redress brought by such injured person.

Thus, Plaintiff alleges that Defendants caused Plaintiff to suffer a deprivation of a "right ... secured by ... [the] laws of the State of Nebraska." The Supreme Court of Nebraska, however, has held that Neb. Reb. Stat § 20–148 "is a procedural statute which does not create any new substantive rights. *Goolsby v. Anderson,* 250 Neb. 306, 313, 549 N.W.2d 153 (Neb.1996)." In order to establish a claim under Neb. Reb. Stat § 20–148, Plaintiff must plead facts demonstrating a deprivation of a right secured to Plaintiff by either "the United States Constitution or the Constitution and laws of the State of Nebraska." *Id.* Plaintiff's claim for relief fails to do so.

In the Complaint, Plaintiff asserts that Plaintiff has suffered a deprivation of a right because Defendants violated the following Nebraska statutes: Neb.Rev.Stat. §§ 28–1343.01, 28–1344, 28–1345, and 28–1347. As these cited statutes are all *criminal* statutes, they do not afford the Plaintiff any *substantive rights.* The legislative history behind the statute's enactment does not support the interpretation that Neb. Reb. Stat § 20–148 creates a right and a cause of action for any victim of a crime

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

made punishable under a Nebraska criminal statute. Instead, the Nebraska Supreme Court has held that "it is clear that the purpose of § 20–148 is to allow plaintiffs to enforce their constitutional and statutory rights in district court without first having exhausted statutory administrative remedies." *Goolsby,* 250 Neb. at 312, 549 N.W.2d 153. "The legislative history of § 20–148 indicates that the major focus of the statute was to wipe out private acts of discrimination by private employers...." *Wiseman v. Keller,* 218 Neb. 717, 358 N.W.2d 768 (Neb.1984)(citing Judiciary Committee Hearing, L.B. 66, 85th Leg., 1st Sess. (Jan. 18, 1977)). *See also Ritchie v. Walker Mfg. Co.,* 963 F.2d 1119, 1122 (8th Cir.1992)("Section 20–148 does not create a civil remedy for conduct which would violate the concept or spirit of a constitutional or statutory provision but for the absence of a jurisdictional fact. Rather it provides a civil remedy for violations of constitutional or statutory right.").

***6** Because a violation of Nebraska's criminal statutes does not give rise to a civil cause of action, Plaintiff has failed to plead sufficient facts to substantiate a claim under Neb.Rev.Stat. § 20–148. Accordingly, the Court will grant Defendants' Motion to Dismiss Plaintiff's Sixth Claim for Relief.

**4. Plaintiff's Ninth Claim for Relief: Deceptive Trade Practices**

Defendants further contend that Plaintiff has failed to plead the claim for deceptive trade practices, under Neb.Rev.Stat. §§ 87–301 –306, with sufficient particularity in satisfaction of the requirements of Fed. R. Civ. Pro. 9(b). The Court has reviewed the pleadings and applicable law and concludes that Plaintiff has pled facts with sufficient particularity to satisfy the heightened requirements of Fed. R. Civ. Pro. 9(b).

"Under Rule 9(b), a plaintiff must plead such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *BJC Health Sys.,* 478 F.3d at 917(internal quotations omitted). "In other words, the party must typically identify the 'who, what, where, when, and how' of the alleged fraud." *Id.*

"Rule 9(b) is to be read in the context of the general principles of the Federal Rules, the purpose of which is to simplify pleading. Thus, the particularity required by Rule 9(b) is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations." *U.S. ex rel. Costner,* 317 F.3d at 888 (8th Cir.2003). Therefore, "[c]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *BJC Health Sys.,* 478 F.3d at 917.

While Plaintiff argues that the standards of Fed. R. Civ. Pro. 9(b) do not apply to " 'allegations of unfair and deceptive trade practices,' " (Filing No. 32 at 12 (quoting *Alpharma, Inc. v. PennField Oil Co.,* 2008 WL 2331019, *2 (D.Neb. Jun 4, 2008)), this argument is irrelevant as the Court has reviewed the Complaint and concludes that Plaintiff's pleading provides enough detail to survive a Fed. R. Civ. Pro. 9(b) challenge. From the face of the Complaint, it is clear that the pleadings "enable the defendant to respond specifically and quickly to potentially damaging allegations ." *U.S. ex rel. Costner,* 317 F.3d at 888.

The Complaint contains detailed and specific allegations of unlawful conduct including Defendants' "use of pictures of Ervin & Smith's confidential and proprietary and copyrighted material on its website, promoting such copyrighted material as work of the Ervin Group, and using confusingly similar trade name the Ervin Group." (Filing No. 1 at ¶ 88). These allegations are not simply conclusory, but rather, they set forth the who, what, when, and where of the alleged acts constituting deceptive trade practices.

Consequently, the Court will deny Defendants' Motion to Dismiss Plaintiff's Ninth Claim for Relief.

**5. Plaintiff's Tenth Claim for Relief: Fraud**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*7 Defendants also contend that Plaintiff has failed to plead the claim for fraud with sufficient particularity to satisfy the requirements of Fed. R. Civ. Pro. 9(b). The Court has reviewed the pleadings and applicable law and concludes that Plaintiff has pled facts with sufficient particularity to satisfy the heightened requirements of Fed. R. Civ. Pro. 9(b). As stated above, Fed. R. Civ. Pro. 9(b) requires the Plaintiff to "identify the 'who, what, where, when, and how' of the alleged fraud." *BJC Health Sys.,* 478 F.3d at 917. It is clear from the face of the Complaint that Plaintiff has done so.

The Complaint clearly alleges the "who," as there can be no question that the Defendants, specifically the Ervin Brothers, are the individuals charged with the allegations of having committed fraudulent acts. Further, the Complaint is replete with examples of specific fraudulent acts Plaintiff alleges the Defendants committed. (*See, e.g.,* Filing No. 1 at ¶ 21 ("When Ervin & Smith directed the Former Employee Defendants to expand the customer contact with Golden Harvest Seeds, Inc., Lindsay Corporation; and Greenleaf Genetics LLC to include other employees of Ervin & Smith, the Former Employee Defendants deliberately refused and thwarted such efforts."); Filing No. 1 at ¶ 26 ("During the months prior to their resignation, the Ervin Brothers e-mailed to their home computer, for their personal and competitive purposes, confidential and Trade Secret documents and copyrighted documents belonging to Ervin & Smith, and on information and belief, removed other documents containing confidential and trade secret information. The Ervin Brothers further concealed from Ervin & Smith job orders from customers, which they then diverted to Ervin Group to fill after they resigned their employment.").

The Court finds that these pleadings "enable the defendant to respond specifically and quickly to potentially damaging allegations ." *U.S. ex rel. Costner,* 317 F.3d at 888. Accordingly, Defendants' Motion to Dismiss Plaintiff's Tenth Claim for Relief will be denied.

**6. Plaintiff's Twelfth Claim for Relief: Computer Fraud and Abuse**

Plaintiff likewise has succeeded in stating a claim upon which relief can be granted for its claim brought under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§ 1030 *et seq.* "The CFAA criminalizes various fraudulent or damaging activities related to the use of computers." *Fiber Sys. Intern., Inc. v. Roehrs,* 470 F.3d 1150, 1156 (5th Cir.2006). Section 1030(g) of the CFAA allows "[a]ny person who suffers damage or loss by reason of a violation of this section [to] maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). Plaintiff's allegations essentially come within the purview of sections 1030(a)(4) [FN2] and (a)(5)(A) [FN3] of the Act.

FN2. Section (a)(4) states a violation has occurred when an individual who: "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1–year period." 18 U.S.C. § 1030(a)(4).

FN3. Section (a)(5)(A) states a violation has occurred when an individual: "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer; (B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or (C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss." 18 U.S.C. § 1030(a)(5)(A).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendants contend, however, that because Defendants were employees at the time they allegedly accessed Plaintiff's computers, they had "authorization" and thus did not access the computers "without authorization" or in excess of "authorized access" as is required by the statute to establish a violation. They argue that because Plaintiffs cannot show that Defendants didn't have the authority to access the information they allegedly appropriated from Plaintiff, the Plaintiff's CFAA claim must fail.

***8** While the Eighth Circuit Court of Appeals has not directly addressed this issue, many courts have interpreted § 1030(a)(4) to permit an employer's claim against an employee who accesses information he is ordinarily authorized to access when the alleged act is committed "in violation of the duty of loyalty that agency law imposes on [the] employee." *Int'l Airport Ctrs., L.L.C. v. Citrin* 440 F.3d 418, 420 (7th Cir.2006)("For his authorization to access the laptop terminated when, having already engaged in misconduct and decided to quit [his job] in violation of his employment contract, he resolved to destroy files that incriminated himself and other files that were also the property of his employer, in violation of the duty of loyalty that agency law imposes on an employee.)".[FN4] This Court concludes that while the Defendants ordinarily may have been authorized to access the information they appropriated from Plaintiff, that authorization was terminated when Defendants destroyed the agency relationship by accessing and appropriating the protected information for their own personal gain and against the interest of their employer.

FN4. *See also Nilfis–Advance, Inc. v. Mitchell,* 2006 WL 827073, at *2 (W.D.Ark., Mar.28, 2006)(finding that Defendant "exceeded any authorization he had when he e-mailed the files to his personal computer with the alleged purpose of misappropriating the information contained in them."); *Personalized Brokerage Servs., LLC v. Lucius,* 2006 WL 208781, at *2 (D.Minn., Jan.26, 2006)("An employee who exceeds authorized access to an employer's computer may violate the CFAA."); *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.,* 119 F.Supp.2d 1121, 1125 (W.D.Wash.2000) ("Under this rule, the authority of the plaintiff's former employees ended when they allegedly became agents of the defendant. Therefore, for the purposes of this 12(b)(6) motion, they lost their authorization and were 'without authorization' when they allegedly obtained and sent the proprietary information to the defendant via e-mail.")(citing Restatement (Second) of Agency § 112 (1958)).

Furthermore, the Confidential Agreement in the Ervin & Smith Employee Handbook supports Plaintiff's contention that Defendants were only authorized to access this protected information so long as they abided by the agreed-upon terms found within the Handbook. (*See* Filing No. 1 at ¶ 16). In the Handbook, Defendants were instructed that they would have access to Plaintiff's protected information so long as they did not "use, directly or indirectly, any confidential information for [their own] or any third party's benefit." (*See* Filing No. 1 at ¶ 16). Consequently, the Court concludes that Defendants never had authorization to access Plaintiff's protected information to further their own business interests. Instead, when Defendants allegedly violated the Confidential Agreement and allegedly appropriated Plaintiff's secret information for their own private benefit, they exceeded their "authorized access." *See EF Cultural Travel BV v. Explorica, Inc. .,* 274 F.3d 577, 582 (1st Cir.2001) (concluding that Plaintiff "is likely to prove such excessive access based on the confidentiality agreement between [Defendant] and [Plaintiff]."). As a result, Plaintiff has sufficiently pled facts to establish its claim that Defendants violated 18 U.S.C. § 1030.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

In their Motion to Dismiss, Defendants also contend that Plaintiff's Complaint fails to plead the jurisdictional amount of loss required by 18 U.S.C. § 1030(c)(4)(A)(i)(I). Specifically, that section requires a Plaintiff to plead "loss to 1 or more persons during any 1–year period ... aggregating at least $5,000 in value" in order to establish a CFAA claim. 18 U.S.C. § 1030(c)(4)(A)(i)(I). Although Plaintiff has pled "losses that are difficult, if not impossible, to quantify, but amount to at least $5,000" (Filing No. 1 at ¶ 110), Defendants suggest this does not satisfy the required pleading because Plaintiff did not specify that its losses resulted from "response costs or revenue due to an interruption of service." (Filing No. 26 at 14). Specifically, Defendants argue that Plaintiff cannot recover any loss of business or revenue Plaintiff incurred as a result of Defendants' actions because § 1030(g)'s limitation on recovery to "economic damages" and the statute's definition of "loss" allow for recovery of the physical damage done to Plaintiff's computer system only.FN5

FN5. Defendants cite to the statute's definition of loss, where the CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). It is Defendants' contention that any revenue lost outside of restoring computer service or data lost is not recoverable under the Act.

***9** Defendants' interpretation of what constitutes "economic damages" and/or "loss" under the statute is flawed. While Defendants object to paying damages for loss of business, this "objection is without force because [loss of business constitutes] economic damages." *Creative Computing v. Getloaded.com LLC,* 386 F.3d 930, 935 (9th Cir.2004) ("When an individual or firm's money or property are impaired in value, or money or property is lost, or money must be spent to restore or maintain some aspect of a business affected by a violation, those are 'economic damages.' ").

Furthermore, should the Court adopt the Defendants' reasoning and limit recovery under the CFAA to those instances in which a Plaintiff can demonstrate actual, physical damage to a computer or computer system, this Court's ruling "would flout Congress's intent" in creating the CFAA. *EF Cultural Travel BV v. Explorica, Inc.,* 274 F.3d 577, 585 (1 st Cir.2001). "As we move into an increasingly electronic world, the instances of physical damage will likely be fewer while the value to the victim of what has been stolen and the victim's costs in shoring up its security features undoubtedly will loom ever-larger. If we were to restrict the statute as [Defendants] urge, we would flout Congress's intent by effectively permitting the CFAA to languish in the twentieth century, as violators of the Act move into the twenty-first century and beyond." *Id.* In a time when most computer crimes result in loss of revenue and little to no physical damage, it is nonsensical to conclude that Congress did not intend to create a remedy for circumstances such as those the Plaintiff has pled in this matter.

Instead, this Court concludes that Plaintiff has pled sufficient facts to establish damages of at least $5,000, satisfying § 1030(c)(4)(A)(i)(I)'s jurisdictional amount. Defendants' Motion to Dismiss Plaintiff's Twelfth Claim for Relief will be denied.

**CONCLUSION**

For the aforementioned reasons, Defendant's Motion to Dismiss is granted in part and denied in part. Accordingly,

IT IS ORDERED:

1. Defendants' Motion to Dismiss (Filing No. 25) is granted in part and denied in part, as follows:

A.. Plaintiff's Third Claim for Relief is dismissed

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(as to Defendants Thomas Ervin, William Ervin, and BTM, Inc., only) with prejudice;

B. Plaintiff's Sixth Claim for Relief is dismissed (as to Defendants Thomas Ervin, William Ervin, and BTM, Inc., only) with prejudice; and

C. Defendants' Motion to Dismiss is otherwise denied.

2. The Defendants, Thomas Ervin, William Ervin, and BTM, Inc., will respond to the remaining claims in the Plaintiff's Complaint on or before February 26, 2009.

D.Neb.,2009.
Ervin & Smith Advertising and Public Relations, Inc. v. Ervin
Not Reported in F.Supp.2d, 2009 WL 249998 (D.Neb.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

C
Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
FORGE INDUSTRIAL STAFFING, INC.,
Plaintiff,
v.
George DE LA FUENTE, and Impaq Solutions,
Inc., Defendants.

No. 06 C 3848.
Oct. 16, 2006.

Michael Dale Wexler, Rachel M. Kindstrand, Seyfarth Shaw LLP, Chicago, IL, for Plaintiff.

Michael John Leech, Hinshaw & Culbertson, Michael J. Merrick, Merrick Law Firm LLC, Chicago, IL, for Defendants.

***MEMORANDUM AND ORDER***

BLANCHE M. MANNING, District Judge.

*1 Plaintiff Forge Industrial Staffing, Inc. has brought suit against George De La Fuente and Impaq Solutions, Inc. alleging breach of fiduciary duty (Count I), breach of duty of loyalty (Count II), violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Count III), breach of contract (Count IV), and tortious interference against Impaq (Count V). De La Fuente and Impaq move to dismiss all counts under Fed.R.Civ.P. 12(b)(6). For the reasons stated below, the motion is denied.

**I. Facts**

For the purposes of this motion to dismiss, the court accepts all well-pleaded allegations as true.

*Forge's business*

Forge specializes in providing highly skilled, full-time, temporary industrial workers to its clients in the Midwest. Forge operates in Illinois, Indiana, Kentucky, Michigan, and Ohio with 150 employees and places thousands of temporary workers. According to Forge, the industry is highly competitive and Forge's profitability depends on numerous factors including its ability to provide customer service, identify and attract reliable and skilled industrial workers, provide creative pricing and benefit strategies, minimize injury and benefit costs, and obtain and maintain its customer relationships.

*De La Fuente's employment at Forge*

De La Fuente was hired by Forge in February 1998 as manager of support services and in early 2000 was promoted to director of operations. Forge alleges that this position was akin to an executive vice-president position at other companies. De La Fuente was one of five directors at the company. He reported directly to the president and had access to all aspects of Forge's business, including proprietary information, customer information, proposals, cost structures, and reports, among other things. Forge alleges that its proprietary and confidential information is valuable and takes reasonable steps to protect it, including, among other things, having employees (De La Fuente included) execute a Proprietary Interest Protection Agreement.

In early 2005, De La Fuente was moved to the director of risk management position "due to certain performance issues." In this role, De La Fuente still participated in directors' meetings, contributed to high level business initiatives, and continued to have access to information regarding all aspects of Forge's business.

Forge alleges that De Le Fuente's performance continued to suffer after he became the director of risk management and that when he was spoken to about his job functions, he indicated that he was going "to bring Forge down."

*De La Fuente's use of computers*

In all of his roles at Forge, De La Fuente used Forge's computer systems, which were linked across state lines and were used to make proposals

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

to customers, monitor assignments at client sites, communicate with customers, and manage payment issues. Forge has a number of policies, procedures, and agreements that it uses to protect its confidential information and safeguard its customer relationships, among other things. De La Fuente was involved in the development of many of these policies and procedures.

*Forge's investigation of De La Fuente*

***2** Forge alleges that when De La Fuente threatened to "bring Forge down," it began to investigate his conduct at the company. On May 24, 2006, Forge asked De La Fuente to submit his laptop computer to the Forge information technology ("IT") department. He initially refused and did not turn it in until the next day, a delay which "raised a few eyebrows." On May 25, 2006, the day that De La Fuente turned in his computer, Forge gave it to a third-party computer forensic examiner for inspection. Forge spent over $5,000 for this inspection as well as for the examiner's attempt to recover destroyed data.

Upon examination, the examiner discovered various improper activities and measures that De La Fuente used to hide his actions. Many aspects of De La Fuente's hard drive were impaired, altered, or destroyed, thus limiting the recovery of data.

Through its investigation, Forge uncovered an alleged scheme by which De La Fuente was setting up a competing business and in the process was taking Forge's customers and revenue. Forge alleges that it learned that as far back as 2001, De La Fuente incorporated and served as president of Impaq, a competing industrial staffing company. These findings were made from the website addresses and web pages found on De La Fuente's computer. Forge further learned that the domain name impaqinc.com was registered to De La Fuente at his home address and that Impaq's address was also De Le Fuente's home address.

Forge's examination showed that software designed to destroy files and the hard drive itself has been run on the computer on or about May 24 and 25, 2006. Forge also became aware that files and documents, such as reports, charts, and communications, had been deleted from the computer and that the destruction software was used to hide internet activity and destroy evidence of Impaq.

In addition to the above, Forge's investigation revealed that the computer had been used to visit websites containing explicit images of the male anatomy and then download these images in violation of Forge's express policies.

**II. Motion to Dismiss Standard**

In ruling pursuant to Fed.R.Civ.P. 12(b)(6), the court assumes the truth of all well-pled factual allegations in the complaint, construing allegations liberally and viewing them in the light most favorable to the non-moving party. *McMath v. City of Gary,* 976 F.2d 1026, 1031 (7th Cir.1992); *Craigs, Inc. v. General Electric Capital Corp.,* 12 F.3d 686, 688 (7th Cir.1993). Dismissal is properly granted if it is clear that no set of facts which plaintiff could prove consistent with the pleadings would entitle plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Kunik v. Racine County, Wis.,* 946 F.2d 1574, 1579 (7th Cir.1991). The court will not dismiss a complaint unless it is clear that there is no set of facts on which a plaintiff could recover on a claim. *Freiburger v. Emery Air Charter,* 795 F.Supp. 253, 259 (N.D.Ill.1992).

**III. Analysis**

A. *Breach of Fiduciary Duty and Breach of Loyalty* (Counts I and II)

1. *Duplicative*

***3** De La Fuente first argues that one of these counts (breach of fiduciary duty or breach of loyalty) must be dismissed because it is duplicative of the other. Specifically, De La Fuente contends that the duty of loyalty is, by definition, a fiduciary duty that arises from the principal-agent relationship between the employer and employee, and therefore,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

because a breach of loyalty is a breach of fiduciary duty, one of the counts must be dismissed as duplicative.

Forge asserts that alternative pleading is appropriate under Fed.R.Civ.P. 8(e)(2) and notes that the duties of loyalty as owed both by employees and officers are different. *See, e.g., Veco Corp. v. Babcock,* 243 Ill.App.3d 153, 160-61 (1993) ("In general, employees may plan, form, and outfit a competing corporation while still working for the employer, but may not commence competition. Corporate officers, however, stand on a different footing; they owe a fiduciary duty of loyalty to their corporate employer not to (1) actively exploit their positions within the corporation for their own personal benefit, or (2) hinder the ability of a corporation to continue the business for which it was developed.")(internal citation omitted). According to Forge, because De La Fuente may be deemed to be either an employee or officer (or both), and the duties owed by each are different, Forge should be allowed to pursue both claims.[FN1]

FN1. Indeed, the breach of fiduciary duty claim uses the "officer" language (i.e., cannot actively exploit their positions for their own personal benefit and cannot hinder the corporations's ability to continue the business for which it was developed) while the breach of loyalty count refers only to "employees" and their duty of loyalty to the company.

The court agrees that these counts are not duplicative in that they have different elements that must be proved. However, the court notes that the misconduct pled in support of each claim is exactly the same, as are the claimed injuries, and whether De La Fuente is ultimately deemed to be an employee or an officer or both, Forge will not be able to recover twice for the same injury. Accordingly, the court will allow both claims to stand pending proof later in the litigation. *Thomas v. Burlington Northern R. Co.,* 1991 WL 249720, at *1 (N.D.Ill. Nov. 15, 1991)("Because Thomas will not be able to recover twice for the same offense, we shall let the count stand; Thomas may attempt to prove that he is entitled to damages for the emotional distress occasioned by the kicking in addition to damages for the alleged battery itself.").

De La Fuente's motion to dismiss either Count I or II as duplicative is denied.

2. *Do exhibits defeat claim for disloyalty?*

De La Fuente also asserts that the Impaq website pages attached as exhibits to the complaint defeat Forge's claim for disloyalty because they show that Impaq was not in competition with Forge. De La Fuente asserts that the website pages describe Impaq as providing "career" clerical and industrial employees while Forge allegedly places only temporary industrial workers. De La Fuente also attaches additional pages from Impaq's website which he asserts show that the website was not in active use and therefore, apparently, Impaq could not be a competitor of Forge.[FN2] Moreover, De La Fuente points to Forge's policies, also attached as an exhibit to the complaint, which allows its employees to engage in outside work. Finally, De La Fuente also claims that the complaint is "entirely devoid of any specific allegations of competitive activity."

FN2. De La Fuente seeks to have this court consider what it calls Exhibits C-1 (additional pages from the Impaq website) and E-1 (additional pages from the Forge Employee Handbook), which it has attached to its motion to dismiss. The court may, without converting the motion to one for summary judgment, consider documents attached to De La Fuente's motion to dismiss if they are referred to in the complaint and are central to the claim. *Venture Associates Corp. v. Zenith Data Systems Corp.,* 987 F.2d 429 (7th Cir.1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."). Selected pages from the website

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

and the handbook were already attached by Forge to its complaint. Because De La Fuente is merely adding pages to documents that were attached to the complaint, the court will consider these on the motion to dismiss.

*4 De La Fuente invites the court to find that based on Impaq's website, it was not a competitor of Forge. However, the court is not willing to make this crucial factual determination at the motion to dismiss stage when it must accept as true all well-pled allegations. While it is true that exhibits to a complaint control over inconsistent allegations, whether one company is a competitor of another is a detailed factual determination that is not amenable to decision without additional evidence. Further, whether the website was active on the date that the website pages were printed may or may not be significant. Again, this one piece of evidence is simply not determinative. Thus, De La Fuente's argument that the exhibits attached to the complaint (as well as De La Fuente's motion to dismiss) negate the claims of breach of fiduciary duty and breach of loyalty is denied.

Further, to the extent that De La Fuente argues that Counts I and II should be dismissed because they fail to specifically allege competitive activity, it is denied. As recently noted by the Seventh Circuit, a full recitation of facts is unnecessary in federal court. *Kolupa v. Roselle Park Dist.,* 438 F.3d 713, 714 (7th Cir.2006) ("It is enough to name the plaintiff and the defendant, state the nature of the grievance, and give a few tidbits (such as the date) that will let the defendant investigate. A full narrative is unnecessary."). Indeed, as noted by the *Kolupa* court, " '[a]ny district judge (for that matter, any defendant) tempted to write 'this complaint is deficient because it does not contain ...' should stop and think: What rule of law *requires* a complaint to contain that allegation?' " *Kolupa,* 438 F.3d at 714 ( *quoting Doe v. Smith,* 429 F.3d 706, 708 (7th Cir.2005) (emphasis in original). "Any decision declaring 'this complaint is deficient because it does not allege X' is a candidate for summary reversal, unless X is on the list in Fed.R.Civ.P. 9(b)." *Id.* at 715. The complaint in the instant case provides more than sufficient facts to apprise De La Fuente of the claims against him. This is all that is needed at this stage of the game.

Finally, De La Fuente also asserts at length that Forge has not specifically alleged that De La Fuente was an "officer," and that, as a matter of law, De La Fuente could not have been an officer and therefore, could not have breached any fiduciary duties owed by officers.[FN3] According to De La Fuente, Forge is merely attempting to restrict the rights of an employee (i.e., De La Fuente) to prepare to compete by vaguely alleging that De La Fuente is an officer, and thus subject to more restrictive rights and obligations with respect to Forge. This argument is simply misplaced at the motion to dismiss stage where resolution of factual matters is inappropriate.

FN3. De La Fuente alludes to this argument in the introductory section of his opening motion but does not discuss it in depth until his reply brief. While the court will generally not address new arguments raised in a reply brief, because De La Fuente briefly mentioned this argument in his opening brief, the court will consider it in the interest of completeness.

At this point, Forge alleges that De La Fuente was "one of the highest level employees at Forge," had "various senior executive positions at Forge," "was one of only five directors at Forge," and was "akin to an Executive Vice President in that no such positions existed at Forge." These allegations are sufficient upon which to base a breach of fiduciary duty claim. De La Fuente will have ample opportunity later in the case to attempt to prove that he was not an officer, and therefore was not subject to the higher duties owed by officers under Illinois law.

*5 De La Fuente's motion to dismiss Counts I

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

and II for failure to allege "competitive activity" or that De La Fuente was an "officer" is denied.

3. *Failure to allege other disloyalty or "proximately-caused damages"*

For the reasons just discussed, De La Fuente's assertion that Forge has not alleged any other disloyalty and has failed to adequately allege damages is unpersuasive. As to allegations of "other disloyalty," no such allegations are necessary for the reasons already described. Further, Forge's allegation that it "has been injured and will continue to be damaged by De La Fuente by the loss of customers, revenues and/or goodwill, the decrease in the value of its property and the payment of monies to De La Fuente while he was employed by Forge" sufficiently alleges damages in federal court.

For all of the reasons discussed above, the motion to dismiss Counts I and II is denied.

B. *Computer Fraud and Abuse Act* ("CFAA") (Count III)

De La Fuente next argues that Count III should be dismissed for failure to state a claim because it fails to establish a lack of authority to erase data (i.e., "unauthorized access"), it does not properly specify what specific information of value or use to Forge was lost, and it does not allege that Forge's expenditures for the forensic computer examiner represented the "reasonable" cost of restoring data.

1. *Unauthorized access*

According to Forge, De La Fuente violated the CFAA, 18 U.S.C. § 1030 *et seq.,* by altering or destroying data on his computer to hide his actions and/or the existence of Impaq, altering or destroying explicit images which violated Forge's policies, running software that destroyed information on the hard drive or destroyed Forge's customer and business information.[FN4]

FN4. Forge alleges that De La Fuente violated the following provisions of the CFAA:

1. Knowingly caused the transmission of a program, information, code or command and as a result of such conduct, intentionally caused damage without authorization, to a protected computer in excess of $5,000 violation of 18 U.S.C. §§ 1030(a)(5)(A)(i);

2. Intentionally accessed a protected computer without authorization or exceeded his authority to obtain information thereby recklessly causing damage in excess of $5,000.00 in violation of 18 U.S.C. § 1030(a)(5)(A)(ii);

3. Intentionally accessed a protected computer without authorization or exceeded his authority to obtain information thereby causing damage in excess of $5,000.00 in violation of 18 U.S .C. § 1030(a)(5)(A)(iii)

4. Knowingly and with intent to defraud, intentionally accessed a protected computer without authorization or exceeded his authority, and by means of such conduct furthered the intended fraud and obtained valuable information resulting in damages exceeding $5,000.00 in violation of 18 U.S.C. § 1030(a)(4).

De La Fuente first argues that the CFAA claim must be dismissed because each of the CFAA sections he is alleged to have violated all require "unauthorized access" of a computer. 18 U.S.C. §§ 1030(a)(5)(A)(i), (a)(5)(A)(2), (a)(5)(A)(iii), and (a)(4).[FN5] According to De La Fuente, the exhibits that Forge attached to its complaint (i.e., company policies and procedures) affirmatively demonstrate that nothing in Forge's policies limited De La Fuente's authority to delete or erase data. Thus, De La Fuente contends that the exhibits refute the assertion that the data elimination was unauthorized.

FN5. De La Fuente is also liable if he "by the conduct described in clause [ §

1030(a)(5)(A) ] (i), (ii), (iii) of subparagraph (A), caused (or in the case of an interrupted offense, would, if completed, have caused)-(i) loss to 1 or more persons during any 1-year period ... aggregating at least $5,000 in value." 18 U.S.C. § 1030(a)(5)(B)(i).

This argument is rejected in light of *International Airport Centers, L.L.C. v. Citrin,* 440 F.3d 418 (7th Cir.2006). The facts in IAC are quite similar to the ones at issue here. Specifically, the defendant, employed by IAC, decided to quit his job there and go into business for himself. However, prior to doing so, he deleted all the information on the laptop computer that IAC had provided to him-"not only the data that he had collected but also data that would have revealed to IAC improper conduct in which he had engaged before he decided to quit." *Id.* at 419. The plaintiff sued under the CFAA and the district court granted the defendant's motion to dismiss.

***6** The Seventh Circuit, however, reversed. It found that the defendant, assuming the well-pleaded facts to be true as the plaintiff appealed from a motion to dismiss, violated 18 U.S.C. § 1030(a)(5)(A)(ii), which imposes liability on anyone who "*intentionally accesses* a protected computer *without authorization,* and as a result of such conduct, recklessly causes damage." *Id.* at 420 (first emphasis in original; second emphasis added). The court found that the defendant's "authorization to access the laptop terminated when, having already engaged in misconduct and decided to quit IAC in violation of his employment contract, he resolved to destroy files that incriminated himself and other files that were also the property of his employer, in violation of the duty of loyalty that agency law imposes on an employee." *Id.* (citations omitted).

According to Forge's allegations, similar circumstances existed here. De La Fuente, who was a director of the company and who allegedly had started a competing business in 2001, accessed prohibited sexually explicit websites, downloaded software destruction programs onto Forge's computer, and intentionally destroyed files, records, and other information and data kept on his computer when Forge asked De La Fuente to turn the computer over to the company. As in *IAC,* and assuming the truth of the complaint's allegations, any authorization De La Fuente had to delete or erase information from the computer ended when he engaged in misconduct in violation of his duty of loyalty to the company. *Beltran v. Brentwood North Healthcare Center,* LLC, 426 F.Supp.2d 827, 831 (N.D.Ill.2006) (citations omitted) ("Courts applying Illinois law have construed the duty of loyalty to prohibit officers or employees from improperly competing with their employer, soliciting the employer's customers, enticing co-workers away from the employer, diverting business opportunities, engaging in self-dealing and/or otherwise misappropriating the employer's property or funds.").

The court acknowledges that De La Fuente has pointed to a recent district court case in Florida that disagrees with the Seventh Circuit's approach in ascertaining whether access was "without authorization." *See Lockheed Martin Corp. v. Speed,* No. 6:05-CV-1580-ORL-31, 2006 WL 2683058, at *5-6 (M.D.Fla.Aug.1, 2006). As De La Fuente is well aware, however, this court is bound by the decisions of the Seventh Circuit Court of Appeals, not the District Court of the Middle District of Florida. Accordingly, De La Fuente's motion to dismiss the CFAA count on the ground that his access was authorized is denied.

2. *Allegations regarding reasonable restoration costs*

De La Fuente asserts that the CFAA count should be dismissed because Forge has not properly alleged "loss" as required under the relevant sections of the CFAA (noted above). De La Fuente argues that: (a) Forge does not allege that its payment was limited to the cost of damage assessment and data restoration; and (b) Forge "cannot achieve the [$5,000] statutory minimum by hiring high-priced expert witness talent."

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***7** Under the CFAA, loss is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

As to De La Fuente's first ground for dismissal, Forge's allegation that it "expended sums in excess of $5,000.00 for the computer examiner *to investigate, analyze and attempt to recover destroyed data* from the De La Fuente computer," Complaint at ¶ 44 (emphasis added), sufficiently alleges loss under the definition in the statute. As to the second ground, that expert witness fees, as De La Fuente terms them, are not "reasonable" is wholly unsupported by any citations to authority or even supportable argument. Thus, the argument is rejected.

C. *Breach of Contract* (Count IV)

*1. Does the employee handbook create a contract?*

De La Fuente next argues that the breach of contract count must be dismissed because the employee handbook, upon which the breach of contract count is purportedly based, expressly disclaims the creation of any contractual relationship. Specifically, De La Fuente points to the following language from the handbook:

> This handbook is not a contract guaranteeing employment for any specific duration ... No supervisor, manager, or representative of the Company, other than a President or Vice-President, has the authority to enter into any agreement for employment for any specified period or to make any promises or commitments contrary to the foregoing. Any employment agreement entered into by the President or Vice-President shall not be enforceable unless it is in writing and signed by both parties.

The handbook also states that "[t]he policies in this handbook are subject to change at the sole discretion of the Company." De La Fuente argues that these provisions preclude treating the handbook as a legally binding document.

"Under Illinois law, ... an employee handbook or other statement of employment policy ... can give rise to an enforceable contract provided three conditions are met: (1) the language of the statement sets forth a promise in terms clear enough to cause a reasonable employee to believe that an offer has been made; (2) the statement is distributed to the employee, so that the employee is aware of its contents and reasonably construes it to be an offer; and (3) the employee accepts the offer by commencing or continuing to work after reading the statement." *Tatom v. Ameritech Corp.,* 305 F.3d 737, 742-43 (7th Cir.2002) (citation omitted). However, an express disclaimer can foreclose any reliance on purported promises made in a handbook or other employment documents. In *Tatom,* the Seventh Circuit stated that the following disclaimer in compensation program documents precluded finding that any contract had been formed:

> ***8** The CBS Compensation Program is a statement of CBS' intentions and does not constitute a guarantee that any particular amount of compensation will be paid. It does not create a contractual relationship or any contractually enforceable rights between CBS and the employee.
>
> *Id.* at 743.

Here, however, the disclaimer in Forge's handbook does not disavow that it forms any contract whatsoever, only employment for a certain period of time. The disclaimer in Forge's handbook is not as broad as that in the *Tatom* case. Thus, the court cannot state at this juncture that, as a matter of law, the employee handbook did not create a contract.

Moreover, the breach of contract count is not based solely on the employee handbook. Forge attaches to its complaint a Proprietary Interest Protection Agreement ("Agreement") that De La Fuente

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

executed upon commencing employment at Forge. *See* Complaint, Exh. D. Pursuant to the Agreement, the signatory agrees not to solicit, participate in soliciting, or provide products or services competitive with or similar to products or services offered by Forge to any person who was a Forge customer or a potential Forge customer. The signatory also agrees not to directly or indirectly on his own behalf or for any other entity provide or sell products or services "competitive with or similar to" products and services that the signatory provided or sold for Forge during the last 18 months of employment. Moreover, the Agreement contains a "best efforts" provision as well as a requirement that the signatory return all materials related to Forge's business.

Forge's breach of contract count alleges, among other things, that De La Fuente breached his contract by forming and operating a competing business and by destroying Forge files maintained on his laptop. These allegations could be based on alleged obligations created by both the employee handbook as well as the Agreement. Thus, even if the handbook is not a contract, the Agreement creates contractual rights and obligations upon which the breach of contract count could be based. Thus, De La Fuente's motion to dismiss the breach of contract count on the ground that the employee handbook fails to create a contract is denied.

*2. Failure to allege facts*

To the extent that De La Fuente asserts that the breach of contract claim is not supported by factual averments (*see* Parts III.B, III.D, III.E of De La Fuente's motion to dismiss), it is denied for the reasons already stated above in Part III.A.2 of this order. Forge need not allege facts in federal court.

*3. No "transmission" of prohibited materials*

Finally, Forge alleges that De La Fuente breached his contract with the company when he did not "refrain from the transmission of sexually explicit images" and did not "refrain from using the Internet for personal gain, obscene messages and downloading of unauthorized software." According to Forge, these activities were prohibited by the policies stated in the employee handbook, which constituted a contract.

***9** De La Fuente first asserts that Forge identifies no specific obscene messages and no personal gain that De La Fuente obtained from the internet. De La Fuente also asserts that Forge did not allege that he "downloaded" software from the internet. As already noted, such factual allegations are unnecessary. Further, contrary to De La Fuente's assertion, Forge does allege that De La Fuente downloaded software. *See* Complaint at ¶ 49 ("De La Fuente's computer hard drive had evidence of multiple highly destructive evidence destroying software programs being downloaded ... from the Internet ....").

De La Fuente's further argument that he did not "transmit" images, as prohibited by the employee handbook, is unavailing. According to De La Fuente, even assuming the handbook policies constituted the terms of a binding contract, he did not violate any policy because Forge only alleges that he "*visit[ed] and download[ed]* numerous explicit sexual images ..." and Forge alleges that he ultimately deleted them in any event. Thus, according to De La Fuente, he did not violate the policy prohibiting offensive and sexually explicit *messages and transmissions*.

However, the court will not at this stage of the litigation conclude that De La Fuente could not as a matter of law have violated the policy against offensive and sexually explicit "messages and transmissions" by visiting and downloading sexually explicit images. De La Fuente has cited no authority for his position and indeed, the Seventh Circuit appears to take a relatively broad view of the term "transmission," at least as it is included in the CFAA. *See IAC,* 440 F.3d at 419 (concluding that the term "transmission" as used in the CFAA includes either downloading file-destroying software from the internet or obtaining it from a floppy disk or CD).

D. *Tortious Interference* (Count V)

In Count V, Forge alleges that Impaq interfered with Forge's contractual relationship with De La Fuente and caused him to violate his fiduciary duties. Impaq seeks to dismiss this count because: (1) the allegations in the breach of contract count do not support a breach of contract by De La Fuente; (2) Impaq is the alter ego of De La Fuente and one cannot be liable for interfering with one's own contract, *Lawrence H. Flynn, Inc. v. Philip Morris USA, Inc.,* No. 05 C 318, 2006 WL 211823, at * (N.D.Ill. Jan. 19, 2006)("It is a well-established rule that a party may not be charged with tortious interference with his own contract.") (citations omitted); and (3) the count fails to allege proximately caused damages.

Regarding the first ground, that there can be no interference claim because there was no breach of contract, it is not entirely clear what Impaq is arguing. However, to the extent that it is asserting that the tortious interference count should be dismissed because the breach of contract count fails to state a claim, the motion is denied because the court denied the motion to dismiss the breach of contract count for failure to state a claim, as set forth above.

***10** As to the second basis for dismissal of this count, that Impaq is the alter ego of De La Fuente and thus cannot have interfered with De La Fuente's contract with Forge, Forge responds that is has not alleged that Impaq is De La Fuente's alter ego. Thus, Forge asserts that the count should not be dismissed. It is true that Forge has not expressly alleged that De La Fuente is the alter ego of Impaq, though it is hinted at when Forge alleges that Impaq's website was registered to De La Fuente's home address. However, the alter ego analysis is fact-intensive and therefore, is inappropriate for resolution on a motion to dismiss. *Larson v. CSX Transp., Inc.,* 835 N.E.2d 138, 145 (Ill.App.Ct.2005) (alter ego determination based on "whether the entities have failed to maintain formal corporate distinctions, or whether recognition of the entities as distinct would allow them some unfair advantage").

Regarding the third argument for dismissal, failure to allege proximately caused damages, the court has already repeatedly noted that specific facts need not be alleged. Forge alleges that it has "been injured and faces irreparable injury." These allegations are sufficient. For this same reason, Impaq's argument in its reply that Forge has not alleged that Impaq did anything to induce De La Fuente to breach his contract with Forge or that Impaq'a alleged conduct caused any harm fails. Forge alleges that "Impaq took steps to move Forge's business to Impaq and otherwise allowed De La Fuente to engage in prohibited conduct for the benefit of Impaq thereby interfering with Forge's contract and economic expectancies." Moreover, Forge alleges that it "has been injured" by Impaq's actions. Again, these allegations are sufficient in federal court.

**IV. Conclusion**

For the reasons provided above, De La Fuente and Impaq's motion to dismiss [22-1] is denied.

N.D.Ill.,2006.
Forge Indus. Staffing, Inc. v.De La Fuente
Not Reported in F.Supp.2d, 2006 WL 2982139 (N.D.Ill.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.



United States District Court,
N.D. Illinois, Eastern Division.
GEORGE S. MAY INTERNATIONAL COMPANY, Plaintiff,
v.
Daniel L. HOSTETLER and Strategic Business Partners, LLC, Defendants.

No. 04 C 1606.
May 28, 2004.

*MEMORANDUM OPINION*

KOCORAS, Chief J.

***1** This matter comes before the court on the motions of Defendants Daniel Hostetler and Strategic Business Partners, LLC ("SBP") to dismiss Counts I and II of the complaint and to stay proceedings in this case pending arbitration. For the reasons set forth below, the motion to dismiss is denied and the motion to stay is granted.

BACKGROUND

Plaintiff George S. May International Company ("GSMIC") is a consulting firm. Hostetler is a former employee of GSMIC; over the more than 15 years that he worked for the company, Hostetler held various management and executive positions. Hostetler held his last two positions with GSMIC pursuant to employment agreements, one executed on April 23, 1995, and the other on March 23, 2003.

Both contracts contained the following provision, captioned "Post Employment Dispute Resolution":

> If, after employment, any dispute, claim or controversy shall arise between [Hostetler], on the one hand, and [GSMIC], on the other hand, as to any issue whatsoever the same shall be referred to and settled by the "arbitration" procedure set forth [within the agreement], which may be requested upon the application of any interested party, provided, however, that either party may seek injunctive relief ... without resorting to or completing arbitration. No arbitrator shall have the authority to grant injunctive relief.

In 2003, Hostetler formed SBP, his own consulting firm.[FN1] In August of that year, Hostetler left GSMIC for SBP. According to the complaint, Hostetler used his access to GSMIC's computer system to take several copyrighted documents with him when he left; SBP is allegedly using the same in its own consulting activities. GSMIC also claims that, prior to his departure, Hostetler used $100,000 of GSMIC funds for his own benefit.

> FN1. Although GSMIC's response assumes that the formation of SBP coincided with Hostetler's departure, the complaint does not make that allegation. The sole statement, contained in ¶ 20, states that Hostetler formed a consulting firm but does not specify when that occurred.

GSMIC filed the instant complaint in March 2004, alleging copyright infringement, violations of the Computer Fraud and Abuse Act ("CFAA"), breach of contract, breach of fiduciary duty, unjust enrichment, and common-law fraud. The prayer for relief seeks legal and equitable remedies. Hostetler and SBP have filed a motion to dismiss the copyright infringement and CFAA counts pursuant to Fed. R. Civ. Proc. 12(b)(1) and 12(b)(6), respectively, as well as a motion to stay the proceedings in this case pending arbitration pursuant to the arbitration clauses contained in Hostetler's two employment contracts.

LEGAL STANDARDS

A. Motions to Dismiss

The purpose of a motion to dismiss pursuant to Rule 12(b)(1) is to dismiss claims over which a federal court lacks subject matter jurisdiction. Jurisdiction is the "power to decide" and must be conferred upon a federal court. *In re Chicago, Rock Island &*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Pac. R.R. Co.,* 794 F.2d 1182, 1188 (7th Cir.1986). The plaintiff bears the burden of establishing that the jurisdictional requirements have been met. *See Kontos v. United States Dep't of Labor,* 826 F.2d 573, 576 (7th Cir.1987). When a defendant moves for dismissal pursuant to Rule 12(b)(1), the plaintiff must support its allegations with competent proof of jurisdictional facts. *See Thomson v. Gaskillwsa,* 315 U.S. 442, 446 (1942).

***2** Fed. R. Civ. Proc. 12(b)(6) evaluates the legal sufficiency of a plaintiff's complaint. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). In ruling on a motion to dismiss, the court must accept all well-pleaded allegations as true and will not dismiss a case for failure to state a claim unless the plaintiff cannot prove any facts sufficient to support his claim. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). All inferences shall be drawn in a light most favorable to the plaintiff. *Jackson v. E.J. Branch Corp.,* 176 F.3d 971, 978 (7th Cir.1999). To survive a motion to dismiss, a plaintiff must only provide a "short and plain statement" under Rule 8(a)(2); the particulars of the claim are not required. *Midwest Gas Servs. v. Ind. Gas Co.,* 317 F.3d 703, 710 (7th Cir.2002).

B. Motion to Stay Pending Arbitration

The Federal Arbitration Act ("FAA") provides that an arbitration clause in a "contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. It is well settled that arbitration is a favored means of dispute resolution, and the FAA established a clear policy favoring arbitration. *See Kiefer Speciality Flooring, Inc. v. Tarkett,* Inc., 174 F.3d 907, 909 (7th Cir.1999). To effect this policy, courts liberally construe any contractual language pertaining to arbitration and resolve doubts in favor of arbitrability. *See Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24-25 (1983).

A party contesting the submission of the claim to arbitration must clearly show that the presumption of arbitrability does not apply. *See International Union of Operating Engineers, Local Union 103 v. Indiana Const. Corp.,* 13 F.3d 253, 255-56 (7th Cir.1994). The arbitrability of a particular issue turns on principles of contract interpretation, as "a party cannot be required to submit to arbitration any dispute which he has not agree so to submit." *United Steelworkers v. Warrior & GulfNavigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347 (1960)). A claim will be deemed arbitrable if an arbitration clause is capable of any interpretation that a claim is covered. *See International Union of Operating Engineers, Local Union 103 v. Indiana Const. Corp.,* 13 F.3d 253, 255-56 (7th Cir.1994). If parties have a contract providing for arbitration of some issues, questions concerning the scope of issues subject to arbitration should be resolved in favor of arbitration. *See Miller v. Flume,* 139 F.3d 1130, 1136 (7th Cir.1998).

DISCUSSION

A. Motion to Dismiss

*1. Count I: Copyright Infringement*

A viable claim for copyright infringement is comprised of two parts: the plaintiff must own a valid copyright, and the defendant must have copied constituent elements of the plaintiff's work that are original. *Feist Publications, Inc. v. Rural Telephone Serv. Co ., Inc.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1296 (1991). While copyright ownership and protection attach at the time a work is created, a suit for infringement cannot be brought until the copyright owner registers a copyright or has a registration application refused. 17 U.S.C. § 411(a); *Pickett v. Prince,* 207 F.3d 402, 404 (7th Cir.2000).

***3** Hostetler's argument in support of his motion to dismiss Count I focuses on the fact that, although the complaint contains general allegations of both copyright registration and infringement, it provides specifics of both issues for only a few works for which GSMIC owns the copyright. Contrary to Hostetler's ultimate position, this shows that we do have subject matter jurisdiction. Allega-

tions as to even one copyrighted and properly registered work would be sufficient to establish our jurisdiction in this case. As that is the only question directly presented by the 12(b)(1) motion, we decline to accept Hostetler's invitation to further define the precise parameters of Count I at this stage of the proceedings. Dismissal under 12(b)(1) is inappropriate, and the motion pertaining to Count I is correspondingly denied.

*2. Count II: Computer Fraud and Abuse Act*

Count II of the complaint is premised upon an alleged violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. As Hostetler correctly points out, the complaint does not specify the sections of the statute upon which it relies. Instead, the allegations contain language that could apply to violations of § 1030(a)(2)(C), § 1030(a)(4), or § 1030(a)(5). Hostetler attacks the sufficiency of the pleading only with respect to the latter two subsections, citing various authorities arising from factual settings distinguishable from those in the case at bar, making them of limited use to offer up guidance for our decision.

A case decided in the Western District of Washington, cited by neither party, supplies us with an analogous factual situation and persuasive reasoning. In *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.,* the plaintiff sued a competitor for luring away its employees after encouraging them to steal trade secrets out of the plaintiff's computer system. 119 F.Supp.2d 1121 (W.D.Wash.2000). The defendant moved to dismiss the CFAA count of the complaint, making much the same arguments as Hostetler and SBP do here. The court engaged in a thorough analysis of the statute and its application to a scenario in which an employee uses his or her access to an employer's computer system to appropriate the employer's intellectual property. Ultimately, the court concluded that, in a situation such as that presented here, causes of action are available under each of the subsections listed above. We are convinced that a like outcome is warranted in this case.

Hostetler's argument that the conduct attributed to him within the complaint did not exceed his authorized access falls flat. While Hostetler may very well be correct that he was entitled to access the information when he was employed by GSMIC, it is no stretch of the imagination to conclude that his authorization did not extend to removing copyrighted material from the computer system for his personal benefit or that of a competitor. *See id.* at 1125 (noting that an employee's prior authorization was lost when proprietary information was obtained and sent to a competitor).

***4** Moreover, Hostetler's contention that the loss alleged within the complaint cannot satisfy the statutory requirement of damages is inconsistent with the definition contained within the statute itself. For purposes of the CFAA, " 'damage' means any impairment to the integrity or availability of data, a program, a system, or information. 18 U.S.C. § 1030(e)(8). We see no principled reason, nor has Hostetler offered one, why infringement of copyrighted material taken from a protected computer system would not qualify as impairment of the integrity of the copyrighted information.

Hostetler also professes that, to the extent Count II relies on § 1030(a)(4), it must be dismissed for failure to comply with the particularity requirements of Fed. R. Civ. Proc. 9(b) because of its inclusion of terminology pertaining to fraudulent behavior. However, the *Shurgard* court again concluded that a cause of action under 18 U.S.C. § 1030(a)(4) is sufficiently pleaded if it alleges that the defendant "participated in dishonest methods to obtain the plaintiff's secret information. *Shurgard,* 119 F.Supp.2d at 1126. GSMIC's complaint satisfies this standard.

Finally, we do not agree with SBP's claim that it cannot be included in the CFAA count. According to SBP, it was not formed at the time Hostetler allegedly acted and therefore no agency relationship was possible between it and Hostetler. Because there is no allegation that SBP independently accessed GSMIC's computers, SBP contends that no

CFAA count can be pleaded against it.

While the complaint is not crystal clear, it is reasonable to infer from GSMIC's allegations that Hostetler was acting as an agent of SBP at the time the claimed acts occurred. The case SBP cites to counter the propriety of allegations against it is inapposite; in that case, there was no allegation of an agency relationship between the two defendants. *Role Models America, Inc. v. Jones,* 305 F.Supp.2d 564 (D.Md.2004). Citing *Shurgard,* the court in *Role Models* acknowledged that the presence of an agency relationship between defendants can make the difference between a viable claim and a 12(b)(6) dismissal. *Id.* at 567. That scenario is conceivable under the allegations advanced here.

Accordingly, the 12(b)(6) motion to dismiss Count II is denied in its entirety.

B. Motion to Stay Pending Arbitration

Hostetler's second motion stems from the arbitration provision of the two employment contracts entered by the parties in 1995 and 2003. According to Hostetler, the broad language of these provisions mandates arbitration of the causes of action listed in the complaint, with the exception of the requests for injunctive relief in Counts I and II.

GSMIC's response is twofold. The first is procedural; GSMIC contends that the motion is premature because neither party has initiated arbitration proceedings. Although we have no indication that arbitration has commenced, that presents no impediment to Hostetler's motion. *See, e.g., Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.,* 50 F.3d 388, 389 (7th Cir.1995). The second challenge is substantive; GSMIC argues that the presence of SBP, which was not a party to the arbitration agreement, and the requests for injunctive relief in its complaint add up to several nonarbitrable claims that this court has the discretion to consider despite any potential or even contemporaneous arbitration proceedings. *See Dickinson v. Heinold Securities, Inc.,* 661 F.2d 638 (7th Cir.1981).

***5** While we agree with GSMIC that we do have discretion to proceed on the nonarbitrable issues, we do not agree that the proper exercise of that discretion in this case would be to do so. Rather, this case presents a situation similar to that in *Air Freight Servs., Inc. v. Air Cargo Transport, Inc.,* 919 F.Supp. 321 (N.D.Ill.1996). Arbitrable issues include whether Hostetler breached his contractual obligations and, if so, how he did so as well as the factual underpinnings of the CFAA and copyright infringement counts. These issues are inextricably linked to any that we would consider in deciding the questions presented by the complaint that are not subject to arbitration. Although the arbitrator could only award part of the relief sought if GSMIC prevailed on its CFAA and copyright claims, there is no advantage to be gained by duplicative adjudication and potentially conflicting results therefrom. Consequently, we conclude that the more prudent course of action in these circumstances is to stay this litigation until GSMIC and Hostetler complete arbitration of issues falling within the ambit of the two employment agreements or both parties waive their entitlement to the same. *See Cabinetree,* 50 F.3d at 390-91.

CONCLUSION

Based on the foregoing analysis, Hostetler's motion to dismiss Counts I and II of the complaint is denied. His motion to stay proceedings pending arbitration is granted.

N.D.Ill.,2004.
George S. May Intern. Co. v. Hostetler
Not Reported in F.Supp.2d, 2004 WL 1197395 (N.D.Ill.), 2004 Copr.L.Dec. P 28,807

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.


United States District Court,
E.D. Texas,
Tyler Division.
HEWLETT-PACKARD COMPANY, Plaintiff,
v.
BYD:SIGN, INC.; Byd:Sine, Co. Ltd., a/k/a Byd:Sign, Co. Ltd., a/k/a Byd:Sign Company Japan, Ltd, a/k/a Byd:Sign Worldwide; Eyefi Digital TV, Inc.; Katsumi Electronics Corp.; J. Brian Dennison; Karl Kamb, Jr.; Katsumi Iizuka; Marc McEachern; David Thorson; Poojitha Preena, Defendants.

No. 6:05-CV-456.
Jan. 25, 2007.

***ORDER ON MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM***

MICHAEL H. SCHNEIDER, United States District Judge.

***1** Came on for consideration this day the Motion to Dismiss Plaintiff's First Amended Complaint and Supporting Brief filed by Defendants Byd:sign Japan, Eyefi, Katsumi Iizuka, Karl Kamb, Jr., and Marc McEachern (Doc. No. 143), the Joinder in Motion to Dismiss Plaintiff's First Amended Complaint filed by Defendant David Thorson (Doc. No. 149), and the parties' responses and replies. The Court is of the opinion that the Defendants' motion to dismiss should be denied in its entirety.

## I. Background

HP alleges in its complaint that each of the individual Defendants-J. Brian Dennison ("Dennison"), Karl Kamb, Jr. ("Kamb"), Katsumi Iizuka ("Iizuka"), Marc McEachern ("McEachern"), David Thorson ("Thorson"), and Poojitha Preena ("Preena") (collectively, the "Individual Defendants")-were at one time either employees or contractors working for HP or for one of its predecessors, Compaq Computer Corporation. HP alleges that Defendants Kamb, McEachern, and Thorson agreed to abide by certain ethical standards as set out in a document entitled "HP's Standards of Business Conduct." The Standards of Business Conduct establish certain standards of behavior that are not acceptable for HP employees, including outside work for a competitor, usurpation of corporate opportunities, or use of HP resources and computer systems for outside employment or personal gain. HP alleges that the Individual Defendants conspired to use their positions of trust and confidence at HP to obtain trade secrets and other proprietary information from HP and then illegally funneled those secrets and HP's corporate opportunities to an enterprise founded by several of the Individual Defendants. HP further alleges that the Defendant companies-byd:sign, Inc., a/k/a byd:sign, L.L.C. ("byd:sign USA"); byd:sine, Co. Ltd., a/k/a byd:sign, Co. Ltd., a/k/a byd:sign Company Japan, Ltd, a/k/a byd:sign Worldwide ("Byd:sign Japan"); and Eyefi Digital TV, Inc. ("Eyefi")-were each formed and/or run by or with the assistance of the Individual Defendants in furtherance of that conspiracy. In this lawsuit, HP seeks an accounting, imposition of a constructive trust, and monetary damages to compensate HP for the loss that HP has suffered as a result of the Defendants' alleged wrongdoing.

Based on these allegations, HP brings claims against the Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Lanham Act, the Computer Fraud and Abuse Act ("CFAA"), and various common law torts, including fraud and breach of fiduciary duty.

Defendants Dennison, McEachern, Preena, and byd:sign USA have answered HP's Complaint.

Defendants Byd:sign Japan, Eyefi, Iizuka, McEachern, Thorson, and Kamb (the "Moving Defendants") have filed the subject motion to dismiss in which they challenge the sufficiency of Plaintiff HP's complaint under Rule 12(b)(6) of the Federal

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Rules of Civil Procedure with regard to HP's claims for civil RICO violation, fraud, breach of fiduciary duty, constructive fraud, Lanham Act unfair competition, and civil CFAA violations. The Defendants also argue that HP's fraud claims fail to comply with Rule 9(b)'s requirement that averments of fraud be stated with particularity.

**II. Legal Standard for Motion to Dismiss**

***2** Generally, in appraising the sufficiency of a complaint under Federal Rule of Civil Procedure 12(b)(6), "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibzon,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Lowrey v. Texas A & M Univ. Sys.,* 117 F.3d 242, 247 (5th Cir.1997). In considering motions to dismiss, the complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Lowrey,* 117 F.3d at 247 (citing *Campbell v. Wells Fargo Bank,* 781 F.2d 440, 442 (5th Cir.1986)). Furthermore, Rule 12(b) (6) motions are "viewed with disfavor and [are] rarely granted." *Lowrey,* 117 F.3d at 247 (citing *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards,* 677 F.2d 1045, 1050 (5th Cir.1982)).

When assessing whether a fraud claim should be dismissed for lack of particularity, the Rule 9(b) standards require specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Plotkin v. IP Axess Inc.* 407 F.3d 690, 696 (5th Cir.2005) (citing *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 412 (5th Cir.2001)). That is, "the who, what, when, and where must be laid out before access to the discovery process is granted." *Williams v. WMX Technologies, Inc.,* 112 F.3d 175, 178 (5th Cir.1997). Rule 9(b)'s particularity requirement applies to RICO predicates of mail and wire fraud as well as to state law claims of fraud. *Id.* at 177.

**III. HP Adequately Alleges Civil RICO Causes of Action**

The Defendants argue that HP's Civil RICO claim is deficient and should be dismissed because it fails to adequately identify the predicate fraudulent "racketeering activities" with particularity, fails to adequately identify an "enterprise," fails to allege the requisite continuity, and fails to allege the appropriate causal relationship between the alleged RICO predicate acts and HP's damages. The Court disagrees, however, and finds that HP's civil RICO claim is sufficient to survive the Defendant's motion to dismiss.

**A. *HP's RICO Allegations***

HP alleges that the Defendants conspired to use certain Individual Defendants' positions of influence within HP to help byd:sign enter the flat-panel television market, without ever disclosing to HP the Defendants' personal interests in the company. (Compl.¶ 59.) HP alleges that the Defendants engaged in a scheme or artifice to defraud HP beginning in October 2003 and continuing through the second quarter of 2004. The alleged scheme to defraud involved the use of positions of influence held by Kamb and others within HP to hire byd:sign Japan to perform consulting services for HP. (Compl.¶ 60.) HP alleges that byd: sign Japan "issued, through the use of the mail, facsimile, and/ or computer, multiple invoices to HP totaling almost a quarter of a million dollars." (*Id.*) HP further alleges that the Defendants structured the invoices and payments such that Kamb was able to use his payment authorization to approve payment without acquiring further approval. (*Id.*) HP also alleges that the byd:sign invoices included wire transfer instructions for payment, which HP followed when it tendered payment from December, 2003 through the second quarter of 2004. (*Id.*) HP alleges that much of the work performed by byd:sign benefitted only byd:sign and not HP, and that by approving the multiple payments to byd:sign, Kamb was "siphoning research and development funds from HP for the benefit of byd:sign." (*Id.*) HP alleges that Kamb failed to inform HP of his interest in the byd:sign enterprise during this period. (*Id.*) HP al-

leges that in September 2004, Defendants Kamb and Preena arranged for byd:sign USA to sell several televisions to HP without revealing either defendants' interest in the byd:sign enterprise. (Compl.¶ 71).

*3 HP further alleges that, on or about August 5, 2005, Kamb and Thorson conspired to fraudulently obtain an HP printer from one of HP's labs through the use of an interstate mail carrier. (Compl.¶¶ 77-79.) HP alleges that Thorson obtained the HP printer under the pretext that it would be used for HP-related tasks, and sent an e-mail to HP employees in California requesting that they send the printer via Federal Express to Kamb's home in Las Vegas for the purpose of gaining an advantage for investigating and developing new lines of business that Defendant Eyefi sought to enter. (Compl.¶ 77.) HP alleges that Thorson also requested that a member of HP's printer products division send him proprietary product and marketing information regarding HP manufactured printers. (Compl.¶ 79.) HP alleges that Thorson sent an e-mail to Kamb containing this information, and that Kamb then forwarded this information to his byd:sign enterprise account. (*Id.*)

### B. *Elements of a Civil RICO Claim*

HP claims that the Defendants' actions violate all four subsections of RICO § 1962. 18 U.S.C. § 1962.[FN1] All subsections of § 1962 require that there be (1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct, or control of an enterprise. *St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 439 (5th Cir.2000) (citing *Delta Truck & Tractor, Inc. v. J.I. Case Co.,* 855 F.2d 241, 242 (5th Cir.1988)). In this case, HP alleges the following facts in support of its civil RICO Cliam: (1) certain persons, including Moving Defendants Kamb, Iizuka, and Thorson, engaged in (2) a pattern of racketeering activity, namely mail and wire fraud, (3) when establishing, conducting, and controlling the "byd:sign enterprise."

FN1. The court in *In re Burzynski* restated the four subsections of § 1962 as follows:

> (a) a person who has received income from a pattern of racketeering cannot invest that income in an enterprise.
>
> (b) a person cannot acquire or maintain an interest in an enterprise through a pattern of racketeering.
>
> (c) a person who is employed by or associated with an enterprise cannot conduct the enterprise's affairs through a pattern of racketeering.
>
> (d) a person cannot conspire to violate subsections (a), (b), or (c).

989 F.2d 733, 741 (5th Cir.1993).

#### 1. HP Pleads the Predicate Fraudulent Acts with Particularity

The Moving Defendants first argue that HP has failed to adequately plead the predicate fraudulent acts with sufficient Rule 9(b) particularity. To prove a "pattern of racketeering activity," a plaintiff must show that the defendant committed certain (1) predicate acts (i.e., the requisite racketeering activity), and must show (2) a pattern of such acts. *In re Burzynski,* 989 F.2d 733, 742 (5th Cir.1993).

The predicate acts of racketeering activity alleged in HP's complaint are mail and wire fraud. *See* 18 U.S.C. § 1961(1)(B). To state a claim for mail or wire fraud, a plaintiff must establish three elements: (1) a scheme or artifice to defraud or to obtain money or property by means of false pretenses, representations, or promises; (2) a use of the interstate mails or wires for the purpose of executing the scheme; and (3) a specific intent to defraud either by revising, participating in, or abetting the scheme. 18 U.S.C. §§ 1341, 1343; *see United States v. Davis,* 752 F.2d 963, 970 (5th Cir.1985) (setting out elements of mail fraud); *Smith v. Ayres,* 845 F.2d 1360, 1366 (5th Cir.1988) (setting out elements of wire fraud).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***4** Under the first element, HP must allege a scheme or artifice to defraud or to obtain money by means of false pretense, representations, or promises. The elements of fraud include (1) a misstatement or omission (2) of material fact (3) made with the intent to defraud (4) on which the plaintiff relied and (5) which proximately caused the plaintiff's injury. *Williams,* 112 F.3d at 177. As stated before, when a civil RICO claim is predicated on alleged acts of mail and wire fraud, the circumstances constituting fraud must be pleaded with particularity. *Tel-Phonic Serv., Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1139 (5th Cir.1992). This Rule 9(b) heightened level of specificity "provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill ... and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs." *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994).

Here, HP has pleaded the elements of the alleged mail and wire fraud with particularity: HP has set out *who* was involved in the scheme to defraud-Kamb, Thorson, and Iizuka; *when* the statements were made-numerous times from 2003 through August 5, 2005; *what* statements were made-that byd:sign had performed certain services and that the printer and corresponding proprietary information were for HP related tasks; and *why* the statements were fraudulent-byd: sign had not actually performed any services for HP's benefit, and the printer was not being acquired for HP-related tasks. HP also alleges that the Defendants' possessed the specific intent to defraud HP by virtue of their misstatements, that HP relied on the Defendants' statements, and that this reliance resulted in certain damages to HP.

While it is true that HP has not pleaded the details of each individual mail or wire transaction with particularity, HP certainly has pleaded the details of the underlying fraudulent scheme in such a way as to provide the Defendants with notice of the Plaintiff's claims. *See Tuchman,* 14 F.3d at 1067. Moreover, courts have found that where a course of conduct occurs over an extended period of time, the plaintiff need not allege in detail the facts of each transaction of the fraudulent scheme. *See United States ex rel. King v. Alcon Laboratories, Inc.,* 232 F.R.D. 568, 570 (N.D.Tex.2005) ("in cases where the plaintiff is alleging that the fraud occurred over a multi-year period, the plaintiff is not required to allege all facts supporting each and every instance when each defendant engaged in fraud"); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 20 F.Supp.2d 1017, 1039 (S.D.Tex.1998) (where allegations of fraudulent conduct are numerous or take place over an extended period of time, less specificity is required to satisfy the pleading requirements of Rule 9(b)). Accordingly, the Court finds that HP has properly pleaded the predicate acts of mail and wire fraud, and has done so with sufficient particularity to survive the Defendants' motion to dismiss.

**2. HP Alleges a Pattern of Racketeering Activities**

***5** The Moving Defendants next challenge whether HP has adequately alleged that the pattern of racketeering activities contained the necessary continuity required to survive a motion to dismiss. To demonstrate a "pattern of racketeering activity," a plaintiff must prove at least two predicate acts of racketeering that are related and amount to or threaten long-term criminal activity. *Tel-Phonic Serv., Inc. v. TBS Intern., Inc.,* 975 F.2d 1134, 1139-40 (5th Cir.1992) (citing *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 238, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)). That is, the predicate acts must be *related* and *continuous. Id.* at 1140. In this context, " '[c]ontinuity' refers 'either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.' " *Id.* (quoting *H.J., Inc.,* 492 U.S. at 241). It is not necessary that there be a "specific threat of repetition" or that the predicate acts are now a part of Kamb's or Iizuka's "regular way of doing business" as argued by Defendants. Rather, it is only necessary that HP allege that the

predicate acts occurred over a period of time sufficient to amount to long-term criminal activity. *See H.J., Inc.,* 493 U.S. at 241, 242 (stating that continuity may refer to a closed period of repeated conduct over a substantial period of time).

In this case, HP has pleaded the elements necessary to establish a pattern of racketeering activity. First, the various predicate acts are *related* in that they all endeavor to use individual contacts within HP to benefit the byd:sign enterprise at HP's expense. Furthermore, the predicate acts have sufficient *continuity* because they occurred over a significant period of time (from October 2003 through August 2005) and amount to long-term criminal activity. HP's allegations of related and continuous conduct are sufficient to endure the Defendants' motion to dismiss.

**3. HP Alleges the Existence of a RICO Enterprise**

The Moving Defendants also challenge whether HP has adequately pleaded the existence of a RICO "enterprise" by failing to identify specific acts by specific defendants. A RICO "enterprise" may consist of either a legal entity or an "association-in-fact" enterprise. 18 U.S.C. § 1961(4); *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *In re Burzynski,* 989 F.2d at 741. Furthermore, a RICO enterprise must be "an entity separate and apart from the pattern of activity in which it engages." *Old Timer Enter. v. International Coffee Corp.,* 862 F.2d 1213, 1217 (5th Cir.1989) (quoting *Montesano v. Seafirst Commercial Corp.,* 818 F.2d 423, 427 (5th Cir.1987)).

In this case, HP has alleged that the Defendants created several legal entities and that the Defendants have joined the entities into an "association in fact" enterprise-referred to in the complaint as the "byd:sign enterprise"-whose alleged business purpose is to market and sell certain consumer electronics. As such, this enterprise exists separate and apart from the pattern of fraudulent acts in which it is alleged to have engaged. HP alleges that it was this enterprise that conspired to fraudulently obtain money, products, and information from HP, which the enterprise then used to fund the start-up operations of byd:sign Japan and Eyefi. (Compl.¶¶ 60, 71, 77, 79.) Accordingly, the Court finds that HP's allegations sufficiently state the existence of a RICO enterprise.

**4. HP Properly Alleges Proximate Cause**

***6** The Moving Defendants finally argue that HP's RICO claim is deficient because it fails to allege that there is a causal relationship between the RICO predicate acts and HP's alleged damages. To properly allege a civil RICO claim, a plaintiff must allege a proximate causal relationship between the RICO predicate acts and the plaintiff's damages. *Anza v. Ideal Steel Supply Corp. .,* --- U.S. ----, ----, 126 S.Ct. 1991, 1998, 164 L.Ed.2d 720 (2006); *Old Time Enter. v. Intern. Coffee Corp.,* 862 F.2d 1213, 1218 (5th Cir.1989). That is, HP must allege a direct relation between the injury asserted and the alleged predicate acts. *See Anza,* 126 S.Ct. at 1996. HP has indeed alleged such a direct relationship between Defendants' predicate acts and HP's injury: HP alleges that the submission of fraudulent invoices resulted in HP's paying for services that it never received, and the fraudulent request for an HP printer deprived HP of its property. Thus, HP has alleged a financial injury that was proximately caused by the Defendants' mail and wire fraud activities.

Because HP has pleaded facts sufficient to state a cause of action under RICO, the Court finds that the Defendants' motion to dismiss as to HP's civil RICO claim should be denied.

**IV. HP Adequately Alleges Fraud**

The Moving Defendants' challenge HP's allegations of common law fraud against Defendants Iizuka, Kamb, and Thorson on the grounds that HP has failed to state its fraud claim with sufficient particularity, and, to the extent that the fraud claims are based on alleged omissions of material fact, that HP has failed to establish a duty to disclose.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

### A. *HP's Allegations of Fraud*

In its complaint, HP alleges that the Defendants "made material misrepresentations to HP regarding the lines of business at issue in this Complaint." FN2 (Compl.¶ 132.) HP alleges that Kamb arranged for numerous invoices to be paid by HP to byd:sign Japan and byd:sign USA while never revealing their interest in the byd:sign enterprise. (Compl.¶ 58-60.) HP further alleges that the Defendants-including byd:sign Japan, Kamb, and Iizuka-knowingly misrepresented the nature of the services that HP was receiving from the byd:sign enterprise, and misrepresented their roles and interest in the enterprise. (Compl.¶ 59-60.) HP alleges that Thorson materially misrepresented the purpose for which he was obtaining an HP test printer and proprietary printer information. (Compl.¶ 77, 79.) HP finally alleges that it relied on Thorson's misrepresentation and unknowingly provided a potential competitor with proprietary information about its printers, as well as a newly designed printer model. (*Id.*)

> FN2. The Moving Defendants concede that, for the purpose of their motion to dismiss only, Texas law should apply. As restated by the Fifth Circuit, the elements of fraud include: (1) a misstatement or omission; (2) of material fact; (3) made with the intent to defraud; (4) on which the plaintiff relied; and (5) which proximately caused the plaintiff's injury. *Williams,* 112 F.3d at 177.

### B. *HP has Stated its Fraud Claim with Sufficient Particularity*

For the reasons stated above as to the alleged RICO predicates of mail and wire fraud, the Court finds that, as to HP's allegations of fraudulent billing and fraudulently obtaining an HP printer and proprietary printer information, HP has alleged the elements of common law fraud with sufficient particularity.

### C. *HP has Alleged a Duty to Disclose*

*7 The Defendants also argue that, to the extent that HP's fraud claims rely on Kamb's and Thorson's misrepresentations by silence, HP has not alleged any relationship that would give rise to a duty to speak. Under Texas law, in the absence of a duty to disclose, mere silence cannot amount to fraud or misrepresentation. *See Imperial Premium Fin., Inc. v. Khoury,* 129 F.3d 347, 352 (5th Cir.1998). Moreover, courts are reluctant to find the existence of special duties in employer/employee relationships. *See, e.g., City of Midland v. O'Bryant,* 18 S.W.3d 209, 211 (Tex.2000) (employer does not owe at-will employee a duty of good faith and fair dealing); *Hamilton v. Segue Software Inc.,* 232 F.3d 473 (5th Cir.2000) (finding that no special relationship existed between employer and employee giving rise to a duty to disclose (citing *O'Bryant,* 18 S.W.3d at 211)).

An employee may, however, owe a fiduciary duty to his employer in certain circumstances. The term "fiduciary" generally applies "to any person who occupies a position of peculiar confidence towards another." *Kinzbach Tool Co. v. Corbett-Wallace Corp.,* 138 Tex. 565, 160 S.W.2d 509, 512 (1942); *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 199 (Tex.2002) (citing *Kinzbach Tool Co. v. Corbett-Wallace Corp.,* 138 Tex. 565, 571, 160 S.W.2d 509, 512 (1942)). A fiduciary relationship similarly arises in "those informal relations which exist whenever one party trusts and relies upon another." *Kinzbach Tool Co.,* 160 S.W.2d at 512-13; *see Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 287-88 (Tex.1998) ("informal fiduciary duty may arise from a moral, social, domestic or purely personal relationship of trust and confidence"). Texas law also recognizes the existence of a fiduciary duty "in those cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed." *Associated Indem. Corp.,* 964 S.W.2d at 288 (quoting *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 594 (Tex.1992)).

In keeping with these principles, Texas courts have held that an employee may owe certain fidu-

ciary duties to his employer when the employee has been placed in a position of peculiar confidence or trust toward the employer. *See Paschal v. Great Western Drilling, Ltd.,* No. 11-05-00101-CV, 2006 WL 2975312, at *10 (Tex.App.-Eastland Oct.19, 2006, no pet. h.) (finding that employer may entrust employee with responsibilities that give rise to a fiduciary duty to the employer); *Daniel v. Falcon Interest Realty Corp.,* 190 S.W.3d 177 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (discussing employee's fiduciary duty to his employer); *Abetter Trucking Co. v. Arizpe,* 113 S.W.3d 503, 510 (Tex.App.-Houston [1st Dist.] 2003, no pet.) (finding that employee was entrusted with responsibilities that would support a finding that employee owed a fiduciary duty to employer). Indeed, the Texas Supreme Court has recognized that an employee may owe certain fiduciary duties to his employer when acting as the employer's agent in the pursuit of business opportunities on the employer's behalf. *Kinzbach Tool Co. .,* 160 S.W.2d at 513; *see Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 200-01 (Tex.2002) (discussing *Kinzbach Tool* ). When acting as agents or fiduciaries of an employer, employees may not act for their own account or to the detriment of their principal on matters within the scope of their agency. *Abetter Trucking,* 113 S.W.3d at 512. Finally, an employee/fiduciary also "has a duty to deal openly and to fully disclose to his employer information that affects his employer's business." *Daniel,* 190 S.W.3d at 185 (citing *Abetter Trucking Co.,* 113 S.W.3d at 510).

***8** In this case, HP alleges that it placed a high level of trust and confidence in Kamb and Thorson, locating them in positions of trust and influence with regard to HP's entry into the market for digital televisions. Specifically, HP alleges that Kamb was assigned a position as Director, and later Vice President, of Business Development at Compaq before Compaq's merger with HP in 2002. After the HP/Compaq merger, HP states that Kamb remained with HP in the same substantive position with the same responsibilities that he had held at Compaq. HP also alleges that Thorson, a pre-merger HP employee, was promoted to the position of Director of Strategy and Business Development where he managed a global alliance between HP and another leading technology company. HP alleges that both Kamb and Thorson held positions of trust and confidence with HP, particularly in regard to the area at issue: the development of a line of flat-panel televisions. These allegations are sufficient to support a finding that a fiduciary relationship existed between HP and its employees, Kamb and Thorson, such that Kamb and Thorson may have owed a duty to disclose their relationship with the byd:sign enterprise. The Defendants' motion to dismiss HP's common law fraud claim is denied.

### V. HP Properly Alleges Breach of Fiduciary Duty

Kamb and Thorson maintain that HP's claim against them for breach of fiduciary duty should be dismissed because HP's allegations do not support an inference that Kamb or Thorson, as employees of HP, owed any duty to HP, or that, if a duty did exist, that the Defendants breached that duty. Kamb and Thorson also challenge the sufficiency of HP's claim for the imposition of a constructive trust over the assets of Bydesign Japan and Eyefi.

#### A. *HP Alleges the Existence of a Fiduciary Relationship*

As stated in the Court's discussion of HP's fraud claim and misrepresentation by silence, *supra,* the Court finds that HP's allegations are sufficient to support a finding that a fiduciary relationship existed between Kamb, Thorson, and HP.

#### B. *HP Properly Alleges Breach of Duty*

Defendants are correct to argue that an employee is permitted to secretly plan a competing activity without violating any duty to his employer. *See Johnson,* 73 S.W.3d at 201. Nevertheless, there are certain prohibitions on the employee's conduct when it comes to competing ventures. Among those activities that are prohibited, an employee

may not appropriate his employer's trade secrets

.... He may not solicit his employer's customers while still working for his employer ..., and he may not carry away certain information, such as lists of customers .... Of course, such a person may not act for his future interests at the expense of his employer by using the employers funds or employees for personal gain or by a course of conduct designed to hurt the employer.

*Johnson,* 73 S.W.3d at 202 (quoting *Augat, Inc. v. Aegis, Inc.* ., 409 Mass. 165, 565 N.E.2d 415, 419-20 (Mass.1991)).

*9 HP alleges that Kamb and Thorson, while overseeing HP's development of flat-panel televisions, engaged in actual competition with HP for Kamb and Thorson's own benefit and abused their positions of influence within HP to misappropriate HP resources and proprietary information for the benefit of their competing ventures. These allegations go beyond simply planning or preparing to compete with HP and, if true, would support a finding that Kamb and Thorson have breached fiduciary duties that they owed to HP. *See Abetter Trucking,* 113 S.W.3d at 512 (stating that an employee/agent may breach his fiduciary duty to his employer by directly competing with the employer).

**C. *Constructive Trust***

Finally, as to HP's prayer for imposition of a constructive trust with respect to the Defendants' breach of fiduciary duty, this is a prayer for relief and not a cause of action that is subject to dismissal under Rule 12(b)(6). Nevertheless, "[a] constructive trust generally arises when a person with legal title to property owes equitable duties to deal with the property for the benefit of another." *Matter of Carolin Paxson Advertising, Inc.,* 938 F.2d 595, 597 (5th Cir.1991). "Under Texas law, such a trust may be imposed when one obtains property by fraudulent means, when an absolute conveyance of property was performed but not intended, or when a party breaches a fiduciary-like relationship." *Id.* Here, HP has alleged that Kamb maintains an interest in either Byd:sign Japan, or Eyefi, or both, and that Kamb has obtained property from HP by fraudulent means and through a breach of fiduciary duty. These allegations, if true, might support imposition of a constructive trust over one or both of these entities.

Accordingly, Kamb's and Thorson's motions to dismiss HP's claim for breach of fiduciary duty is denied.

**VI. HP Adequately Alleges Constructive Fraud**

Kamb and Thorson further challenge HP's claim for constructive fraud on the basis that HP has failed to allege the existence of a special relationship of confidence and trust as required for a constructive fraud claim.

"Constructive fraud is the breach of some legal or equitable duty which, regardless of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Gillum v. Republic Health Corp.,* 778 S.W.2d 558, 571 (Tex.App.-Dallas 1989, no pet.) (citing *Archer v. Griffith,* 390 S.W.2d 735, 740 (Tex.1964)).

As discussed above, HP has pleaded facts which, if true, are sufficient to support a finding that Kamb and Thorson owed and breached certain duties to HP, and did so through the perpetration of certain deceptive acts. Accordingly, the Defendants' motion to dismiss HP's constructive fraud claim is denied.

**VII. HP Alleges a Lanham Act Claim for Unfair Competition**

The Moving Defendants argue that HP fails to state a proper claim under the Lanham Act for unfair competition. Particularly, the Defendants argue that HP fails to allege that the Defendants "made a false statement of fact about the product" at issue; fails to allege that any statements made by the Defendants deceived, or had the potential to deceive, "a substantial segment of potential customers"; fails to allege that any false statement of fact allegedly made by the Defendants tended to influence customer purchasing decisions; and fails to allege that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the Defendants misappropriated any of HP's "goods or services."

**A. *HP's Allegations of Unfair Competition***

***10** HP alleges that the Defendants, by forming and operating their business through the misappropriation of HP's "designs and products," has misrepresented the origin and qualities of their products and designs. (Compl.¶ 143.) HP further alleges that the Defendants' use of HP's design in the stream of interstate commerce falsely designates and misrepresents the origin of Defendants' designs and creates a likelihood of confusion to those third persons to whom Defendants made such representations. (Compl.¶ 144.) HP also alleges that HP introduced prototype LCD and PCD televisions at the January 2004 Consumer Electronics Show in Las Vegas, Nevada, that, unbeknownst to HP, were the same televisions that had been manufactured for byd:sign with only the front bezels modified to include the HP logo. (Compl.¶ 66.)

HP claims that the Defendants, in forming and operating their business through the misappropriation of HP's designs and products, have misrepresented the origin and qualities of Defendants' products and designs in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

**B. *Elements of Claim for Lanham Act Unfair Competition***

The Lanham Act's section pertaining to unfair competition imposes liability on

> [a]ny person who, on or in connection with any goods or services ... uses in commerce any word, term, name, ... or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]

15 U.S.C. § 1125(a)(1)(A). To bring a cause of action under 15 U.S.C. § 1125(a)(1)(A), HP must allege that (1) the Defendants made false statements of fact in connection with any goods or services; (2) those statements deceived, or had the potential to deceive, a substantial segment of potential customers; (3) the deception was material, in that it tended to influence purchasing decisions; (4) the Defendants caused their products to enter interstate commerce; and (5) HP has been or is likely to be injured as a result. *See King v. Ames,* 179 F.3d 370, 373-74 (5th Cir.1999) (citing *Taquino v. Teledyne Monarch Rubber,* 893 F.2d 1488, 1500 (5th Cir.1990)).

**C. *HP States a Claim under the Lanham Act***

HP does state the essential elements of a claim for unfair competition under the Lanham Act: HP alleges that the Defendants, by forming and operating their business through the misappropriation of HP's "designs and products," has misrepresented the origin and qualities of their products and designs. (Compl.¶ 143). HP further alleges that the Defendants' use of HP's design in the stream of interstate commerce falsely designates and misrepresents the origin of Defendants' designs and creates a likelihood of confusion to those third persons to whom Defendants made such representations. (Compl.¶ 144.)

***11** As recognized by the Moving Defendants, HP's claim is for a practice known as "reverse palming off." "Reverse palming off" occurs when a producer misrepresents someone else's goods or services as his own. *General Universal Sys., Inc. v. Hal,* 379 F.3d 131, 148 (5th Cir.2004). Reverse palming off may be accomplished by "remov[ing] or obliterat[ing] the original trademark, without authorization, before reselling goods produced by someone else.... A defendant may also be guilty of reverse palming off by selling or offering for sale another's product that has been modified slightly and then labeled with a different name." *Roho, Inc. v. Marquis,* 902 F.2d 356, 359 (5th Cir.1990).

Though HP does not directly allege a specific

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

misrepresentation, HP does allege that Defendants manufactured televisions that were the same as HP's prototype televisions, but with different logos on the front bezel. In order to give proper notice of his or her claim, "[a] plaintiff's complaint ordinarily need only be a short and plain statement that gives the defendant notice of what the claim is and the grounds upon which it rests. In most cases, challenges to 'barebones pleadings' are doomed with respect to an attack based on a failure to state a claim." *Colle v. Brazos County,* 981 F.2d 237, 243 (5th Cir.1993) (citations omitted). "[T]he complaint must contain either direct allegations on every material point necessary to sustain a recovery ... or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial." *Campbell v. City of San Antonio,* 43 F.3d 973, 975 (5th Cir.1995).

In this case, liberally construing the complaint in favor of HP, the Court finds that HP's complaint as to its Lanham Act unfair competition claim contains allegations from which an inference may fairly be drawn that evidence on the material points of an unfair competition claim will be introduced at trial. Moreover, the Defendant has not shown that HP can prove no set of facts in support of its claim that would entitle it to relief. *See Conley,* 355 U . S. at 45-46. The Moving Defendants motion to dismiss HP's Lanham Act claim is therefore denied.

**VIII. HP Alleges a Civil CFAA Claim**

The Moving Defendants also challenge whether HP has stated valid claims under the Computer Fraud and Abuse Act ("CFAA"). 18 U.S.C. § 1030. Specifically, the Defendants argue that HP has failed to allege that the Defendants accessed HP computers and information "without authorization."

**A. *HP's CFAA Allegations***

HP alleges, first, that the Moving Defendants acted without authorization or exceeded their authorized access when they used HP's computers to further their fraudulent scheme against HP while acting as agents of the byd:sign enterprise. (Compl.¶ 166.) In support of HP's allegation that Kamb, McEachern, and Thorson acted without authorization or exceeded their authorized access, HP points to certain sections of confidentiality agreements signed by these defendants, in which each defendant agreed to refrain from disclosing HP's proprietary information. (Compl. Ex. A, C, D, and E .) HP also alleges that Kamb, McEachern, and Thorson each agreed to abide by HP's Standards of Business Conduct, which prohibits employment in a competing business or use of HP computers for personal gain. (Compl.Ex.H.)

***12** Each of the Defendants' confidentiality agreements, though not identical, provide that the employee agrees not to disclose any of HP's "intellectual property," "trade secrets," "technical secrets," or "confidential information" to unauthorized persons. (Compl. Ex. A, D, and E.) HP's Standards of Business Conduct provides that an HP employee "may not work for a competitor of any HP division or operation." (Compl. Ex. H at 2.) The Standards of Business Conduct also provide that "certain messages and materials simply must not be sent or accessed on HP equipment or through HP systems; these include messages for personal gain." (Compl. Ex. H at 14.)

HP has also alleged that Kamb, McEachern, and Thorson attempted to "scrub" their computers thereby damaging or deleting HP information, "an act for which they were not authorized." (Compl.¶ 167).

**B. *Elements of a Civil CFAA Claim***

The CFAA, which is primarily a criminal statute, punishes various fraudulent and damaging activities related to the use of computers. An individual may bring a civil action for damage arising from violations of the CFAA, however, under 18 U.S.C. § 1030(g). Section 1030(a)(2)(C) prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access," thereby "obtain[ing] information from any protected computer." 18 U.S.C. § 1030(a)(2)(C). Section 1030(a)(4) prohibits the "knowing[ ] ... access[of] a protected computer without authorization," with in-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

tent to defraud, if "such conduct furthers the intended fraud and [the violator] obtains anything of value." 18 U.S.C. § 1030(a)(4). Section 1030(a)(5)(i) punishes one who "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization." 18 U.S.C. § 1030(a)(5)(i). Sections 1030(a)(5) (ii) and (iii) punishes one who "intentionally accesses a protected computer without authorization" and causes damage as a result of such access. 18 U.S.C. § 1030(a)(5)(ii) and (iii).

The CFAA does not define "authorization" or "authorized access ." It does, however, define "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).

The Moving Defendants argue that HP fails to allege that Kamb, McEachern, and Thorson accessed HP's computers without authorization or in some way exceeded their authorized access. The Defendants argue that because HP had granted the Defendants access to its computers and information, they cannot be said to have accessed the computers "without authorization" or to have "exceeded their authorized access."

Several courts have concluded that an employee may exceed his authorization or may act without authorization when he obtains proprietary information from his employer's computers and uses that information in a competing venture. *See International Airport Ctrs., L.L.C. v. Citrin,* 440 F.3d 418, 420-21 (7th Cir.2006) (reversing dismissal of CFAA claims where employee went into business for himself and used "scrubbing" software to delete all of the files on his company-issued computer); *EF Cultural Travel BV v. Explorica, Inc.,* 274 F.3d 577, 582-84 (1st Cir.2001) (finding that employer was likely to prove access in excess of authorization where former employee obtained proprietary information and then provided that information to his new employer in violation of his confidentiality agreement.); *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.,* 119 F.Supp.2d 1121 (W.D.Wash.2000) (finding that the employee acted without authorization when he obtained proprietary information from his former employer's computers for the benefit of his new employer.).

***13** In response, Defendants note that several courts have questioned the key holdings in the above cited cases. *See, e.g., Lockheed Martin Corp. v. Speed,* 2006 U.S. Dist. Lexis 53108, at *12, *16-*25 (M.D.Fla. August 1, 2006); *Int'l Assoc. of Machinists and Aerospace Workers v. Werner-Masuda,* 390 F.Supp.2d 479, 499 (D.Md.2005); *Secureinfo Corp. v. Telos Corp.,* 387 F.Supp.2d 593, 609-10 (E.D.Va.2005). Though helpful in assessing the scope of conduct prohibited by the CFAA, these cases do not speak specifically to HP's allegation that the Defendants used employer-provided computers, e-mail, and instant messaging systems to conduct the business of a competing venture. The cases cited by Moving Defendants involve scenarios in which the defendants, all of whom had signed non-disclosure or confidentiality agreements, were authorized to access certain information on the plaintiffs' respective computer systems. The defendants each accessed that information and then disclosed that information to third parties in violation of the employees' non-disclosure agreements. Each court held that because the defendant was indeed authorized to access the information at issue, the defendant could not be said to have acted "without authorization" or "in excess of his or her authorization ." *Lockheed Martin Corp.,* 2006 U.S. Dist. Lexis 53108, at *15; *Werner-Masuda,* 390 F.Supp.2d at 498-99; *Secureinfo Corp.,* 387 F.Supp.2d at 609. As stated by the court in *Werner-Masuda,* "the gravamen of [the plaintiff's] complaint is not so much that [the defendant] improperly accessed the information ..., but rather what she did with the information once she obtained it." 390 F.Supp.2d at 499.

In contrast, HP has actually alleged that the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendants had agreed not only to refrain from disclosing information, but also to refrain from sending or accessing messages on HP's computer systems for personal gain. By doing so, HP has alleged more than misappropriation of trade secrets, but has alleged actual access without or in excess of authorization. This is enough to defeat the Moving Defendants' motion to dismiss as to HP's claims under §§ 1030(a)(2) and 1030(a)(4).

HP has also alleged that Kamb, McEachern, and Thorson attempted to "scrub" their computers thereby damaging or deleting HP information, "an act for which they were not authorized," in violation of § 1030(a)(5). (Compl.¶ 167.) Because § 1030(a)(5) (i) punishes *damaging* computers without authorization and not accessing HP's computer systems without authorization, Defendants' arguments do not speak to HP's § 1030(a)(5) claim. Indeed, HP has alleged that its employees are not authorized to damage HP computers by "scrubbing" as HP alleges was done by several of the Defendants. Accordingly, the Moving Defendants' motion to dismiss HP's CFAA claim is denied.

**IX. Conclusion**

Because HP has adequately stated claims for which relief may be granted, the Court finds that the Moving Defendants' Motion to Dismiss should be denied in its entirety.

***14 It is SO ORDERED.**

E.D.Tex.,2007.
Hewlett-Packard Co. v. Byd:Sign, Inc.
Not Reported in F.Supp.2d, 2007 WL 275476 (E.D.Tex.), RICO Bus.Disp.Guide 11,238

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
HUB GROUP, INC., Plaintiff
v.
Jeffrey M. CLANCY, Defendant

No. Civ.A. 05-2046.
Jan. 25, 2006.

Anne E. Duprey, Daniel F. Lanciloti, Molly Eastman, Seyfarth Shaw, LLP, Chicago, IL, Glenn A. Beard, Pepper Hamilton LLP, Philadelphia, PA, for for Plaintiff.

John A. Fitzpatrick, Mylotte, David & Fitzpatrick Whetstone Run Office Complex, Broomall, PA, for Defendant.

*MEMORANDUM*

STENGEL, J.

*1 Plaintiff, HUB Group, Inc. ("HUB") seeks a preliminary injunction temporarily barring defendant, Jeffrey Clancy, from contacting, soliciting, or servicing any of the 29 customers he serviced during his final year of employment with HUB. HUB contends that Clancy stole secret information regarding those current and former HUB clients, and that he should not be allowed the opportunity to use that information to unfairly compete against HUB. HUB's complaint alleges violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et. seq.,* Misappropriation of Trade Secrets, Breach of Contract, Breach of Fiduciary Duty, Conversion, Tortious Interference with an Economic Advantage, and Unfair Competition. This court entered a temporary restraining order on May 4, 2005 directing the defendant to cease using or disclosing any confidential or proprietary information that Mr. Clancy obtained from HUB. On August 23, 2005, a hearing was held so the court could consider evidence as to whether its temporary restraining order should remain in place. Based upon my findings of fact after careful consideration of the evidence from the hearing, and based upon the legal conclusions and discussion which follow, I will dissolve the temporary injunction entered on May 4, 2005.

I. FINDINGS of FACT

1) HUB is a Delaware corporation with its principal place of business in Downers Grove, Illinois. HUB is a transportation management service company that provides intermodal, truckload, LTL International and logistics services to its customers. Specifically, HUB arranges for the transportation of goods in trailers and/or containers on behalf of third parties from their point of origin to their final destination.

2) Defendant, Jeffrey Clancy ("Clancy") is a Pennsylvania resident. Clancy worked for HUB between June of 1999 and March 15, 2005. He worked out of his home as a Regional Sales and Account Manager using a HUB-issued computer.

3) Clancy worked for HUB as an at-will employee. There was no employment contract between Clancy and HUB.

4) While working for HUB, Clancy had access to HUB's electronic database containing detailed customer information. The database contained information including the prices HUB charges and HUB's profit margins.

5) HUB compiled the electronic database and considers it a trade secret.

6) The database is password protected.

7) Some of the information contained within the database was compiled and entered by Clancy.

8) With the information contained in HUB's database, one may make a detailed pricing proposal to a prospective client without ever having met the client.

9) During his employment with HUB, Clancy was presented with a "confidentiality agreement" as part of a Code of Business Conduct and Ethics Guide. He was also presented with a "confidentiality agreement" prepared by HUB as part of an Employment Guide. He signed each "agreement." The "agreements" related to the confidentiality of HUB's database. These confidentiality agreements did not constitute an employment agreement. By signing these "agreements," Clancy indicated his understanding of the policy statements contained in each and confirmed that he received the statements. These statements were drafted by HUB, and HUB made the unilateral decision to require Mr. Clancy to sign them. The policy statements, or "agreements," were not bargained-for conditions of Clancy's employment with HUB.

***2** 10) Clancy did not sign a covenant or agreement not to compete with HUB.

11) Following Clancy's resignation from HUB on March 15, 2005, he began working for one of HUB's direct competitors, Trailer Transport Systems, Inc. ("TTS").

12) TTS issued Clancy a computer.

13) Immediately after Clancy's resignation, HUB revoked his password and prohibited his access to their electronic database.

14) Clancy returned the HUB-issued computer on April 1, 2005.

15) After Clancy's resignation, HUB investigated Clancy's recently sent emails to see if he had informed a client about HUB's rate increases. While searching those emails, HUB discovered that Clancy sent emails with attachments to his wife's Hotmail account.[FN1]

FN1. A Hotmail account is a free web-based email service. Once an account is opened, it may be accessed by the account-holder from any computer linked to the internet.

16) The attachments sent by Clancy to his wife's Hotmail account contained detailed pricing and customer information that HUB considers confidential.

17) The attachments also contained information compiled by HUB for its sales reports.

18) Pricing within HUB's industry is competitive. HUB's prices are set by its Pricing Department and are dependant upon many variables. Due to the unstable nature of dependent variables, i.e. gas prices and other costs, HUB's prices fluctuate regularly.

19) Although Clancy, as a Sales and Account Manager, had some input and worked with the Pricing Department, he did not set HUB's final prices.

20) Clancy has extensive experience within the transport industry. He has a good working knowledge and understanding of the specific price ranges charged by HUB and other companies in the industry.

21) HUB's prices are readily available from its current and former customers.

22) HUB regularly prepares sales reports for its account managers based upon the manager's volumes, revenues, and profit margins on individual accounts. Clancy received these reports.

23) Clancy emailed the confidential information with the intention of advancing his ability to do his job as an employee of TTS.

24) There is no evidence that Clancy has used the information to compete with HUB.

25) There is uncontroverted evidence that Clancy did not actually use the information he emailed from his HUB computer to his wife's email account.

26) Clancy first interviewed with TTS in February of 2005. During that interview process,

Clancy had expectations about the amount of business he could transfer over from HUB to TTS.

27) Before leaving HUB, Clancy received a solicitation from Carlisle Tire & Wheel Co., a customer of HUB's, requesting a price quote for a specific shipping lane. Clancy waited on the request, did not inform any of his HUB supervisors, and then while working for TTS gave Carlisle Tire a TTS price quote. Carlisle Tire conducted the business with TTS.

28) A computer forensic expert hired by HUB, Robert O'Leary, testified that “an attachment” had been sent from Clancy's TTS computer to his wife's Hotmail account, but could not testify as to the contents of this attachment.

***3** 29) According to Robert O'Leary, “something” was attached to the USB storage port on Clancy's TTS computer on March 26, 2005. HUB infers that a thumbnail memory storage drive was attached to the USB port, but that evidence was inconclusive.

30) Clancy testified that he never used the data he sent from his HUB computer to his wife's Hotmail account. This testimony was credible and was not controverted by any other testimony.

31) On May 4, 2005, this Court entered a temporary restraining order preventing Clancy from using the information he emailed to his wife's Hotmail account to unfairly compete against HUB.

II. DISCUSSION

A. Subject Matter Jurisdiction

In order for this Court to have proper subject matter jurisdiction to hear this case, a federal claim must be alleged pursuant to 28 U.S.C. § 1331, or diversity jurisdiction must be invoked in accordance with 28 U.S.C. § 1332. HUB alleges to have both types of federal subject matter jurisdiction.

*1. Plaintiff's Claim Under the Computer Fraud and Abuse Act*

According to Clancy, HUB fails to allege a proper claim under the Computer Fraud and Abuse Act (“CFAA”) because it does not meet the CFAA's damage requirements. The pertinent section of the CFAA, 18 U.S.C. § 1030 provides:

> Fraud and related activity in connection with computers:
>
> (a) Whoever-
>
> (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $ 5,000 in any 1-year period;
>
> (5)(A)(i) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;
>
> (ii) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or
>
> (iii) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage; and
>
> (B) by conduct described in clause (i), (ii), or (iii) of subparagraph (A), caused (or, in the case of an attempted offense, would, if completed, have caused-(i) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $ 5,000 in value;

(e)(8) the term "damage" means any impairment to the integrity or availability of data, a program, a system, or information;

18 U.S.C. § 1030.

HUB argues that the integrity of its computer database was damaged through Clancy's unauthorized access to confidential information. In support of this contention, HUB cites *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.,* 119 F.Supp.2d 1121, 1126-27 (W.D.Wash.2000) (CFAA applied in plaintiff employer's suit against defendant for actively soliciting plaintiff's former employees and requesting that they transmit confidential files to defendant); *Pac. Aerospace & Elecs., Inc. v. Taylor,* 295 F.Supp.2d 1188, 1196-97 (E.D.Wash.2003) (CFAA case in which the court looked to the history of the Act and concluded that it could be applied to prevent a former employee from using wrongfully acquired trade secret information in order to compete with former employer); *EF Cultural Travel BV, EF v. Explorica, Inc. .,* 274 F.3d 577 (1st Cir.2001) (former employee's use of a "scraper program" to copy otherwise public information on the former employer's website likely exceeded the authorized access in violation of the CFAA); *George S. May Int'l Co. v. Hostetler,* No. 04-C-1606, 2004 U.S. Dist. Lexis 9740 (N.D.Il.2004) (Kocoras, J.) (CFAA claim was properly stated where a former consultant accessed copyrighted materials while still an employee of the consulting firm to be used for his personal benefit); *I.M.S Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.,* 307 F.Supp.2d 521, 525 (S.D.N.Y.2004) (Cause of action under the CFAA was adequately plead where plaintiff alleged the integrity of their copyrighted data system was impaired by defendant's copying it); and *Book Wholesalers, Inc. v. Rooth,* No. 04 CV 2428 DMS (Southern District of California court found a CFAA cause of action after a former employee downloaded the former employer's database onto her personal computer).

***4** Based upon the cases cited above, and the Third Circuit's recent opinion in *P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC,* Civ. No. 04-4254, (November 7, 2005) HUB has adequately invoked this Court's federal question subject matter jurisdiction. Clancy admitted that he took the information to use as a TTS employee. For purposes of federal question jurisdiction, Clancy exceeded the scope of his authorization into the database, thereby giving HUB the ability to plead a cause of action under the CFAA. Further, under the cases cited above, the damages alleged by HUB are of the type covered under the Act.

*2. Diversity Jurisdiction*

In the alternative, and assuming that this is not a federal question case, the two parties are diverse. It appears this claim is in excess of $75,000 as well.

The value of injunctive actions, for diversity purposes, is measured by the right sought to be protected. *In re Corestates Trust,* 39 F.3d 61, 65 (3d Cir.1994). In this case, HUB has alleged that the value of keeping its database secret exceeds $75,000. No evidence has been presented by Clancy to contest that claim, nor is there any reason to believe it was made in bad faith. As a result, the court has diversity jurisdiction over this case.

III. PRELIMINARY INJUNCTION

A. Standard of Review

In order to obtain a preliminary injunction, HUB must establish that it suffered irreparable harm by Mr. Clancy's actions. HUB must also prove a reasonable probability of success on the merits, that the harm to HUB outweighs the possible harm to other interested parties, and that the injunction is in the public interest. *See Continental Group, Inc. v. Amoco Chem. Corp.,* 614 F.2d 351, 356-57 (3d Cir.1980); *Frank Russell Co. v. Wellington Mgmt. Co.,* 154 F.3d 97, 101 (3d Cir.1998).

B. Discussion

*1. Has HUB Shown Irreparable Harm?*

Clancy argues that HUB has failed to show ir-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

reparable harm by not showing actual damages to the HUB database or actual losses due to Clancy's actions. HUB has, however, shown that it will suffer serious financial injury if the information protected within its database is made known to its competitors. HUB's showing is not enough to grant a preliminary injunction on these facts. *See Campbell Soup Co. v. ConAgra, Inc.,* 977 F.2d 86 (3d Cir.1992) (reversing a district court's preliminary injunction based upon a lack of evidence of irreparable injury). In particular, the court in *Campbell* found that "in order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." *Id.* at 91.

Although HUB has not demonstrated any actual damages caused by Clancy's unauthorized access and copying of parts of its database, the threat of harm is present. Clancy currently works for one of HUB's direct competitors and the information contained within the email attachments sent by Clancy to his wife's computer could cause injury to HUB. That injury, however, would not be "irreparable harm" as any profits made on a transaction by TTS using HUB's information could be recovered in a claim for damages. This is not a situation where Clancy has continuing access to the HUB database. The threat to HUB is that Clancy will use the information emailed to his wife's Hotmail account to compete improperly with HUB. There are adequate remedies at law available to HUB as a means of redressing that threat.

*2. Has HUB shown that it will likely succeed on the merits of its case?*

***5** The evidence presented at the preliminary injunction hearing does not establish likelihood of success on the merits of this case. The evidence indicates that the pricing data taken by Clancy is already obsolete due to fluctuating fuel prices and other general rate changes. In fact, the pricing information had a very short life. Given the dramatic increase in fuel prices alone since the hearing, the information Clancy allegedly took with him to TTS is likely useless. Further, the information regarding contacts with former clients is the type of knowledge Clancy acquired through his years of experience, or could have easily obtained through a few well-placed phone calls. Contact information is readily available to someone with Mr. Clancy's experience with a minimum of research.

*3. Does the harm to Clancy outweigh the harm to HUB?*

Enjoining Clancy from conducting any business with thirty separate entities, some of which he serviced prior to working at HUB, is a drastic and unwarranted measure in this case. The evidence presented relating to HUB's losses that could be saved or mitigated through this injunction was slight, whereas the proposed injunction places a severe restriction on Clancy's ability to work.

*4. The Public Interest*

HUB argues that adopting a "no harm, no foul" attitude towards Clancy's actions would legitimize the type of theft alleged in this case and undermine business confidentiality agreements generally. This is not a situation where the court ignores improper conduct because of a lack of proof of harm. Rather, the court has evaluated the plaintiff's evidence and found it inadequate to sustain an injunction.

IV. CONCLUSION

Based upon an inability to show irreparable harm in accordance with *Campbell,* or a likelihood of success on the merits, and after weighing the potential harm to each side by the granting of an injunction, I deny HUB's request for a preliminary injunction. An appropriate Order follows.

*ORDER*

AND NOW, this 25th day of January, 2006, upon consideration of plaintiff's motion for a temporary injunction (Docket # 2), it is hereby ORDERED that the motion is DENIED. The temporary injunction entered on May 4, 2005, (Docket # 13) is DISSOLVED. A telephone status confer-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ence will be held with counsel on February 10th, 2006 at 9:30 a.m. Plaintiff's attorney shall initiate the call.

E.D.Pa.,2006.
HUB Group, Inc. v. Clancy
Not Reported in F.Supp.2d, 2006 WL 208684 (E.D.Pa.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Only the Westlaw citation is currently available.

United States District Court,
M.D. Tennessee, Nashville Division.
INTERNATIONAL SECURITY MANAGEMENT GROUP, INC., Plaintiff,
v.
Christopher SAWYER and Citadel Security Services, LLC, Defendants.

No. 3:06CV0456.
June 6, 2006.

William S. Rutchow, Ogletree, Deakins, Nash, Smoak & Stewart, L.L.P., Nashville, TN, for Plaintiff.

Stephen H. Price, Stites & Harbison, PLLC, Nashville, TN, for Defendants.

*MEMORANDUM OPINION*

WISEMAN, J.

*1 Plaintiff International Security Management Group, Inc. ("ISMG") filed its Complaint against Defendants Christopher Sawyer ("Sawyer") and Citadel Security Services, LLC ("Citadel") (collectively, "Defendants") on May 8, 2006 alleging, among other things, that Sawyer individually and through Citadel was in violation of certain restrictive covenants set forth in an employment agreement ("Employment Agreement") between Sawyer and ISMG, his former employer. Among other requested relief, the Complaint seeks temporary, preliminary and permanent injunctive relief prohibiting Sawyer, individually or through Citadel, from further breach of the Employment Agreement.

Along with its Complaint, ISMG filed an Emergency Application For a Temporary Restraining Order ("TRO"). The hearing on Plaintiff's Emergency Application was held on May 9, 2006 and resulted in the entry of a TRO by Judge Haynes, also on May 9, 2006 (Doc. No. 10). Now pending is ISMG's motion to convert the TRO into a preliminary injunction (Doc. No. 12). In addition, ISMG also argues that it is entitled to a preliminary injunction barring Defendants from soliciting current ISMG employees in violation of the Employment Agreement, which issue was not addressed in the TRO. Defendants have filed a response in opposition to Plaintiff's motion (Doc. No. 14) and ISMG filed a reply brief (Doc. No. 17). An evidentiary hearing was conducted on Monday, May 22, 2006 and the issue is ripe for consideration.

For the reasons explained herein, ISMG's motion to convert the TRO into a preliminary injunction will be granted in part and denied in part, and a preliminary injunction will enter.

I. FINDINGS OF FACT

Plaintiff ISMG, a Georgia corporation, is in the business of providing private security services for office buildings and other establishments throughout the southeastern United States. As part of its services, ISMG provides security guards, electronic security systems, and remote monitoring arrangements. ISMG's service area includes Tennessee and Kentucky. The Tennessee/Kentucky territory is managed from ISMG's Nashville, Tennessee office. ISMG presently has approximately fifty employees managed through its Nashville office.

ISMG maintains that the security services business is highly competitive, and that ISMG's continued survival in the Nashville market depends upon certain confidential information that ISMG has developed over the course of a number of years. ISMG presented evidence at the hearing that its business information is very valuable and is maintained with secrecy. In particular, ISMG contends that information about specific services, techniques, pricing models and customers is closely guarded, confidential business information that cannot be easily or readily ascertained by competitors. According to ISMG, this information, which is maintained in both electronic and hard-copy format, was com-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

piled through and by the use of ISMG's ingenuity, time, market- and product-development strategies, investigation and experience.

***2** In the course of performing business, ISMG discloses a significant amount of its confidential, proprietary and trade secret information to senior management employees. ISMG takes steps to protect the confidentiality of this information, including requiring its key employees to execute employment agreements containing certain restrictive covenants. ISMG also has adopted internal policies whose purpose is to protect confidential, proprietary and trade secret information from unnecessary disclosure to third parties.

Defendant Chris Sawyer began working for ISMG in its Atlanta, Georgia office as a business development manager in or around November 1999. He was promoted to the position of District Manager for the region encompassing Tennessee and Kentucky and transferred to ISMG's Nashville office in June 2003. Sawyer remained in that position until he resigned on April 13, 2006. At the time of his departure, Sawyer was the most senior employee in ISMG's Tennessee/Kentucky district.

As District Manager in the Nashville office, Sawyer was responsible for, *inter alia,* procuring new clients for ISMG,[FN1] servicing existing ISMG clients to maintain their accounts, overseeing all negotiations for new and renewal contracts for ISMG clients in Tennessee and Kentucky, and ensuring compliance with all company policies, procedures and practices, including those related to maintaining the confidentiality of the company's proprietary and customer information.

FN1. The evidence presented at the hearing indicated that ISMG employee Asa Helton is primarily charged with procuring new business in the Tennessee/Kentucky market, while Sawyer's primary focus is on developing and maintaining clients obtained by Helton. Sawyer maintained that client procurement was not his responsibility, but the Court nonetheless finds that Sawyer too engaged in the development of new business and new clients.

At the time he was first hired in November 1999, Sawyer executed an employment agreement containing non-solicitation and confidentiality/non-disclosure covenants. Although he moved to Nashville in June 2003, Sawyer did not sign a new agreement in relation to his employment in the Tennessee/Kentucky market until March 22, 2005. Sawyer testified that he believed he would have been required to leave the company if he had not signed the agreement at that time. This updated agreement ("Employment Agreement") contained the same restrictive covenants as the first and covered ISMG's Tennessee/Kentucky territory. In pertinent part, the Employment Agreement states as follows:

> In consideration of the Company's [ISMG's] continued employment of Employee [Sawyer], Employee agrees as follows:
>
> ....
>
> 2. Employee promises that for (1) year following the termination of that employment with the Company, for any reason whatsoever, Employee shall not disclose to any person the ... business secrets ("Business Secrets") of the Company [as defined in parts 2(a) through 2(h) of the Agreement]....
>
> 3. (a) Employee promises that during employment with the Company, the Employee will not disclose any Business Secrets of the Company to any other person.
>
> (b) Employee promises that Employee shall not take from the business premises of the Company or in any way convert to Employee's own use the Company's books, lists, files, computer software, computer disks or other storage of data or record, records or documents or compilation of information of any kind (or copies, transcriptions, or oth-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

er excerpts of the same) related in any way to the business of the Company, even if such materials would not be considered Business Secrets. Employee also promises that, upon termination of employment, Employee shall surrender all such material to the Company but Employee may retain copies of items which relate solely to Employee's personal affairs, and copies of any items which are publicly available or generally available to those in the trade (but not to [sic] the originals of such documents which are and shall remain the property of the Company).

***3** 4. If Employee's employment with the Company is terminated, the Employee may establish or accept employment with a competing private security business and may compete with the Company or aid the competing business to compete with the Company. However, upon the termination of Employee's employment with the Company, for any reason whatsoever and at any time, regardless of whether the Company has complied with its obligations to Employee, Employee promises that for one (1) year after the date of termination of employment, that the Employee will comply with the following limitations:

(a) Employee shall not for himself or for another solicit or aid any other person to solicit any person who is a client of the Company at the time of termination or who has been a client at any time within 180 days prior to termination either to terminate the client's private security business services relationship with the Company for a project located in the Territory, or to purchase private security business services from Employee or from another for any other project in the Territory. This promise applies to any client or former client *(if it is a former client I do not believe this should apply)* [sic] only if the Employee had contact with such client during the Employee's employment with the Company or had administrative responsibility for the Company's relationship with that client while Employee was employed by the Company.

(b) Employee shall not solicit or aid any other person to solicit any person who is at the time Employee's employment is terminated, or who has been at any time within 180 days prior to termination, in negotiations with the Company for private security business services or to whom the Company had submitted a proposal for such services or received a request for proposal for such services within that time, for a project located in the Territory, to select the competing services of Employee or any other provider of private security business services for that project. This promise applies only if the Employee had contact with the person solicited while employed by the Company as part of the Employee's performance of the Employee's duties or if the Employee participated in the negotiations with such person or in the development of the Company's proposal or the response by the Company to a request for a proposal by such person, or if the Employee has administrative responsibilities in connection with the proposal or response or its preparation.

(c) Employee shall not solicit or aid a competing provider of private security business services to solicit any person who is employed by the Company at the time Employee's employment is terminated, to terminate that person's employment the Company [sic] and to accept employment with a competing provider of private business security services within the Territory.

(d) Employee will not disclose and will not use for himself or any other person any Business Secrets of the Company in order to solicit or aid any private security services business to solicit any person to purchase private security business services for a project located in the Territory.

***4** (Pl.'s Ex. 5.)

There is no dispute that Sawyer submitted notice of his resignation from ISMG on or about March 24, 2006. He was requested and agreed to

stay on an additional three weeks beyond that date to assist with the transition of his duties to the new manager. His last day with ISMG was April 13, 2006, though he was paid through April 15, 2006.

Sawyer began contemplating leaving ISMG no later than the end of January 2006. Sawyer and his new business partner, Rob Cesternino, both testified that they did not begin discussing the possibility of going into business for themselves until early March 2006. They moved quickly once these talks began, however, as Cesternino filed Articles of Incorporation for the new company, Defendant Citadel Security Services, on March 17, 2006, naming Cesternino as the registered agent for service of process and providing Sawyer's home address as the service address. Robert Cesternino is himself a former employee of ISMG and is currently employed as Vice President of Operations for Star Protection Agency, based outside of Seattle, Washington.[FN2]

FN2. Although Cesternino, like Sawyer, signed an employment agreement containing restrictive covenants while he was employed by ISMG, such covenants have long since expired, since Cesternino separated from ISMG in 2000.

There is no dispute that Sawyer, while still employed by ISMG during the fall of 2005, e-mailed to Cesternino information and documents that ISMG characterizes as confidential and proprietary information belonging to ISMG, including: a copy of ISMG's Nashville Master Client Proposal; the Nashville Master Client Information Packet; "Strengths of ISMG New Prospective Clients"; and ISMG's corporate pricing program; as well as copies of corporate compliance audits for the Nashville branch; numerous e-mails by and between ISMG management employees containing confidential business information; a copy of the proposed lease for ISMG's office space in Nashville; and 2006 projected sales expectations for ISMG. ISMG has submitted a copy of an e-mail from Sawyer to Cesternino dated November 3, 2005, enclosing five different ISMG documents that ISMG alleges contain confidential and proprietary information. In the e-mail communication itself, Sawyer simply stated: "Could be a little useful!!" (*See* Complaint, Ex. C.) Cesternino and Sawyer testified that the context of this exchange was that Sawyer and ISMG were not satisfied with the level of business growth in the Tennessee/Kentucky market, and Sawyer was looking to Cesternino, as his friend and mentor, for marketing advice. He forwarded ISMG documents to Cesternino for his review and suggestions for possible improvements. Cesternino and Sawyer both testified that they had no intention of using these ISMG documents in the development of forms and procedures for Citadel.

During his employment, Sawyer had substantial contact with existing client contacts for ISMG, including various property managers and supervisors at Colliers Turley Martin Tucker ("Colliers"). Colliers does not actually own any of the buildings that it manages, but its employees function as agents for the different building owners with respect to the specific properties they manage. Specifically, Colliers employees are generally authorized to act as agents for the building owners for the purpose of entering into security services contracts. One question at issue in this case, which will be discussed below, is whether Colliers is itself a client or customer of ISMG, or, instead, whether the individual buildings or building owners for which ISMG provides services are the customers.

***5** One of the buildings for which Sawyer was actively pursuing a contract, prior to his departure from ISMG, was the Financial Center at 424 Church Street in Nashville ("Financial Center"). ISMG already has the security contract for the adjacent building, the SunTrust Bank Building on the corner of 4th Avenue and Church Street. Both buildings are managed by Colliers through different property managers employed by Colliers. Connie Carpenter is the Colliers employee who manages the SunTrust Bank Building. Carolyn Riddle is the Colliers employee who manages the Financial Cen-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ter. Sawyer worked for nearly a year in developing a relationship with Carolyn Riddle in the hopes of securing, on behalf of ISMG, the security services contract for the Financial Center through her.

Specifically, Riddle and Sawyer originally became acquainted as a result of their participation in BOMA, a trade group for real estate management professionals. In October 2005, Riddle made it known to Sawyer that she was interested in hiring a new security services company for the Financial Center, but she was concerned about maintaining a couple of the specific guards employed at that building. To assist her in putting together a Request For Proposal ("RFP"), since she had not done one for security services before, Sawyer sent to Riddle a book of 5 or 6 different sample RFPs. Riddle selected the one she preferred, and Sawyer then assisted her in tailoring it to fit the Financial Center's needs. (*See* Pl.'s Exs. 1, 2, 3.) The RFP Riddle ultimately issued in April 2006 was almost identical to the one Sawyer prepared for her in the fall of 2005.

In January 2006, Riddle and Sawyer exchanged communications about meeting to discuss ISMG's bid for security services at the Financial Center. Specifically, in response to Sawyer's proposal that they meet for lunch one day soon, Riddle responded: "There are some changes in security here at the building. We have two of our guards leaving, one is retiring and one got a better paying job closer to his home, so it is a perfect time to get the bid out." (Pl.'s Ex. 4 .)

While there was no testimony regarding whether Sawyer made an actual oral "bid" for the security services contract at the Financial Center while he was still employed by ISMG, there is no doubt that Riddle knew Sawyer wanted the contract for ISMG and that ISMG was in the running for the contract, at least while Sawyer was still employed by ISMG. Further, Sawyer clearly was charged by ISMG to procure that contract. In early 2006, Sawyer submitted to his superiors at ISMG a "Proposal Log" that purported to track business activity for the company. In that log, Sawyer indicated that a proposal had actually been delivered to the Financial Center and was pending. (Pl.'s Ex. 6.) Sawyer testified that the notation that the Financial Center contract was pending was simply an "error" on his part, and Riddle testified that Sawyer never delivered a formal proposal on behalf of ISMG.

***6** Notwithstanding, on April 10, 2006, while Sawyer was still employed by ISMG but after he had given notice of his resignation, he and Cesternino put on a presentation for Colliers employees to discuss the services their new company was going to provide. According to Cesternino, Citadel's focus was going to be on patrol services, a service ISMG does not currently offer in Nashville or the Tennessee/Kentucky market as a whole. However, when asked by one of the Collier employees who attended the presentation if Citadel would also provide guard services, Cesternino replied that it certainly would. Sawyer took a day off work from ISMG to participate in the presentation to Colliers.

Sawyer's last day with ISMG was Thursday, April 13, 2006. On Monday, April 17, 2006, Riddle issued an RFP for security services at the Financial Center. She submitted the RFP to Citadel and to three other companies offering private security services. She did not submit an RFP to ISMG. Riddle testified that if Sawyer had still been at ISMG, she would have submitted an RFP to ISMG. She further testified that for her, Sawyer is the face of ISMG.

Cesternino prepared the proposal submitted by Citadel in response to Riddle's RFP. Defendants initially maintained that Cesternino did not use or rely in any way upon any forms or documents developed by ISMG in preparing the proposal. Testimony elicited at the hearing indicated, however, that the proposal incorporated information about Nashville bill rates and pricing information which Sawyer provided. Sawyer also supplied a list of "References," which includes the property managers and client contacts for current properties for which ISMG provides security services. ISMG maintains that the pricing information is confiden-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

tial and proprietary business information which Sawyer wrongfully disclosed to Cesternino and Citadel, and that the use of ISMG's clients as references constitutes a theft of the goodwill developed in the Nashville market by ISMG.

At any rate, Cesternino submitted the proposal to Riddle, and announced her decision to award the contract to Citadel on or around April 28, 2006. On May 3, Citadel began advertising in the Tennessean for managers and guards to staff this contract. While the advertisement directs potential applicants to Cesternino, Cesternino testified that after reviewing and screening the resumes submitted, he directed qualified applicants to Sawyer, who performed the initial round of interviews. More than one of the applicants in the pool are current employees of ISMG. Sawyer testified that, although he interviewed the current ISMG employees, he had not as of the hearing date offered any of them employment at Citadel.

II. PROCEDURAL BACKGROUND

Judge Haynes issued a TRO granting the relief requested in paragraphs 1, 2, and 3 on page 2 of Plaintiff's Emergency Application For a Temporary Restraining Order, and numbers 4 and 5 except that the restraint pertained to existing clients of ISMG and to Colliers, but did not apply to any other "prospective" clients. (*See* Doc. No. 10.) Specifically, the TRO:

*7 (1) Prohibits Defendants from destroying documents, materials, information or other property, including electronically stored information that is related to the subject matter set forth in ISMG's Verified Complaint, including but not limited to any property belonging to ISMG;

(2) Requires Defendants to immediately return any property of ISMG in Defendants' possession, custody or control, including electronically stored information;

(3) Prohibits Defendants from disclosing or making use of any Business Secrets of ISMG, as that term is defined in the March 22, 2005 agreement between ISMG and Defendant Sawyer; and

(4) Restrains Defendants from soliciting or performing security services for any existing ISMG client with which Defendant Sawyer had contact or administrative responsibility while employed by ISMG, or for any building in the Tennessee/Kentucky market managed by Colliers Turley Martin Tucker.

(*See* Doc. Nos. 2 and 10.)

The parties have not submitted any arguments with respect to No. 1; the parties agree that Defendants have complied with No. 2 in that they have gathered and retrieved any and all electronic and hard copies of any documents in their possession relating to ISMG, and have delivered all original versions and copies of those documents to their counsel of record, who conveyed them to ISMG's counsel.

ISMG now seeks to convert the remaining proscriptions contained in the TRO into a preliminary injunction. In addition, ISMG also argues that it is entitled to a preliminary injunction barring Defendants from soliciting current ISMG employees in violation of the Employment Agreement.

III. ANALYSIS AND DISCUSSION

A preliminary injunction is "an extraordinary and drastic remedy" which should be granted with great caution. *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (citation omitted). The decision whether to issue a preliminary injunction lies within the sound discretion of the district court. The factors to be considered in determining whether to issue a preliminary injunction include: "(1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the public interest is advanced by the issuance of the injunction." *United States v. Edward Rose & Sons,* 384 F.3d 258, 261 (6th Cir.2004) (quoting *Washington v. Reno,* 35 F.3d 1093, 1099 (6th Cir.1994)). These are factors to be balanced, not prerequisites that must be met. *Id.* While no single factor will be determinative as to the appropriateness of the equitable relief sought, *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir.1985), "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir.2000) (citation omitted). The purpose of a preliminary injunction is simply to preserve the status quo; thus, findings of fact and conclusions of law made by a district court in granting a preliminary injunction are not binding at a trial on the merits. *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). Under Rule 52 of the Federal Rules of Civil Procedure, a district court is required "to make specific findings concerning each of these four factors, unless fewer are dispositive of the issue." *DeLorean Motor Co.,* 755 F.2d at 1228.

***8** With respect to the first factor, a plaintiff "must show more than a mere possibility of success" on its substantive claims in order to establish a likelihood of success on the merits; "[h]owever, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.,* 119 F.3d 393, 402 (6th Cir.1997) (citations omitted).

The second factor to be considered has been identified by the Sixth Circuit as "irreparable harm that could result if the injunction is not issued." *See Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir.1992). As a general rule, a plaintiff has not established irreparable harm where damages would adequately compensate it for the asserted harm. *See id.* If the total damages associated with a plaintiff's loss would be difficult to calculate, then plaintiff's injury would not adequately compensate plaintiff for its injury. Under such circumstances, injunctive relief would be appropriate. *Id.* The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute. *Id.* (citations omitted); *see also AmeriGas Propane, Inc. v. Crook,* 844 F.Supp. 379, 390 (M.D.Tenn.1993). Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to constitute irreparable harm to an employer. *Id.* (citations omitted).

The third factor the Court must consider is whether enforcement of the injunction will cause "substantial harm" to others. *Leary v. Daeschner,* 228 F.3d 729, 736 (6th Cir.2000). This requires a court to balance the harm a plaintiff would suffer if its request for a preliminary injunction was denied with the harm the defendants would suffer if they were to be preliminarily enjoined. It also requires a court to assess the impact a preliminary injunction might have on relevant third parties. *Corporate Exp. Office Products v. Warren,* 2002 WL 1901902, at *27 (W.D.Tenn. May 24, 2002).

Finally, the somewhat nebulous fourth factor requires to court to consider whether entry of an injunction will serve the public interest by, for example, promoting stability and certainty in business and employment relationships. *See, e.g., AmeriGas Propane,* 844 F.Supp. at 390.

Here, ISMG seeks injunctive relief against Defendants arising out of Sawyer's alleged misappropriation of trade secrets, unfair competition, breach of loyalty, breach of contract, intentional interference with business relations, and violation of the Computer Fraud and Abuse Act. With respect to the claims for breach of loyalty, breach of contract and intentional interference with business relations, the relief sought is the same: ISMG seeks to enjoin Defendants from contracting with the Financial Center for the provision of private security services. Each of these claims will nonetheless be analyzed individually in light of the factors outlined above.

A. Misappropriation Of Trade Secrets and Unfair Competition

*1. Likelihood Of Success On the Merits*

***9** The elements of a claim under Tennessee law for misappropriation of a trade secret are: (1) the existence of a trade secret; (2) communication of the trade secret to the defendant while in a position of trust and confidence; (3) defendant's use of the communicated information; and (4) resulting detriment to the plaintiff. *See Hickory Specialties, Inc. v. B & L Labs., Inc.,* 592 S.W.2d 583, 586 (Tenn.Ct.App.1979). Moreover, Tennessee courts have recognized that an action for unfair competition may be sustained for breach of a fiduciary relationship by an employee who uses confidential information to the employer's detriment. *See, e.g., B & L Corp. v. Thompson & Thomgren, Inc.,* 162 S.W.3d 189, 215 n. 7 (Tenn.Ct.App.2004) (recognizing unfair competition tort arising out of unlawful use of confidential information).

ISMG claims that it will be able to establish each of these elements at a trial on the merits and has presented evidence regarding the confidential nature of the information at issue and the steps ISMG took to maintain its trade secret status. Defendants do not seriously contest the question of whether the information at issue constitutes trade secrets and, in any event, as discussed briefly below, Sawyers was contractually bound not to disclose any proprietary information, regardless of whether it could properly be characterized as trade secrets. Further, there is no dispute that he did in fact disclose proprietary information to Cesternino and others outside ISMG. The real question is whether Defendants used the information to ISMG's detriment.

Based upon their demeanor at the hearing, the Court credits Cesternino's and Sawyer's testimony to the effect that Sawyer forwarded various ISMG documents to Cesternino in the Fall of 2005 with the intent to request his input and suggestions as to how to improve the documents and so that he could, in exchange, compare them with the forms Cesternino used in the security services company for which he worked on the west coast. Further, Defendants presented proof that the marketing documents and forms generated thus far by Citadel, as well as the proposal submitted to the Financial Center, are for the most part not based upon ISMG's. Sawyer has conceded, however, that he and Cesternino have put to use certain pricing information obtained from ISMG, and that they used ISMG clients as "references" on Citadel's proposal. Sawyer, in fact, agreed in open court to remove these references from any future proposals to be submitted by Citadel. Consequently, the Court finds that ISMG has demonstrated a substantial likelihood of success on its claims for misappropriation of trade secrets or unfair competition based upon Sawyer's concessions.

*2. The Possibility Of Irreparable Harm*

As set forth above, Sawyer admitted to using ISMG clients as references on Citadel's proposal and to providing certain pricing information from the Nashville market, which Cesternino incorporated into the Financial Center proposal. ISMG has reasonably demonstrated that the total damage to its goodwill associated with defendants' continued use of ISMG's proprietary information and references would be difficult to calculate. The Court finds that a strong possibility of irreparable harm exists with respect to these claims.

*3. The Risk Of "Substantial Harm" To Others*

***10** In balancing the risk of harm to the Defendants if an injunction is imposed with the risk of harm to ISMG if one is not, the Court finds that the risk of harm to Defendants resulting from the relatively limited nature of an injunction barring Defendants from doing what they have already agreed not to do, is slight. The risk of harm to relevant third parties, namely Cesternino or potential clients of Citadel, is even smaller.

*4. Whether "Public Interests" Will Be Advanced*

Companies such as ISMG have a legitimate public interest in keeping certain information con-

fidential and in maintaining their clientele, and Tennessee has recognized that businesses have the right to protect their confidential and trade secret information as well as their business good will. The court finds that no public interest will be disserved if a preliminary injunction is granted with respect to this particular cause of action.

*5. Balancing All the Factors*

Each of the relevant factors weighs in favor of entry of a preliminary injunction prohibiting further use or disclosure of certain of ISMG's confidential and/or proprietary business information.

B. Breach Of Loyalty

*1. Likelihood Of Success On the Merits*

Under Tennessee common law, the duty of loyalty imposes upon an employee an obligation to act solely for the benefit of the employer in matters within the scope of his employment during the course of his employment. Thus, an employee should not compete with his employer while still employed, regardless of whether an actual noncompetition agreement exists. *Knotts Wholesale Foods, Inc. v. Azbell,* 1996 WL 697943, at *3 (Tenn.Ct.App. Dec.6, 1996) (citing 27 Am.Jur.2d, *Employment Relationship* § 216; *Restatement (Second) of Agency* § 393). An act that constitutes a breach of loyalty is considered the act of a "traitor" and is "most often [an] intentional, destructive act completed explicitly for the employee's own self-interests, in direct violation [of] or competition with the interests of an employer." *Booth v. Fred's, Inc.,* 2003 WL 21998410, at *13 (Tenn.Ct.App. Aug.19, 2003).

ISMG characterizes Sawyer's contacts with Cesternino and Gary Conrad beginning in August 2005 through the date of his termination in April 2006 as instances of breach of loyalty. The Court finds that, at a minimum, the meeting between Sawyer and Cesternino with Colliers representatives, conducted on April 10, 2006 for the purpose of introducing Colliers agents to Citadel and the services it would be providing, constituted an instance in which Sawyer breached his duty of loyalty to ISMG, regardless of whether he had taken that day off of work from ISMG. In addition to that instance, there is significant evidence in the record from which a jury could readily conclude that Sawyer began courting Carolyn Riddle on behalf of Citadel, rather than on behalf of ISMG, prior to his departure from ISMG, given that Riddle's RFP for security services at the Financial Center was issued to Citadel two days after Sawyer's employment with ISMG officially ended, with only a weekend in between.

***11** As Defendants point out, an employee does not breach a duty of loyalty to his employer by making preparations to compete while still employed, for instance by filing a corporate charter for a new competing company. *Cf. Venture Express, Inc. v. Zilly,* 973 S.W.2d 602, 606 n. 2 (Tenn.Ct.App.1998). He may also, while still employed, inform current or potential clients of the company that he intends to leave and what his future plans are without breaching any duty of loyalty. *See, e.g., Baker v. Battershell,* 1986 WL 7602, at *3 (Tenn.Ct.App. July 0, 1986). The behavior of Sawyer in putting on a presentation on behalf of his new company while still employed by ISMG, however, went beyond merely preparing to compete.

The Court concludes that ISMG has demonstrated a substantial likelihood of success on the merits in proving its claim for breach of the duty of loyalty.

*2. The Possibility Of Irreparable Harm*

While ISMG has demonstrated a substantial likelihood of success on the merits of its breach of loyalty claim, that claim arises from acts committed by Sawyer while he was still employed by ISMG, which is no longer the case. While the damages already caused by such breach of loyalty may be difficult to calculate, entry of an injunction at this juncture would not have the effect of preventing future damages, nor would it make proof of damages

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

any easier. This factor therefore does not weigh in favor of entry of an injunction.

*3. The Risk Of "Substantial Harm" To Others*

The risk of damage to Defendants resulting from entry of an injunction barring them from going forward with finalizing and performing the Financial Center contract is much higher than the relative harm that ISMG would suffer if the requested injunction is not entered. The testimony at the hearing strongly suggested that preventing Citadel from performing the contract would not be likely to enable ISMG to step into Citadel's shoes and perform the contract instead. The Financial Center would also be further inconvenienced. This factor does not weigh in favor of granting the injunction

*4. Whether "Public Interests" Will Be Advanced*

The only public interest that would be advanced by entry of an injunction would be the punitive effect such an injunction would have upon Citadel. While the tort of breach of loyalty is not condoned by business practices or the courts, neither is punishment simply for the sake of punishment warranted.

*5. Balancing All the Factors*

Despite the fact that ISMG has demonstrated a strong likelihood of success on the merits of its claim for breach of loyalty, it is not clear to what extent ISMG suffered damages resulting specifically from that breach of loyalty, as distinct from injury suffered merely as a result of Sawyer's departure. Moreover, the remaining factors do not weigh in favor of entry of a preliminary injunction barring Defendants from finalizing and performing the contract for the provision of private security services at the Financial Center.

C. Breach Of Contract

*1. Likelihood Of Success On the Merits*

***12** The basic elements of a claim for breach of contract in Tennessee are (1) the existence of an enforceable contract; (2) breach of that contract; and (3) damages that flow from that breach. *LifeCare Ctrs. Of Am., Inc. v. Charles Town Assocs. Ltd. P'ship, LPIMC,* 79 F.3d 496, 514 (6th Cir.1996). In addition, "there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement." *TSC Indus., Inc. v. Tomplin,* 743 S.W.2d 169, 173 (Tenn.Ct.App.1987). This duty extends to the performance and enforcement of employment contracts. *Hooks v. Gibson,* 842 S.W.2d 625, 628 (Tenn.Ct.App.1992). This duty of good faith and fair dealing means that the parties to an employment contract are bound "to act in word and deed, in a responsible manner." *Williams v. Maremont Corp.,* 776 S.W.2d 78, 81 (Tenn.Ct.App.1989) (citing *Gibson's Suits In Chancery,* 6th Ed. § 23).

Generally speaking, an agreement in restraint of trade, such as the Employment Agreement at issue here, is enforceable under Tennessee law so long as it is reasonable under the particular circumstances. Factors to be considered in determining an agreement's reasonableness include whether it is supported by adequate consideration; the threatened danger to the employer in the absence of such an agreement; the economic hardship imposed on the employee by such a covenant; and whether or not such a covenant would be "inimical to public." *Allright Auto Parks, Inc. v. Berry,* 219 Tenn. 280, 409 S.W.2d 361, 363 (Tenn.1966).

As suggested above, it is clear that Sawyer breached Paragraph 3(b) of the Employment Agreement by conveying company information to persons outside ISMG. Because it appears that Sawyer has now returned any documents and files he initially failed to return to ISMG, and because the issue of the use of ISMG's information for the benefit of Citadel is addressed in the section concerning the claim for misappropriate of trade secrets/confidential information, above, the Court will not dwell on this point here.

Apart from that issue, the parties's breach-of-contract dispute is focused upon the provisions of the Employment Agreement barring solicitation

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

of current or prospective customers of ISMG, and barring solicitation of current employees of ISMG.

*(a) Contract Provision Barring Solicitation Of Current or Prospective Customers*

ISMG argues that the contract expressly prohibits Sawyer from soliciting current clients of ISMG's for a period of one year after his termination, and that Colliers itself is a current client, such that Sawyer, and Citadel, are barred from soliciting contracts at any building in the Tennessee/Kentucky region managed by Colliers. In the alternative, ISMG argues that the Employment Agreement also bars the solicitation of prospective clients, as that concept is narrowly defined in the Agreement itself, and that the Financial Center specifically met that definition of a prospective client prior to Sawyer's departure from ISMG. Thus, ISMG argues, regardless of whether Colliers or the buildings themselves are considered to be the "client," Sawyer, both individually and through Citadel, has breached the non-solicitation provision by soliciting a security services contract with the Financial Center specifically.

***13** In response, Defendants argue that (1) to interpret the Employment Agreement as barring solicitation of any building in the relevant region managed by Colliers renders it unenforceably broad; (2) ISMG has no protectable interest in mere potential or prospective clients; and (3) even if it does, the Financial Center does not meet the contract definition of prospective client.

Each of these arguments is addressed below.

i. Enforceability Of Prohibition Against Soliciting Current Clients

In support of its first argument-that Colliers should be considered a current client-ISMG points to the following facts: (1) Colliers is the property management company that manages both the SunTrust Bank Building, for which ISMG currently provides security services, and the Financial Center; and (2) the property manager is the party who solicit bids for security services, selects the security services contractor, and negotiates and administers the contract; (3) the property manager manages the property on behalf of the building owners; and (4) Sawyer himself, as demonstrated by a document entitled "Current Client Info. Page for References," considers the property manager for the specific buildings to be the client contact.

In response, Defendants contend that the individual buildings or building owners are the "client," while Colliers is merely the property manager for different buildings owned by various different entities. The Financial Center is owned by Corac New Life General Partnership ("Corac") and managed by Carolyn Riddle for Colliers. The SunTrust Bank Building is owned by Nashville Office Associates, L.P. ("NOA") and is managed by Connie Carpenter for Colliers. The signatories to the contract for security services in the SunTrust Bank Building are its owner, NOA, and ISMG. Although the Colliers property manager executed the security services contract for the SunTrust building, she did so as the agent for and in the name of NOA and for its benefit. Similarly, Colliers executed the current contract for security services in the Financial Center with Guardsmark, Inc. as "agent" for its owner, Corac, in 2001. The RFP for security services at the Financial Center issued by Carolyn Riddle states: "Colliers Turley Martin Tucker, *in its capacity as managing agent for the owners of the Financial Center,* requests that you submit a proposal for the provision of Security Services at the property."

Basically, Defendants argue that ISMG is improperly trying to expand the scope of the limited "currentclient" non-solicitation provision in the Agreement far beyond those buildings for which Plaintiff currently provides security services to include every building in this area that happens to be managed by Colliers. As Defendants point out, Colliers, according to its website, "manage[s] 140 million square feet of office, industrial and retail space" nationwide, and its Nashville office alone manages over ten million square feet of space. *See www.colliers.com/Markets/Nashville.* Defendants

also argue that if ISMG had intended for the contract to be construed so broadly as to bar solicitation of any property managed by Colliers, it should have made that clear in the language of the agreement.

***14** The Court agrees that restrictive covenants in employment agreements are to be strictly construed in favor of the employee, and that the employer as drafter of the agreement must "take responsibility for its allegedly ambiguous provisions." *B & L Corp. v. Thomas & Thomgren, Inc.,* 917 S.W.2d 674, 678 (Tenn.Ct.App.1995). *See also Selox v. Ford,* 675 S.W.2d 474, 476 (Tenn.1984) ("Post-employment restraints are scrutinized with particular care because they are often the product of unequal bargaining power.... This is especially so where the restraint is imposed by the employer's standardized printed form." (citation omitted)). Further, there is no dispute that the SunTrust Bank Building is the only building managed by Colliers in Tennessee or Kentucky for which ISMG provides security services. Reading the Employment Agreement to prohibit Defendants, for an entire year, from bidding for security services contracts at any other building in the Nashville/Kentucky market that happens to be managed by Colliers, regardless of whether ISMG has ever actively pursued a security services contract at those buildings, would render the Agreement so broad in scope as to be unenforceable. ISMG has no legitimate, protectable interest in preventing competition for services at buildings for which it has never provided services nor sought to provide services.

Consequently, the Court construes the "current-client" non-solicitation provision as barring Sawyer or Citadel, for a one-year period, from soliciting a contract or providing security services at any building for which ISMG was actually providing security services as of Sawyer's departure date. Construed this narrowly, the provision is reasonable and enforceable. Thus, Sawyer may be determined to have breached the Employment Agreement with respect to soliciting the Financial Center only if ISMG has a legitimate interest in protecting its relationship with prospective clients *and* if the Financial Center qualifies as such a prospective client.

ii. Enforceability Of Prohibition Against Soliciting "Prospective Clients"

In support of their argument that ISMG has no protectable interest in preventing solicitation of potential or prospective customers, Defendants cite to the unreported case of *Vaughn v. Weems,* 1994 WL 681158 (Tenn.Ct.App. Dec.7, 1994), in which the defendant/employee signed a nonsolicitation agreement providing that he would not "directly or indirectly, alone or with others, solicit or attempt to solicit" business from any current customer or any entity that "had been solicited as a potential customer" during the employee's employment with the plaintiff. *Id.* at *1. Besides finding the temporal reach of that provision unreasonable insofar as it purported to bar solicitation of any potential client solicited during the entire term of the defendant's lengthy employment, the Tennessee Court of Appeals also held that the prohibition pertaining to *potential* clients generally was unenforceable. As the court stated, "Unarguably, *present* customers are a protectable interest of the employer. However, extending this covenant to include any solicited potential customer is inimical to the public interest and unreasonable." *Id.* at *3 (citations omitted); *cf. Thompson, Breeding, Dunn, Creswell & Sparks v. Bowlin,* 765 S.W.2d 743, 745 (Tenn.Ct.App.1988) ("Although the term 'clients' in the Contract was not specifically limited to present clients, we find that this is the only defendable client interest the Partnership had.").

***15** The specific provision at issue in the case at bar pertaining to potential clients prohibits an employee who leaves ISMG from soliciting any person "who has been at any time within 180 days prior to termination, in negotiations with [ISMG] for private security business or to whom [ISMG] had submitted a proposal for such services or received a request for proposal for such services

within that time, for a project located in the Territory." (Pl.'s Ex. 5, ¶ 4(a) & (b).) This provision is clearly much narrower in scope than those provisions pertaining to "potential" clients that other courts have previously held to be unreasonable under Tennessee law. The provision at issue here pertains to a very narrow range of easily identifiable prospective clients with which ISMG had been in active negotiations within the six months prior to the employee's termination. The Court therefore predicts that Tennessee courts would uphold this provision as sufficiently narrow in scope to be considered reasonable and enforceable.

iii. Whether the Financial Center Was a "Prospective Client"

The next issue then is whether Defendant Sawyer has actually breached the provision at issue by soliciting, on behalf of Citadel, the security services contract at the Financial Center. Resolution of this issue depends upon whether the Financial Center qualifies as a *prospective* client in which ISMG has a protectable interest under the Employment Agreement. In arguing that the Financial Center does not meet that definition, Defendants point out that Carolyn Riddle never submitted a formal RFP to ISMG for security services at the Financial Center; ISMG never submitted a formal proposal for the provision of such services; and Riddle and Sawyer (on behalf of ISMG) never actively engaged in negotiations regarding the terms of a security services contract for the Financial Center. ISMG, on the other hand, points out that in October 2005, well within 180 days prior to his termination, Sawyer, on behalf of ISMG, was communicating with Riddle about the possibility of ISMG's providing security services for the financial center. Indeed, in October 2005, Sawyer assisted Riddle in selecting the form for the RFP she would eventually issue to various contractors requesting bids for security services, and then revised the form for her to tailor it for use by the Financial Center. On October 27, 2005, Sawyer forwarded to Riddle, at her request, a Request for Proposal he had prepared for her to use, and which was basically identical to the RFP Riddle ultimately issued in April 2006.

In January 2006, Sawyer sent a document via electronic mail to his superior at ISMG in which he identified the Financial Center as a proposal that he intended to deliver within 120 days, and that he was going to get together with Carolyn Riddle the following week to discuss this matter. Later in the month, Sawyer and Riddle exchanged e-mails about meeting for lunch. The context of the e-mails clearly suggests that the purpose of the meeting was to discuss ISMG's prospects as the Financial Center's next security services provider. Shortly thereafter, Sawyer prepared a bid proposal log indicating that as of February 6, 2006, he had delivered a bid proposal to Riddle for the Financial Center and that this bid was pending. This log was given to one of Sawyer's superiors at ISMG, who used it to track the status of the company's sales. In other words, as ISMG insistently points out, Sawyer represented to ISMG well within 180 days of his termination that he was not only engaged in negotiations on ISMG's behalf for the Financial Center contract, but that he had already drafted and delivered a proposal to Riddle.

***16** It is simply beyond dispute that Sawyer was actively courting Riddle for the Financial Center contract during the 180 days prior to his termination. Although Riddle did not submit a formal RFP to ISMG and ISMG apparently never submitted a formal written proposal for services, the Court nonetheless finds the evidence sufficient to establish that Sawyer and Riddle were actively in negotiations for that contract within the definition of the Agreement and, therefore, that Sawyer breached the Employment Agreement provision barring solicitation of prospective clients when he later persuaded Carolyn Riddle to select Citadel to provide security services at the Financial Center.

*(b) Contract Provision Barring Solicitation Of Current ISMG Employees*

Paragraph 4(c) of the Employment Agreement states:

Employee shall not solicit or aid a competing provider of private security business services to solicit any person who is employed by the Company at the time Employee's employment is terminated, to terminate that person's employment [with] the Company and to accept employment with a competing provider of private business security services within the Territory.

There is no dispute that an advertisement for Citadel was placed in the Tennessean. That advertisement did not mention Sawyer's name and applicants initially were put in contact with Cesternino. Cesternino, after an initial screening of the resumes, directed the applicants to follow up with Sawyer. Sawyer actually conducted interviews of the various applicants. Defendants concede that more than one ISMG employee responded to the advertisement and were interviewed by Sawyer. According to Defendants, no current ISMG employee has been offered a position with Citadel.

The Court is again presented with a two-fold question. First, does ISMG have a protectable interest in limiting Sawyer's ability to solicit current employees to come work at his new company? And second, assuming so, has Sawyer breached that restraint by conducting interviews of the applicants, including the current ISMG employees?

i. Enforceability Of the Employee-Solicitation Provision

According to Defendants, the Tennessee Supreme Court has stated that "the loss of employees to competitors is the type of injury which results from ordinary competition and which cannot be restrained by contract." *Hasty v. Rent-A-Driver, Inc.,* 671 S.W.2d 471, 474 (Tenn.1984). In fact, *Hasty* does stand for the proposition that an employer "cannot by contract restrain ordinary competition." *Id.* The restraint in that case purported to prevent an employee truck driver from going to work for any client to which he had previously been assigned by the Defendant, his former employer. That case did not address the solicitation of current employees by a former employee.

In fact, the Court is not aware of any Tennessee case law specifically addressing this question, but it nonetheless appears that Tennessee courts have enforced similar provisions. *See, e.g., Internation Mktg. Group, Inc. v. Speegle,* 2000 WL 329375, at *3 (Tenn.Ct.App. Mar.30, 2000) (affirming the trial court's decision to enforce a restrictive covenant prohibiting solicitation of current employees, and affirming damages judgment against defendants for $13.5 million dollars for injuries resulting from defendants' "stripp[ing] [plaintiff] of more than one half of its former sales force and almost half of its customers"). Courts applying the law of other states have upheld similar provisions. *See, e.g., Robert Half Intern., Inc. v. Van Steenis,* 784 F.Supp. 1263, 1274-75 (E.D.Mich.1991) (applying Michigan law, entering a permanent injunction specifically enforcing a provision in an employment agreement that prohibited defendant from "solicit[ing], induc[ing], or attempt[ing] to induce any other employee of the Plaintiff to leave its employ to become connected in any way with, or employ any such employee in, any other executive recruiting firm, employment agency or temporary personnel service business"); *Benfield, Inc. v. Moline,* 351 F.Supp.2d 911, 920 (D.Minn.2004) (applying Minnesota law, granting preliminary injunction prohibiting defendants from, among other things, soliciting plaintiff's employees to work at their new company).

***17** The Court finds that ISMG has a protectable interest in maintaining its current employees, and that the non-solicitation provision is narrowly enough drawn to protect that interest without encroaching upon the rights of the individual employees to be employed where they choose. The Court concludes that a Tennessee court confronted with the provision at issue would conclude that it is enforceable.

ii. Alleged Breach Of the Employee Solicitation Provision

The next issue is whether Sawyer has actually breached the provision at issue. Merriam-Webster defines "solicit" as follows:

1 a: to make petition, to entreat; b: to approach with a request or plea

2: to urge (as one's cause) strongly

3 a: to entice or lure especially into evil b: to proposition (someone) especially as or in the character of a prostitute

4: to try to obtain by usually urgent requests or pleas

*See http://www.merriam-webster.com/dictionary/solicit.* Similarly, Black's Law Dictionary defines solicitation as "the act or an instance of requesting or seeking to obtain something; a request or petition." *Black's Law Dictionary* 1427 (8th ed.2004).

The conduct in question includes the placement of the advertisement in the newspaper, and then conducting interviews of potential candidates. While merely placing a neutral advertisement in the newspaper, requesting applications, does not in and of itself fit the definitions of "solicit" as set forth above, conducting an interview after potential candidates respond to the ad might well constitute solicitation. There is no evidence before the Court regarding the actual content of the interviews, other than the fact that no job offers were extended to any current ISMG employees. The extension of a job offer alone would qualify as solicitation, as it constitutes "an instance of requesting or seeking to obtain something." *Id.* Even if no job offer were made, however, depending upon how Sawyer went about describing the benefits of working for Citadel and in particular whether any unfavorable comparisons with ISMG were made, the interviews conducted by Sawyer might conceivably be characterized as solicitation regardless of whether a job offer was extended.[FN3]

FN3. The Court notes that other courts presented with this same issue have gone both directions in interpreting the scope of non-solicitation provisions. Those courts finding non-solicitation provision unenforceable to the extent they go beyond prohibiting the former employee from *initiating* contact with current employees generally do so on the basis of state statutes barring agreements that act in restraint of trade. *See, e.g., Atmel Corp. v. Vitesse Semiconductor Corp.,* 30 P.3d 789, 793-94 (Colo.Ct.App.2001) (based upon a state statute barring agreements that act in restraint of trade, finding co-employee non-solicitation provision "void and unenforceable to the extent it can be interpreted to prohibit those defendants from doing anything other than initiating contacts with [plaintiff's] employees."); *Loral Corp. v. Moyes,* 174 Cal.App.3d 268, 219 Cal.Rptr. 836, 843-44 (Cal.Dist.Ct.App.1985) (finding a non-solicitation provision enforceable so long as it was constructed only to prohibit the defendant from initiating contact with his former co-employees, based upon a specific California statute).

Because there is no evidence that a job offer was extended and no other evidence whatsoever regarding the content of the interviews, the Court finds that there is insufficient evidence to determine that Sawyer has actually breached the employee non-solicitation provision. However, the evidence is clear that Sawyer intended to do so by interviewing current ISMG employees with the possibility of extending job offers to ISMG employees.[FN4]

FN4. The Court recognizes that Sawyer did not have the intent to breach the Employment Agreement *per se,* but he did intend to interview current ISMG employees, which the Court finds may constitute breach on the non-solicitation provision in the Employment Agreement.

*2. The Possibility Of Irreparable Harm*

With respect to the first issue, as discussed above in the context of the discussion regarding breach of loyalty, any harm that can accrue to IS-

MG as a result of Sawyer's solicitation of the Financial Center contract for Citadel has already occurred and, in fact, likely occurred simply by virtue of Sawyer's leaving ISMG, as Carolyn Riddle clearly testified that Sawyer was, for her, the face of ISMG, and she does not have (and apparently does not desire to have) any relationship with Sawyer's former colleague at ISMG, Asa Helton. An injunction barring Citadel from providing security services at the Financial Center is not likely to cause further irreparable harm, since, as counsel for ISMG himself recognized, Carolyn Riddle is unlikely to award the contract to ISMG even if Citadel steps out of the picture.

***18** As for the employee-solicitation issue, it is unlikely that ISMG has actually incurred damages resulting from the purported solicitation, since Citadel, as of the date of the hearing at least, had not offered jobs to any current ISMG employees. However, it will be difficult to quantify the damages ISMG may incur if Sawyer continues to interview current ISMG employees and proceeds to offer them employment with Citadel. Moreover, because Sawyer was, prior to his resignation, the highest ranking employee in ISMG's Nashville office, it is highly likely that many of the employees in that office have developed strong relationships with Sawyer and consider Sawyer to be the "face" of ISMG. Failure to enforce this provision would give Sawyer an advantage over ISMG in luring ISMG employees away, which risk ISMG specifically sought to minimize by including the bar against soliciting current employees in its Employment Agreement. Thus, likelihood of irreparable harm is relatively high in this regard.

*3. The Risk Of "Substantial Harm" To Others*

For the same reasons outlined under the discussion of breach of loyalty, this factor does not weigh in favor of entry of an injunction prohibiting Citadel from performing the Financial Center contract. It does, however, weigh slightly in favor of granting the injunction to prohibit solicitation of current ISMG employees.

*4. Whether "Public Interests" Will Be Advanced*

Again, companies generally have a legitimate public interest in maintaining current employees in whom they have invested substantial time and funds in training. In addition, Tennessee has a strong public policy in favor of upholding contracts. *See AmeriGas Propane,* 844 F.Supp. at 390 (citing Tenn.Code Ann. § 47-50-112(a) (contracts shall be enforced as written, subject to statutory and common law defenses)) (other citations omitted). The court therefore finds that the public interest would be served if a preliminary injunction were granted enforcing the contract provision barring solicitation of current ISMG employees.

*5. Balancing All the Factors*

Despite the fact that ISMG has demonstrated a strong likelihood of success on the merits of its claim for breach of contract with respect to Sawyer's solicitation of the security services contract at the Financial Center for Citadel, as set forth in the discussion regarding alleged breach of loyalty, it is not clear to what extent ISMG suffered damages resulting specifically from that breach as distinct from injury suffered merely as a result of Sawyer's departure. Moreover, the remaining factors do not weigh in favor of entry of a preliminary injunction barring Defendants from finalizing and performing the contract for the provision of private security services at the Financial Center.

On the other hand, the factors generally weigh in favor of an injunction enforcing the contract provision barring solicitation of current ISMG employees.

D. Intentional Interference With Business Relations

*1. Likelihood Of Success On the Merits*

***19** Tennessee has recently recognized the tort of intentional interference with business relations, but the scope of this tort is narrow and its elements clearly defined. According to the Tennessee Supreme Court, liability should be imposed upon an "interfering party" only if the plaintiff can demon-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

strate: "(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference. *Trau-Med of Am., Inc. v. Allstate Ins. Co.,* 71 S.W.3d 691, 701 (Tenn.2002) (internal citations and footnotes omitted).

In the case at bar, it seems highly likely that ISMG, with respect to Sawyer's and Citadel's pursuit of the Financial Center contract, could establish the first three and fifth elements of this claim. ISMG had a prospective relationship with the Financial Center; Sawyer and Citadel knew about that relationship; Sawyer and Citadel intended to cause termination of that relationship; and that ISMG suffered damages as a result. The fourth element, however, is not so readily established. With respect to that element, the Tennessee Supreme Court has noted that a plaintiff must "demonstrate that the defendant's predominant purpose was to injure the plaintiff." *Id.* at 701 n. 5. In fact, "to provide further guidance" as to what may constitute an actionable interference, the court cited the following methods as "some examples of improper interference":

> those means that are illegal or independently tortious such as violations of statutes, regulations, or recognized common-law rules; violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship; and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition.

*Id.* (internal citations omitted). On the other hand, merely acting in furtherance of one's own economic interest is not an improper motive. *See Leigh Furniture & Carpet Co. v. Isom,* 657 P.2d 293, 307-08 (Utah 1982), *cited in Trau-Med,* 71 S.W.3d at 701 n. 5. In evaluating a plaintiff's motive for signs of impropriety, a court must determine whether "the acts of which complaint is made ... rest on some legitimate interest, or if there is sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated ... [. T]he line of demarcation between permissible behavior and interference reflects the ethical standards of the community." *Trau-Med,* 71 S.W.3d at 700-01 (citation omitted).

*20 One basis ISMG raises in support of a finding of "improper motive" on Defendants' part is the fact that Citadel had not actually become licensed as a contract security company at the time it bid for and was awarded the Financial Center contract toward the end of April 2006. It did not actually receive its license until May 1, 2006. The Court finds that this point is immaterial, however, first because there is no evidence that Sawyer and Cesternino affirmatively misrepresented Citadel's status as licensed or unlicensed, and second, Citadel never actually provided security services prior to receipt of its license. *Cf.* Tenn.Code Ann. § 62-35-130(a)(2) & (8) (providing that disciplinary action may be taken against any company that has practiced fraud, deceit or misrepresentation, or "[a]cted as a contract security company or proprietary security company without a currently valid license").

ISMG also appears to argue that Sawyer "spent much of his time" in the months prior to his resignation "misappropriating ISMG's confidential business information and trade secrets," which enabled him to obtain the security services contract at the Financial Center for Citadel. The Court finds the causal relationship between any alleged or actual misappropriation of trade secrets and Citadel's successful bid for the Financial Center security ser-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

vices contract to be quite tenuous. Because the tort at issue is narrowly drawn and of limited application, the Court finds that ISMG has not demonstrated a substantial likelihood of success on the merits of its claim for tortious interference with prospective business relations.

*2. The Other Factors*

Regardless of the likelihood of success, however, the same analysis applied to breach of contract and breach of loyalty claims applies here: Whatever damage might have resulted from the alleged interference is likely minimal and has already occurred; issuance of a preliminary injunction will not prevent any additional injury to ISMG. Thus, the risk of injury to Defendants and to other third parties if an injunction is entered outweighs the risk of harm to ISMG if the injunction is not entered, and no legitimate public interests would be advanced by entry of the requested injunction. In sum, the relevant factors weigh against entry of a preliminary injunction barring Defendants from finalizing and performing the contract for the provision of private security services at the Financial Center.

E. Violation Of the Computer Fraud and Abuse Act

*1. Likelihood Of Success On the Merits*

ISMG alleges that defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), and specifically that provision of it which provides recourse against any person who, "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value." 18 U.S.C. § 1030(a)(4). An employee who exceeds authorized access to an employer's computer may violate the CFAA. *See Pac. Aerospace & Elec., Inc. v. Taylor,* 295 F.Supp.2d 1188, 1196-97 (E.D.Wash.2003); *EF Cultural Travel BV v. Explorica, Inc.,* 274 F.3d 577, 581-83 (1st Cir.2001); *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.,* 119 F.Supp.2d 1121, 1124-25 (W.D.Wash.2000).

***21** There is no dispute that Sawyer exceeded his authority when he e-mailed to Cesternino and Gary Conrad documents that ISMG considers proprietary and trade secret. While defendants argue that Sawyer had no fraudulent intent in forwarding documents to Cesternino and that ISMG has suffered no damages, Sawyer has admitted that he provided certain pricing information to Cesternino for use in Citadel's proposal forms. Thus, based on the standard set forth above, the Court finds that ISMG has established a likelihood of success on the merits of this claim.

*2. The Possibility Of Irreparable Harm and the Other Factors*

Regardless of whether Sawyer actually violated the CFAA, there is no dispute that he no longer has access to ISMG's computers, and he has apparently returned to ISMG all hard- and electronic-copies of ISMG's documents. Issuance of an injunction now will not have the effect of preventing further damage to ISMG. Entry of an injunction is not likely to harm Defendants or other third parties either, simply because it is unlikely to have any effect on the them at all, nor will public interests be affected one way or the other.

*3. Balancing All the Factors*

The relevant factors do not weigh in favor of entry of a preliminary injunction barring Defendants from further violation of the CFAA. As discussed above in connection with the claim for misappropriation of trade secrets and/or confidential business information, however, Defendants will be enjoined from any future use of proprietary information that remains in their possession.

F. Whether Injunction Applies Both To Sawyer and Citadel

In its response in opposition to ISMG's motion, Defendants argue generally that any restrictive covenants contained in the Employment Agreement apply only to Sawyer personally but do not restrict or apply to Citadel generally or to any other principal or employee of Citadel, namely, Rob Cesternino. In support of this argument, Defendants cite to the

case of *Brasfield v. Anesthesia Services, P .C.,* 1999 WL 817507 (Tenn.Ct.App. Oct.13, 1999).

In that case, the Tennessee Court of Appeals found that the relevant covenant not to compete, by its terms, restricted the former employee personally from practicing medicine in competition with his former medical group/employer but did not restrict or apply to the other physicians in the already-existing competing medical group of which he became a shareholder. The non-compete in question simply provided: "[U]pon any termination of employment, Physician shall not thereafter practice medicine in any facility in which the Corporation is providing services or is negotiating to provide services at the time of his termination." *Id.* at *3. The court stated that reading the contract to prohibit the physician's new group or the other physicians in that group from practicing medicine at the facility at issue would require the court "to broaden the language of the contract to include a provision stipulating that a terminating employee is not permitted to join a group of doctors who practice at a facility of the type described in the contract." *Id* .

***22** In the case at bar, however, there is an almost complete identity between Sawyer and Citadel, particularly since Citadel has only one other principal and employee, Cestemino, and Cesternino lives and works in Seattle. Sawyer is effectively the face and arm of Citadel, even if Cesternino is its brain. Consequently, the Court concludes that any restriction in the Employment Agreement pertaining to Sawyer also restricts Citadel.

G. Fed.R.Civ.P. 65(c)'s Security Requirement

Although Federal Rule of Civil Procedure 65(c) might seem to require the movant to post bond to secure preliminary injunctive relief, the Sixth Circuit recognizes the court's discretion not to require security. *See Moltan Co. v. Eagle-Picher Indus.,* 55 F.3d 1171, 1176 (6th Cir.1995) (citations omitted). Because this temporary restraint to be issued herein will cause no discernible monetary damage to the defendants, ISMG need not post security. *See, e.g., Fehribach v. City of Troy,* 321 F.Supp.2d 727, 734 (E.D.Mich.2004) (because plaintiff was very likely to succeed and defendant suffered no loss or damage as a result of preliminary injunction, court waived bond requirement). If ISMG has already posted a bond (which is unclear from the docket), it may retire or withdraw it.

V. CONCLUSION

In sum, based upon the above analysis, the Court finds as follows:

1. ISMG's request for a preliminary injunction prohibiting Defendants from destroying any documents, materials, information or other property, including electronically stored information related to the subject matter set forth in Plaintiff's complaint, will be denied on the basis that no evidence was presented at the hearing suggesting that Defendants have engaged in such unlawful destructive behavior in the past nor that they will do so in the future.

2. ISMG's request for a preliminary injunction requiring Defendants immediately to return to ISMG any of its property in the Defendants' possession, custody or control, will be denied on the basis that ISMG has conceded that Defendants have already complied with the prior Temporary Restraining Order requiring such action.

3. ISMG's request for a preliminary injunction prohibiting Defendants from disclosing or making use of any of ISMG's Business Secrets, as that term is defined in the Employment Agreement, will be granted under the terms set forth above. Specifically, both Defendants shall be barred from continued use of any of ISMG's pricing information and from listing or naming ISMG's clients as "references" in ISMG's proposal forms.

4. With respect to ISMG's request for a preliminary injunction prohibiting Defendants from (1) soliciting or (2) performing private security services for any existing client of Plaintiff with whom Defendant Sawyer had contact or administrative responsibility while employed by ISMG, including Colliers Turley Martin Tucker, the Court finds as

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

follows:

(a) Defendants have agreed in open court that they are prohibited from and that they will refrain from contacting, soliciting, or providing private security services for any current clients of ISMG, including the eight buildings in Tennessee for which ISMG presently provides private security services, for one year following the effective date of Sawyer's resignation from ISMG. Accordingly, Plaintiff's motion to convert the TRO as to this issue into a preliminary injunction will be granted.

***23** (b) It is completely unreasonable to construe the term "actual client" as used in the Employment Agreement to include Colliers Turley Martin Tucker generally, as such an interpretation would preclude Defendants from soliciting business or providing services at a vast number of buildings in Tennessee and Kentucky for which Plaintiff does not now and has not ever provided security services, and with respect to which Plaintiff has never submitted proposals for the provision of security services. Plaintiff's motion to convert the TRO into a preliminary injunction barring Defendants from soliciting or performing private security services for any building in Tennessee or Kentucky managed by Colliers will therefore be denied.

(c) The Financial Center qualifies as a prospective client under the Employment Agreement, and ISMG has presented evidence indicating that Defendant Sawyer breached the Employment Agreement and otherwise may be subject to liability under Tennessee law in connection with his and Defendant Citadel's solicitation of the security services contract at the Financial Center. Notwithstanding, ISMG has not established that entry of a preliminary injunction prohibiting Defendants from going forward with execution and performance of the contract with the Financial Center is warranted. It is likely that the Financial Center contract likely would not have been awarded to ISMG even if Sawyer had not solicited it for Citadel, and probably would not be awarded to ISMG even if Citadel were enjoined from going forward with finalizing and performing the security services contract at the Financial Center. Awarding prospective injunctive relief would not prevent further injury from occurring, nor would maintaining the *status quo* benefit any of the parties involved, including the Financial Center and Colliers as well as Plaintiff and Defendants. Plaintiff's motion to convert the TRO into a preliminary injunction barring Defendants from providing security services at the Financial Center for one year following Sawyer's resignation date will therefore be denied.

5. ISMG's request for a preliminary injunction enforcing the Employment Agreement provision prohibiting Defendant Sawyer from "solicit[ing] or aid[ing] a competing provider of private security business services to solicit any person who is employed by the Company at the time Employee's employment is terminated, to terminate that person's employment [with] the [Plaintiff] and to accept employment with a competing provider of private business security services," will be granted. As discussed above, the Court finds that the act of placing a generic advertisement in the Tennessean seeking qualified applicants, without disclosing Defendant Sawyer's involvement with the company placing the ad, does not constitute "solicitation," but that the acts of interviewing, negotiating with, persuading or making a job offer to a current ISMG employee to come work for Citadel would constitute "solicitation" under the ordinary meaning of the term. ISMG's motion to enter a preliminary injunction enforcing the Employment Agreement provision barring Defendants from soliciting current ISMG employees to work for Citadel will be granted.

***24** Plaintiff shall no longer be required to post a bond.

An appropriate Preliminary Injunction consistent with this Opinion will enter.

M.D.Tenn.,2006.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

International Sec. Management Group, Inc. v. Sawyer
Not Reported in F.Supp.2d, 2006 WL 1638537 (M.D.Tenn.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

United States District Court,
E.D. Missouri,
Eastern Division.
LASCO FOODS, INC., Plaintiff,
v.
HALL AND SHAW SALES, MARKETING, & CONSULTING, LLC, et al.,[FN1] Defendants.

FN1. Plaintiff dismissed its claims against Consolidated Mills, Inc., with prejudice, on September 11, 2009. (Doc. No. 73).

No. 4:08CV01683 JCH.
Oct. 26, 2009.

West KeySummary **Telecommunications 372 1342**

372 Telecommunications
372VIII Computer Communications
372k1339 Civil Liabilities; Illegal or Improper Purposes
372k1342 k. Fraud; Unauthorized Access or Transmission. Most Cited Cases

Under the Computer Fraud and Abuse Act (CFAA), company sufficiently alleged that employees acted without authorization when they obtained company's information for their personal use and in contravention of their fiduciary duty to their employer. Employees maintained that the CFAA's without authorization requirement applied only to hackers or other unauthorized outsiders, not employees. However, employees had authorization only to further the interests of company, and did not have authorization to act in furtherance of their own business interests while employed. 18 U.S.C.A. § 1030.

Burton D. Garland, Jr., Nathan J. Plumb, Rodney A. Harrison, Ogletree and Deakins, St. Louis, MO, for Plaintiff.

Brian E. McGovern, Bryan M. Kaemmerer, McCarthy and Leonard, Chesterfield, MO, for Defendants.

***MEMORANDUM AND ORDER***

JEAN C. HAMILTON, District Judge.

***1** This matter is before the Court on Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint ("Motion") (Doc. No. 50).[FN2] The matter is fully briefed and ready for disposition.

FN2. This Court previously granted Defendants' Motion to Dismiss Plaintiff's First Amended Complaint on January 22, 2009. (Doc. No. 24). In that Order, the Court found that Plaintiff had failed to adequately plead that Defendants' access to Plaintiff's information was "unauthorized," as required under Computer Fraud and Abuse Act ("CFAA") and Stored Wire and Electronic Communications Act ("SECA"). Since then, Plaintiff filed a Second Amended Complaint (Doc. No. 26), which Defendants answered. (Doc. No. 31). Thereafter, Plaintiff sought leave and filed a Third Amended Complaint (Doc. Nos.48, 49), which is the subject of the instant Motion.

***BACKGROUND***

Plaintiff Lasco Foods, Inc. ("Lasco" or "Plaintiff") is a Missouri limited liability corporation with its principal place of business in the State of Missouri. (Third Amended Complaint ("Complaint" or "Compl."), Doc. No. 49, ¶ 1). Defendant Ronald N. Hall, a resident of Weatherford, Texas, was formerly employed by Lasco as a Regional Sales Manager. (Compl., ¶¶ 2, 43). Defendant Charles R. Shaw, a resident of St. Charles County, Missouri, was formerly employed by Lasco as a National and Regional Sales Manager. (Compl., ¶¶ 3, 20). Defendant Hall and Shaw Sales, Marketing & Consulting LLC ("HSSMC") is a Missouri limited liability company. (Compl., ¶ 4). De-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

fendants Shaw and Hall formed and currently work for HSSMC. (Compl., ¶¶ 59-62).

Plaintiff filed its Third Amended Complaint on May 18, 2009. (Doc. No. 49). Plaintiff asserts the following claims for relief: Misappropriation of Trade Secrets in Violation of the Missouri Uniform Trade Secrets Act ("MUTSA"), Mo.Rev.Stat. § 417.450, *et seq.* (Count I), Violations of SECA, 18 U.S.C. § 2701, *et seq.* (Count II), Violations of CFAA, 18 U.S.C. § 1030, *et seq.* (Count III), Unfair Competition (Count IV), Violation of the Missouri Statute Against Tampering with Computer Data and Equipment, R.S. Mo. § 537.525, and the Missouri Statute Against Tampering with Computer Equipment, R.S. Mo. § 569.097 (Count V), Conversion (Count VI), Tortious Interference with Plaintiff's Contracts and/or Business Expectancies (Count VII), Civil Conspiracy (Count VIII), and Breach of Duty of Loyalty to Lasco (Count IX).

As stated above, Defendants filed the instant Motion to Dismiss on May 29, 2009. (Doc. No. 50). Defendants allege that Plaintiff has not properly pled its claims under SECA and CFAA, and those claims must be dismissed. Specifically, Defendants claim that Plaintiff has not pled sufficient facts to demonstrate that Defendants' access to Plaintiff's confidential and trade secret information ("Information") [FN3] was unauthorized, as required by both statutes. Defendants assert that the state law claims likewise must be dismissed because the state common law claims are preempted by MUTSA and because this Court lacks supplemental jurisdiction these claims.

FN3. Lasco identifies its confidential and trade secret information as including, but not limited to, "customer lists, prospect lists, pricing information, customer preferences, costs and processes, profit margins, proprietary processes, and recipes and formulae." (Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint ("Memorandum in Opposition"), Doc. No. 57, p. 2 (citing Compl., ¶ ¶ 13, 15, 20, 21, 23, 44, 46)).

***STANDARD FOR MOTION TO DISMISS***

In ruling on a motion to dismiss, the Court must view the allegations in the complaint liberally in the light most favorable to Plaintiff. *Eckert v. Titan Tire Corp.,* 514 F.3d 801, 806 (8th Cir.2008) (citing *Luney v. SGS Auto. Servs., Inc.,* 432 F.3d 866, 867 (8th Cir.2005)). Additionally, the court, "must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Coons v. Mineta,* 410 F.3d 1036, 1039 (8th Cir.2005) (citation omitted). To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (abrogating the "no set of facts" standard for Fed.R.Civ.P. 12(b)(6) found in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp.,* 550 U.S. at 555; *Huang v. Gateway Hotel Holdings,* 520 F.Supp.2d 1137, 1140 (E.D.Mo.2007).

***DISCUSSION***

**I.** ***CFAA***

***2** "The CFAA criminalizes various fraudulent or damaging activities related to the use of computers." *Fiber Sys. Int'l v. Roehrs,* 470 F.3d 1150, 1156 (5th Cir.2006). CFAA recognizes "private causes of action for individuals damaged by computer fraud: 'Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief .' " *In re AOL, Inc. Version 5.0 Software Litig.,* 168 F.Supp.2d 1359, 1368 (S.D.Fla.2001) (quoting 18 U.S.C. § 1030(g)).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

To state a cause of action under CFAA, Plaintiff must allege that the Defendants Hall and Shaw accessed its Information "without authorization." *See* 18 U.S.C. § 1030. CFAA does not define the term "without authorization." (Defendants' Reply Brief in Support of Their Motion to Dismiss Plaintiff's Third Amended Complaint ("Reply"), Doc. No. 62, p. 3). Defendants rely on *Shamrock Foods Co. v. Gast,* 535 F.Supp.2d 962 (D.Az.2008) which discussed the meaning of "without authorization" under CFAA. *Id.* at 964-65. The *Shamrock Foods* court noted that "[s]ome courts have applied principles of agency law to the CFAA and have held that an employee accesses a computer 'without authorization' whenever the employee, without knowledge of the employer, acquires an adverse interest or is guilty of a serious breach of loyalty." *Id.* at 964 (citing cases). The *Shamrock Foods* court, however, noted that other courts have held that the phrase "without authorization" applies to "outsiders who do not have permission to access the plaintiff's computer in the first place." *Id.* at 964-65 (citing cases). The *Shamrock Foods* court agreed with the reasoning of the latter group of cases and determined that CFAA's "without authorization" requirement applies only to computer hackers or other unauthorized outsiders, not employees. *Id.* at 965; *see also Int'l Ass'n of Machinists & Aero. Workers v. Werner-Matsuda,* 390 F.Supp.2d 479, 495 (D.Md.2005) (citations omitted) (Federal courts interpreting SECA and CFAA have noted that their "general purpose ... was to create a cause of action against computer hackers (*e.g.,* electronic trespassers).").

Along the contrary line of cases, in *International Airport Centers, LLC v. Citrin,* 440 F.3d 418 (7th Cir.2006),[FN4] Citron quit his employer, IAC, and went to business for himself, in breach of his employment contract. *Id.* at 419. Before returning his IAC issued and owned laptop, Citron utilized a secure-erase program that erased the his employer-owned data as well as data demonstrating the formation of his new business venture. *Id.* On appeal, Citron argued that erasing a file does not constitute a transmission within the meaning of CFAA. *See* 18 U.S.C. § 1030(a)(5)(A) (whoever "knowingly causes the *transmission* of a program, information, code or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer" violates CFAA) (emphasis added).[FN5] The *Citron* court held that Citron's transmittal of a secure-erasure program to the computer constituted a "transmission" under CFAA.[FN6] 440 F.3d at 420.

FN4. This case came before the Seventh Circuit on appeal from dismissal of the plaintiff's suit for failure to state a claim. *Id.* at 418.

FN5. Based upon a prior version of the act, the *Citron* court refers to this section as 18 U.S.C. § 1030(a)(5)(A)(i).

FN6. Defendants argue for the first time in their Reply that Plaintiff cannot demonstrate there was a "transmittal," as required under CFAA. (Reply, pp. 5-6). Only § 1030(a)(5)(A) has the "transmission" requirement. *See* 18 U.S.C. § 1030(a)(5)(A). Even if this Court were to find that there was not a "transmission," Plaintiff could still state a claim under § 1030(a)(4), § 1030(a)(5)(B) or § 1030(a)(5)(C).

***3** In addition, the *Citron* court also noted that, in CFAA, Congress intended to address both outside internet hackers [FN7] and also internal disgruntled programmers. *Id.* Congress demonstrated that it intended CFAA to reach the actions of the disgruntled programmer by providing that whoever, " *intentionally accesses* a protected computer without authorization, and as a result of such conduct, recklessly causes damage," violates CFAA. *Id.* (emphasis in original)(citing 18 U.S.C. § 1030(a)(5)(B)).[FN8] The Seventh Circuit held that Citron had violated that subsection because his authorization terminated "when, having already engaged in misconduct and decided to quit IAC in violation of his employment contract he resolved to

destroy files that incriminated himself and other files that were also the property of his employer, in violation of the duty of loyalty that agency law imposes on an employee." *Id.* at 420 (citing cases). Because Citron was acting in his own interests, not those of this employer (IAC), Citron was not authorized to access that company's trade secret information.

FN7. *See In re AOL, Inc. Version 5.0 Software Litig.*, 168 F.Supp.2d at 1370 (the phrase "without authorization" in §§ 1030(a)(5)(B) and (C) "contemplate[s] a situation where an outsider, or someone without authorization, accesses a computer").

FN8. Based upon a prior version of the act, the *Citron* court refers to this section as 18 U.S.C. § 1030(a)(5)(A)(ii).

The *Citron* court also noted, as the Defendants do in the present case, [FN9] that CFAA distinguishes between "without authorization" and "exceeding authorized access," 18 U.S.C. §§ 1030(a)(1),(2),(4),(5). *Id.* at 420; *see also* 18 U.S.C. §§ 1030(e)(6) (defining "exceeds authorized access). The *Citron* court stated that, while "exceeding authorized access" may be a "more apt" description of Citron's actions, the difference between "without authorization" and "exceeding authorized access" is "paper thin." [FN10] The *Citron* court found that Citron had acted "without authorization" because he breached his duty of loyalty, which terminated any rights or authority he had as IAC's agent. *Id.; see* Restatement (Second) of Agency § 112 (1958) ("Unless otherwise agreed, the authority of an agent terminates if, without knowledge of the principal, he acquires adverse interests or if he is otherwise guilty of a serious breach of loyalty to the principal."). [FN11] When Citron decided to act out of his own interests, instead of his employer's interests, his "authority to access the laptop" was voided "because the only basis of his authority had been that relationship." *Id.* at 420-21; *see also Ervin & Smith Adver. & Pub. Rels., Inc. v. Ervin,* No. 8:08cv459, 2009 U.S. Dist. LEXIS 8096, at * 22-23 (D.Neb. Feb. 3, 2009) ("The Court concludes that while the Defendants ordinarily may have been authorized to access the information they appropriated from Plaintiff, that authorization was terminated when Defendants destroyed the agency relationship by accessing and appropriating the protected information for their own personal gain and against the interest of their employer."); *Nilfisk-Advance, Inc. v. Mitchell,* No. 05-5179, 2006 U.S. Dist. LEXIS 21993, at *6-7 (W.D.Ark. Mar. 28, 2006) (plaintiff stated a CFAA cause of action when plaintiff alleged that "Mitchell exceeded any authorization he had when he e-mailed the files to his personal computer with alleged purpose of misappropriating the information contained in them"); *Personalized Brokerage Services, LLC v. Lucius,* No. 05-1663, 2006 U.S. Dist. LEXIS 36176, at *6-7 (D.Minn. Jan. 25, 2006) (finding the plaintiff had stated a claim under CFAA and that court had federal jurisdiction when the plaintiff alleged that its former employee exceeded his "authorization by using its computers to set up his competing business, email competitors, distribute [employer's] proprietary information to software developers, and negotiate contracts to sell products to [employer's] competitors"); *Shurgard Storage Ctrs. v. Safeguard Self Storage, Inc.*, 119 F.Supp.2d 1121, 1125 (W.D.Wash.2000) ("for purposes of this 12(b)(6) motion, [the former employees] lost their authorization and were 'without authorization' when they allegedly obtained and sent the proprietary information to the defendant via e-mail").

FN9. Defendants seem to argue that Plaintiff's claim, if any, should be for exceeding authorized access. Defendants note that CFAA defines "exceeds authorized access" as to "access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." (Reply, p. 3) (citing *Shamrock Foods Co.,* 535 F.Supp.2d at 965;18

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

U.S.C. § 1030(e)(6)).

FN10. As discussed below, this Court finds that Plaintiff sufficiently pled "without authorization" so this Court saves for another day the discussion regarding the difference, if any, between "without authorization" and "exceeding authorized access" in a situation such as this. *See also Modus, Inc. v. Bardelli,* 531 F.Supp.2d 314, 319 (D.Conn.2008) (In denying the defendant's motion to dismiss plaintiff's CFAA claim, the court held that plaintiff had sufficiently pled the element of "access that exceeded authorization" where the employee's authorization to plaintiff's database was limited to access "in furtherance of Modis' Business").

FN11. The Missouri Supreme Court has adopted the Restatement (Second) of Agency. *See State ex rel. Ford Motor Co. v. Bacon,* 63 S.W.3d 641, 642 (Mo.2002).

***4** Here, Lasco has alleged that Hall and Shaw accessed Lasco's Information and used that information to advance their own interests and HSSMC's interest. Plaintiff pled that Defendants had authorization only to further the interests of Lasco, and did not have authorization to act in furtherance of their own business interests while employed by Lasco. (Compl., ¶ 21). Specifically, Plaintiff pled that Shaw and Hall "did not have authorization to access Lasco's Trade Secret Information for the purpose of deleting the Information, altering the Information in anyway [sic], or copying the Information to a personal computer or storage media." (Compl., ¶¶ 21, 44). Defendants Shaw and Hall also "did not have any authorization to access the Information in any manner or for any purpose upon termination of his employment with Lasco." (Compl., ¶¶ 21, 44). Accordingly, "the Court concludes that Defendants never had authorization to access Plaintiff's protected information to further their own business interests." *Ervin & Smith Adver. & Pub. Rels., Inc.,* 2009 U.S. Dist. LEXIS 8096, at *24 ("Instead, when Defendants allegedly violated the Confidential Agreement and allegedly appropriated Plaintiff's secret information for their own private benefit, they exceeded their 'authorized access.' "). Under the statute, the Restatement, and the reasoning of *Citron* and other courts, Lasco sufficiently alleged that Hall and Shaw acted without authorization when they obtained Lasco's Information for their personal use and in contravention of their fiduciary duty to their employer, Lasco. Defendants' Motion to dismiss Plaintiff's CFAA claim is denied.

**II. *SECA***

In Count II, Plaintiff alleges a SECA claim against the Defendants. Section 2701(a) of SECA provides that:

> whoever (1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished as provided in subsection (b) of this section.

18 U.S.C. § 2707 provides a civil cause for any violation of SECA. *See* 18 U.S.C. § 2707(a) ("any provider of electronic communication service, subscriber, or other person aggrieved by any violation of this chapter [18 U.S.C. §§ 2701 *et seq.*] in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind may, in a civil action, recover from the person or entity, ... which engaged in that violation such relief as may be appropriate").

Defendants' Motion presents the question of whether Lasco sufficiently alleged a colorable claim that Defendants Hall's and Shaw's access to Lasco information was "unauthorized," as required under SECA. *See Sherman & Co. v. Salton Maxim Housewares, Inc.,* 94 F.Supp.2d 817, 821 (E.D.Mich.2000) ("Where a party consents to an-

other[']s access to its computer network, it cannot claim that such access was unauthorized."). Defendants argue that there cannot be a cause of action under SECA if Hall's and Shaw's access to the computer systems at issue was authorized.

***5** This Court finds that Plaintiff states a claim against Defendants under SECA. Here, unlike in its First Amended Complaint, Lasco has alleged that Defendants had direct, continuous, and extensive authorization to access Lasco's Information for the limited purpose of using the Information to further the business interests of Lasco. (Compl., ¶¶ 21, 44). While Lasco afforded Defendants access to its computers, networks and Information for purposes of their employment, Lasco alleged that Hall and Shaw accessed Lasco's Information to benefit the interests of Defendants, not Lasco. Defendant Hall and Shaw's authorization to access this information ceased when they breached their duty of loyalty to Lasco and their employment terminated. Lasco also identified the specific restricted information that Defendants accessed after their authorization from Lasco terminated.[FN12] Accordingly, at this stage of the litigation, the Court finds that Plaintiff has sufficiently plead a SECA violation and denies Defendants' Motion to Dismiss Lasco's SECA claim.

FN12. Lasco alleges that it performed a forensic analysis of a USB storage drive and discovered that Defendant Shaw had accessed, printed and/or copied Lasco's Information from the drive after his authorization to access the Information had been revoked. Lasco alleges that, on August 22, 2008, after the termination of Shaw's employment, Shaw accessed two documents on his home computer that he had forwarded from his Lasco computer. These e-mails included allegedly confidential information from Lasco. (Compl., ¶¶ 39-40).

Similarly, Lasco alleges that Defendant Hall "did not have any authorization to access the Information in any manner or for any purpose following the termination of his employment with Lasco." (Compl., ¶ 44). Lasco alleges that, on September 23, 2008, the day after Hall resigned, Lasco sent Hall a letter demanding that he preserve the information on the laptop computer and return the laptop to Lasco. (Compl., ¶ 51). A forensic analysis performed on Hall's laptop computer provided by Lasco demonstrated that Hall had accessed and deleted Information from the computer after the termination of Hall's employment, and after Hall's authorization to access the Information had been revoked. (Compl., ¶ 53).

## III. STATE LAW CLAIMS

Defendants argue that Plaintiff's state law claims in Counts IV, VI-VIII are preempted by the Missouri Uniform Trade Secrets Act ("MUTSA"). "Under the Missouri Uniform Trade Secrets Act, a plaintiff may obtain an injunction or seek damages for the misappropriation of trade secrets." *Foam Supplies, Inc. v. Dow Chem. Co.,* No. 4:05CV1772, 2006 U.S. Dist. LEXIS 53497, at *41 (E.D.Mo. Aug. 2, 2006) (citing Mo.Rev.Stat. §§ 417.455, 417.457). The MUTSA "displace[s] conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." Mo.Rev.Stat. § 417.463(1). "Thus, by virtue of the statute, civil claim[s] that are derivative of a claim of misappropriation of trade secrets are preempted. A claim that is based on facts related to the misappropriation claim is deemed derivative and, thus, preempted." *Bancorp Services, LLC v. Hartford Life Ins. Co.,* No. 4:00cv70, 2002 U.S. Dist. LEXIS 26267, at *12-13 (E.D.Mo. Feb. 25, 2002). Defendants claim that "Counts IV through VIII of its Third Amended Complaint merely reallege Plaintiff's trade secrets cause of action under the guise of a different cause of action," and should be preempted. (Reply, p. 9).[FN13]

FN13. As discussed herein, Defendants appear to abandon their Motion to Dismiss

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Count V based upon a clarification by Plaintiff.

A. Count IV and Count IX

In Count IV, Plaintiff alleges that Defendants Hall and Shaw breached their common law duties not to compete with Lasco during their employment by "using confidential and trade secret information acquired during and after their employment to solicit the customers they serviced while employed by Lasco for the benefits of Defendants." (Compl., ¶¶ 92-93). Similarly, in Count IX, Plaintiff alleged that Defendant Hall acted contrary to Lasco's interests and for the benefit of Defendants and thereby breached his duty of loyalty to Lasco. (Compl., ¶¶ 122-126). The basis of both Count IV and Count IX appear to be Defendant Shaw's and Hall's use and misappropriation of Lasco's Information in breach of their duties and obligations to Lasco. Accordingly, these causes of action are preempted by MUTSA. *See also Bancorp Services, LLC,* 2002 U.S. Dist. LEXIS 26267, at * 13 (E.D.Mo. Feb. 25, 2002) (claim for unfair competition preempted by MUTSA).

B. Count VI

***6** In Count VI for conversion, Lasco alleges that Defendants assumed ownership over the personal property of Lasco without authorization after Lasco demanded return of the property. (Compl., ¶¶ 105-106). Defendants assert that Count VI derives from Defendants' alleged theft or misappropriation of Lasco's Information. (Defendants' Suggestions in Support of their Motion to Dismiss Plaintiff's Third Amended Complaint ("Memorandum in Support"), Doc. No. 51, p. 14). Count VI appears to relate also to Lasco's personal, tangible property, in addition to its Information. (Compl ., ¶ 105 (referencing "personal property")). The Court finds that Count VI may state a claim that is not preempted by MUTSA. *Cf. Bancorp Services, LLC,* 2002 U.S. Dist. LEXIS 26267, at * 13 (E.D.Mo. Feb. 25, 2002) (claim for conversion preempted by MUTSA). Defendants' motion to dismiss Count VI is denied.

C. Count VII

In Count VII, Plaintiff alleges that Defendants "intentionally interfered with Lasco's customer contracts, relationships and/or expectancies in a manner which included a breach of said contracts and/or severed said relationships." (Comp., ¶ 112). Defendants assert that the basis of Lasco's tortious interference claim is that Defendants "improperly induced its customers to cease doing business with it by utilizing its trade secrets to gain an unfair advantage." (Memorandum in Support, p. 15). Plaintiff's claim for intentional interference with contracts or business expectancies may be based upon "additional facts aside from the alleged misappropriation of trade secrets." *Trinity Hospice, Inc. v. Miles,* No. 4:06CV1674, 2007 U.S. Dist. LEXIS 18805, at *8 (E.D.Mo. Mar. 16, 2007). Plaintiff has not limited its claim only to interfering with its business expectancies through utilization of trade secrets. At this stage of the litigation, this Court denies Defendants' motion to dismiss Count VII.

D. Count VIII

In Count VIII, Plaintiff alleges that "Defendants conspired with one another with the unlawful objective to misappropriate Lasco's Trade Secret Information, engage in unfair competition against Lasco, tortiously interfere with Lasco's contracts and/or business expectancies, and breach Defendant Hall's duty of loyalty to Lasco." (Compl., ¶ 117). "In Missouri, if tortious acts alleged as elements of a civil conspiracy claim fail to state a cause of action, then the conspiracy claim fails as well." *Rice v. Hodapp,* 919 S.W.2d 240, 245 (Mo.1996) (citing *Williams v. Mercantile Bank of St. Louis,* 845 S.W.2d 78, 85 (Mo.Ct.App.1993)). This Court has dismissed Plaintiff's duty of loyalty claim. The Court, however, did not dismiss Plaintiff's conversion and tortious interference claims in Counts VI and VII. Accordingly, the Court denies Plaintiff's motion to dismiss Count VIII to the extent that it alleges a claim for conspiracy to convert Plaintiff's property and/or conspiracy to tortiously interfere with Lasco's contracts and/or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

business expectancies.

**IV. COUNT V**

*7 In Count V, Plaintiff attempts to plead a cause of action under Missouri's Tampering with Computer Data and Equipment Statute, R.S. Mo. § 537.525, and Missouri's Tampering with Computer Equipment Statute, R.S. Mo. § 569.097. (Compl., ¶¶ 99-103). In Plaintiff's Memorandum in Opposition, Lasco clarifies that Lasco's claim "concerns [Hall's and Shaw's] actions with respect to the data on the computer." (Memorandum in Opposition, p. 25) (emphasis in original). Plaintiff acknowledges that although Count V's caption provides that the claim is brought pursuant to R.S. Mo. § 569.097 (which relates to computer equipment),[FN14] the claim more properly relates to R.S. Mo. § 569.095 (which relates to data).[FN15] Accordingly, the Court grants Plaintiff ten (10) days to amend its Complaint by interlineation to reflect the proper statute for this claim.

FN14. 569.097.1 provides that:

1. A person commits the crime of tampering with computer equipment if he knowingly and without authorization or without reasonable grounds to believe that he has such authorization:

(1) Modifies, destroys, damages, or takes equipment or data storage devices used or intended to be used in a computer, computer system, or computer network; or

(2) Modifies, destroys, damages, or takes any computer, computer system, or computer network.

FN15. 569.095.1 provides:

"A person commits the crime of tampering with computer data if he knowingly and without authorization or without reasonable grounds to believe that he has such authorization:

(1) Modifies or destroys data or programs residing or existing internal to a computer, computer system, or computer network; or

(2) Modifies or destroys data or programs or supporting documentation residing or existing external to a computer, computer system, or computer network; or

(3) Discloses or takes data, programs, or supporting documentation, residing or existing internal or external to a computer, computer system, or computer network; or

(4) Discloses or takes a password, identifying code, personal identification number, or other confidential information about a computer system or network that is intended to or does control access to the computer system or network;

(5) Accesses a computer, a computer system, or a computer network, and intentionally examines information about another person;

(6) Receives, retains, uses, or discloses any data he knows or believes was obtained in violation of this subsection."

***CONCLUSION***

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint (Doc. No. 50) is **GRANTED,** in part, and **DISMISSED,** in part.

**IT IS HEREBY FURTHER ORDERED** that Counts IV and IX of Plaintiff's Third Amended Complaint are **DISMISSED,** with prejudice.

**IT IS HEREBY FURTHER ORDERED** that Plaintiff has ten (10) days to file an amended Third

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Amended Complaint in accordance with this Order.

E.D.Mo.,2009.
Lasco Foods, Inc. v. Hall and Shaw Sales, Marketing, & Consulting, LLC
Slip Copy, 2009 WL 3523986 (E.D.Mo.), 159 Lab.Cas. P 10,164

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
MARKETING TECHNOLOGY SOLUTIONS, INC., Plaintiff,
v.
MEDIZINE LLC, Daniel Brandt, Michael Rowsom and Etruvian, Inc., Defendants.

No. 09 Civ. 8122(LMM).
May 18, 2010.

West KeySummary**Copyrights and Intellectual Property 99 75**

99 Copyrights and Intellectual Property
991 Copyrights
99I(J) Infringement
99I(J)2 Remedies
99k72 Actions for Infringement
99k75 k. Defenses. Most Cited Cases

Competitor's alleged copyright infringement had qualitative value and, thus, was not de minimis. Former employees of interactive, informational website went to work for competitor and allegedly copied one of website's electronic files directly into source code for two of competitor's computer programs. While it constituted a very small fraction of competitor's code, the allegedly infringing file performed a real function for competitor. As such, the de minimis defense to website's copyright infringement claim did not apply..

*MEMORANDUM AND ORDER*
McKENNA, District Judge.

**1.**

***1** In this action, plaintiff Marketing Technology Solutions, Inc. ("MTS") asserts that its former employee, defendant Brandt (acting at times through his company, defendant eTruvian, Inc. ("eTruvian")), and another former employee, defendant Rowsom, have acted together for the benefit of defendant MediZine LLC ("MediZine"), a competitor of MTS, by, among other things, transferring to MediZine trade secrets of MTS and infringing MTS' copyrights.

Both MTS and MediZine present health-related information on interactive websites; users can put questions to the websites, and the websites can put questions to the users; based on the users' input, the programs present advertising, specific to individual users' interests, from health care suppliers such as pharmaceutical manufacturers. "So, for example, if I were to go on either the plaintiff's website or Meclizine's website and the question [to the user] was ... what concerns you have, and I say I have diabetes, they might ask follow-up questions and then they present an ad that is relevant to that concern." (Tr., Dec. 4, 2009, at 11 [counsel to MediZine].)

**2.**

This case involves three computer programs that will be referred to below.

"Promotion Serving Platform Software" ("PSP") refers to software developed and used by MTS, described in paragraph 2 of its complaint. "iConnect" is a computer program, developed by defendants Brandt and eTruvian, used by MediZine from about 2007 to about September 30, 2009, described in paragraph 8 of the complaint. MTS asserts ownership of PSP and iConnect (the latter as a work made for hire by Brandt, and has registered copyrights in PSP, in MTS' name (Compl. Ex. B, Registration No. TX6-938-819, and a revision thereof, Compl. Ex. C, Registration No. TX6-938-643); MTS has not registered copyright in iConnect. "New MediZine Software" ("NMS") refers to software, developed by MG LLC d/b/a Tranzact, used by MediZine from October 1, 2009. (Phares Decl., Ex. D ¶ 4; Ex. C at 12.) The iConnect program was, allegedly, developed for MediZine by defendant Brandt, at least in part while Brandt was employed by MTS. (Compl.¶ 6.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**3.**

Meclizine moves for orders (i) dismissing MTS' Counts I and II, for copyright infringement of PSP and iConnect, respectively, pursuant to Fed.R.Civ.P. 56, (ii) dismissing MTS' Count VII, alleging unauthorized computer access in violation of 18 U.S.C. § 1030, pursuant to *id.* 12(b)(6), and (iii) dismissing all of the other claims of such complaint (which are alleged under state law) pursuant to 28 U.S.C. § 1367(c)(3).[FN1]

FN1. There is not complete diversity in this case because both MTS and MediZine are Delaware corporations. (Compl.¶¶ 16, 17.)

MTS moves for denial of MediZine's Rule 56 motion pursuant to Rule 56(f), or, in the alternative, for a continuance pursuant to Rule 56(f)(2).

**4.**

After reciprocal expedited discovery by MTS and MediZine, MTS' expert, Dr. Benjamin Goldberg, examined the question whether "any literal or non-literal elements of MTS's source code for its PSP software were copied into either the iConnect source code or the Tranzact source code." (Goldberg Report, Oct. 26, 2009, ¶ 8.) [FN2]

FN2. "Source code" refers to "a series of instructions written in a computer language such as COBOL, BASIC or FORTRAN," *Softel Inc. v. Dragon Med. & Scientific Comm's., Inc.,* 118 F.3d 955, 958 n. 3 (2d Cir.1997) (citing *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 698 (2d Cir.1992)). "Once the source code has been completed, the second step is to translate or 'Compile' it into object code." *Altai,* 982 F.2d at 698. " 'Object code' is a machine-readable binary translation of source code." *Softel,* 118 F.3d at 959 n. 4). "Source code" and "object code" are "the literal elements of computer programs." *Altai,* 982 F.2d at 702. Both literal and non-literal elements of a computer program may be protected by copyright." *Id.* at 701-02.

***2** MTS, on the basis of Dr. Goldberg's Report, has identified two ways in which, it argues, iConnect infringes PSP. First, according to Dr. Goldberg, a file-referred to by the parties as "engine.js"-in PSP "was copied virtually wholesale into the iConnect code." (Goldberg Report ¶ 23.) Second, "[n]on-literal aspects of the PSP code were also copied into the iConnect code" (*id.* ¶ 24); MTS refers to the relevant portion of the PSP program as the "Campaign Ranking Code." (*See, e.g.,* Tr., Dec. 4, 2009, at 41.) "Although the code that computes the ranking of each campaign is written in a different language in the iConnect software than in the PSP software, the two codes perform the same computation in the same series of steps and produce the same result." (Goldberg Report ¶ 25.)

**5.**

MTS' Count I asserts MediZine's infringement of MTS' copyrights in PSP on the basis of MediZine's copying from PSP, in iConnect, of the "engine.js" file (literally) and the Campaign Ranking Code (non-literally).

In a copyright case, as in any other, to obtain summary judgment, a party must demonstrate that "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party.' " *Castle Rock Ent'ment, Inc. v. Carol Pub. Group, Inc.,* 150 F.3d 132, 137 (2d Cir.1998) (quoting *Garza v. Marine Transp. Lines, Inc.,* 861 F.2d 23, 26 (2d Cir.1988)).

To sustain a claim of copyright infringement, a plaintiff must demonstrate first that a copyrighted work was actually copied, and second, that the copying amounted to an improper or unlawful appropriation. After proving that the copyrighted work was actually copied, a plaintiff must estab-

> lish that the copying was improper or unlawful by showing that the second work bears a "substantial similarity" to protected expression in the copyrighted work.

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.,* 166 F.3d 65, 69-70 (2d Cir.1999) (quoting *Repp v. Webber,* 132 F.3d 882, 889 (2d Cir.1997) (other citations omitted)).

Here, MediZine assumes, for purposes of the present motion, that MTS has established that it has a valid copyright in PSP and that there was copying by MediZine. (Tr., Dec. 4, 2009, at 11.)

**6.**

As to the claim of infringement based on the inclusion in iConnect of "engine.js," MediZine's responsive argument is that the presence of the few lines of code comprising "engine.js" is *de minimis.*

"To establish that the infringement of a copyright is *de minimis,* and therefore not actionable, the alleged infringer must demonstrate that the copying of the protected material is so trivial 'as to fall below the quantitative threshold of substantial similarity, which is always a required element of actionable copying .' " *Sandoval v. New Line Cinema Corp.,* 147 F.3d 215, 217 (2d Cir.1998) (quoting *Ringgold v. Black Ent'ment Television, Inc.,* 126 F.3d 70, 74 (2d Cir.1997)).

*3 In *Sandoval,* a scene in a motion picture showed a light box with photographic transparencies (ten of which were reproductions of the plaintiff's self-portraits) attached to it. 147 F.3d at 216.

> At approximately one hour and seventeen minutes into the movie, the light box is turned on, allowing light to pass through the non-opaque portions of the transparencies posted on the box. During the next minute and a half, the light box and Sandoval's pictures, or portions of each, are briefly visible in eleven different camera shots. The longest uninterrupted view of the light box lasts six seconds, but the box is otherwise visible, in whole or in part, for a total of approximately 35.6 seconds. The photographs never appear in focus, and except for two of the shots, are seen in the distant background, often obstructed from view by one of the actors. In these two shots, figures in the photographs are barely discernable, with one shot lasting for four seconds and the other for two seconds. Moreover, in one of the shots, after one and a half seconds, the photograph is completely obstructed by a prop in the scene.

*Id.* The Court of Appeals concluded that the use in the motion picture of the plaintiff's works was *de minimis,* so that no cause of action lay for copyright infringement. *Id.* at 218.

The Court of Appeals in *Sandoval* pointed out that the "inquiry into the substantial similarity between a copyrighted work and the allegedly infringing work must be made on a case-by-case basis, as there are no bright-line rules for what constitutes substantial similarity." *Id.* at 217. *Sandoval* also notes that courts will look at "the amount of the copyrighted work that was copied," *id.,* and further points out that, in the case of visual works, "observability of the copyrighted work in the allegedly infringing work" is relevant. *Id.* (citation omitted). The Second Circuit has also said, it must, however, be added, that "the guantitative analysis of two works must always occur in the shadow of their qualitative nature." *Nihon,* 166 F.3d at 71.

MediZine's "engine.js" argument is largely quantitative: it argues that "PSP consists of 953, 612 lines of code, and iConnect contains 233,751 lines of code. Of those, only 437 lines of code are even allegedly similar." (Def. Mem. at 7 (citations omitted).)[FN3] MTS' expert states that "[t]he code in engine.js drives much of the user interface when a user is answering survey questions concerning health and medication issues." (Goldberg Report ¶ 22; *see also* MTS Reply Mem. at 8.)

FN3. Meclizine adds that these lines of

code do not serve a function in iConnect. ( *Id.* at 7-8.)

It may be granted that the "engine.js" code is a quantitatively very small part of the programs of which it is a part. At the same time, there is no substantial dispute that it performs a real function in at least the PSP program. The smallness alone is not enough by itself to avoid liability. *Nihon,* 166 F.3d at 71-72. The qualitative value in the equation, on the present record, however, remains an issue of fact. "A de minimis defense does not apply where the *qualitative* value of the copying is material." *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.,* 307 F.3d 197, 208 (3d Cir.2002).

**7.**

***4** As to the Campaign Ranking Code, MediZine's argument is that it is merely an "algorithm" (Tr., Dec. 4, 2009, at 9, and *passim* ) FN4, or a "process" or "method of operation" within the meaning of 17 U.S.C. § 102(b). (MediZine Mem. at 5-6.)

FN4. MTS also at times refers to the Campaign Ranking Code as an "algorithm." (Tr., Dec. 4, 2009, at 46, and *passim.*)

Section 102(b) of the Copyright Act provides that: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b).

"Section 102(b) assumes the existence of a protected work-'an original work of authorship'-but cautions that protection for such an original work of authorship does not extend to any unprotectible components contained therein, or to concepts, procedures, processes, systems, and methods of operation." 2 William F. Patry, *Patry on Copyright* § 4.30, at 4-108 (2009) (footnotes omitted). The reason for excluding ideas, procedures, processes, systems, methods of operation, concepts, principles or discoveries from copyright protection "is to avoid monopoly power being exercised in an across-the-board manner, that is, without regard to the particular characteristics of any individual work." *Id.* at 4-109; *see also, Attia v. Soc'y of N.Y. Hosp.,* 201 F.3d 50, 53-55 (2d Cir.1999); *Altai,* 982 F.2d at 708; *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1252-53 (3d Cir.1983).

Section 102(b) does not use the word "algorithm," but the word has been used in copyright case law. *See Torah Soft Ltd. v. Drosnin,* 136 F.Supp.2d 276, 291 (S.D.N.Y.2001) ("An algorithm ... is clearly a method of operation which cannot be protected." FN5 Nevertheless, it will be clearer to use the language of Section 102(b) rather than the word "algorithm" in considering whether MediZine's non-literal copying of the Campaign Ranking Code is or can be a violation of MTS' copyright in PSP.

FN5. The term is also used in the patent context. "A procedure for solving a given type of mathematical problem is known as an 'algorithm.' " *Gottschalk v. Benson,* 409 U.S. 63, 65, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972); *Diamond v. Diehr,* 450 U.S. 175, 185-86 & n. 9, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981).

It is not at all clear that the identification of a component of a computer program as an "algorithm" ends the analysis. "Although algorithms are typically perceived as individual components of a software design, they have a number of component parts which are organized into a coherent whole. Moreover, algorithms, conceptually speaking, determine the behavior of the programs that embody them. Viewed in this way, even individual algorithms seem to be among the aspects of programs that could be protected within an industrial compilation framework." Samuelson, Davis, Kapor & Reichman, *A Manifesto*

> *Concerning the Legal Protection of Computer Programs,* 94 Colum. L.Rev. 2308, 2383 (1994) (footnotes omitted). Those authors define an "algorithm" as " 'a prescribed set of well-defined, unambiguous rules or processes for the solution of a problem in a finite number of steps.' " *Id.* at 2321 n. 37 (quoting *Webster's New World Dictionary of Computer Terms* (3d ed.1988)).

It is necessary first to understand what the Campaign Ranking Code is. Recognizing that "the value in a program lies in its behavior," Samuelson, *supra,* note 5 at 2323, that means what the program does.

According to MTS' expert, the Campaign Ranking Code computes "the order in which campaigns (offers related to pharmaceutical products) appear on a web page-based on a ranking function applied to each campaign," and is "virtually identical in the PSP and iConnect code." (Goldberg Report ¶ 24.) "Although the code that computes the ranking of each campaign is written in a different language in the iConnect software than in the PSP software, the two codes perform the same computation in the same series of steps and produce the same result." (*Id.* ¶ 25.) The PSP code "iterates over each campaign, computing the campaign's rank by first computing the previous day's take rate, which is the number of takes (i.e., the number of times the offer was signed up for divided by the number of views) for that campaign." (*Id.*) With a relatively small variation, the iConnect code does the same thing. (*Id.* ¶ 26.) Counsel for MTS has expressed the "idea" of the Campaign Ranking Code:

> ***5** The algorithm [Campaign Ranking Code] that is at issue here is the one that determines how many ads or what ads the user sees, the order in which they appear. From a business standpoint this is how MTS makes money. This is what differentiates the MTS platform from other online lead generation platforms. This is the algorithm that determines how MTS prices its services and how MTS negotiates with its clients in terms of the way in which their campaigns and their ads are going to appear.
>
> (Tr., Dec. 4, 2009, at 47.)

MediZine does not show that the protectable expression claimed by MTS in the Campaign Ranking Code "was dictated by considerations of efficiency, so as to be necessarily incidental to [the] idea; required by factors external to the program itself; or taken from the public domain and hence is nonprotectable expression." *Altai,* 982 F.2d at 707.

Nor is the Campaign Ranking Code a means of giving instructions to a computer, as was the menu command hierarchy in *Lotus Development Corp. v. Borland Int'l, Inc.,* 49 F.3d 807 (1st Cir.1995), but, rather, guides the PSP's interaction with users of the website.

And, significantly for purposes of the present motion, MediZine has not shown that the idea of the Campaign Ranking Code is not only one of a number of ways to express that idea, and so copyrightable. *See Apple,* 714 F.2d at 1253 ("If other programs can be written or created which perform the same function as an Apple's operating system program, then that program is an expression of the idea and hence copyrightable.")

**8.**

For the reasons so far set forth, Meclizine's motion for summary judgment dismissing Count I of the complaint is denied.

**9.**

MediZine's motion for summary judgment dismissing Count II is granted.

Initially, MediZine argued that the fact that copyright in iConnect had not been registered deprived this Court of jurisdiction under 17 U.S.C. § 411(a) (MediZine Mem. at 10-11), which the Second Circuit, in *In re Literary Works in Electronic Databases Copyright Litig.,* held to be a "jurisdictional prerequisite to a copyright infringe-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment suit." 509 F.3d 116, 125 (2d Cir.2007) (footnote omitted). In *Reed Elsevier, Inc. v. Muchnick,* ---U.S. ----, 130 S.Ct. 1237, 176 L.Ed.2d 17 (2010), however, the Supreme Court reversed the Second Circuit, concluding that 17 U.S.C. § 411(a) "does not implicate the subject-matter jurisdiction of federal courts." (*Id.* at 1248.)

The Supreme Court did not conclude, on the other hand, that 17 U.S.C. § 411(a) was to be ignored. It recognized that that section's "registration requirement is a precondition to filing a claim that does not restrict a federal court's subject-matter jurisdiction" (*id.* at 1241), and expressly declined to address whether the statutory registration requirement was a "mandatory precondition to suit that ... district courts may or should enforce *sua sponte* by dismissing copyright infringement claims involving unregistered works." (*Id.* at 1249.)

***6** The language of 17 U.S.C. § 411(a) is clear, MTS has not shown that it comes within any of the exceptions to the registration requirement noted by the Supreme Court in *Reed Elsevier* (*see* 130 S.Ct. at 1246), and summary judgment is granted dismissing Count II.[FN6]

> FN6. The Court does not act *sua sponte.* The parties have taken the opportunity to give their views on *Reed Elsevier* to the Court in writing. *See* Ms. Finguerra-DuCharme's letter to the Court of March 4, 2010, and Ms. Phares' letter to the Court of the same date. employer.
>
> *Morris,* a criminal case under an earlier version of the CFAA, focused on whether the defendant had accessed a federal government computer without authorization-not on whether he had exceeded authorization.

**10.**

MediZine moves for dismissal, pursuant to Fed.R.Civ.P. 12(b) (6), of Count VII of the complaint, alleging the violation of 18 U.S .C. § 1030, the Computer Fraud and Abuse Act ("CFAA").

"In deciding whether a complaint states a claim, a 'court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor.' " *Phelps v. Kapnolas,* 308 F.3d 180, 184 (2d Cir.2002) (quoting *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994)). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient "to raise a right to relief above the speculative level.' " *ATSI Comm's, Inc. v. The Shaar Fund. Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (footnote omitted).

The CFAA provides that: "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). The statute further provides that: "A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." *Id.*

In its brief, MTS suggests that the complaint intends to assert a claim under 18 U.S.C. § 1030 subsections (a)(2)(C) and (a)(4) and as to the (c)(4)(A)(i) factor, it claims that the conduct involved is that described in (c)(4)(A)(i)(I). (MTS Mem. at 17-18.)

18 U.S.C. § 1030(a)(2)(C) subjects to liability "[w]hoever ... intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains ... information from any protected computer." *Id.* § (a)(4) subjects to liability

> [w]hoever ... knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the

object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period.

A "protected computer" under the CFAA includes a computer "which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States." *Id.* § 1030(3)(2)(B).

The (c)(4)(A)(i) factor apparently relied on by MTS is, in a civil context, "loss to 1 or more persons during any 1-year period ... aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I).

*7 The CFAA defines both "damage" and "loss." "[T]he term 'damage' means any impairment to the integrity or availability of data, a program, a system or information." *Id.* § 1030(e)(8).

> [T]he term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service.

*Id.* § (e)(11).

The term "loss" has been construed to mean "a cost of investigating or remedying damage to a computer, or a cost incurred because the computer's service was interrupted." *Nexans Wires S.A. v. Sark-USA, Inc.,* 319 F.Supp.2d 468, 475 (S.D.N.Y.2004). "[L]ost revenue due to lost business opportunity" does not come within the statutory definition of "loss," *id.* at 477, and "the loss of business due to defendants' eventual use of the information, rather than a loss of business because of computer impairment, was too far removed from computer damage to count toward the jurisdictional threshold." *Id.* at 477 (discussing the court's holding in *Reaister.com, Inc. v. Verio, Inc.,* 126 F.Supp.2d 238, 252 n. 12 (S.D.N.Y.2000), *aff'd* 356 F.3d 393 (2d Cir.2004)).[FN7] "In sum, revenue lost because the information was used to unfairly compete after extraction from a computer does not appear to be the type of 'loss' contemplated by the statute." *Nexans,* 319 F.Supp.2d at 478.

> FN7. In *Register.com,* Circuit Judge Fred Parker's draft dissent (the circumstances resulting in the publication of which are set forth at 356 F.3d at 395 n. 1) states: "We agree with the (near) unanimous view that any civil action under the CFAA involving 'damage or loss,' must satisfy the $5,000 threshold." 356 F.3d at 439 (quoting 18 U.S.C. § 1030(g) and citing *id.* § (e)(8)(A)) (other citations omitted).

MediZine argues that MTS has not alleged (and cannot allege) that Brandt accessed MTS' computer(s) without authorization or in excess of authorization, because of the broad access Brandt had as an employee. (MediZine Mem. at 13-14.) In light of the Employment Agreement between Brandt and MTS, and its broad confidentiality section (*see* Complaint Ex. A, ¶ 5), in the Court's view, Brandt's access to MTS' computer(s) exceeded his authorized use. *EF Cultural Travel BV v. Explorica, Inc.,* 274 F.3d 577, 581-84 (1st Cir.2001).[FN8]

> FN8. The Second Circuit's decision in *United States v. Morris,* 928 F.2d 504 (2d Cir.1991), *see EF Cultural Travel,* 274 F.3d at 582 n. 10, does not require a different result. Here, it is alleged that Brandt violated 18 U.S.C. § 1030(a)(4) by accessing a computer with the intent to defraud and there is no suggestion that Brandt was authorized to defraud his

In its reply brief, but not in its initial brief, Meclizine argues that it cannot be held vicariously liable for conduct by Brandt in violation of the

CFAA. (MediZine Reply Mem. at 11-12.) Even if that is so-because, as MediZine asserts, "Brandt was an independent contractor to MediZine and not an employee or agent" (*id.* at 11)-the argument fails to take into consideration the fact that the complaint alleges that MediZine, eTruvian and Rowsom conspired with Brandt to intentionally exceed Brandt's authorized access to MTS' computer(s).

In any event, since the argument was raised only in a reply memorandum, the Court does not decide it on the present record.

* * *

While the Court does not conclude that MTS cannot allege a claim under the CFAA, it is clear that the present complaint does not adequately allege such a claim, in two particulars: (1) the complaint must allege the particular provisions of the CFAA that MTS claims to have been violated, as well as the Section 1030(c)(4)(A) (i) factor(s) which MTS claims to have been involved, with facts to support the statutory allegations; and (2) the complaint must also allege with some particularity the "damage" and "loss" (as defined in the CFAA) claimed to be involved, with, moreover, facts showing that the $5,000 threshold of Section 1030(a)(4) is satisfied.

***8** Count VII is dismissed. MTS is to submit an amended complaint amending Count VII only, within 20 days of the date hereof.

**11.**

Since Count I remains pending, MediZine's motion for dismissal of the state law counts is denied.

**12.**

For the foregoing reasons: (i) defendants' motion for summary judgment dismissing Count I is denied; (ii) defendants' motion for summary judgment dismissing Count II is granted; (iii) defendants' motion for dismissal of Count VII for failure to state a claim is granted, with leave to plaintiff to replead that Count within 20 days; and (iv) defendants' motion to dismiss all state law claims for lack of subject matter jurisdiction is denied.

Plaintiff's motion for relief under Fed.R.Civ.P. 56(f) is denied as moot.[FN9]

FN9. The parties are to complete all discovery not later than September 30, 2010.

The parties are to advise the Court within 10 days of the date hereof as to what parts hereof require redaction prior to public filing.

SO ORDERED.

S.D.N.Y.,2010.
Marketing Technology Solutions, Inc. v. Medizine LLC
Not Reported in F.Supp.2d, 2010 WL 2034404 (S.D.N.Y.), 96 U.S.P.Q.2d 1914

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas,
Dallas Division.
MEATS BY LINZ, INC., Plaintiff,
v.
Steve DEAR d/b/a the Supreme Foodservices Group, Defendant.

Civil Action No. 3:10–CV–1511–D.
April 20, 2011.

Douglas C. Bracken, Bennett, Weston, Lajone & Turner, P.C., Dallas, TX, Bradley John Wartman, Peter Walter Andjelkovich, Peter Andjelkovich & Associates, Chicago, IL, for Plaintiff.

Kenneth Stuart Harter, Law Offices of Kenneth S. Harter, Carrollton, TX, for Defendant.

*MEMORANDUM OPINION AND ORDER*
SIDNEY A. FITZWATER, Chief Judge.

***1** In this action arising from the alleged misuse of a former employer's confidential business information, defendant's motion to dismiss under Fed.R.Civ.P. 12(b)(6) presents the question whether plaintiff has stated claims for violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, breach of contract, or conversion on which relief can be granted. For the reasons that follow, the court concludes that plaintiff has stated plausible CFAA and breach of contract claims on which relief can be granted, but has not pleaded a plausible conversion claim. The court therefore grants in part and denies in part the Rule 12(b)(6) motion to dismiss but also grants plaintiff leave to replead.

I

Plaintiff Meats by Linz, Inc. ("MBL") supplies meats to restaurants, hotels, and other food vendors.[FN1] MBL hired defendant Steve Dear ("Dear") to work in national sales and later selected him as General Manager of its Dallas sales facility. As General Manager, Dear handled daily operations of the facilities and had access to confidential business information, such as customer contact information, pricing, cost of goods sold, and sales histories.

FN1. In deciding Dear's Rule 12(b)(6) motion to dismiss, the court construes MBL's complaint in the light most favorable to it, accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in its favor. *See, e.g., Lovick v. Ritemoney Ltd.,* 378 F.3d 433, 437 (5th Cir.2004).

MBL alleges that this customer information—which is maintained in password-protected computer hard drives and not shared with competitors—provides MBL a competitive advantage because MBL possesses unique knowledge of customer buying habits and business practices that are not readily known to its competitors. MBL protects this information by providing password access only to those employees whose duties require use of this information, and paper copies are only circulated internally to employees who need the information as a part of their duties.

During his tenure at MBL, Dear entered into a restrictive covenant agreement that precludes him from disclosing this confidential business information to others without MBL's express consent; becoming employed in a position involving buying or selling of meats that is in direct competition with MBL in Dallas or Tarrant County, Texas; soliciting any customer or former customer to purchase the same type of products that MBL sells; or engaging in activities that disparage or undermine MBL products, reputation, or business opportunities. In exchange for Dear's commitment, MBL disclosed to Dear its confidential business information and provided him employment.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

MBL alleges that, on Sunday, February 28, 2010, at about 9:15 p.m ., Dear accessed an MBL company computer from a remote computer to obtain a confidential MBL Gross Profit Report listing each of MBL's Dallas- and Fort Worth-area customers, together with the pricing, cost of goods sold, and profit margin for each customer. About two hours later, at 11:24 p.m., Dear resigned from MBL in an email, even though he had never before expressed such intentions. Dear then began soliciting MBL's customers and distributed business cards that identified him as associated with Supreme Food Service Group ("SFSG"). SFSG appears to be based at the same address occupied by Crystal Creek Cattle Co., Inc., one of MBL's direct competitors. One of MBL's customers, Culpeppers Cattle Co., began buying meat products from SFSG fewer than three weeks after Dear resigned. Dear was also observed calling on Tillman's Roadhouse, a Fort Worth restaurant and MBL's customer, on April 28, 2010, after he resigned as an MBL employee. Based on this information, MBL alleges that Dear used the contents of the Gross Profit Report to solicit and sell meat products to several of the accounts listed in the report.

***2** MBL sues Dear for downloading confidential information without authorization for use in his business, in violation of the CFAA, and on state-law claims for breach of contract and conversion. Dear moves to dismiss these claims under Rule 12(b)(6) for failure to state a claim on which relief can be granted.

II

In deciding Dear's Rule 12(b)(6) motion, the court evaluates the sufficiency of MBL's complaint by "accept[ing] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.' " *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 205 (5th Cir.2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d 464, 467 (5th Cir.2004)). To survive the motion, MBL must plead enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.; see also Twombly,* 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (alteration omitted) (quoting Rule 8(a)(2)).

III

The court turns initially to whether MBL has stated a plausible claim under the CFAA. Dear maintains, first, that he had authorization to access the MBL Gross Profit Report and that he did not exceed his authority by accessing or downloading it on February 28, 2010. He argues, second, that MBL has not sufficiently pleaded facts to show damages or loss in excess of $5,000.

A

The Fifth Circuit has interpreted the CFAA to encompass limits placed on *the use* of information obtained by permitted access to a computer system and data available on that system. *See United States v. John,* 597 F.3d 263, 271 (5th Cir.2010) ("The question before us is whether 'authorized access' or 'authorization' may encompass limits placed on *the use* of information obtained by permitted access to a computer system and data available on that system."). In *John,* a criminal case, the panel addressed the defendant's contention that the evidence was insufficient to convict her of violating the CFAA because "the statute [did] not prohibit unlawful *use* of material that she was authorized to access through authorized use of a computer." *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The defendant contended that the "statute only prohibits using authorized access to obtain information that she is not entitled to obtain or alter information that she is not entitled to alter." *Id.* Rejecting the defendant's argument, the panel noted that, in *United States v. Phillips,* 477 F.3d 215, 219 (5th Cir.2007), when analyzing whether a criminal defendant had accessed computers "without authorization," the Fifth Circuit had applied "intended-use analysis." *John,* 597 F.3d at 271. In *John* the defendant's use of the computer system to perpetrate fraud was not an intended use of that system. The defendant's use of the computer system to perpetrate a fraud was also contrary to the employer's policies. *Id.* at 272. In support of this latter conclusion, the *John* panel cited the First Circuit's decision in *EF Cultural Travel BV v. Explorica, Inc.,* 274 F.3d 577 (1st Cir.2001). In that case the plaintiffs sued under CFAA for injunctive relief against former employees (now competitors) who had used knowledge obtained during their employment to mine their former employer's public website for pricing information. The former employees had entered into a broad confidentiality agreement protecting proprietary information. Based on this confidentiality agreement, the First Circuit held that their actions exceeded "authorized access," within the meaning of § 1030(a)(4). Although the *John* panel cautioned that it did not "necessarily agree that violating a confidentiality agreement under circumstances such as those in *EF Cultural Travel BV* would give rise to criminal culpability, [it did] agree with the First Circuit that the concept of 'exceeds authorized access' may include exceeding the purposes for which access is 'authorized.' " *John,* 597 F.3d at 272. The panel concluded that "[a]ccess to a computer and data that can be obtained from that access may be exceeded if the purposes for which access has been given are exceeded." *Id.* The panel concluded that

> ***3** the Government demonstrated at trial that [the defendant's employer's] official policy ... prohibited misuse of the company's internal computer systems and confidential customer information. Despite being aware of these policies, [the defendant] accessed account information for individuals whose accounts she did not manage, removed this highly sensitive and confidential information from [the employer's] premises, and ultimately used this information to perpetrate fraud on [the employer] and its customers.
>
> *Id.*

MBL has pleaded a plausible CFAA claim against Dear because it has alleged facts that allow the court to draw the reasonable inference that Dear accessed the MBL computer system and the Gross Profit Report and then used it, in violation of the restrictive covenant agreement without MBL's express consent, to compete directly with MBL in the restricted geographical area, to solicit MBL customers to purchase the same type of products sold by MBL, and to engage in activities that undermine MBL's business opportunities.

B

Dear's second argument also lacks force. MBL alleges that Dear's actions resulted in "damage or loss to MBL aggregating at least $5,000 in value." Compl. ¶ 32. This allegation is augmented by factual assertions that meat products were sold to specific customers listed in MBL's Gross Profit Report. These averments make plausible MBL's theory that Dear obtained confidential business information while exceeding his authorized access, then used this customer data to deprive MBL of sales from regular customers, resulting in lost revenue that could amount to over $5,000 over the course of one year.[FN2]

> FN2. *See* 18 U.S.C. §§ 1030(c)(4)(A)(i)(I) and (g) (requiring loss aggregating at least $5,000 in value "during any 1–year period" for a civil action to be maintained, and limiting damages to "economic damages").

Accordingly, the court denies Dear's motion to dismiss MBL's claim under the CFAA.

IV

Dear also moves to dismiss MBL's breach of contract claim. This cause of action is based on two grounds—“use” of confidential information, in breach of § 1(a) of the covenant,[FN3] and solicitation of customers of MBL, in breach of § 1(b) of the covenant. Because MBL had pleaded a plausible claim based on a breach of § 1(a), the court in its discretion will not address the other grounds of Dear's motion or of MBL's breach of contract claim.

FN3. Section 1(a):

> Employee shall not, without the prior written consent of the Employer, use, divulge, disclose or make accessible to any other person, firm, partnership, corporation or other entity any Confidential Information (as defined below) pertaining to the business of the Employer, except (i) while employed by the Employer, in the business of and for the benefit of the Employer, or (ii) when required to do so by a court of competent jurisdiction, or by any governmental agency having the lawful power to order such disclosure .... “Confidential Information” shall mean non-public information concerning the financial data, strategic business plans, product development (or other proprietary product data), trade secrets, customer names and lists, supplier and vendor names and lists, information made available to Employee while employed by Employer relating to customers, suppliers, and vendors, marketing plans, efforts, and techniques, and other non-public, proprietary and confidential information of the Employer.

Compl. Ex. A at 2.

Dear maintains that he cannot have breached § 1(a) because MBL does not allege that he used or disclosed confidential information. The court disagrees. Although MBL does not assert that Dear disclosed to anyone else any part of the customer information he downloaded, MBL alleges that “Dear has utilized the contents of the MBL Gross Profit Reports and information contained therein to successfully solicit and sell meat products to several of the accounts listed on the MBL Gross Profit Reports.” Compl. ¶ 24.

Dear next argues that Illinois law does not recognize information about MBL's customers as confidential. Under Illinois law, when evaluating the enforceability of a restrictive covenant on employment, a court must consider not only the reasonableness of the covenant but also whether the “plaintiff has proven the existence of a protectable business interest or property right [.]” *Image Supplies, Inc. v. Hilmert,* 71 Ill.App.3d 710, 28 Ill.Dec. 86, 390 N.E.2d 68, 70–71 (Ill.App.Ct.1979). A restrictive covenant may be enforced “if the employee learned trade secrets or other confidential information while in plaintiff's employ and subsequently attempted to use it for his or her own benefit.” *Springfield Rare Coin Galleries v. Mileham,* 250 Ill.App.3d 922, 189 Ill.Dec. 511, 620 N.E.2d 479, 485 (Ill.App.Ct.1993). If, as a matter of law, the information Dear used cannot be deemed “confidential,” then Dear cannot be found in violation of § 1(a).

***4** The court will not deem MBL's customer listings to be confidential information based merely on the allegation in the complaint that they are. Although the court accepts the wellpleaded factual assertions of the complaint as true for the purposes of deciding Dear's Rule 12(b)(6) motion, it does not accept the complaint's legal conclusions as true. The restrictive covenant in question provides that “[t]his Agreement shall be construed, interpreted and governed in accordance with the laws of Illinois, without reference to rules relating to conflicts of law.” Compl. Ex. A at 3. Therefore, to evaluate whether MBL has pleaded a plausible claim, i.e., whether MBL's customer listings qualify as confidential information, the court turns to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Illinois law for guidance.

In *Schulenburg v. Signatrol, Inc.,* 33 Ill.2d 379, 212 N.E.2d 865 (1965), the Illinois Supreme Court explained the following distinction for determining what the employer may restrict as confidential:

> It is clear that an employee may take with him, at the termination of his employment, general skills and knowledge acquired during his tenure with the former employer. It is equally clear that the same employee may not take with him confidential particularized plans or processes developed by his employer and disclosed to him while the employer-employee relationship exists, which are unknown to others in the industry and which give the employer advantage over his competitors.

*Id.* at 869. Specifically, regarding customer information, Illinois courts have recognized restrictive covenants to cover a protectable business interest where "a trade secret or a near-permanent customer relationship exists which an employee learned of through his employment[.]" *Lincoln Towers Ins. Agency v. Farrell,* 99 Ill.App.3d 353, 54 Ill.Dec. 817, 425 N.E.2d 1034, 1036 (Ill.App.Ct.1981).

The court will assume *arguendo* that MBL has not adequately pleaded that a near-permanent customer relationship exists. Even so, Dear is not entitled to dismissal of the component of MBL's breach of contract claim based on § 1(a) of the covenant if MBL has adequately pleaded facts that make the plausible showing that the Gross Profit Report qualifies as confidential information based on status as a trade secret or under the general guidelines in *Schulenburg.*

The Illinois Supreme Court describes a trade secret as a "plan or process, tool, mechanism or compound known only to its owner and those of his employees to whom it is necessary to confide it." *Victor Chem. Works v. Iliff,* 299 Ill. 532, 132 N.E. 806, 811 (1921); *accord Schulenburg,* 212 N.E.2d at 868. The following factors are considered significant in determining whether something is a trade secret:

> (1) the extent to which the information is known by others in the field; (2) the extent to which the information is known by the business' employees; (3) the extent to which the employer takes measures to guard the secrecy of the information; (4) the value of the information to the employer and his competitor; (5) the amount of effort or money spent in developing the information; and (6) the ease or difficulty in acquiring or duplicating the information.

***5** *Lincoln Towers,* 54 Ill.Dec. 817, 425 N.E.2d at 1037 (citing *ILG Indus., Inc. v. Scott,* 49 Ill.2d 88, 273 N.E.2d 393, 396 (1971)). Furthermore, Illinois courts have held that a customer list or other customer information constitutes a trade secret where "the list has been developed by the employer over a number of years, the employer developed the list at great expense, and the information was kept under lock and key." *Id.* at 1038 (citations omitted). They have held that the same type of information is not a trade secret where it has not been treated as confidential and secret by the employer, was generally available to other employees, the information was known to those in the field or could be easily duplicated ... and where customers did business with more than one company or otherwise changed businesses frequently so that they were known to an employer's competition.

*Id.* (citations omitted).

If the complaint merely alleged that Dear took MBL's list of customers and used it for his personal benefit, then under the relevant factors it would not have adequately pleaded that the list qualifies as a trade secret or that Dear breached the contract on this basis. By using local directories or by canvassing the streets, competitors can easily duplicate a list of local restaurants, hotels, and other establishments that serve meat. But MBL has pleaded a claim based on a Gross Profit Report that contains more than names: it includes pricing information, costs and profit margins per customer, and observa-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

tions developed over several years about customer product preferences. *See* Compl. ¶ 49. MBL alleges that this information had been developed over a number of years at great cost and that the information is password-protected with access granted only on a need-to-know basis. The well-pleaded facts show that MBL *treated* the information as confidential; the question becomes whether MBL has sufficiently pleaded that the information is in fact confidential. For example, in *Midwest Micro Media, Inc. v. Machotka,* 76 Ill.App.3d 698, 32 Ill.Dec. 241, 395 N.E.2d 188, 192 (Ill.App.Ct.1979), the court concluded that information that was "developed totally through [an employee's] own work efforts" could not constitute confidential information because such information was part of the employee's "general skills and knowledge acquired during his tenure with the former employer[.]" And in *Lincoln Towers* the court credited an expert witness' testimony that competitors could easily discover prices charged by others by speaking with their customers, even though a customer might lie. *See Lincoln Towers,* 54 Ill.Dec. 817, 425 N.E.2d at 1039.

The court holds that MBL has made a plausible claim that at least some of the contents of the Gross Profit Report—such as the information about profit margins or customer preferences—qualify as confidential information that is protectable under Illinois law as a trade secret. The MBL Gross Profit Report appears to contain more than Dear's accounts, *see, e.g.,* Compl. Ex. B at 1–4 (indicating entries marked by different salesperson IDs), such that the customer information amounts to more than a mere summation of Dear's "knowledge acquired during his tenure." Moreover, even if Dear or another competitor of MBL could investigate customer prices independently (as in *Lincoln Towers* ), without the Gross Profit Report he would still lack knowledge of MBL's profit margins and years of MBL's accumulated knowledge about customer preferences. If, as MBL alleges, such information was only obtained at great cost over years of observation, then permitting Dear to take this information at no cost would instantly give a competitor what it took MBL years to develop. Given the well-pleaded facts, it is plausible that Dear not only used the names of the customers, but also used knowledge about customer preferences and profit margins to select which of MBL's customers to solicit for his own business. Therefore, MBL has pleaded a plausible claim for breach of contract of § 1(a) of the covenant by alleging that, after resigning from MBL, Dear used for his own purposes one of MBL's trade secrets.

***6** Dear's motion to dismiss MBL's breach of contract claim is denied . FN4

FN4. MBL also raises for the first time in its response brief the contention that Dear breached his fiduciary duty to MBL by soliciting customers for himself during his employment. "[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss." *In re Sec. Litig. BMC Software, Inc.,* 183 F.Supp.2d 860, 915 (S.D.Tex.2001) (quoting *In re Baker Hughes Sec. Litig.,* 136 F.Supp.2d 630, 646 (S.D.Tex.2001)). The court therefore declines to consider this argument.

V

Dear also moves to dismiss MBL's conversion claim on the ground that Texas law does not recognize a cause of action for the conversion of intellectual property, such as trade secrets. The court agrees.

"Texas law has never recognized a cause of action for conversion of intangible property except in cases where an underlying intangible right has been merged into a document and that document has been converted." *Express One Int'l, Inc. v. Steinbeck,* 53 S.W.3d 895, 901 (Tex.App.2001, no pet.); *see Procom Cable TV Serv., Inc. v. Paragon Commc'n,* 1994 WL 406013, at *3 (Tex.App. Aug.4, 1994, no writ) (not designated for publication) ("Only tangible personal property is subject to a

suit for conversion.") (citing, *inter alia, U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.,* 865 S.W.2d 214, 222 (Tex.App.1993, writ denied)); *cf. Quantlab Techs. Ltd. (BVI) v. Godlevsky,* 719 F.Supp.2d 766, 779 (S.D.Tex.2010) (noting two ambiguous cases but declining to depart from the interpretation of Texas law "shared by the majority of Texas courts and the Fifth Circuit," and holding that "conversion applies only to physical property under Texas law"). MBL's lawsuit is based on intangible property: the confidential information that Dear allegedly obtained when he accessed MBL's computer system. MBL has not pleaded a plausible conversion claim, and the court grants Dear's Rule 12(b)(6) motion in this respect.

VI

Although the court is in part granting the motion to dismiss, it will permit MBL to replead. Courts often grant a plaintiff one opportunity to replead, unless it appears that the plaintiff cannot cure the initial deficiencies in the pleading. *See In re Am. Airlines, Inc., Privacy Litig.,* 370 F.Supp.2d 552, 567–68 (N.D.Tex.2005) (Fitzwater, J.) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." (internal quotation marks and citation omitted)). Because there is no indication that MBL cannot, or is unwilling to, cure the defects that the court has identified, the court grants MBL 30 days from the date this memorandum opinion and order is filed to file an amended complaint.

* * *

For the reasons explained, the court grants in part and denies in part Dear's motion to dismiss. MBL may file an amended complaint within 30 days of the date this memorandum opinion and order is filed.

**SO ORDERED.**

N.D.Tex.,2011.
Meats by Linz, Inc. v. Dear
Slip Copy, 2011 WL 1515028 (N.D.Tex.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Only the Westlaw citation is currently available.

United States District Court,
W.D. Arkansas, Fayetteville Division.
NILFISK-ADVANCE, INC. Plaintiff
v.
Kevin MITCHELL Defendant

No. Civ. 05-5179.
March 28, 2006.

Herbert Charles Rule, III, Byron Jansen Walker, Rose Law Firm, Little Rock, AR, Michael Iwan, Dorsey Whitney LLP, Minneapolis, MN, for Plaintiff.

John M. Scott, Keisling, Pieper & Scott, PLC, Fayetteville, AR, for Defendant.

*ORDER*

HENDREN, J.

*1 Now on this 28th day of March, 2006, comes on for consideration defendant's Motion To Dismiss (document # 6), and from said motion, and the response thereto, the Court finds and orders as follows:

1. Plaintiff Nilfisk-Advance, Inc. ("Nilfisk") brings this suit under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (the "CFAA" or the "Act"). The gravamen of the Complaint is that defendant Kevin Mitchell ("Mitchell"), an engineer developing certain new products for Nilfisk, transmitted confidential information and trade secrets from his work computer to his home computer, with the intent of conveying that information to Nilfisk's competitors. State law claims for violation of the Arkansas Trade Secrets Act and breach of contract are appended to the federal claim.

2. Mitchell moves the Court to dismiss the federal claim for failure to state a claim, pursuant to F.R.C.P. 12(b)(6), and to dismiss the state law claims over which it has supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Nilfisk objects to such dismissal.

3. It is well settled that a complaint should not be dismissed under Rule 12(b)(6) unless-viewing the complaint in the light most favorable to the plaintiff-it appears beyond doubt that he can prove no set of facts in support of his claim that would entitle him to relief. *Krentz v. Robertson Fire Protection District,* 228 F.3d 897 (8th Cir.2000).

Mitchell contends that he meets this high standard, in that the factual allegations of the Complaint would not, even if proven, establish a violation of the CFAA.

4. The Complaint specifically alleges that Mitchell violated 18 U.S.C. § 1030(a)(5)(B)(i), but in its briefing, Nilfisk asserts that the factual allegations are sufficient to also put Mitchell on notice of a claim under 18 U.S.C. § 1030(a)(4). The Court agrees with this proposition, and has so addressed the issues.

5. While the CFAA is basically a criminal statute, it provides a civil remedy, in the form of a suit for recovery of economic damages and injunctive relief, against a person who causes certain kinds of loss. 18 U.S.C. § 1030(g).

The prohibited conduct alleged by Nilfisk falls into the following categories established by the Act:

* that Mitchell knowingly, and with intent to defraud, accessed a protected computer either without authorization, or in excess of authorization, and thereby obtained something of value other than the use of the computer itself (the § 1030(a)(4) claim);

* that Mitchell knowingly caused the transmission of a program, information, code, or command, and as a result, intentionally caused dam-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

age, without authorization, to a protected computer;

* that Mitchell intentionally accessed a protected computer without authorization, and as a result of such conduct, recklessly caused damage; or

* that Mitchell intentionally accessed a protected computer without authorization, and as a result caused damage.

The Act defines "protected computer" to include a computer which is used in interstate or foreign commerce or communication. 18 U.S.C. § 1030(e)(2). It defines the term "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).

***2** 6. The factual allegations of the Complaint, as they go to Nilfisk's claim under the CFAA, may be briefly summarized as follows:

* Mitchell worked for Nilfisk as a Project Engineer, in which position he had access to proprietary and confidential technical data, design drawings, pictures, and other information regarding an orbital scrubber under development at Nilfisk. He was under a duty not to disclose such information to anyone outside Nilfisk's organization without Nilfisk's express authorization.

* On or about May 9, 2005, Mitchell submitted a letter to Nilfisk's Human Resources Manager, indicating dissatisfaction with a performance review and an intent to leave his employment as soon as he found other work.

* On his work computer's hard drive, Mitchell had a number of zip files pertaining to the orbital scrubber and to another research project then under development, known as the Encore 17 project. Zip files are files in a compressed format primarily used to facilitate the transmission of large quantities of data by e-mail or by downloading to a portable storage device. The data in zip files is not directly accessible.

* On May 10, 2005, Mitchell e-mailed to his personal e-mail address numerous electronic documents and files containing confidential information and trade secrets relating to the orbital scrubber.

* On May 16, 2005, Mitchell was terminated.

* Following his termination, Mitchell was unwilling to allow Nilfisk to conduct an unlimited inspection of his personal computer to ascertain whether it contained any of Nilfisk's confidential information.

* Nilfisk's computers are used to communicate with plaintiff's offices, customers, and suppliers in other states and countries, thus meeting the definition in the CFAA for "protected computers."

7. Mitchell contends that these allegations, even if proven, would not constitute a violation of the CFAA because, at all times when he accessed Nilfisk's protected computers, he was employed by Nilfisk and had authorization for such access.

Nilfisk does not, however, allege that Mitchell had no authority to access his computer at work, or that the data he obtained went beyond what he was authorized to obtain. Instead, it takes the position that Mitchell exceeded any authorization he had when he e-mailed the files to his personal computer with the alleged purpose of misappropriating the information contained in them. Nilfisk points to its allegation that the zip files were not in a form used by Mitchell at work, and that the transmission occurred after Mitchell had decided to resign, as allegations that Mitchell's access exceeded such authorization as he had for use of the data.

8. Taking the allegations of the Complaint as true, and giving them the inferences favorable to Nilfisk, the Court believes Nilfisk has stated a claim under the CFAA. In *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

F.Supp.2d 1121 (W.D.Wash.2000), the plaintiff was held to have stated a CFAA claim on the allegation that an employee with authorization to access files exceeded his authority when he accessed the files for the purpose of sending information to his employer's competitor. In *Personalized Brokerage Services, LLC, v. Lucius,* 2006 WL 208781 (D.Minn.2006), the plaintiff was held to have stated a CFAA claim on the allegation that an employee used his company computer to set up competing companies, e-mail competitors, distribute employer's proprietary information to software developers, and negotiate contracts to sell products to employer's competitors. The allegations here are of the same nature.

***3** IT IS THEREFORE ORDERED that defendant's Motion To Dismiss (document # 6) is denied.

IT IS SO ORDERED.

W.D.Ark.,2006.
Nilfis-Advance, Inc. v. Mitchell
Not Reported in F.Supp.2d, 2006 WL 827073 (W.D.Ark.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

C
Only the Westlaw citation is currently available.

United States District Court, M.D. Florida,
Tampa Division.
PHARMERICA, INC., Plaintiff,
v.
Scott ARLEDGE, Defendant.

No. 8:07-cv-486-T-26MAP.
March 21, 2007.

Adam P. Schwartz, Fentrice Driskell, Nancy J. Faggianelli, Carlton Fields, PA, Tampa, FL, Thomas A. Dye, Carlton Fields, P.A., West Palm Beach, FL, for Plaintiff.

***ORDER***

RICHARD A. LAZZARA, United States District Judge.

***1** This cause comes before the Court on Plaintiff. PharMerica, Inc.'s. Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction and Supporting Memorandum of Law (the "Motion" and "Memorandum"). After careful consideration of the Motion and Memorandum, the Court GRANTS Plaintiff's Motion.

## I. BACKGROUND

### A. Arledge's Knowledge of Confidential and Proprietary Information and Trade Secrets Belonging to PharMerica

Arledge was at the top level of PharMerica's management team and, in that capacity, had access to extremely sensitive and proprietary information and documents that were restricted to management at the executive vice president level. In this regard, Arledge had authorization to access and use information concerning all of PharMerica's confidential projects and plans. Arledge was also instrumental in developing and implementing many of PharMerica's most important and sensitive trade secrets. These trade secrets can be grouped into several categories. which include (a) PharMerica's development of a major plan to transform its operations by centralizing distribution and moving to a paper-less communication system with its nursing home customers; (b) PharMerica's development and implementation of a specialized Quality Management Program, and (c) PharMerica's pricing, especially those for major corporate clients, who represent at least one-third of PharMerica's total revenues.

PharMerica's trade secrets give it a distinct advantage over its competitors. There are no commercially available programs or systems tailored to fit the highly regulated long term care industry so if PharMerica's competitors wish to design and implement such programs or systems, they must do what PharMerica did-invest hundreds of thousands of dollars and thousands of hours of employee time.

#### 1. PharMerica's Centralized Distribution and Paper-less Communication System

Arledge has detailed knowledge of a major project PharMerica began in late 2005 to modernize, streamline, and centralize its distribution and move to a paper-less communication system with its nursing home customers. At that time, PharMerica realized that its distribution system needed to be updated to shift to a more centralized system and that its communications system should become more computerized. As a result, PharMerica began studying the methods by which it could modernize its distribution system from one where each of its distribution centers operated much like a neighborhood pharmacy, with primarily manual entry of information and packaging of drugs, to a more efficient computerized and centralized system. At the same time. PharMerica began studying how to computerize its communications with customers to replace a system that relied primarily on paper and faxes.

*The "Hub and Spoke" Distribution System and the Mercer Report*

PharMerica dedicated hundreds of hours of management time and hired an outside consultant,

Mercer, to assist PharMerica in determining methods and procedures that would enable it to shift to a more centralized hub and spoke distribution system and a paper-less electronic communication system. In addition to the hundreds of hours of time invested by PharMerica employees in this effort, PharMerica paid Mercer over $275,000. Mercer delivered an extensive report to PharMerica, detailing its findings and recommendations (the "Mercer Report").

***2** In addition to the Mercer Report, numerous other documents were prepared by the PharMerica team working on this project. These documents included detailed models, pro formas, and similar documents that addressed issues of importance in PharMerica's industry. Because of the highly regulated nature of the pharmaceutical industry (including packaging and disbursement of prescription medication), the details of such a system are crucial to its success, and include an analysis of operational and financial metrics and compliance with regulatory standards for the packaging and distribution of pharmaceuticals.

As a result, information concerning PharMerica's hub and spoke distribution system (including the Mercer Report) and the transition to a paperless communication system, have been closely guarded secrets at PharMerica. Only a few members of the PharMerica team working on this project had knowledge about the entire project. This was done in an effort to further protect the confidentiality of this information. Furthermore, a "Clean Team" designation was placed on the Mercer Report when PharMerica was in merger negotiations with Kindred Pharmacy Services, which is one of PharMerica's competitors. This was done to insure that confidential and proprietary information that flowed back and forth between the companies in merger discussions would not be used to competitive advantage in the event a merger did not occur.

*PharMerica's Electronic Paper-less Transmittal System*

The other aspect of this project-PharMerica's transformation to an electronic paper-less communication system-is underway. While Arledge was with PharMerica, it acquired Vector, Inc., a company that owned patent-pending technology which permitted the transition to a paper less system. Since that acquisition. PharMerica has moved forward with its planned roll-out of a paper-less system. Arledge and his operations staff were intimately involved in the implementation of this program, which involved technical, regulatory, and operational issues, all of which had to be analyzed and addressed in detail. PharMerica's investment in this system and its roll-out thus far exceeds $15 million.

**2. PharMerica's Quality Management Program**

In addition to Arledge's high-level participation in the analysis and development of the hub and spoke distribution system and the paper-less communication system, Arledge was a primary participant in the development and implementation of PharMerica's Quality Management Program. PharMerica differentiates itself from its competitors by focusing on quality assurance and customer satisfaction. Because there is no commercially available customized quality assurance program customized for the long term care pharmacy industry, PharMerica was required to create its own customized program, which it began in early 2004. At that time, PharMerica engaged the firm of Philip Crosby and Associates, an expert in the quality assurance field, to assist PharMerica in developing a formal Quality Management Program, incorporating education, training, establishment of best practices, policies and procedures, and metrics for measuring success.

***3** PharMerica invested thousands of hours of employee time and well over $175,000 in consulting fees and other hard costs to develop its Quality Management Program. Although Quality Management Program materials are made available to PharMerica employees in branches around the country, those employees are all required to sign non-disclosure agreements which are intended to cover these and other PharMerica materials.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**3. PharMerica's Pricing Matrix**

As the Senior Vice-President of Operations at PharMerica, Arledge was also instrumental in the development and use of PharMerica's pricing analyses, schedules, and information. This information is crucial to PharMerica's business because the vast majority of its major clients award contracts based on pricing. PharMerica keeps it pricing confidential and only those employees involved in pricing are given access to price information. In addition, PharMerica's contracts with its customers include an express provision requiring the customer to maintain the secrecy of PharMerica's pricing.

**B. Arledge's Resignation and Systematic Copying and Deletion of Confidential, Proprietary, and Trade Secret Information Belonging to PharMerica**

On March 9, 2007, Arledge resigned from his employment with PharMerica to become a Vice-President at Omnicare, Inc. ("Omnicare"), PharMerica's primary competitor. At that time, Arledge stated that he was going to work on Omnicare's hub and spoke distribution plan and on Omnicare's quality control processes to make Omnicare more "friendly" to its customers. (Declaration of Janice Rutkowski). Arledge also told PharMerica that Omnicare had offered him a two year contract and had agreed to indemnify him from any claims made by PharMerica. (Declaration of Janice Rutkowski)

Shortly thereafter, PharMerica began examining its computers, including the laptop computer that Arledge used in his Tampa office. Stephen J. Myers, Director of Windows and Communications Services at PharMerica, was directed to review of Arledge's laptop computer. While reviewing the laptop, he determined that there were several thousand e-mails on the laptop but that the hard drive" C" drive was virtually empty. (Declaration of Stephen J. Myers). PharMerica also employed a forensic computer expert. Adam Sharp at E-Hounds, to examine the PharMerica computer that Arledge had been using at his Tampa office.

As a result of these efforts, on March 14, 2007, PharMerica learned that:

(a) On February 13, 2007, Arledge downloaded a copy of the Mercer Report, which was marked "CLEAN" (regarding PharMerica's hub and spoke system), to an external personal AOL account ( *SA1961@aol.com* ) at 8:25 a.m. (Declaration of Stephen J. Myers). Later that day, Arledge met with Pat Keefe, the Executive Vice-President of Omnicare, and Joel Gemunder, the President of Omnicare, at Omnicare's headquarters in Covington, Kentucky. Arledge apparently download the Mercer Report in preparation for his meeting at Omnicare. In an email fragment retrieved from Arledge's laptop computer, Arledge wrote to Mr. Keefe on February 14, 2007, about the February 13 meeting:

> ***4** Just wanted to drop you a quick note to say thanks for spending time with me yesterday. I really appreciate the professional and friendly nature of the conversation. It certainly seems we have a similar philosophy and approach to the LTC Pharmacy business. I enjoyed meeting with Joel as well. I appreciate him making time to talk. Please pass along my appreciation as I do not have his email address.
>
> Pat, I am very interested in continuing our discussions. It certainly seems like a great opportunity. Do not hesitate to call me on my cell at any time, including over the weekend if you would like to talk.
>
> I hope you have a good rest of the week and a good board meeting.

(Declarations of Adam Sharp, Exhibit 2).

(b) On March 7, 2007, two days prior to his resignation, Arledge copied almost all of his electronic files from his work computer and then permanently deleted many, if not most, of those files. Specifically, Arledge downloaded files containing PharMerica*s confidential proprietary information and trade secrets likely using a "Store'N'Go" USB drive, then permanently deleted more than 475 of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

these files from the computer. The "Store'N'Go" device is marketed as a device that permits the user to access and download information from a computer without a trace. (Declarations of Adam Sharp).

PharMerica has analyzed the files that Arledge downloaded and has determined that they contain PharMerica's Confidential Information and trade secrets including, but not limited to. files concerning (a) PharMerica's hub and spoke distribution model and its paper-less electronic communication system with customers; (b) merger and account management information; (c) PharMerica's corporate pricing; (d) PharMerica's development and implementation of a specialized Quality Management Program, and (e) the Market Analytics Group ("MAG") study enlisted by PharMerica at considerable expense and effort in order to improve its operating efficiencies and bottom line. (Declaration of Janice Rutkowski).

Arledge never informed PharMerica that on February 13, 2007 and March 7, 2007, he purposefully downloaded files containing PharMerica's confidential proprietary information and trade secrets to his personal AOL account or to a "Store'N'Go" device. Similarly, Arledge never informed PharMerica that he permanently deleted over 475 files from his laptop computer. Arledge has not returned to PharMerica any of its Confidential Information or trade secrets.

PharMerica now seeks injunctive relief enjoining Arledge from using any of the confidential and proprietary information he learned during the course of his employment with PharMerica, and from working for any of PharMerica's competitors for a period of six months. PharMerica also requests that this Court direct Arledge to return any and all of the documents, data, and information that he took from PharMerica.

## II. LEGAL STANDARD

In evaluating whether a motion for temporary injunctive relief should be granted, district courts must evaluate whether the movant establishes "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo v. Schiavo,* 403 F.3d 1223, 1225-26 (11th Cir.2005) (citing *Ingram v. Ault,* 50 F.3d 898, 900 (11th Cir.1995)); *see also* Local Rule 4.05(b)(4). PharMerica succeeds in establishing each of these elements as set forth more fully below.

## III. LEGAL ANALYSIS

### A. PharMerica's Likelihood of Success on the Merits of Its Claims

#### 1. The Breach of Nondisclosure Agreement Claim

***5** PharMerica has demonstrated a likelihood of success on its claim that Arledge breached his nondisclosure agreement. This is essentially a breach of contract claim. Under Florida law, the elements of an action for breach of contract are "(1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach." *Rollins, Inc. v. Butland,* 2006 WL 3686484. *12 (Fla. 2d DCA Dec. 15, 2006) (citing *Knowles v. C.I.T. Corp.,* 346 So.2d 1042, 1043 (Fla. 1st DCA 1977)).

PharMerica has alleged facts that satisfy all the elements of such a claim. To wit, PharMerica has demonstrated the existence of a contract by virtue of the nondisclosure and non-solicitation agreement. The agreement explicitly required Arledge to return all of the confidential information, including data stored on his computer that he acquired during the course of his employment at PharMerica. The agreement also prohibits Arledge from copying, summarizing, or disclosing to any person not employed by PharMerica any confidential information. Rather than return the materials, Arledge copied and kept them for his own use in clear breach of the agreement. Specifically, on February 13, 2007,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Arledge downloaded a copy of the Mercer Report to his AOL account and then met with at least two senior executives from Omnicare that very same day. Moreover, within only a few short days prior to his resignation. Arledge surreptitiously copied numerous electronic files from his work computer containing PharMerica's confidential proprietary and trade secret information and downloaded files containing PharMerica's confidential proprietary and trade secret information likely to a "Store'N'Go" USB drive. He then deleted many of these files from his work computer, all in breach of the nondisclosure and non-solicitation agreement.

PharMerica has also demonstrated that it has been damaged by Arledge's breach of the agreement. In fact, the agreement explicitly states that any breach of the agreement by Arledge constitutes harm to PharMerica. Arledge resigned from his employment with PharMerica to become vice-president at PharMerica's primary competitor, Omnicare. Arledge's very presence at Omnicare puts at risk and seriously jeopardizes the hundreds of thousands of dollars and hundreds of hours of manpower that PharMerica has invested in the development of its market strategy.

Accordingly. PharMerica has shown a likelihood of success on its breach of nondisclosure and non-solicitation agreement claim against Arledge.

**2. The Misappropriation of Trade Secrets Claim**

Additionally, PharMerica has demonstrated a likelihood of success on its claim that Arledge misappropriated trade secrets. Under Florida law, "trade secret" means:

> information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

***6** Fla. Stat. § 688.002(4).

PharMerica has demonstrated both that it derives value from the information that it considers to constitute protected trade secrets, and that it has taken reasonable efforts to ensure the secrecy of that information. For example, PharMerica's development of a major plan to transform its operations by centralizing distribution and moving to a paperless communication system with its nursing home customers resulted in the creation of several confidential documents. One of the most important documents, the Mercer Report, was the result of hundreds of hours of manpower and an expense of more than $275,000 to PharMerica. PharMerica designated the Mercer Report as a "Clean Team" file in order to ensure that it was guarded with the utmost secrecy as PharMerica conducted merger negotiations with a competitor, Kindred Pharmacy Services. PharMerica likewise took steps to protect the confidentiality of its Quality Management Program and pricing information, both of which are critical to PharMerica's commercial success. PharMerica took further efforts to protect confidentiality of its information by having Arledge and others like him sign the Agreement Not to Disclose or Solicit, which Arledge signed on December 16, 2004, and by restricting access to this information.

Accordingly, information pertaining to (a) the development of PharMerica's "hub and spoke" distribution system and paper-less communication system with its nursing home customers, (b) the development and implementation of PharMerica's specialized Quality Management Program, and (c) pricing, especially for PharMerica's major corporate clients, constitutes trade secrets as defined in § 688.002 of the Florida Statutes.

Arledge misappropriated those trade secrets by duplicating and copying them and/or sending them to his home computer or personal email account and deleting them from the PharMerica computers. Arledge further misappropriated PharMerica's trade

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

secrets by breaching his duty return the documents. Hence, PharMerica has demonstrated that it would likely win a misappropriation of trade secrets claim against Arledge.

**3. The Computer Fraud and Abuse Act Claim**

PharMerica likewise has demonstrated a likelihood of success on its claim brought under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§ 1030 *et seq.* Section 1030(g) of the CFAA allows "[a]ny person who suffers damage or loss by reason of a violation of this section [to] maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1320(g). PharMerica's allegations essentially come within the purview of two sections of the Act-18 U.S.C. §§ 1030(a)(4) and 1030(a)(5).

In order to prove a claim under § 1030(a)(4), a party must satisfy four elements: that the defendant (1) has accessed a "protected computer" (2) without authorization or by exceeding such authorization as was granted, (3) "knowingly" and with " 'intent to defraud," and (4) as a result has "further [ed] the intended fraud and obtain[ed] anything of value." *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC,* 428 F.3d 504, 508 (3d Cir.2005); *ViChip Corp. v. Lee,* 438 F.Supp.2d 1087, 1100 (N.D.Cal.2006); *see also Pacific Aerospace & Elecs., Inc. v. Taylor,* 295 F.Supp.2d 1188, 1195 (E.D.Wash.2003).

***7** As set forth in more detail above, on March 7-9, 2007. Arledge intentionally accessed the PharMerica laptop computer assigned to him and, using that laptop computer for his own improper and illegal purposes (and thus, without authorization from PharMerica), downloaded a large body of data (including PharMerica's confidential proprietary information and trade secrets) for his personal use so that he could use that information after leaving PharMerica's employment (and in competition with PharMerica). After copying such data to his USB device, Arledge then permanently deleted, without authorization, over 475 files. Arledge also permanently deleted, without authorization, emails and other files to "cover his tracks" and deprive PharMerica of the benefit of the information contained in those files.

Approximately one month earlier, on February 13, 2007, Arledge downloaded the highly confidential Mercer Report and other materials concerning PharMerica's hub and spoke distribution project to his personal AOL account. Later that same day, Arledge met with officers of Omnicare to discuss his employment at Omnicare. From that time until March 9, 2007, Arledge accessed PharMerica computers and permanently deleted files that he was not authorized to permanently delete. Arledge's actions damaged PharMerica in that they destroyed information and electronic data belonging to PharMerica, impaired PharMerica's access to its data, and caused PharMerica to incur substantial expenses to attempt to recover its information and electronic data. All of these actions tend to show a likelihood of success on PharMerica's claim brought under § 1030(a)(4).

PharMerica's CFAA claim also includes a claim under § 1030(a)(5) for Arledge's permanent deletion of files from his laptop computer without authorization. That section imposes criminal liability on whomever:

> (5)(A)(i) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer:
>
> (ii) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or
>
> (iii) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage; and
>
> (B) by conduct described in clause (i), (ii), or (iii) of subparagraph (A), caused (or, in the case of an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

attempted offense, would, if completed, have caused)-

(i) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value....

18 U.S.C. § 1030(a)(5).

Arledge's actions have likely caused damage to PharMerica's electronic information and computer systems in a loss exceeding $5,000. Such loss would include, but would not be limited to, expenses incurred to (a) examine the laptop computer that had been assigned to Arledge, (b) determine what files had been copied and deleted, and (c) attempt to restore information and electronic data Arledge destroyed or deleted.

***8** For these reasons, not unlike similar cases where employers have pursued civil remedies under the CFAA against employers who "seek a competitive edge through wrongful use of information from the former employer's computer system," *P.C. Yonkers, Inc.*, 428 F.3d at 510 (quoting *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F.Supp.2d 1121, 1124 & n. 3 (W.D.Wash.2000)), PharMerica would likely succeed in winning on the merits of this claim. *See also Int'l Airport Ctrs., LLC v. Citrin*, 440 F.3d 418 (7th Cir.2006).

**B. Whether PharMerica Has Shown that It Will Suffer Irreparable Injury if the Relief Is Not Granted**

PharMerica has demonstrated that it will suffer irreparable harm if a temporary restraining order against Arledge does not issue. Again, Arledge assented to a non-disclosure and non-solicitation agreement that included a provision stating that irreparable harm would result to PharMerica if Arledge failed to honor his promise in the agreement, monetary damages would not be an adequate remedy for PharMerica, and PharMerica would be entitled to an injunction as a matter of right and law. (Nondisclosure and Non-Solicitation Agreement). Independent of the agreement, the fact remains that if Arledge disclosed any of the confidential information or trade secrets he misappropriated to Omnicare, PharMerica will suffer damage that cannot be reversed or repaired. Courts have recognized the need for immediate injunctive relief when employers are threatened by conduct of former employees that would "irreversibly alter the status quo." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1054 (4th Cir.1985). In *Bradley*, the court awarded an injunction to an employer after a former employee breached a non-solicitation agreement by soliciting customers belonging to the employer. The court recognized that the breach of such an agreement required immediate action in order to have any effect and that "[a]n injunction even a few days after solicitation has begun is unsatisfactory because the damage is done. The customers cannot be 'unsolicited.' " *Id.* Similarly. PharMerica would not be able to "undisclose" any of the misappropriated trade secrets that Arledge passes on to Omnicare. Once Omnicare learns PharMerica's trade secrets, the status quo between the competitors as to that particular information is lost forever. As such, PharMerica has demonstrated an irreparable injury.

**C. Balance of the Harms**

PharMerica argues that its actual harm outweighs any threat of injury to Arledge by the issuance of this injunction. This Court agrees. The Agreement Not to Disclose alone demonstrates an understanding between the parties that irreparable harm would result to PharMerica if Arledge failed to act has he promised to do under the agreement. As PharMerica correctly points out in its motion, "Arledge simply has no right to keep PharMerica's information or to use it for Omnicare's benefit in competition against PharMerica, particularly given that the information was developed at great expense and effort by PharMerica." (Motion at 17). By con-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

trast, PharMerica has a statutorily protected right to preserve its most confidential and proprietary information in a manner that shields PharMerica from damage that could be caused by someone acquiring or disclosing the information through improper means. *See* Fla. Stat. § 688.002. In addition, Arledge gave PharMerica thirty days' notice on March 9, 2007. By Arledge's own admission, he likely has not begun working for Omnicare and will not do so until sometime in April 2007. Thus, the immediate harm to PharMerica is greater than any threatened injury to Arledge.

**D. The Public Interest**

***9** PharMerica asserts that the public interest will be served by protecting the trade secrets and confidential and proprietary information of businesses such as PharMerica who invest a great deal of resources in developing intellectual property to serve its customers. The court agrees with this proposition as well. The public has an interest in protecting business from theft of confidential information. Remedies at law are often insufficient "because of the time-sensitive nature" of confidential information and trade secrets "and the possible advantage it could engender." *Hatfield v. Autonation, Inc.,* 939 So.2d 155, 158 (Fla. 4th DCA 2006). Here, an injunction against Arledge is appropriate not only because it would help protect PharMerica from the harm that a competitor could inflict by gaining an unfair advantage, but also because it protects the "advancement of honest business enterprises and the economic well-being of the nation as a whole." (Motion at 18).

**IV. FINDINGS OF FACT**

PharMerica has presented facts sufficient to warrant the entry of a temporary restraining order. Based on the foregoing, the Court makes the following findings:

1. Arledge breached his non-disclosure and non-solicitation agreement with PharMerica.

2. Arledge's breach of his non-disclosure and non-solicitation agreement with PharMerica has caused PharMerica to suffer an irreparable harm.

3. PharMerica's development of a major plan to transform its operations by implementing "hub and spoke" distribution, including the Mercer Report, is a trade secret.

4. PharMerica's plan to move to a paper-less communication system with its nursing home customers, including the Vector system, is a trade secret.

5. PharMerica's development and implementation of a specialized Quality Management Program is a trade secret.

6. PharMerica's pricing analyses, schedules, and information constitutes trade secrets.

7. Arledge misappropriated trade secrets from PharMerica.

8. Arledge's misappropriation and disclosure or threatened disclosure of the aforementioned trade secrets to Omnicare has caused PharMerica to suffer an irreparable harm

**V. CONCLUSION**

Based on the foregoing, it is **ORDERED** that:

1. Plaintiff, PharMerica, Inc.'s, Motion for Temporary Restraining Order is **GRANTED.**

2. Defendant, Scott Arledge, is hereby ordered and directed to:

a. Immediately return to PharMerica any and all documents, data, and information Arledge has taken from PharMerica and enjoining any use or disclosure of PharMerica's Confidential Information;

b. Immediately cease use or deletion of any materials from the computer to which he sent or uploaded PharMerica documents and any and all other computers, equipment, USB storage devices, hard drives, PDA's, or any similar device on which data may be stored, in his custody, pos-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

session or control ("the Computer Equipment").

c. Within two days of his receipt of the Order, deliver the Computer Equipment to PharMerica's computer expert, Adam Sharp, E-Hounds, Inc., 2045 Lawson Road, Clearwater, Florida 33763, so that PharMerica's expert can examine and copy the information on the computer Equipment.

***10** d. Within ten days of his receipt of the Order, appear in Tampa for deposition (not to exceed 8 hours) by PharMerica.

e. Immediately postpone beginning his new employment with Omnicare until at least 10 days after all of the above requirements are met and the deposition is concluded, thereby allowing PharMerica time to seek additional relief if necessary, including but not limited to an injunction further postponing Arledge's employment with Omnicare.

3. Defendant shall file a response to Plaintiff's request for preliminary injunctive relief on or before **12:00 noon** on **Thursday, March 29, 2007.**

4. This Temporary Restraining Order shall remain in effect until **1:30 p.m.,** on **March 30, 2007,** at which time a hearing on Plaintiff's Motion for Preliminary Injunction shall be conducted before this Court in Courtroom 15B, Sam M. Gibbons U.S. Courthouse, 801 North Florida Avenue, Tampa, Florida 33602. Defendant may present evidence and show cause as to why a preliminary injunction should not issue against him at that time.

**DONE** and **ORDERED** in Tampa, Florida on this 21st day of March, 2007, at 1:15 p.m.

M.D.Fla.,2007.
Pharmerica, Inc. v. Arledge
Not Reported in F.Supp.2d, 2007 WL 865510 (M.D.Fla.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

H
Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
TEKSYSTEMS, INC., Plaintiff,
v.
MODIS, INC., Brian Pelligrini, Jason Lukas, and Robert J. Ruf, Defendants.

Civil Action No. 08 C 5476.
Dec. 5, 2008.

Monica L. Thompson, Elizabeth Haney Bartels, Raj Niranjan Shah, Tomas M. Thompson, DLA Piper US LLP IL, Chicago, IL, for Plaintiff.

Michael J. Gray, Mark W. Demonte, Sara Paull Leitenberger, Jones Day (CH), Jeffrey L. Widman, Stephen J. Raab, Shaw, Gussis, Fishman, Rebecca J. Hanson, Chaw, Gussis, Fishman, Glantz, Wolfson, and Towbin, Chicago, IL, Jeffrey Pope Watson, Robert G. Riegel, Jr., Fowler White Boggs Banker, P.A., Jacksonville, FL, for Defendants.

***MEMORANDUM OPINION AND ORDER***

SUZANNE B. CONLON, District Judge.

***1** TEKsystems, Inc. ("TEKsystems") sues its former employee Jason Lukas for breach of hi s employment agreement (Count II), misappropriation of trade secrets (Count IV), and violation of the Computer Fraud and Abuse Act ("CFAA"), FN1 18 U.S.C. § 1030(a) (2)(C) and (a)(4) (Count VI). TEKsystems alleges Lukas downloaded its trade secret and confidential client information onto an external hard drive after accepting a position with its competitor, Modis, Inc. ("Modis"), and provided the information to Modis. Lukas moves to dismiss the complaint for failure to state a claim. For the reasons set forth below, the motion is denied.

FN1. The statute was amended effective September 26, 2008. The amendments are not applicable to this case.

**BACKGROUND**

The following allegations are derived from TEKsystems' complaint. TEKsystems and Modis compete in the field of information technology and communications consulting services and staffing. Both companies provide temporary and permanent staffing services to clients in various industries. TEKsystems developed and maintains business methods and sales strategies systems. It relies on confidential client databases that include information such as staffing preferences, previous staffing bids, a company's internal organizational information, and unique business practices or technical requirements.

Lukas worked for TEKsystems as a technical recruiter in its Detroit, Michigan office and then an account manager in its Downers Grove, Illinois office from February 2002 to August 2007. TEKsystems requires every person in these positions, without exception, to sign an employment agreement containing noncompete, nonsolicitation, and nondisclosure provisions. Compl. ¶¶ 20, 36, 40 and Ex. A. The agreement also requires employees to return all TEKsystems records and information when ceasing employment. Compl. ¶ 40 and Ex. A. TEKsystems alleges, upon information and belief, that Lukas signed this employment agreement when he was hired, but that it cannot locate a copy. Compl. ¶ 37.

TEKsystems alleges that on or about July 29, 2007, after accepting a position at Modis, but before notifying TEKsystems, Lukas attached a hard drive to his TEKsystems laptop computer and, on information and belief, downloaded TEKsystems' confidential and trade secret customer information. Compl. ¶ 64. On August 3, 2007, Lukas announced his resignation and future employment with Modis in its Detroit office. Compl. ¶ 65.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

At some point before the middle of November 2007, after Lukas started working for Modis, Modis' regional senior vice-president Jim Sweeney telephoned Tim Cebula, the managing director of Modis' Chicago office, and told him to expect a visit from Lukas. Compl. ¶ 66. Sweeney told Cebula that Lukas would bring Teksystems' information, and instructed Cebula to review the information with Lukas. Compl. ¶ 66. Defendant Brian Pelligrini, the managing director of Modis' Minneapolis, Minnesota office (and former TEKsystems manager), also advised Cebula that Lukas would be visiting the Modis Chicago office and bringing TEKsystems' client information. Compl. ¶ 67.

***2** In approximately November 2007, Lukas met with Cebula, and downloaded a file called "Chicago Data" to Cebula's computer. Compl. ¶ 68. The data included confidential TEKsystems client information, client job order history, and detailed client technology spending information. Compl. ¶ 69. The information was everything a salesperson would need to start calling upon a new account. Compl. ¶ 71. Information from the Chicago Data file was later added to Modis' intranet system for tracking clients and candidates. Compl. ¶ 73.

## DISCUSSION

### I. Legal Standard

A motion to dismiss may challenge the complaint for failure to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6). In ruling on a Rule 12(b)(6) motion, all well-pleaded allegations are accepted as true and all reasonable inferences are drawn in plaintiff's favor. *Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th Cir.2008). The complaint need only provide a short and plain statement giving defendants fair notice of the nature and basis of the claim. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007); *Tamayo,* 526 F.3d at 1081; Fed.R.Civ.P. 8(a)(2). This requires more than labels and conclusions, or a formulaic recitation of the elements of a cause of action. *Bell Atlantic Corp.,* 127 S.Ct. at 1964-65. Factual allegations must be sufficient to state a claim to relief that is plausible on its face, rather than merely speculative. *Id.* at 1965, 1974; *Tamayo,* 526 F.3d at 1083.

### II. Sufficiency of Complaint

Lukas argues TEKsystems' complaint against him should be dismissed because it improperly pleads the factual predicate for all counts-that Lukas downloaded its client information and provided it to Modis-on information and belief. Compl. ¶ 64. Lukas argues allegations based exclusively on information and belief are improper unless the facts are inaccessible to the pleader, and there is a reasonable basis to suspect the facts are true. *See Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 684 (7th Cir.1992). According to Lukas, TEKsystems has the relevant information within its control, *i.e.,* the alleged download was from its own computer, and TEKsystems fails to plead the grounds for its suspicions.

Lukas mischaracterizes TEKsystems' complaint. TEKsystems alleges Lukas attached an external hard drive to his TEKsystems computer after accepting a job with Modis and downloaded TEKsystems' confidential customer information. Compl. ¶ 64. A few months later, Modis management apprised its Chicago office that Lukas would be arriving with TEKsystems' customer information. Compl. ¶¶ 66-67. Lukas visited the Modis Chicago office and downloaded a TEKsystems' customer information file to Modis' managing director's computer, which made its way to Modis' internal client and candidate tracking system. Compl. ¶¶ 68-69, 73.

The only allegation pled on information and belief was that Lukas downloaded the customer information. Compl ¶ 64. TEKsystems argues it pleads this on information and belief because Lukas surreptitiously downloaded the information; there were no eyewitnesses. A reasonable inference may be drawn that Lukas, as an account manager, had opportunity to access and remove confidential information, particularly from his own laptop computer, without others being aware of his activities.

*See Assurance Alliance, Inc. v. Gardner,* No. 93 C 2263, 1993 WL 243355, at *2 (N.D.Ill. June 30, 1993) (Kocoras, J.) (an information and belief allegation that company president removed confidential files stated a claim). TEKsystems sufficiently pleads a reasonable basis for its breach of employment agreement (Count II), misappropriation of trade secrets (Count IV), and violation of CFAA (Count VI) counts against Lukas.

**III. Breach of Employment Agreement**

*3 Lukas argues TEKsystems fails to state a breach of employment agreement claim (Count II) because it alleges the existence of Lukas' employment agreement on information and belief. Lukas argues this is improper because the existence of his purported employment agreement is information within TEKsystems' own knowledge, citing *Oil Express Nat'l. Inc. v. Burgstone,* No. 96 C 4816, 1996 WL 666698 (N.D.Ill. Nov.14, 1996) (Kocoras, J.), and *HWB, Inc. v. Braner, Inc.,* No. 92 C 5900, 1993 WL 389346 (N.D.Ill. Sept.30, 1993) (Nordberg, J.). Both cases involved tortious interference with contractual relations claims. The heightened pleading standard for fraud was applied, requiring that a claim made upon information and belief also contain allegations of the facts upon which the information and belief rests. *Oil Express Nat'l,* 1996 WL 666698, at *6-7; *HWB,* 1993 WL 389346, at *2. In *Oil Express Nat'l,* Oil Express sued its franchisee, alleging, on information and belief that the franchisee induced other franchisees to breach their Oil Express contracts. 1996 WL 666698, at *6-7. Pleading this allegation on information and belief was held improper because whether a franchisee breached an Oil Express contract was a matter within the personal knowledge of Oil Express. *Id.* at 8.

In *HWB,* HWB produced turret head slitters (steel coil processing equipment), and held multiple patents in the field. 1993 WL 389346, at *1. HWN entered into a exclusive licensing agreement with Repco Metal Center Machine, Inc., subject only to similar agreements with Terico Engineering and Durmech Engineering for their use of the patents in Asia and Europe. *Id.* HWB alleged Repco marketed the turret head slitters in Japan, which induced Terico to breach its licensing agreement. HWB pled the breach of agreement upon information and belief. *Id.* This was held improper because HWB would have known better than anyone whether Terico breached its agreement. *Id.* at 2.

TEKsystems does not allege tortious interference with contractual relations against Lukas, and the rationale of these cases does not apply here. TEKsystems identifies the basis for its belief that Lukas executed an employment agreement. TEKsystems alleges every technical recruiter and account manager like Lukas is required to sign an employment agreement-no exceptions. Compl. ¶ 36. TEKsystems describes the standard agreement's terms, including its noncompete, nonsolicitation, and nondisclosure provisions, and attaches a copy executed by defendant Pelligrini as an exhibit to the complaint. Compl. ¶¶ 26-31 and Ex. A. TEKsystems alleges, upon information and belief, that Lukas signed this employment agreement when he was hired, but that TEKsystems cannot locate a copy. Compl. ¶ 37. These allegations do not amount to a mere hunch as Lukas contends. A reasonable inference may be drawn that Lukas executed TEKsystems' employment agreement.

Moreover, a plaintiff is not required to attach the contract to a breach of contract complaint. *See Murphy v. White Hen Pan try Co.,* 691 F.2d 350, 352-53 (7th Cir.1982) (complaint must reference agreement between the parties to allege breach of contract claim); *U.S. Data Corp. v. Realsource, Inc.,* No. 08 C 1092, 2008 WL 4369766, at *6 (N.D.Ill. Sept.22, 2008) (Manning, J.) (allegation of existence and content of contract sufficient to state a claim). Thus, in *Parks v. Female Health Care Ass'n, Inc.,* No. 96 C 7133, 1997 WL 285870, at *5 (N.D.Ill. May 23, 1997) (Anderson, J.) (unsigned agreement attached to a complaint was sufficient to withstand a motion to dismiss). Dismissal would be premature because the plaintiff would not have the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

benefit of obtaining the fully executed copy of the contract through discovery. *Id.*

***4** TEKsystems alleges Lukas executed the employment agreement it requires every employee in Lukas' position to sign. TEKsystems describes the agreement, and attaches the standard agreement as an exhibit to its complaint. Dismissal of the breach of employment agreement claim (Count II) is unwarranted.

**IV. CFAA Violation**

**A. Improper Access**

Lukas argues TEKsystems fails to state a CFAA claim (Count VI) because it has not alleged improper access to a protected computer. Lukas states he was still working for TEKsystems, and authorized to view the customer information at the time of his alleged wrongdoing. According to Lukas, he could not have violated the CFAA, §§ 1030(a) (2)(C) and (a)(4), requiring lack of computer authorization. Specifically, § 1030(a)(2)(C) provides that a person violates the CFAA by intentionally accessing a computer *without authorization,* or exceeding Ms authorized access, and thereby obtaining information from a protected computer. 18 U.S.C. § 1030(a)(2)(C). A violation of § 1030(a)(4) occurs when a person knowingly and with the intent to defraud accesses a protected computer *without authorization,* or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains something of value. 18 U.S.C. § 1030(a)(4). Lukas' theory is that he had authorization to access the information on his company computer.

Lukas relies upon district court cases from other jurisdictions. *See, e.g., Black & Decker, Inc. v. Smith,* 568 F.Supp.2d 929 (W.D.Tenn.2008); *Shamrock Foods Co. v. Gast,* 535 F.Supp.2d 962 (D.Ariz.2008); *Diamond Power Intern., Inc. v. Davidson,* 540 F.Supp.2d 1322 (N.D.Ga.2007). These cases stand for the proposition that the CFAA was not intended to apply to employees who misappropriate confidential information from computers for which they had authorized access at the time. These cases are not binding, and conflict with Seventh Circuit precedent. *Int'l Airport Ctrs., LLC v. Citrin,* 440 F.3d 418 (7th Cir.2006).

In *Citrin,* the employer alleged its former employee permanently deleted, through an erasure software program, incriminating and company information from his company computer after he decided to quit and go into business for himself. Dismissal of the claim was reversed. *Id.* at 421. As alleged, the employee in *Citrin* violated § 1030(a)(5)(A)(ii) of the CFAA, another provision of CFAA containing the "without authorization" language. Section 1030(a)(5)(A)(ii) provides that a person violates the statute by intentionally accessing a protected computer *without authorization,* and thereby recklessly causes damage. 18 U.S.C. § 1030(a)(5)(A)(ii). When he destroyed the company files, the employee breached his duty of loyalty, and consequently terminated his agency relationship. Unless otherwise agreed, an agent's authority terminates if, without knowledge of the principal, he acquires adverse interests or seriously breaches the duty of loyalty. *Id.* at 421 (citing RESTATEMENT (SECOND) OF AGENCY § 112). The agency relationship was the basis for authority to access the company computer. *Id.* at 420-21.

***5** TEKsystems alleges Lukas downloaded its confidential information after accepting a position with its competitor Modis, but before notifying TEKsystems. Compl. ¶¶ 64-65. His agency relationship with TEKsystems terminated at this point, and he no longer was authorized to access the information under the CFAA. Under *Citrin,* Count VI sufficiently alleges Lukas accessed TEKsystems' computer without authorization.

**B. Damage**

Lukas argues TEKsystems fails to state a CFAA claim (Count VI) because TEKsystems alleges mere loss from Lukas' alleged conduct, not loss *and* damage as required by the statute. The CFAA defines damage as any impairment to the in-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

tegrity or availability of data, a program, a system, or information. 18 U.S.C. § 1030(e)(8). Loss is defined as any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, restoring the system or information to its prior condition, and lost revenue, cost incurred, or other consequential damages incurred because of service interruption. 18 U.S.C. § 1030(e)(11).

Section 1030(g) unambiguously provides that a civil action may be maintained for damage *or* loss. 18 U.S.C. § 1030(g). *See Charles Schwab & Co., Inc. v. Carter,* No. 04 C 7071, 2005 WL 351929, at *3 (N.D.Ill. Feb.11, 2005) (St.Eve, J.) (holding the CFAA provides a civil cause of action). Damage is expressly required in specific subsections of the CFAA. *See, e.g.,* 18 U.S.C. § 1030(a)(5)(A)(I) (prohibiting knowingly causing the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causing *damage* without authorization to a protected computer). The word is not included in §§ 1030(a)(2)(C) or (a)(4)-the provisions Lukas is alleged to have violated. If the language of a statute is plain and unambiguous, then the inquiry ends there, and it must be applied to the facts of the case. *See United States v. Jones,* 372 F.3d 910, 913 n. 2 (7th Cir.2004). Under the plain language of CFAA, a damage pleading is not required to state claims under §§ 1030(a)(2) (C) or (a)(4). TEKsystems pleads that Lukas' purported violation of the CFAA caused it loss exceeding $5,000 for the cost of a computer forensic investigation into Lukas' conduct. Compl. ¶ 149. TEKsystems sufficiently alleges loss, and is not required to plead damage to state its CFAA claim (Count VI).

**C. Heightened Pleading Standard**

Lukas asserts TEKsystems § 1030(a)(4) claim (Count VI) must be pled with particularity under Rule 9(b)'s heightened pleading standard for fraud because this statutory provision requires an intent to defraud. This argument ignores Rule 9(b)'s provision that malice, intent, knowledge, and other conditions of a person's mind may be alleged generally. Fed.R.Civ.P. 9(b). TEKsystems is not required to meet a heightened pleading standard to state a § 1030(a) (4) claim. *See C.H. Robinson Worldwide, Inc. v. Command Transportation, LLC,* No. 05 C 3401, 2005 WL 3077998, at *4 (N.D.Ill. Nov.16, 2005) (St.Eve, J.) (rejecting identical argument). Count VI stands.

**CONCLUSION**

***6** Lukas' motion to dismiss the complaint is denied. TEKsystems sufficiently pleads that Lukas downloaded its client information and provided it to Modis (Counts II, IV, and VI). TEKsystems sufficiently pleads the existence of Lukas' employment agreement (Count II). TEKsystems states a CFAA claim (Count VI) because Lukas' access to TEKsystems' computer after he allegedly accepted employment with Modis and decided to download TEKsystems' confidential client information was unauthorized. TEKsystems is not required to plead damage to state its §§ 1030(a)(2)(C) and (a)(4) claim (Count VI). TEKsystems need not meet a heightened pleading standard to state a § 1030(a)(4) claim (Count VI).

N.D.Ill.,2008.
TEKsystems, Inc. v. Modis, Inc.
Not Reported in F.Supp.2d, 2008 WL 5155720 (N.D.Ill.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.